ramifications of the on-going investigation that Mr. Cantú prepared a presentation on the matter, which he delivered to Dr. Cuéllar, referring to "the possibility of an investigation against RIMSA" (*see id.* at 1209, 1221-1222; Ex. C-3 at 9; RPF ¶86).

- In August 2000, only a few days after the execution of the SPA by Respondents and Claimants, Mr. Cantú and Mr. Rojas appeared formally before the ICO to testify at the ICO's request about RIMSA's performance of the 1997 Hexachlorides Contract (*see* Ex. C-95; Transcript at 1230-1232 (Cantú)).

- In September 2000, Mr. Rojas, Mr. Espinosa and Mr. Olguín, RIMSA's Public Relations Manager, met again with the ICO to inquire "whether SECODAM intended to bring any kind of a case against RIMSA" (*see* Ex. C-287; R-34; RPF ¶91).

102.    The unease of these RIMSA officers over the potential collateral effect of this investigation and their apprehensiveness about the likelihood of a follow-up proceeding against RIMSA proved justified: on October 23, 2000 (a month before the Closing date, the date as of which Respondents had declared and guaranteed the truthfulness of their warranties to Claimants), the ICO issued a decision concluding the internal Petroquímica investigation and levying heavy fines and other penalties on the Mexican officials found to have abetted RIMSA's breach of the 1997 contract (*see* Ex. C-97). The condemnation of RIMSA's practices under the 1997 contract was a major setback to RIMSA.

103.    Dr. Cuéllar and Mr. Sánchez, RIMSA's in-house counsel, among others, were notified by Mr. Rojas about the decision on October 30, 2000 (*see* Ex. C-99; Transcript at 1563 (Sanchez)). Mr. Sánchez admitted to reading the ICO decision at the time and to having the understanding that the next step in the process would be for the ICO decision to be reported and passed on to SECODAM (*see* Transcript at 1566-1567 and 1593 (Sanchez)). Respondent Mr. Héctor Vargas and Mr. Vargas Aguirre also conceded knowledge of the decision (*see* Vargas Aguirre Stmt., § XI ¶ 10; Vargas Garza Stmt., § VIII ¶ 5; Aguirre Reply, § X ¶ 8; Garza Reply, § VIII ¶ 1).

104.    Mr. Aguirre testified that, following the decision, Dr. Cuéllar and a lobbyist sought, and managed to obtain, assurances from SECODAM officials that SECODAM

43

would not investigate RIMSA (*see* RPF ¶95; *see* CPF ¶¶108-109; Aguirre Reply, § X ¶¶ 9 – 10). The documentary record, however, is devoid of any evidence corroborative either of the meeting itself or of the "assurances" allegedly received. The Tribunal therefore rejects Mr. Aguirre's testimony on this point. Nor has any governmental official confirmed the validity of these statements and Dr. Cuéllar's unavailability during the hearings has obliged the Tribunal to conclude that no such assurances were in fact received.

105.    In sum, the Tribunal finds that, at the Closing date, on November 14, 2000, there was an objective threat of a SECODAM investigation against RIMSA concerning the violation of the 1997 Hexachlorides Contract. Respondents had "reasons to believe that [a] proceeding, . . . or investigation may be brought or threatened." SPA ¶2.20. The October 2000 determination in the ICO decision that RIMSA had breached its 1997 contract with Pemex substantiated the earlier premonitions and made more likely the possibility of a RIMSA-directed investigation. That decision signaled that the governmental inquiry into the 1997 contract had reached a point of "no return." The initiation of a direct proceeding against RIMSA was only a matter of time and even its likely negative outcome, in view of the prior ICO finding, must have been contemplated by RIMSA officers.

106.    Despite all the interaction and the exchanges between RIMSA and SECODAM, which intensified during the summer of 2000 and despite the issuance of the October 2000 administrative decision condemning RIMSA's performance under the 1997 contract, nothing relating to this activity, including the ICO decision itself, was ever communicated to Claimants.

107.    Respondents maintain that the 1997 Contract and RIMSA's confinement of the drums at the Mina landfill (instead of their incineration elsewhere) were brought to the attention of the Claimants during the due diligence stage of the negotiations and in the SPA disclosure schedule in which there was reference made to the dispute between RIMSA and Petroquímica concerning the performance bond for the project (see RPF ¶ 78). The basic aspects of the disclosed bond dispute have already been described (*see supra* under III.B; *also* RPF ¶¶67-78). Indeed, the bond litigation and Petroquímica's assertions that RIMSA

44

was allegedly overpaid were disclosed to Claimants, both during the due diligence process (*see* Transcript at 1553-1554, 1658 (Sanchez); RPF ¶¶73-76) and in the SPA Disclosure Schedule, at ¶ 2.20, but no breach of warranty is alleged as to this dispute. Hence, the legal costs that Claimants incurred in defending RIMSA against the bond issuer in the disclosed litigation are not recoverable as contractual damages under the SPA and accordingly we reject Claimants' characterization of those fees as having "resulted" from "Vargas' breaches of warranty" (*see* CPF ¶505(b)).

108.    However, the disclosure of the pending litigation between RIMSA and the bonding company did not cover the objective threat of the initiation of *another* proceeding against RIMSA, this time by a Mexican administrative agency and not by a private party. The increasing contacts and communications between RIMSA officers and Mexican officials vis-à-vis the pending investigation into the 1997 contract, the escalating fears of RIMSA officers about RIMSA's eventual direct involvement, the October 23, 2000 ICO resolution, and all the developments that gave rise to a heightened risk (*i.e.*, a threat) of a SECODAM investigation against RIMSA were not disclosed.

109.    Section 10.15(f) of the SPA reinforces Claimants' argument that the essence of the existing peril was never disclosed by Respondents (*see* CPF ¶¶190-193). That clause unambiguously states that an event qualifies as an exception to a warranty only if the SPA's disclosure schedules "identi[fy] the exception with particularity and describe . . . the relevant facts in reasonable detail." The record reveals that this was not done.

110.    Respondents argue that the initial ICO audit and the subsequent ICO investigation against the Petroquímica employees were disclosed to Claimants (*see* RPF ¶82; *also* Transcript at 1550-51, 1553-54 (Sanchez) and 1659-63 (Kingham Opening)). Neither the authenticity nor, in some cases, the source of some of the documents allegedly provided to Claimants has been proved (*see* Ex. R-79; Ex. C-276; Transcript at 1553-54 and 1621 (Sanchez)), let alone their delivery to Claimants' due diligence team. We find it significant that the list of documents reviewed by Claimants' legal counsel in the negotiations between the parties in 2000 does not include the alleged documents (*see* Santos Due Diligence Report

45

of 6/2/00, Annex A, Ex. R-78; *also* CPF ¶¶194 – 199). Nor have we been presented with reliable evidence proving that discussions took place between Mr. Sánchez or Dr. Cuéllar and Claimants' due diligence team.

111. Moreover, even if these pre-Closing disclosures and communications did indeed take place, none of them is reflected on the SPA Disclosure Schedule (*see* ¶2.20 thereof]. The sole exceptions to Respondents' liability under the SPA warranties were the disclosures made in the corresponding provisions of the SPA Disclosure Schedule (*see* SPA Article II, *chapeau* ("The Seller represents and warrants to the Buyer that the statements contained . . . are correct and complete. . . , except as set forth in the disclosure schedule accompanying this Agreement. . . ") and ¶2.20 (beginning with the statement: "Except as set forth on Disclosure Schedule 2.20 hereto . . ")). If Respondents had sought in earnest to shield themselves from future liability for breach of the SPA warranties, they could have simply disclosed to Claimants, at the very least, the evidence of the October 2000 ICO resolution and ICO's obligations, under Mexican law, to forward the resolution to the competent branch of SECODAM in reasonable detail, as mandated by Section 10.15(f) of the SPA (*see* CPF ¶202).

112. Respondents' arguments focus on whether Mr. Cantu's 2000 presentation was made to anyone other than Dr. Cuellar (*see* RPF ¶ 87) –according to Mr. Cantu, it was not (*see* Cantu Stmt., § II, ¶ 11; Transcript at 1209 (Cantu))— and on whether Mr. Sanchez, after studying the October 2000 decision, discussed "the risks of a SECODAM investigation or a strategy to deal with the ICO decision" – (Mr. Sanchez also denied this (*see* Transcript 1574-75, 1596-97 (Sanchez)). Nevertheless, the parties' individual beliefs or personal assessments of the situation are simply irrelevant in determining whether the SPA warranties were breached.

113. Respondents' comprehensive description of the factual background to the 1997 contract and RIMSA's performance thereunder (*see* CPF ¶¶51-66) misses the point. This Tribunal has not been charged with second-guessing the decisions of Mexican administrative agencies. Whether RIMSA actually breached the 1997 contract is not the

46

concern of this Tribunal. It is sufficient for our analysis that the ICO of Petroquímica made that determination in its October 2000 resolution and referred the case for further proceedings to SECODAM, which later agreed with the determination and declared RIMSA ineligible to participate in or bid on government contracts.

114.    Our inquiry here is confined to asking whether, at the Closing date, there was an objectively discernible threat of a SECODAM investigation against RIMSA, whether Respondents had at least one reason to believe that an adverse SECODAM-initiated proceeding could be anticipated and whether the threat was disclosed to Claimants. Our answer to the two former questions is in the affirmative and to the last is in the negative.

115.    We are persuaded that high-ranking officers of RIMSA were conscious of the critical importance of the October 2000 resolution, although they downplayed their concerns and conspicuously refrained from raising them before the Closing date, all in manifest contravention of the representations in sections 2.20 and 2.15 of the SPA. The "Seller's knowledge" requirement in the latter warranty is satisfied by virtue of the interpretative statement in Section 10.15 of the SPA ("Definitions") that the definition of the phrase "Seller's knowledge" would cover knowledge by Dr. Cuéllar, who was clearly involved in RIMSA's communications with SECODAM more than any other RIMSA employee, and whose knowledge and participation must be attributed to Respondents.

116.    On the other hand, Claimants' argument that these facts also make out a breach of the Section 2.11(b) warranty (see CPCL ¶18) is unpersuasive. Pursuant to section 2.11(b) of the SPA, the seller warranted that there is no fact, event, or action which exists or has occurred, which would indicate that any of RIMSA's significant customers (defined as current customers "that accounted for over 1% of the total net sales of the Company for the year ended December 31, 1999") "will terminate its business relationship with the company" (emphasis added). This provision alludes to a degree of certainty in Respondents' beliefs about the prospect of a customer termination that in our case is wanting: according to the wording of the clause, Respondents must have been aware of an event that would indicate, with absolute certainty, that a significant customer will terminate its business relationship

47

with RIMSA. Claimants have not shown either that there existed at Closing an event evidencing that the termination of an existing customer was certain, or that Respondents knew it. The Tribunal therefore finds, in connection with the SECODAM investigation, that Respondents breached only the warranties under Sections 2.20 and 2.15 of the SPA.

## C.    Environmental Non-Compliance

### 1.    *The SPA Warranties and Parties' Claims*

117.    The SPA contains a number of broad warranties guaranteeing that RIMSA had been operated in an environmentally compliant manner. Claimants have been keen to demonstrate the violation by Respondents of four distinct assurances given to them in the SPA. In particular, Respondents warranted:

(a)  in Section 2.7(a) of the SPA that RIMSA had "complied with *all* applicable *laws* and legal *regulations*, *permits* and *orders*."

(b)  in Section 2.13(a) of the SPA that RIMSA "(i) possesses all Environmental Permits necessary to operate its business; and (ii) is in compliance with *all* terms and conditions of such Environmental *Permits* and with the *Environmental or Safety Laws*, except with respect to matters that will not have an adverse effect on the operations, assets or business of . . . the Company"

(c)  in Section 2.13(g) of the SPA that "no person has generated, collected, manufactured, refined, produced, processed, treated, stored, handled, transported, disposed of, discharged, emitted, poured, emptied, leached, leaked, spilled, injected, dumped, accumulated, buried, transported, released or used any hazardous material at any site or facility operated by [RIMSA] . . . *in violation of, or* in a manner that would give rise to liabilities under, *any Environmental or Safety Laws*."

(d)  in Section 2.13(h) of the SPA that RIMSA "has *no liabilities* under the Environmental or Safety Laws with respect to the facilities or activities of . . . the Company" (emphasis added).

48

118.    It should be noted at the outset that, as mandated by Section 10.4 of the SPA, Mexican law applies to the subject matter of the above warranties, namely the compliance of RIMSA's operations and overall condition with "Environmental or Safety Laws" and permits issued by the Mexican government. "Environmental or Safety Laws" is defined in Section 2.13(j)(i) of the SPA as "federal, state and local laws, norms, ordinances, rules, regulations, official standards, codes, orders, compacts, treaties, agreements" in Mexico, "the principal purpose of which is to protect human health and or the environment, including worker health and safety."

119.    Claimants have sought to establish that RIMSA, when under Respondents' management prior to Closing, had conducted its business in disregard of applicable Mexican laws and regulations (*see, inter alia*, CPCL ¶¶23-43). Claimants argue that the environmental conditions in various areas of the Mina site were deplorable, as a result of chronic flaws in the environmental aspects of RIMSA's operations, and in flagrant violation of both RIMSA's licenses and the relevant Mexican legislation (*see, inter alia*, CPF ¶¶337-354) and therefore of the warranties of the SPA.

120.    Respondents point to the absence, prior to Closing, of any official enforcement action, either judicial or administrative, against RIMSA concerning violations of the environmental regulatory or legislative framework, as well as to the absence of a governmental order mandating remediation beyond some limited measures, which in any case have not had and will not have an adverse effect upon the operation, assets or business of the company (*see, inter alia*, RPF ¶¶204-214). According to Respondents, had it not been for the initiative taken by the Claimants in filing a complaint with the Mexican authorities in 2003 – after the Amended Arbitration Request had been filed – the involvement of the Mexican government would have been altogether averted. In any event, Respondents argue that governmental inquiry into RIMSA's environmental compliance was concluded within a few months after the filing of Claimants' Request, and required that RIMSA carry out only minor remediation in the areas concerned (*see* RPF ¶¶326 ff. and mainly ¶¶351-356). Respondents further contend that the bulk of the remediation argued by Claimants to be

49

compulsory would be undertaken only under the voluntary Industria Limpia certification process (*see* RPF ¶¶366-373).

2.    ***The Breaches***

121.    The question of whether the Mina site at the Closing date was or was not in compliance with applicable laws and governmental permits, and thus whether the Respondents complied with their representations and assurances under the SPA, is inevitably fact-intensive. The parties' memorials have been instrumental in guiding us through voluminous evidence relating to technical standards and specifications, intricate scientific analyses and descriptions of complex conditions, all within the labyrinth of Mexican laws and regulations, RIMSA's operation licenses, expert opinions and witness statements.

122.    After reviewing the factual record and carefully examining the multiple issues, always in light of the parties' legal arguments, we conclude that Claimants have successfully carried their burden of proof and established – to the extent described in the following paragraphs – the existence of several environmental irregularities in RIMSA's operating site, the causes of which preceded the Closing date and Claimants' assumption of RIMSA's management. On the one hand, pre-closing waste treatment operations were carried out by RIMSA, under Respondents' management, in a manner inconsistent with applicable laws and licenses, and therefore were in breach of Respondents' warranties in Sections 2.7(a), 2.13(a) (as to the lagoons and the catalyst waste cell) and 2.13(g) of the SPA. On the other hand, the Claimants have not, in the view of the Tribunal, adduced evidence sufficient to establish a breach under the more demanding language of Section 2.13(h) of the SPA and its limiting terminology (which speaks of the existence of already incurred "liabilities"). In particular:

123.    ***First Generation Cells ("FGCs")***:  The use of the FGCs for the confinement of hazardous waste (contrary to their initial design for the storage of non-hazardous waste only) without a geomembrane liner (cells 2-6) and without the requisite synthetic liner (cells 7-10), coupled with the defective and malfunctioning – even if not totally inoperative – leachate collection system (*see* CPF ¶17(c)), constitute a violation of RIMSA's licenses and

50

the applicable Mexican legal requirements, creating a significant risk of soil and groundwater contamination (*see* CPF ¶¶12-21, 176). Respondents have acknowledged the environmental dangers lurking in the condition of the FGCs (*see* RPF ¶¶250 ('...as shown in photographs taken in October 2003, holes and cracks exist in the caps of first generation cells 2 and five...[R]ainwater could infiltrate through the holes and cracks in the cell caps ...and cause leachate that could contaminate groundwater'); Transcript at 1322, 1330-31 (Rincon)).

124.    There is also a high likelihood that the cells have vertically straight and not sloped sides as required by the RIMSA licenses – although the inconsistency between the construction diagrams Respondents have produced (*see* RPF ¶¶230-233) and the schematic drawings and photographs on which Claimants rely (*see* CPF ¶¶17(c)), has not been completely resolved. However, resolution of this issue is not a prerequisite to our finding violations of Sections 2.7(a) and 2.13(g) of the SPA, which we find were breached with respect to the FGCs.

125.    With respect to Section 2.13(a), on the other hand, Respondents correctly stress (*see* RPF ¶¶243-247) the absence of any adverse impact of the conditions at the FGCs on the "operations, assets or business" of RIMSA, as required by that provision. In Section 2.13(a) Respondents specifically warranted that ...the Company ...is in compliance with all terms and conditions of [its] Environmental Permits and with the Environmental or Safety Laws except with respect to matters that *will not have an adverse effect on the operations, assets or business* [of] ...the Company" (emphasis added). The use of the verb "will" refers to the future as contemplated by the parties at the Closing date, i.e., the post-Closing period. In order to determine with certainty whether the operational defects of the FGCs, as they existed at Closing, *would have* any (even immaterial) adverse impact on RIMSA, and whether this warranty was breached as to them, we must examine the actual post-Closing effect that the condition of the FGCs *had* on RIMSA's operations. We find that the Claimants have not carried their burden of proof in demonstrating the existence of an adverse impact on RIMSA in this regard –particularly in light of their failure to invest substantial or any resources in remediating or attempting to remediate the situation in the FGCs—and

51

therefore conclude that Respondents complied with the Section 2.13(a) warranty in relation to the FGCs.

126. Claimants' stated reasons for opting for inertia in this case (preservation of evidence to be used in this arbitration – *see* Transcript at 650-652 (Roussel)) – further undermine the credibility of their own allegations about the gravity of the situation and the occurrence of an adverse impact on RIMSA's operations. Whether the problems in the FGC area could have been corrected or even mitigated by Claimants' timely intervention is something that we do not know. If, however, the situation was brought to the attention of Claimants and they opted for non-intervention under the pretext of proof preservation, then it is reasonable to infer from their conduct that (1) either the problems and the resulting contamination hazard was not as grave as presented to us or (2) that Claimants knowingly refrained from undertaking any remediation efforts to permit them to present larger, speculative claims before the Tribunal. In either case, we conclude that, unlike Sections 2.13(g) and 2.7(a) of the SPA, which do not contain an "adverse impact" requirement, the specific warranty of Section 2.13(a) of the SPA was not infringed by Respondents.

127. ***First Treatment Zone***: The absence of a properly functioning liner (double-layer or not) at the First Treatment Zone, which Claimants have sufficiently proved (*see* CPF ¶¶ 49-52, 345-346; Exs. C-15, 176) and which Respondents indirectly acknowledge (*see* RPF ¶¶ 299 –"There is no specific requirement in any of RIMSA's permits for a liner in the first treatment zone") and 301 (admitting the existence of "remnants of a liner")) violates RIMSA's 1993 authorization (*see* CPF ¶¶45-53) and hence Sections 2.7(a) and 2.13(g) of the SPA. Claimants, by contrast, have not made the requisite showing of an "adverse effect" on the "operations, assets or business" of RIMSA, as required by Section 2.13(a) (*see* analysis *supra* at ¶¶125-126, in relation to the FGCs). Their claim that the latter warranty was violated must therefore be rejected.

128. Respondents are correct in pointing out that "RIMSA's 1993 permit did not require that RIMSA have a synthetic liner" (*see* RPF ¶¶300). However, we note that it did require that waste-treatment facilities "shall have systems . . . which prevent spillage onto the

52

ground, and shall operate such systems effectively" (*see* CPF ¶ 50; Ex. C-15). In a resolution dated October 23, 2003, PROFEPA also concluded that the FTZ did not have a liner (*see* Ex. C-15). Respondents' focus on the absence of a specific order by PROFEPA to rectify the identified problem is again misplaced – the requirement to remediate is nowhere mentioned in the applicable Sections of the SPA as a prerequisite to finding a violation of the SPA warranties.

129. · ***Hexachloride Treatment Zone***: Although, in light of the March 1998 special authorization/ INE official letter (*see* Ex. C-300; Ex. R-46), we do not find a violation of any SPA warranty with respect to the confinement and storage of the uncleaned hexachloride drums at the Mina site and thus reject Claimants' corresponding breach of warranty claims (*see* CPF ¶¶67-73, CPCL ¶30 (b) and (c)), we agree with Claimants as to the existence of strong evidence of SPA violations with respect to the on-site handling of the hexachlorides. In particular, RIMSA's unloading of hexachloride drums on unlined soil not equipped for hexachlorides (*see* CPF ¶ 62) violated RIMSA's 1997 temporary authorization permitting the handling of hexachlorides solely "in areas... specifically marked out and . . . equipped for this purpose" (*see* Ex. C-299). Furthermore, RIMSA's failure to properly remove the contaminated soil (*see* CPF ¶¶64-66) evidently violated Mexican law prohibiting contamination of the soil (*see* Ex. C-15; Reply L.A. Ex. 10). Both of these violations amount to breaches of the warranties in Sections 2.7(a) and 2.13(g) of the SPA. We have not, however, been presented with evidence of any, even immaterial adverse effect on the operations, business or assets of the company, Respondents therefore are entitled to invoke the relevant exception to the Section 2.13(a) warranty (*see* RPF ¶290).

130. Claimants seek to cast doubt on the validity of the March 1998 official letter from a Mexican governmental official authorizing the confinement of hexachlorides at Mina. They maintain that the authorization came in the form of a post-facto letter from a low-ranking government official who lacked the authority and competence to provide that permission and who was actually subject to later investigations for his attempt to do so (*see* CPF ¶¶ 70-72). Nevertheless, absent an annulment of that authorization by a court of law on grounds of illegality, or an affirmative finding by competent Mexican authorities that the

53

author of the letter had engaged in illegal conduct the Tribunal cannot accept Claimants' allegations; Respondents obtained an authorization that was presumed legal, that was never invalidated and with which RIMSA was in compliance at the Closing date.

131.    The Tribunal takes notice of the fact that the SECODAM investigation into RIMSA's performance of the 1997 Hexachlorides contract and the subsequent ruling of debarment were in part premised on factual findings identical to Claimants' arguments about illegal treatment of the hexachlorides –namely, the improper confinement of hexachloride drums instead of their incineration. Yet, even though the confinement was prohibited under the 1997 contract, this does not inevitably lead to the conclusion that it was prohibited under RIMSA's applicable authorizations and permits. RIMSA's failure to perform certain of its obligations under that contract might be relevant to other parts of the legal analysis (mainly the breach of financial condition warranties, *see infra* under V.D), but that failure has no bearing on our analysis of the breach of environmental warranties. Thus, the SECODAM inquiry into RIMSA's contractual obligations and the ensuing 2001 debarment are irrelevant to consideration of Section 2.13(a).

132.    Respondents mistakenly attempt to focus the discussion on whether mishandling the hexachlorides satisfies the statutory definition of contamination (*see* RPF ¶¶266-278) – *i.e.,* poses any risk to human health, as opposed to the environment in general, which Claimants have sufficiently demonstrated (*see* CPF ¶¶342-344)—or on whether the Mexican authorities have ordered an extensive remediation at the HTZ (*see* RPF ¶¶287-289). The extent of the hexachlorides at Mina (*see* RPF ¶286), the fact that PROFEPA, in its 2003 onsite inspection report, did not find traces of a contamination urging immediate remediation (*see* RPF ¶288; Ex. R-25), and the appropriate measures to remediate the existing problems (*see* RPF ¶¶2292-297), are all factors to be assessed by the Tribunal in connection with its selection of an appropriate remedy. By contrast, our task here is simply to determine whether the SPA warranties were breached. Unloading the drums onto the unlined ground and subsequently commingling contaminated and clean soil (instead of removing the unclean soil) constituted a violation of Mexican laws and RIMSA's temporary permit conditions and therefore of Sections 2.7(a) and 2.13(g) of the SPA.

54

133.    *Lagoons and Catalyst Waste Cell*: The indefinite storage of inadequately or half-treated sludge in Lagoons 1A and 1B violated the applicable Mexican law prohibiting the temporary storage of hazardous waste for longer than ninety days (*see* CPF ¶¶110-115; CPCL ¶36(a); Reply L.A. Ex. C-19); the same legal prohibition was violated with respect to the use of the so-called Catalyst Waste Cell for the prolonged storage of combustible hazardous catalyst waste (*see* CPF ¶¶117-119; CPCL ¶¶34-35).    Moreover, RIMSA's dumping of sludge from Lagoon 3A onto the western end of the HTZ violated Mexican laws requiring the disposal of waste in confinement cells and prohibiting the use of partially treated waste as daily cover (*see* CPF ¶116 and citations; CPCL ¶36(b)) – even if Respondents correctly indicate the non-hazardous character of the Lagoon 3A sludge under Claimants' own tests (*see* RPF ¶310).

134.    Since Claimants have actually expended US$1,600,000 in remediation costs concerning the half-treated hazardous waste at Lagoons 1A and 1B (*see* CPF ¶531; RPF ¶308; Transcript at 650 (Roussel)), as well as US$256,999 in excavation, treatment and disposal costs concerning the hazardous substances at the Catalyst Waste Cell (*see* CPF ¶530), we find not only a violation of the warranties in Sections 2.7(a) and 2.13(g) of the SPA, but also of the Section 2.13(a) warranty. The substantial expenditures Claimants have incurred to remediate the situation at Lagoons 1A and 1B, and at the Catalyst Waste Cell, as well as the amount of time devoted to this remediation effort, qualify as an "adverse effect" on RIMSA's business or financial assets, which Claimants would not have suffered had there been no violation of Mexican environmental laws.  That no major/material disruption of RIMSA's business has been shown to have resulted therefrom is not critical; materiality of the adverse impact is not a requirement under 2.13(a) of the SPA –although we do find that the adverse effect was significant in both these cases.

135.    Respondents prefer to focus their arguments on the absence of soil and groundwater contamination as a result of the catalyst waste storage (*see* RPF ¶318).  Yet these assertions, although they rebut Claimants' separate breach-of-warranty claims based on the existence of soil and groundwater contamination as such (*see* CPCL ¶¶40-41), are beside the point, for neither the Mexican law prohibitions on the temporary storage of hazardous

55

waste, nor any of the warranties found to be violated here require the existence of actual contamination. Respondents' allegations that the US$6 million purchase price reduction during the parties' negotiations was supposed to cover, *inter alia,* the remediation costs for the Lagoons (*see* RPF ¶315) or that PROFEPA "found no violation of Mexican law associated with the Lagoons" (*see* RPF ¶312) are addressed below.

136. ***Chloride Road Spreading:*** RIMSA's application and spreading (as a dust-suppression measure) of untreated and partially-treated hazardous waste on dirt roads in and around the Mina site without relocating the existing plant life amounted to a violation of the terms of its dust-suppression authorization granted by PROFEPA, which required the use of non-hazardous material and the relocation of all threatened plant life (*see* CPF ¶¶ 120-22 and citations; CPCL ¶¶38-39; Ex. C-23). Respondents concede the existence of the program, as well as the use of calcium chloride as a dust suppressant (*see* Vargas Aguirre Stmt., § 7, ¶ 10; RPF ¶321), but they fail to articulate any plausible justification for the way it was conducted or defend its consistency with RIMSA's permits. They only point to Claimants' own failure to put forward specific remediation proposals required by law (*see* RPF ¶321), an argument that carries no weight in the breach of warranties context. Consequently, we find a violation of the warranties under both Sections 2.7(a) and 2.13(g), but we find no evidence of an "adverse effect" on RIMSA's "operations, assets or business," and thus no violation of Section 2.13(a) of the SPA.

137. ***Overall Groundwater & Soil Contamination:*** Claimants have also proved by a preponderance of the evidence the existence of hazardous constituents in the soil and the groundwater at the Mina site. The sampling and testing analyses undertaken have demonstrated the presence of non-natural occurring pollutants at the HTZ, the FTZ, and the FGCs, in concentrations exceeding the allowable limits (*see* CPF ¶¶337-46). In spite of Respondents' persistent objections (*see, e.g.,* RPF ¶¶266-278, as to the HTZ), we are satisfied that contamination has been proved to exist at the Mina site, in breach of the applicable Mexican law concerning groundwater and soil contamination (*see* CPF ¶¶ 347-54; CPCL ¶¶40-41), and in direct contravention of Respondents' warranties under Sections 2.7(a) and 2.13(g) of the SPA, which we conclude that Respondents violated. PROFEPA's

56

own May 20, 2003 relevant finding (*see* Ex. R-23; CPF ¶352) is enlightening in that regard, as are Mr. Rincon's admissions (*see* CPF ¶351). It should be noted, after all, that Respondents' argument as to the non-existence of any legally cognizable "ecological imbalances" at Mina is substantially based on the testimony of Mr. Rincon, an expert who, unfortunately, has "never been to the Mina site" (*see* Transcript at 1371 (Trincon); also CPF ¶354 and footnotes). Claimants have, however, failed to show "an adverse effect" on RIMSA's operations and assets, resulting from the contamination itself; hence we find no violation of Section 2.13(a) of the SPA.

138. ***Section 2.13(h) Warranty:*** With respect to the alleged violation by Respondents of the warranty in Section 2.13(h) of the SPA that RIMSA "*has no liabilities* under the Environmental or Safety Laws," we find that RIMSA did not "have" as of the Closing date and had not *incurred*, prior to Closing, any *actual* liabilities (either paid or unpaid, yet *incurred* liabilities) in connection with a compulsory environmental remediation scheme. We therefore conclude that this warranty was not violated; we bear in mind, however, that whether RIMSA actually incurred liabilities is different from a finding that its operations were not consistent with Mexican laws and regulations. For the same reason (i.e. absence of *incurred* liabilities with respect to the environmental remediation) we also find that the breaches of the environmental warranties, as described in the preceding paragraphs, do not amount to an additional breach of Respondents' financial warranties under the SPA.

139. ***The Controlled Confinement:*** Although RIMSA's operation of a controlled containment site at Mina was not without fault, we do not find evidence that RIMSA had, prior to Closing, *in toto* "failed to achieve controlled confinement in violation of [the applicable] provisions of [Mexican] law" (*see* CPCL ¶43). We thus reject Claimants' allegations of breaches of warranties in this respect.

3. ***Respondents' Defenses.***

      a. ***The Inaction of the Mexican Authorities.***

57

140. Respondents' single most important counterargument to Claimants' claims and allegations is that the Mexican authorities have conducted numerous and thorough inspections from RIMSA's inception, and, aside from the rather minor remediation measures Claimants were ordered to take pursuant to PROFEPA's May 20, 2003 resolution, they have not found RIMSA to have been in violation of environmental laws and government permits and licenses. Respondents point to: (1) the absence of any affirmative finding by Mexican authorities of a material violation by RIMSA of Mexican environmental laws and permits in connection with its conduct of business, (2) the limited scope and the low cost of the government-mandated remediation both pre- and post-closing, and (3) Claimants' own modest post-closing remediation efforts. According to Respondents, all these "dispositively" prove that RIMSA has a clean record of environmental health (*see* RPF ¶¶324-356; ROM at 26, 30; RRM at 36-42; CPCL ¶44; CPF ¶¶355-356).

141. We agree with Claimants that Respondents' environmental warranties guaranteed RIMSA's *compliance* with Mexican law and its own licenses as of the closing date, not the absence of any enforcement action against RIMSA or the absence of an affirmative administrative finding of noncompliance. *Cf.*, Paraco Gas Corp. v. AGA Gas, Inc., 253 F. Supp. 2d 563, 573 (S.D.N.Y. 2003). After all, the absence of a pending proceeding, action or investigation against RIMSA by Mexican administrative agencies was warranted to Claimants under the broad coverage of Section 2.20 of the SPA. Respondents' contentions concerning remediation ordered by the Mexican authorities and undertaken by Claimants are directly relevant to the question of the damages, but not to whether breaches of warranties occurred.

142. In addition, we take into account that, even though PROFEPA has not found a *material* violation of Mexican laws, it has not entirely abstained from any enforcement action against RIMSA, nor has it found RIMSA fully compliant with its legal obligations and the conditions of its permits. On several occasions PROFEPA has criticized RIMSA's business practices, going so far as to find a violation, as in 2003:

58

- PROFEPA conducted an investigation at the FTZ in October 2003 and found that the FTZ 'does not have protective membrane or liner or any protection that avoids infiltrations or the leaching of hazardous wastes toward the subsoil' (*see* Ex. C-176).

- Most importantly, even before closing, PROFEPA expressed concern about the absence of a liner in the FTZ (*see* Ex. C-40) and subsequently (in 2003) chastised RIMSA (and its management) for providing, in response, deceptive and untrue design documents, going so far as to warn RIMSA of the criminal penalties for using false information in its communications with the Mexican authorities (*see* Ex. C-379; CPF ¶378).

- In its May 2003 resolution, after being notified by Claimants, PROFEPA did require that RIMSA bring the Mina site into compliance with Mexican law and RIMSA's permits by undertaking 'corrective' measures to remediate the contamination *found to exist* at Mina (*see* Ex. R-23; RPF ¶¶351-353); the scope of the measures ordered notwithstanding, the May 2003 resolution included an affirmative post-closing finding of contamination at the Mina site, as well as an order of remediation.

- Finally, on March 17, 2004, RIMSA was notified by PROFEPA that its Industria Limpia certificate had been revoked precisely for abnormalities in the handling and storage of waste, and contamination in the very areas that are at issue in this arbitration (the HTZ, the FGCs, the FTZ, the Lagoons, the Catalyst Waste Cell, the Chloride Road Spreading) (*see* CPF ¶¶384-385). PROFEPA in fact stated that the certificate would not be restored until RIMSA "carr[ied] out the actions required under Mexican environmental legislation, as established in the Plan of Action, to be completed by March 2006", including actions labeled SYS-01 (concerning the FTZ), SYS-02 (concerning the HTZ), SYS-03 (concerning the Lagoons), SYS-04 (concerning concerning the Catalyst Waste Cell), SYS-05

(concerning the FGCs) and SYS-06 (concerning the Chloride Road Spreading) (*see* Ex. C-289; CPF ¶385).

143.    The probative value of PROFEPA's 2003-2004 enforcement actions and these affirmative findings that RIMSA was noncompliant, cannot be discounted. The significance of those actions is considerable for the additional reason that they took place after the Closing date, when Respondents' alleged improper influence over Mexican governmental officials had long ceased to cloud PROFEPA's prior findings.

144.    PROFEPA's post-closing findings were based on time-consuming inspections and analyses that detected the existence of certain inconsistencies between the actual and the warranted conditions at Mina. The found irregularities were attributable to *chronic* problems that were already in existence when Claimants assumed control of RIMSA's operations. In support of our finding here, we bear in mind that some of the areas concerned were no longer operating when Claimants assumed control of RIMSA: the ten FGCs, for example, were built and operated between 1987 and 1992 (*see* Ex.C-23; CPF ¶13); the source of the problems in that area, therefore, has to be traced at the pre-Closing period.

145.    Finally, we cannot ignore the fact that the nature of the business RIMSA conducts is such that the new shareholders and managers – as in fact is the case in all corporate acquisitions and purchases – needed a certain amount of time before they could assert effective control over RIMSA's day-to-day planning, policy decision-making and waste treatment techniques. We pay due regard to the contribution of Claimants' post-Closing inertia in worsening the environmental contamination at the Mina site, when we address the appropriate level of damages below.

b.    *The US$6 Million Purchase Price Reduction.*

146.    Before we conclude this section on environmental noncompliance, we discuss another recurring theme in Respondents' argumentation: the extent to which the environmental conditions and problems at the Mina site were disclosed to Claimants by the Respondents during the negotiations and were in fact covered by the $6 million reduction of

60

the initially agreed purchase price (*see* CPF ¶¶144-146) and whether, thus, Claimants have conclusively consented to a waiver of the protection afforded under the SPA express environmental warranties.

147.    To address this issue, we look at the SPA. The SPA not only expresses the entire understanding of the parties with respect to the subject matter addressed therein, but also embodies and supplants their prior negotiations (*see* Tempo Shain Corp. v. Bertek, Inc., 120 F.3d 16 (2d Cir. 1997); Bradford Co. v. Dunn, 250 N.Y. 461, 466 (1929)). In fact, the merger clause contained in Section 10.6 of the SPA evidences the parties' intent that their written agreement is to be considered a completely integrated writing, precluding extrinsic proof to add to or vary its terms (*see* Jarecki v. Shung Moo Louie, 95 N.Y.2d 665, 669 (2001); Primex Intern. Corp. v. Wal-Mart Stores, Inc., 89 N.Y.2d 594, 599, 600 (1997); Braten v. Bankers Trust Co., 60 N.Y.2d 155, 162 (1983)). The purpose of a merger clause is to require full application of the parol evidence rule to bar the introduction of evidence as to what might have been agreed to between the parties prior to the execution of the final integrated written agreement (*see* Glen Banks, *New York Contract Law* ¶8:17 (2006); *Williston on Contracts* ¶¶33:1 to 33:13 (4th ed.)).

148.    With this in mind, we now turn to the question of whether there is any evidence in the SPA that the parties agreed to waive, in relation to the matters allegedly disclosed to Claimants during negotiations and allegedly covered by the $6 million purchase price reduction, the protection afforded to Claimants under certain environmental warranties.

149.    Although a buyer may be deemed to have waived the protection of a warranty, if, before closing, a seller discloses through events or actions outside the contract the inaccuracy of a warranted fact, there is no waiver where the buyer has expressly reserved his breach-of-warranty rights under the purchase agreement. S*ee* Paraco Gas Corp. v. AGA Gas, Inc., 253 F.Supp.2d 563, 575 (S.D.N.Y.2003). A buyer can (and must, if it wants to avoid waiving its rights under the purchase agreement) preserve its rights by expressly stating at or prior to the closing that the buyer is closing the transaction without waiving any rights it may

61

have with respect to such warranties. *See* <u>Rogath v. Sibenmann, 129 F.3d 261, 264-65 (2d Cir.1997)</u>.

150.    Accordingly, the critical questions to be asked in a claim of waiver are: (1) whether the purchaser was indeed aware of the truth as to what the seller was warranting; (2) whether the seller itself had disclosed the inaccuracy of its own warranties to Buyer and (3) whether there was an express reservation of the buyer's rights, the disclosure notwithstanding. An affirmative response to the last inquiry would suffice to reject the waiver claim. *Id.* 265.

151.    In the case at hand, the broad language of Section 7.2 of the SPA (*see supra* at ¶¶79-74), along with other sections of the purchase agreement, satisfies the express preservation requirement and obliges us to reject Respondents' knowledge-based arguments: Respondents' warranties apply irrespective of the buyer's knowledge of the guarantees' inaccuracy. As the SPA provides, "[t]he right to indemnification, payment of damages or other remedy based on such representations, warranties, covenants. . . will not be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this agreement or the Closing Date, with respect to the. . . inaccuracy of any such representation, warranty. . ." (Section 7.2 of the SPA).

152.    The parties did indeed negotiate a purchase price reduction corresponding to certain aspects of RIMSA's operations that were found to be problematic, so as to compensate (in advance) Claimants for the additional capital expenditures and investments they would have to undertake in certain areas of concern. If the parties had, however, desired to exclude the disclosed facts as to the specific operational matters from the warranties, they would have either included an explicit relevant provision in the SPA itself, or would have listed the disclosed facts/details in the Disclosure Schedule annexed to the SPA. *See* SPA ¶10.15 (f). They could have also opted, after the execution of the SPA, for a written waiver of any related inaccuracies in the critical representations and warranties by observing the requirements of Section 10.2 (written waiver signed by any officer of the Buyer).

62

153. The parties did none of this. Instead, Respondents accepted the broad language of Section 7.2 and, most importantly, the inclusion of a merger clause in Section 10.6 of the SPA, which expresses the parties' intent to consider it as the sole, complete and final expression of their agreement. The merger clause precludes the parties from contending that there was an oral agreement on the subject matter of the contract (i.e., the extent to which Respondents warranted RIMSA's environmental compliance and financial soundness) that was not set forth in the writing; extrinsic evidence of additional understandings and representations can only be admitted to the extent that they are consistent with and not contradictory of the parties' written contract (*see* Cornhusker Farms, Inc. v. Hunts Point Co-op. Market, Inc., 2 A.D.3d 201, 204 (1st Dep't 2003); Doherty v. New York Telephone Co., 202 A.D.2d 627 (2d Dep't 1994); Thomas v. Scutt, 127 N.Y. 133, 138 (1891); Shah v. Micro Connections, Inc., 286 A.D.2d 433 (2d Dep't 2001)). This is the very essence of the parol evidence rule that the parties, by agreeing on the merger clause, have expressly opted to apply.

\*       \*       \*

154. *In sum*, we find violations of Sections 2.7(a) and 2.13(g) of the SPA, as to the HTZ, the FGCs, the FTZ, the lagoons, the catalyst waste cell, the chloride road spreading and the overall groundwater and soil contamination at Mina; and a violation of Section 2.13(a) as to the catalyst waste cell and the lagoons. We find no violation of Section 2.13(h) of the SPA.

155. Our finding of breaches of the SPA environmental warranties does not mean that we consider the remediation plan proposed by Claimants to be necessary or that contamination existed to the extent claimed by Claimants. Our findings are confined to the violation by RIMSA's pre-Closing management team of certain provisions of its permits and of the applicable Mexican laws and regulations. The gravity of the violations, the severity of the contamination and the extent to which RIMSA is required to undertake measures to remedy the environmental condition at the Mina site are all issues that bear on our findings below as to the appropriate remedy and the size of the damage award.

63

**D.    RIMSA's Financial Condition**

156.    With respect to RIMSA's financial condition at the Closing, Respondents warranted to Claimants that, except as specifically mentioned in the Disclosure Schedule:

(a)    "the Financial Statements (including the notes thereto) have been prepared in accordance with United Mexican States generally accepted accounting principles" and that those statements "are correct and complete except in immaterial respects" [Section 2.6 of the SPA]

(b)    all collectibles were "valid accounts receivable which have been or will be . . . collectible in full . . . except to the extent of any reserve for uncollectible receivables" [Section 2.8(a) of the SPA]

(c)    "[t]he stock of collected but unprocessed waste . . . can be treated in the ordinary course of business without unusual delays" [Section 2.8(c) of the SPA]

(d)    ". . . the company has no debts, liabilities or obligations, either accrued, absolute, contingent, unquantified, disputed, unliquidated, indeterminable or otherwise, except: (i) to the extent specifically reflected and reserved against in the balance sheet as of December 31, 1999 included in the Financial Statements and not heretofore paid or discharged . . . " [Section 2.12 of the SPA]

(e)    RIMSA was not "in default" with respect to any and all company agreements in force on the date of the SPA, and "that none of [these] contracts contains obligations which cannot reasonably be performed in the normal course of business, and without incurring any penalties, late fees or similar . . . charges in relation to any contract signed or in existence on the Date of Closing" [Section 2.19 of the SPA] .

(f)    ". . . [a]s of Closing, . . . the company will have no liability or obligation (and to the Seller's knowledge there is no basis for any present or future . . . charge, complaint, claim or demand) arising out of any "contractual commitment . . . as a result of any service provided by the company" [section 2.22 of the SPA].

64

157.    In Section 2.16(a) of the SPA, Respondents also warranted that " . . . the company has good valid marketable title to all . . real property . . . free and clear in each case of all mortgages, liens, options, pledges, encumbrances, charges, assessments, leases licenses, concessions, contract rights *or other rights* except as may be specifically indicated in [disclosure] schedule 2.16" (emphasis added).

158.    Respondents have conceded responsibility for the FNM lease agreement (*see* RPF ¶¶401-403), the land and equipment rental at the Villahermosa site (*see* RPF ¶¶404-405) and the PCB processing costs (*see* RPF ¶¶406-407). They characterize the expenses and contractual liabilities that RIMSA has incurred with respect to each of those matters as "unreserved obligation[s] incurred prior to December 31, 1999" and admit the respective violation of SPA Section 2.12. Respondents' concessions therefore remove these issues from the array of disputed issues and there is no need for further analysis of them.

159.    We therefore find, in accord with Respondents' own concessions, that Respondents violated the warranties under SPA Sections 2.6, 2.19 and 2.12 with respect to the Villahermosa land lease, the Villahermosa equipment rental agreement, the FNM lease agreement and the PCB processing costs.

160.    Regarding the remaining claims of allegedly pending and yet undisclosed financial liabilities incurred by RIMSA in violation of Respondents' warranties, we find them persuasive and well-substantiated, and we thus find a violation of Respondents' warranties in relation thereto as well:

161.    *Accounts receivable.* RIMSA's failure to fully reserve for the amount of Mx$1,933,783 in collectible (though uncollected) accounts receivable was a violation of the warranty contained in Section 2.8(a) of the SPA, according to which "[a]ll of the receivables either listed [on Section 2.8(a) of the Disclosure Schedule] or set forth or reflected in the balance sheet as of December 31, 1999 included in the Financial Statements . . . are . . . valid accounts receivable . . . which have been or will be, within 180 days (or such longer period of time as is customary for the particular account) . . . collected in full except to the extent of

any reserve for uncollectible accounts receivables in the balance sheet as of December 31, 1999 included in the Financial Statements."

162.    Even if the uncollected and uncollectible amounts of Mx$1,933,783 were "not reflected in the balance sheet as of December 31, 1999, nor set forth on the Disclosure Schedule 2.8(a) of the SPA", and thus the second sentence of Section 2.8(a) (which contains Respondents' assurance that the accounts receivable reflected in the 1999 balance sheet or the SPA Disclosure Schedule have or will be paid within 180 days except to the extent reserved on the balance sheet) does not apply, as Respondents contend (*see* RPCL ¶393-394), equal regard must be paid to the first sentence of Section 2.8(a) and its assurance that "[s]et forth in Section 2.8(a) of the Disclosure Schedule is a *complete and accurate list of all receivables* of . . . the Company as [of] May 31, 2000, including accounts receivable, notes receivable and insurance proceeds receivable" (emphasis added).  Construing the second sentence through the prism of the first sentence warranty reveals that the underlying premise of the second sentence warranty is the complete and *full* disclosure of *all* accounts receivable, either on the disclosure schedule or on the December 31, 1999 balance sheet.  If, therefore, there are indeed uncollectible accounts receivable that were neither disclosed in the corresponding section of the Disclosure Schedule nor reserved for on the 1999 balance sheet, Respondents' failure to disclose and/or reserve for these accounts inescapably amounts to a violation of their representations and warranties under SPA section 2.8(a).  Claimants have therefore met their burden of proof on this issue (*see also* Exs. C-338, Apps. E.1, E.2 & E.3; C-344).

163.    ***The Dos Bocas Contract:***  Claimants have offered sufficient evidence to prove that Respondents failed either to disclose the penalty imposed by Pemex or to include the necessary reserves in RIMSA's balance sheets prior to Closing, in direct violation of the guarantee of Section 2.19 of the SPA (that except as otherwise disclosed, RIMSA was not in default with respect to any of its contractual obligations and that any contractual obligations existing at the Closing date could be satisfied "without incurring any penalties, late fees or similar charges"(SPA ¶ 2.19).  Respondents are correct in delineating the scope of the clause to include only "such" agreements, contracts, commitments or obligations as were "*in force*

66

on the date of the Agreement, . . . to which . . . the Company is a party" (SPA ¶ 2.19, beginning sentence; emphasis added). However, the disputed performance of certain obligations under a contract and the still pending compliance of certain parties with their contractual obligations prevents completion and termination of the agreement.

164.    Even if the contract is considered completed, nevertheless, the violation of the SPA Section 2.22 warranty (that "as of the Closing, . . . the company will have no liability or obligation . . . arising out of any contractual commitment") remains uncorrected. The same holds true for the warranty in SPA Section 2.12, that ". . . the company has no debts, liabilities or obligations, *either accrued*, absolute, *contingent*, unquantified, *disputed*, unliquidated, *indeterminable or otherwise*, (except: (i) to the extent specifically reflected and reserved against in the balance sheet as of December 31, 1999") (emphasis added). These clauses do not contain any language limiting their coverage to merely contractual liabilities and obligations "in force on the Date of the [SPA]" (SPA Section 2.19).

165.    *The 1999 Villahermosa Contracts.* Claimants' contention that Respondents were in breach of the representations in SPA Sections 2.8(c), 2.19 and 2.22 (*see* CPCL ¶¶73-74) is supported by the evidence. The 1999 contractual penalties calculated and imposed on RIMSA by Pemex, on the one hand, and the processing costs required for the treatment of the drilling-mud stockpiles, well in excess of the amounts reserved for by Respondents for the treatment of unprocessed waste, on the other, in combination with the unexpectedly thorny process of obtaining the necessary governmental license to operate new equipment at the site, are inconsistent with Respondents' representation of RIMSA's performance and business planning under the 1999 contracts, and are also inconsistent with Respondents' warranties in the SPA.

166.    Respondents, in defense, emphasize the disclosure to Claimants, during the due diligence process, of the operational backlog at the Villahermosa site (*see* RPF ¶¶378-380), and they also point to the parties' pre-Closing negotiation and final agreement to a US$6 million purchase price reduction, which was mutually understood to encompass in part a compensation to Claimants for the additional waste processing costs they would have to

NYCDMS/1005454. 14

incur in dealing with the Villahermosa backlog (*see* RPF ¶¶382, 388, 392; CPF ¶¶144-146). In addition, Respondents invoke their own lack of knowledge and the absence of any specific notification of the imposition by Pemex of contractual fines (*see* RPF ¶390).

167.   These arguments are not relevant to our legal analysis: the purchase price reduction and the parties' knowledge of the accuracy or inaccuracy of the SPA warranties have been exhaustively discussed in earlier parts of this Award and will not be reiterated here. As the SPA provides, neither Respondents' lack of knowledge nor Claimants' knowledge of the inaccuracy of the representations relating to the Villahermosa contracts (knowledge acquired during the due diligence phase of the negotiations and culminating in a purchase price reduction) matter.

168.   ***The Land Dispute.*** Finally, the evidence presented by Claimants (*see* Ex. C-223-224, 255, 307-309), leaves little doubt that, despite the Section 2.16 warranty of "good, valid and marketable title" and promise of access to all the land sold to Claimants under the SPA, RIMSA's title to the land was far from free and clear of any claims or "other rights" at the time of Closing. In particular, the occupation of a (however small) part of the estate (lots 37 & 38) by a farmer gave rise to claims of adverse possession and a protracted and disproportionately costly litigation, which, at least until the dispute was finally resolved by the Mexican courts, cast a cloud over Claimants' ownership and blocked their possession to the whole purchased land (*see* CPF ¶¶493-504). Respondents were thus in breach of Section 2.16 (a) of the SPA, which contains Respondents' warranty that "...each of Confinamina and the Company has good valid marketable title ... to all said real property... free and clear in each case of all ...encumbrances, ... licenses, concessions, ... or other rights except such as may be specifically indicated in said Schedule 2.16 [annexed to the SPA]...".

169.   ***Other Indemnity Claims.*** Claimants also assert indemnity claims for Mx$5,841,680 in interest on payment obligations under the SPA. Claimants' interest payments were part of the underlying consideration for their purchase of the 30% of RIMSA's stock, a bargain that we find below should not be rescinded. Since our benefit-of-the bargain analysis set forth in the damages analysis below compensates Claimants for the