losses, which in a breach of warranties scenario consist in the lost benefit of their bargain, i.e. the differential between the actual and warranted value of the 90% stake acquired by Claimants. The 40% rate does not apply directly to the total amount of *RIMSA's* post-Closing financial liabilities. These liabilities burden the *Company* –not Claimants. Claimants suffered an injury by paying a price that did not correspond to the actual value of the 90% controlling block they bought; they, thus, have a right of redress in the form of benefit-of-the-bargain damages. Claimants' analysis on the one hand disregards that they only acquired 90% in RIMSA, and, on the other hand, fails to consider that the 40% rate applies to the losses suffered by them (not RIMSA). The actual amount of expenses that RIMSA had to incur as a result of unsettled pre-Closing financial problems and contractual defaults is certainly a factor in our assessment of the actual value of the purchased stock at the Closing Date, but does not reflect Claimants' *direct* total losses under the SPA.

226. *Third,* we point to another flaw in Claimants' bifurcated damage analysis: both benefit-of-the-bargain models and the indemnification damages take into account RIMSA's default on rental payments (*cf.* CPCL ¶¶156 and 175). On the one hand, the 5% profit margin reduction rate in the PwC benefit-of-the-bargain analysis (assumption (2) above) which we have rejected as unwarranted and unjustifiable, is based on RIMSA's historical failure to incur certain remediation costs and rental expenses (*see* CPCL ¶156). On the other hand, Claimants request "indemnification" for RIMSA's outstanding financial liabilities, including (again) its failure to reserve for unpaid rent due to (1) Ferrocariles Nacionales de Mexico, (2) the state of Tabasco, and (3) Trans-Quimica Nacional, S.A. de C.V. (*see* CPCL ¶¶174 and 175(d),(e) and (f)). This double-counting of unpaid rental expenses is inconsistent and illogical.

*         *         *

227. In summary, we reject Claimants' request for relief, as far as the "indemnification damages" are concerned. The Tribunal allows only recovery of their benefit-of-the-bargain damages, which remedies Claimants' total losses under the SPA. In that regard, Respondents' financial misrepresentations are taken into account in evaluating

92

the value of RIMSA's purchased stock at the Closing date – but they do not give rise to a separate item of damages under the SPA.

13.    ***Our Method of Computation***

228.    The Tribunal rejects the PwC financial models, because they contain inconsistencies and assumptions that the Tribunal is disinclined to accept. We conclude that a reasoned assessment of Claimants' damages is best achieved by examining the events that actually occurred after the Closing date. The computation method that we apply as best tailored to the needs of the facts as presented to us includes several stages, which we outline below:

229.    First, we determine the undiscounted amount of the liabilities that RIMSA *actually* incurred after that date. The second step involves a calculation of how these liabilities affected RIMSA's actual value at Closing; for this purpose, the Tribunal applies to each of these liabilities that were incurred more than a year after the Closing a reasonable discount rate, for each complete year from the date when each was incurred back to the Closing date in 2000. To arrive at the discounted present value of these liabilities, the Tribunal applies a compound discount rate of 5% per annum, which it considers more appropriate and reasonable under the circumstances than the 18% discount rate applied by PwC in its various models (*see* CPF ¶544, at note 812); the discount rate in our model is compounded on an annual basis, i.e., it will apply to the amount of the post-Closing liabilities for each complete year between the date of the Closing and the time when each liability was incurred. Liabilities incurred at the Closing or within a year thereafter (as is the case with the majority of the liabilities arising from pre-Closing contractual irregularities and unreserved financial liabilities) are not subjected to the 5% discount rate.

230.    The Tribunal inserts the 5% discount rate and the applicable amounts into the following formula, designed to discount each of those actual losses to present value at the Closing date (*see, inter alia,* W.T. Allen-R. Kraakman, *The Law of Business Organizations*

93

115-117 (2003); *also* visit www.studyfinance.com/lessons/timevalue/index.mv and www.financescholar.com/timevalueofmoney.html):

$$PV \ = \ \frac{FV}{(1+r)^n}$$

231.  This basic formula has four variables:

1.  PV stands for the value of a dollar at time=0 (i.e. the Closing Date in our case);

2.  FV stands for the value of a dollar at time=n in the future, after the Closing;

3.  r equals the interest rate that would be compounded for the applicable period of time; and

4.  n is the period of time between the Closing and the occurrence of the loss, i.e. the period of time that is applicable each time.

232.  The total sum of those discounted liabilities, as produced by the above formula, is the best and least speculative indication of the value at Closing of RIMSA's undisclosed liabilities and other risks that Claimants should have been aware of when they entered the SPA and agreed with Respondents the purchase price. This discounted value, if subtracted from RIMSA's total warranted value, enables us to arrive at RIMSA's actual worth and thus the amount that Claimants overpaid for the 90% stake in RIMSA.

233.  This overpayment best captures Claimants' total direct losses and in order to ascertain this amount, the Tribunal subjects the total discounted value of RIMSA's liabilities and losses to two further reductions: on the one hand, we apply a 90% rate to the total sum of those discounted liabilities, since this amount refers to the liabilities of the company itself, while Claimants purchased a 90% ownership stake in RIMSA. We then apply the contractually agreed ratio of 40% that, according to Section 7.5 of the SPA, represents Respondents' liability for Claimants' losses.

94

234. As far as the amounts expressed in Mexican pesos are concerned, they are converted to U.S. dollars at the rate of Mx$9.6 to US$1, pursuant to Section 10.13 of the SPA, which provides that:

> "Except to the extent already expressed in U.S. dollars, all payments to be made hereunder, *and all amounts on which payments are to be based hereunder*, shall be in the form of United States dollars calculated at the peso-dollar exchange rate applicable to liabilities denominated in foreign currency and payable in Mexican Pesos within Mexican territory (the "Exchange Rate Fix 48 Hours"), as determined by reference to such rate as published in the "Diario Oficial de la Federacion" on the business day immediately preceding the Closing Date" (emphasis added).

235. This analysis is an appropriate computation method in this case because it allows us to evaluate the risks facing RIMSA at Closing, without having to place ourselves in Claimants' shoes at the Closing date and without thus resorting to subjective assessments and successive layers of hypothetical factual scenarios, such as the effect of the Respondents' contractual breaches on the company's future profitability, or the costs of future environmental remediation as would have been reasonably foreseeable by the parties at the Closing date. Under this benefit-of-the-bargain damage model, we still seek "to determine how much RIMSA would have been valued at Closing had RIMSA's noncompliance with the SPA warranties been known" (*see* CPCL ¶155) and we compensate the Buyer for the frustration of its expectations (*see* Schonfeld v. Hilliard, 218 F.3d 164, 177 (2d Cir. 2000); Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 495 (2d Cir. 1995)). To determine, however, which expectations were reasonable under the circumstances at the Closing date, we begin with the examination of the company's actual losses in the years after the Closing, when the pre-Closing risks materialized. We believe that fairness is best assured by opting for a discounted analysis of actual losses rather than by referring to speculative scenarios based on largely questionable and, in some cases, unproven, assumptions.

95

236.    In the following paragraphs we address in turn the liabilities that RIMSA actually incurred after the Closing date, but which had their cause or source prior to Closing and were thus attributable to Respondents' misrepresentations and breaches of warranties. Based on the record before us, we calculate the losses sustained in connection with each category of contractual breaches – i.e., the SECODAM investigation and the resulting debarment, the environmental non-compliance and the financial malfeasance. In particular:

a.    *The SECODAM Matter*

237.    We have earlier concluded that Respondents' failure to disclose the threat of the SECODAM investigation constituted a breach of a warranty in Section 2.20 of the SPA (*see supra* under V.B). Having reached this point in our analysis, we now address the issue of damages that are payable by Respondents pursuant to the indemnification provisions of the SPA with respect to this matter.

238.    Claimants have expended considerable effort, through PwC, to present a case for damages based on RIMSA's estimated losses of contracts directly or indirectly (through contracts with persons directly contracting) with the Mexican government and the profits that would have been made had there not been, at various times in the period 2001 to mid-2003, Mexican government orders forbidding RIMSA to bid on such contracts. Claimants also contend that damages from the SECODAM debarment extended to the loss of private contracts.

239.    Claimants have presented an analysis by PwC that attempts to determine the contracts that RIMSA would have obtained had it not been subject to the government debarment order. Such an exercise is fraught with uncertainty and speculation: it is a difficult task to go back in time and rewrite history on a "what if?" basis. Moreover, there is a dispute between the parties as to the periods of time during which the Mexican government's debarment orders had an effect, not just as a formal matter, but also as a matter of the attitudes and thinking of persons who might have been willing to enter into contracts with RIMSA had it not been for their perception – erroneous at times – that RIMSA was illegally

96

disqualified from bidding. We are also asked to speculate on the extent of the period during which there was a "spill-over" effect by which RIMSA lost business when disqualification orders were not formally in effect. Lastly, we are asked to make assumptions concerning the win rate, profit margin and final bid prices of contracts that RIMSA might have obtained had the debarment order not been in effect.

240. The Tribunal is of the view that there are indeed damages that must be paid by the Respondents to the Claimants pursuant to the indemnification provisions of the SPA by reason of the breach of the warranty in question. Respondents have conceded that, should there be liability with respect to the SECODAM debarment, damages may be as much as Mx$47 million. Claimants, on the other hand, seek far greater amounts in damages.

241. Part of Claimants' case is based on the seemingly strong circumstantial evidence that, during the years when the government's debarment order was in effect – 2001 to mid-2003 – there was a marked decline in RIMSA's direct government sales, as well as a decline in indirect government sales. The question is the extent to which this decline is a matter of *post hoc ergo propter hoc* or it reflects a true causal relationship between the government's debarment order and these declines in sales volumes.

242. Our damage analysis must be based, fundamentally, on the extent of coverage afforded by the warranty and indemnification provisions of the SPA – which Claimants' witnesses have likened to insurance, the cost of which was included in the purchase price. We are guided in our damage analysis by the intent of the parties in this regard. With respect to the disclosures of investigations, it is reasonable to believe that the existence and scope of known threatened or pending investigations were required to be disclosed because investigations by government authorities can lead to significant problems to the business being investigated. Thus, it is likely that the parties intended that coverage would be provided by the warranties for risks that could be characterized as emanating with reasonable foreseeability from undisclosed threats.

243. One of the reasonably foreseeable consequences of the SECODAM investigation and its precursor was the eventual restriction on the business activities of

97

RIMSA – that is, sales not made during RIMSA's debarment. The spill-over effect of the government order on the minds of persons in the industry – including both those in the government and those in the private sector – is something that is more remotely related to the reasonably foreseeable consequences of the threatened investigation.

244.    Faced with these various considerations, we have endeavored to arrive at a measure of damages based on the reasonably foreseeable consequences of the non-disclosure of the threatened investigation. Although Claimants assert that the sharp decline in government direct sales in 2001 is attributable to the debarment, it seems likely that much of the decline could be ascribed to other factors. The debarment order was not issued until mid-July of 2001 and contracts that would have been affected by that debarment order – which, in any event, only lasted four weeks – would not likely have had an effect, in the form of sales and profits not obtained, until late in 2001, if in that year at all. Consequently, we remove from consideration lost sales and lost profits for the year 2001 with respect to all categories of alleged lost sales.

245.    Although a debarment order was officially in effect for a small portion of the year in 2002 – the first two weeks– we consider it likely that there was a reasonably foreseeable effect of the order in the industry in 2002. First, contracts not obtained in 2001 would have resulted in a diminution of sales in 2002. Moreover, we give consideration to the likelihood that there was some spill-over effect with respect to contracts that might have been entered into when the debarment order was not in effect. Claimants have presented evidence that in several instances RIMSA was forbidden to bid by government agencies at times when the debarment order was not technically in effect, including at least two instances in 2002 (*see* Exs. C-202, 207, 208 and 386). There is also evidence that in June 2004 the Legal Department of Halliburton, RIMSA's potential customer, drew the management's attention to the pendency of the judicial proceeding concerning the debarment; in fact, an electronic communication circulated internally at Halliburton advised against the conduct of any business with RIMSA until the whole issue is resolved (*see* Ex. C-386; CPF ¶240). Employees of government agencies were evidently under the impression that RIMSA was suffering from a disability with respect to bidding, and it is fairly likely that others in

98

government and others in the private sector were under a similar impression (*see supra* at ¶¶32-34).

246.     Considering the decline in revenues from government direct and indirect contracts in 2002 and estimating, based on our analysis of the evidence provided to us, that approximately 50 percent of the lost revenues were lost as a result of the investigation and consequent debarment order, we arrive at an amount, for 2002, of Mx$100 million, which we divide by two to take into account uncertainties such as the fact that, in or around 2001, another competitor to RIMSA entered the marketplace, thereby dividing the market and having a presumed impact on RIMSA's government sales volume (*see* RPF ¶179). Taking the same approach with respect to the first half of 2003, we add another Mx$50 million to the amount of Mx$100 million, leaving us with Mx$75 million as a fair and reasonable determination of the gross revenue lost by 2003 as a consequence of the SECODAM debarment.

247.     We find, in light of all the evidence, that a reasonable profit margin of 20% should be applied, resulting in lost profits for RIMSA of Mx$15,000,000. This amount will be subject to a reasonable 5% annual discount rate from mid-2003 back to the Closing date (November 2000); Claimants also apply the loss from the SECODAM debarment to a two-year period, from mid-2001 to mid-2003 (*see* CPF ¶550). Applying the formula described above, we end up with the amount of Mx$13,605,442.18 (or, if converted to US dollars, US$1,417,233.56), representing the discounted value of RIMSA's lost profits as a result of the SECODAM investigation. It is this discounted value that best quantifies the risk of a SECODAM investigation and a SECODAM-mandated debarment, as the risk existed at the time of Closing.

b.     *The Environmental Non-Compliance*

248.     The Tribunal has carefully reviewed and considered Claimants' allegations, analyses and contentions regarding the issue of environmental non-compliance, which we have already discussed in detail. After paying due regard to the absence of a compulsory

99

environmental remediation scheme mandated by the Mexican authorities, we decide that the best indicator of RIMSA's remediation costs is the amounts actually expended by Claimants for this purpose.

249.  The record (*see* CPF ¶¶433-434 and 529-532) establishes that Claimants have spent US$1,600,000 for remediation work performed at Lagoons 1A and 1B; Claimants in particular completed the remediation of Lagoon 1A in November 2003 and Lagoon 1B in spring 2004 (*see* RPF ¶308; *also* Transcript at 650 (Roussel)) at a cost of US $600,000 and US $1,000,000 respectively. The record also establishes that Claimants spent approximately US$256,999 with regard to the Catalyst Waste Cell in a two-year period after the Closing (*see* CPF ¶530, at note 791) –in fact, Claimants' expert has originally provided an estimated range of the cost of remediation of the catalyst cell of between US$220,000 and US$280,000 (*see* Golder Reply Report, Table 2, p. 13; *also* RPF ¶319).

250.  Claimants have presented no other specific evidence as to the actual amounts that RIMSA spent in environmental remediation schemes after the Closing. In fact, they admit that, although some "limited remediation measures were undertaken" in the aftermath of PROFEPA's May 2003 order, those expenses were incurred "in the ordinary course of RIMSA's business," thus precluding RIMSA from isolating "the specific costs associated with this work" (*see* CPF ¶529);

251.  Claimants have spent US$1,856,999 on remediation for environmental deficiencies present at the Closing the non-existence of which the Sellers warranted. The discounted value of each of these amounts, after application of the present value formula is: US$518,302.56 for the US$600,000 spent for the remediation of Lagoon 1A within three years after the Closing; US$863,837.60 for the US$1,000,000 spent for the remediation of Lagoon 1B within three years after the Closing; and US$233,105.67 for the US$256,999 approximately spent for the remediation of the Catalyst Waste Cell within two years after the Closing. The total discounted value of those expenditures is US$1,615,245.83.

c.  *Various Financial Warranties*

100

252.    Inasmuch as Respondents have conceded responsibility for the claims relating to the FNM lease, the land and equipment rental at the Villahermosa site, and the PCB processing costs, we discount at present value, where appropriate, the amounts set forth below for the following categories of claims:

| Claim (and approximate date when liability was incurred) | Amount (in Mx$) | Discounted Present Value at Closing (in Mx$) |
|---|---|---|
| FNM Lease <br><br> (September 2002 –*see* CPF ¶473, note 729) | $1,055,800 | $1,005,523.81 |
| Villahermosa equipment rental (lease with Trans-Química Nacional, S.A. de C.V.) <br><br> (the outstanding rent was paid as due as of the Closing date, *see* CPF ¶483, note 740) | $412,500 | $412,500 |
| Villahermosa land rental (lease with the stae of Tabasco) <br><br> (the outstanding rent was paid as due as of the Closing date, *see* CPF ¶480, note 737) | $271,929 | $271,929 |
| PCB processing costs <br><br> (costs incurred within a year from the Closing date –*see* CPF ¶¶489-491) | $1,710,429 | $1,710,429 |

253.    Consistent with our earlier findings that Respondents have likewise breached the warranties of the SPA in connection with certain accounts receivable, the Dos Bocas contract, the Villahermosa contracts and the adverse possession claims asserted by a farmer living on the RIMSA property, we award additional damages to the extent of 40% of the amounts set forth below:

101

| Claim (and approximate date when liability was incurred) | Amount (in Mx$) | Discounted Present Value at Closing (in Mx$) |
|---|---|---|
| Accounts receivable (at and within one year from the Closing –*see* CPF ¶¶485-488) | $1,993,783 | $1,993,783 |
| Dos Bocas contracts (the penalty, including prior partial payments by Vargas, was imposed in August 2001, within a year from the Closing –*see* Ex. C-128; CPF ¶¶462, note 719, and 466, note 724) | $663,959 | $663,959 |
| Villahermosa contracts (penalties and processing costs) (costs incurred within one year from the Closing date, *see* CPF ¶¶445-461) | $28,599,746[3] | $28,599,746 |
| Costs associated with occupied land (litigation costs and enforcement costs were incurred by Claimants as far as 2004 –*see* CPF ¶¶493-504[4]) | $216,350 | $177,991.68 |

254.    The above costs, when totaled, amount to Mx$34,835,861.49 or, when converted to U.S. dollars at a rate of Mx$9.6 to US$1, to US$3,628,735.57.

---

[3] This amount (Mx$ 28,599,746) is made up of Mx$ 9,860,129 in penalties (*see* CPF ¶¶460, note 716) and processing costs in the amount of Mx$ 18,739,617, as reflected in the original report of Claimants' experts PwC (*see* PwC Report App. I.A., Ex. C-320). Although we are cognizant of the fact that in its reply report PwC changed the second amount to some Mx$ 30.1 million (*see* PwC Reply Apps. L.1, L.4, Ex. C-344; *also* CPF ¶457, note 714), we find that Claimants have failed to provide sufficient evidence and explanation for the difference, and have accordingly based our damage calculation on the originally submitted figure.

[4] Although the appellate court decision declaring Claimants the rightful owners of the disputed land was issued in August 2004 (*see* Ex. C-308), there is evidence that the actual enforcement of the judgment and the farmer's eviction from Claimants' land did not take place until later that year (*see, for example,* Ex. C-309); we thus apply the 5% compound interest rate over a four-year period from the date when these costs were incurred back to the Closing date.

102

*   *   *

d.   *Claimants' Losses and Respondents' Final Liability*

255.   Based on the above findings, the total discounted value of RIMSA's post-Closing losses can be determined by adding together the US$1,417,233.56 representing the losses suffered in connection with the SECODAM investigation, the US$1,615,245.83 representing RIMSA's actual post-Closing remediation costs, and the US$3,628,735.57, representing the losses resulting from undisclosed and unreserved-for pre-Closing financial liabilities. The total is US$6,661,214.96 and it represents the discounted value, at Closing, of the company's undisclosed liabilities. The 90% of this total discounted value – representing the 90% interest in RIMSA purchased by Claimants, and thus the total direct losses Claimants incurred when they purchased RIMSA's controlling stake — is US$5,995,093.46, against which must be applied the 40% rate corresponding to Respondents' liability, as provided for in Section 7.05 of the SPA. The end result is an award of compensatory damages in favor of Claimants in the amount of US$2,398,037.38.

14.   **_The EBITDA Claim_**

256.   With regard to the calculations of the 2000 EBITDA, the Parties agreed to appoint an independent accountant and, on May 24, 2005, they appointed Mr. Bernardo Soto Peñadiel, CPA, a Partner in the firm of BDO Seidman Hernández Marrón y Cía, S.C. On November 29, 2005, Mr. Soto determined that Respondents were required to pay Claimants Mx$37,333,000 because of the EBITDA shortfall; converted to US dollars at the exchange rate of Mx$9.6 to US$1, this amount equals US$3,888,854.17, to which Claimants are entitled. This amount (Mx$37,333,000 or US$3,888,854.17) will be directly debited to and reduced by the "Withholding Fund" of Mx$8,424,000 –as expressly provided for in Section 1.5(e) of the SPA, in combination with Section 1.1(a)(i)(B)— leaving the total amount due of Mx$28,909,000, which, converted to US dollars, equals US$3,011,354.17; this amount represents the final amount of Claimants' EBITDA entitlement. The Tribunal, therefore, takes note of Mr. Soto's report of November 29, 2005, finds no reason to question its

103

reasoning or conclusions and orders Respondents to pay Claimants US$3,011,354.17 (the amount determined by Mr. Soto, after application of the exchange rate established in Section 10.13 of the SPA, and after reduction by the amount of the Withholding Fund), plus interest at the rate of 5% per annum (as determined *infra, see* under VI.B.6) from seven business days after receipt by Respondents' counsel of Mr. Soto's report, or December 9, 2005, until the date of payment. *See* SPA, Section 1.5 (f) (iii).

15.    *The Pre-Award Interest Claim*

257.    That Claimants are entitled to pre-award interest on the amount of damages awarded by this Tribunal, is, in our view, beyond question, notwithstanding the absence of a provision in the SPA (*see also* <u>Arove Skanska v. Lockhead Aircraft Int'l AG, ICC Case No. 3903 of 1981</u> (awarding interest as element of compensatory damages, irrespective of the absence of a contractual provision in that effect)). Interest represents an element of the damage suffered by the aggrieved party and, as the Supreme Court has put it, "[i]t is a dictate of natural justice, and the law of every civilized country, that a man is bound in equity, not only to perform his engagements, but also to repair all the damages that accrue naturally from their breach..." (*see* <u>Spalding v. Mason, 161 U.S. 375, 396 (1896)</u> (quoting *Curtis v. Innerarity,* 47 U.S. (6 How) 146, 154 (1848)).

258.    The availability and rate of interest awards in civil lawsuits vary significantly from nation to nation. Claimants are correct in pointing out (*see* CPCL ¶¶179-180) that, under the law of New York, "...prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract" (*see* <u>Adams v. Lindblad Travel, Inc., 730 F.2d 89, 93 (2d Cir. 1984)</u>; *also* N.Y. C.P.L.R. 5001(a) (McKinney Supp. 2005)). Claimants are also correct in stating that the statutory rate of pre-judgment interest in New York is established at nine percent per annum (9%) (*see* N.Y. C.P.L.R. 5004 (McKinney 1992).

259.    Nevertheless, Claimants fail to substantiate the underlying assumption of their interest claim – that New York law governs the award of interest in this arbitration. There is no doubt that New York law governs the construction and interpretation of the SPA (SPA

104

Section 10.4). This agreement by the parties does not extend to their joint agreement as to the applicability of Section 5004 of the Civil Practice Law abd Rule (CPLR) of the State of New York. The CPLR governs "the civil procedure in the courts of New York" and not in procedure in the courts of New York" and not in arbitration proceedings taking place in New York, other than as provided for under Article 75 of the CPLR. As a result, although we have applied New York law to the interpretation of the SPA, we do not consider ourselves compelled to apply the New York C.P.L.R. interest rate of 9%, as Claimants urge. Since that rate was fixed by statute over 20 years ago, the 9% rate inevitably bears no relation to existing market rates.

260.    The Tribunal opts, instead, for an interest rate that approximates market rates since the Closing date for the currency (US$) in which damages are awarded. After a careful review of all the circumstances of this case, as well as of relevant precedents in international arbitration, the Tribunal finds it to be just and reasonable to allow pre-award interest at the rate of five percent (5%) per annum. See *Award in ICC Case No. 2930 of 1982*, IX Y.B. Comm. Arb. 105, 107-08 (1984) (awarding interest at Swiss statutory rate, notwithstanding fact that law governing contract was Yugoslav); *Final Award in ICC Case No. 5460 of 1987*, XIII Y.B. Comm. Arb. 104, 109 (1988) (applying statutory rate of interest prescribed by Austrian law, to debt in Austrian schillings, despite the application of English contract law to the contract and despite the English arbitral situs). *See also* G. Born, *International Commercial Arbitration* 905-07 (2d ed. 2001); and Branson & Wallace, *Awarding Interest in International Commercial Arbitration*, 28 Va. J. Int'l L. 919, 920, 924 (1988).

261.    Accordingly, the Tribunal determines that Claimants are entitled to pre-award interest at the rate of five percent (5%) per annum with respect to the damages awarded for the breach by Respondents of the warranties under the SPA. This interest is to be calculated and due from the time that the warranties were breached and Claimants are considered to have suffered their injuries, i.e., the Closing date, when they overpaid for RIMSA (November 15, 2000), until the date of payment of the award or until the date on which a judgment for the enforcement of the award is entered in a court of competent jurisdiction. In

the latter case, local law governing interest on judgments can be expected to be applied, by the court entering the judgment, in place of the interest provided for in this paragraph.

16.    *The pagarés and the Escrow Account*

262.    Upon issuance of this Award, the contractual obligations underlying the two *pagarés* delivered to Respondents pursuant to Sections 1.1(a)(i)(C) and 1.1(a)(i)(E) of the SPA, will be cancelled: Respondents will no longer have the right to seek the payment of Mx\$20,592,000 (or US\$2,145,000) payable to them under each of the two *pagarés* (in total, Mx\$41,184,000 or US\$4,290,000), nor of any interest that these amounts have borne pursuant to Section 1.1(a)(i)D) of the SPA. Thus, upon issuance of the award, the *pagarés* will no longer be enforceable by the Respondents. Claimants' outstanding obligations to make any payments under the SPA are hereby definitively terminated and Respondents are hereby ordered to discontinue any litigation that may be pending before the Mexican courts for the enforcement of the two *pagarés* and to refrain in general from any enforcement action with respect to the *pagarés* in the future. The Tribunal's authority to order the termination of Claimants' outstanding payment obligations under the SPA and the discontinuance of any proceeding initiated in Mexico for the enforcement of the *pagarés* emanates from the broadly worded arbitration agreement itself, granting the Tribunal the jurisdiction to decide "any dispute, controversy or claim arising out of or *relating to*" the SPA (*see supra* at ¶¶74-75).

263. The Tribunal also orders the release to Claimants of the balance in the escrow account at the Banco Mercantil Del Norte S.A. Institucion De Banca Multiple, Grupo Financiero Banorte, pursuant to Section 1.2 of the SPA. According to the parties' own agreement, that amount (Mx\$46,800,000 or, converted into US\$ at a rate of Mx\$9.6 to US\$1, US\$4,875,000) was intended to "serve as security for any claims that Buyer may have against Seller under the indemnification provisions of the [SPA]" (Section 1.2 of the SPA). The Tribunal finds that Claimants are entitled to the entire amount found in the escrow account at the date of its release to Claimants, including any interest the escrow account has borne from 2000 until the date the funds contained therein are actually released to Claimants. Therefore, upon the issuance of the Award, the entirety of this amount is

106

ordered to be returned to Claimants in payment of part of the damages to which they are entitled under this Award. The Tribunal also orders Respondents to consent to and refrain from taking any action that would pose any impediment to the release of the funds from the escrow account to Claimants.

264. We note that the Mx$41,184,000 (or US$4,290,000, plus any interest accrued) of Claimants' outstanding obligations under the *pagarés* – which are therefore canceled pursuant to this Award — and the Mx$46,800,000 (or US$4,875,000, plus any interest accrued) originally placed in the escrow account as security for Claimants' claims under Section 1.2 of the SPA –which the Tribunal finds should be released to Claimants— will set off *pro tanto* damages awarded to Claimants under this award (compensatory damages and EBITDA compensation, plus interest accrued on both claims until the payment of the award). As we have noted above (*see supra* at ¶213), these amounts were part of the purchase price to be paid by Claimants for the acquisition of RIMSA's 90% controlling stake and, thus, cannot be returned to Claimants separate from or *in addition to* their indemnification entitlements under the SPA: these amounts essentially represent amounts due to Respondents under the SPA and their cancellation or return to Claimants will simply counterbalance dollar for dollar any award of damages due to them by Respondents. Especially as far as the escrow account is concerned, it was originally intended to "serve as security" for any claims Claimants might have against Respondents. It was the parties' contemplation and intent, therefore, to satisfy any claims the Buyer would have against the Seller, from the funds placed in this account. By ordering the release of the escrow funds to Claimants, the Tribunal simply enforces the parties' contractual arrangement.

265. It is self-evident, however, that if for any reason Claimants should have to pay any portion of the Mx$41,184,000 (or US$4,290,000) under the *pagarés* or if they do not, for example obtain any portion of the escrow funds, because of Respondents' opposition to their release – then there will be no set-off and Respondents will have to pay the entire amount of the damages awarded to Claimants. In other words, Claimants have an independent entitlement to damages for their injury in the amounts found above; the cancellation of their outstanding obligations underlying the *pagarés* and the release of the

107

escrow funds will, upon Claimants' receipt of the benefits of the Tribunal's disposition with regard thereto, set off this entitlement.

266. The Tribunal, therefore, orders the cancellation of Claimants' outstanding payment obligations (in the amount of US$4,290,000, plus any interest accrued pursuant to Section 1.1(a)(i)(D)) under the *pagarés*, which will no longer be enforceable by Respondents. The Tribunal also orders the release to Claimants of the Mx$46,800,000 (or US$4,875,000) placed in the escrow account pursuant to Section 1.2 of the SPA, along with any interest accrued until the date of its actual release to Claimants. Respondents are ordered to refrain from either continuing any litigation in the Mexican courts for the enforcement of the *pagarés* or posing any obstacle in the release of the escrow funds.

17.  *The Exchange Rate Adjustment Claim*

267. The Tribunal finds that Claimants are not entitled to an exchange rate adjustment as they claim (*see* CPCL ¶¶182-187). The transaction was done in U.S. dollars and the risks of currency fluctuations relating to U.S. dollars were to be borne by each of the parties on its own. Claimants' claim with respect thereto is therefore denied.

18.  *The Joint and Several Liability Claim*

268. Respondents have also sufficiently rebutted Claimants' joint and several liability claim. There is insufficient persuasive evidence of a conspiracy involving Vargas and Waste Management to defraud Claimants. Therefore, the claim for Respondents' and Waste Management's joint and several liability for the full amount of Claimants' benefit-of-the-bargain damages (*see* CPCL ¶¶191-192) is also rejected.

## VII.  RESPONDENTS' COUNTERCLAIM

269. Section 1.1(a)(i)(F) of the SPA provides that Respondents will receive Mx$20,592,000 "...only when either [RIMSA] or Confinamina receive a permit from the appropriate Mexican authorities permitting such entities to use and operate as a hazardous waste landfill at least 700 hectares of flat land comprised in Lot No 39 ..., provided that if

108

such permit is not received within 5 years from the Time of Closing, the payment due shall cease to be due…". The same section states that RIMSA and Confinamina agree to provide Respondents with their "reasonable co-operation in pursuing the permit application" and accept responsibility "for the costs incurred in preparing, filing, prosecuting and supporting the permit application" (Section 1.1(a)(i)(F)).

270.    Respondents claim that Claimants breached that section of the SPA by failing to provide Respondents with their reasonable cooperation in pursuing the application for a landfill operation permit on Lot 39 (*see* RPF ¶¶451-453). Respondents claim in particular that Claimants essentially disregarded Respondents' various requests made to RIMSA for such cooperation, in and after 2002 (*see* Ex. C-155), with the result that the permit was not received within the 5 years after the Closing Date and no opportunity was afforded to Respondents to receive the Mx\$20,592,000 provided for under the SPA to be paid upon the receipt of the permit by RIMSA.

271.    Claimants, on the other hand, concede that they decided "to suspend cooperation pending the outcome of this arbitration" (*see* CPCL ¶195; CPF ¶516). They justify their decision, however, by claiming that their cooperation was reasonable within the meaning, and therefore not a breach, of Section 1.1.(a)(i)(F) (*see* CPCL ¶¶193-195).

272.    We agree with Claimants. The record before the Tribunal shows no bona fide effort by the Respondents to seek a permit for the use and operation of Lot 39 as a landfill or to pursue, with reasonable diligence, the cooperation of Claimants in such an effort. Respondents sent their first letter to Claimants in September 2002, after the Claimants had filed a Request for Arbitration in May 2002. Respondents' initial request was met with Claimants' expressions of willingness to co-operate, to the extent necessary, with Vargas in the application process (*see* Exs. C-158, 160).   Claimants, however, requested more specifications as to the technical studies proposed to be conducted, before they were willing to disburse any funds to Vargas to finance those studies.  This response did not constitute a failure to cooperate.

109

273.    Moreover, Vargas provided no response to Claimants' request for more specifications concerning the proposed technical studies until January 2003, when he sent a letter to Claimants demanding transfer of the title to Lot 39 from Confinamina to RIMSA within two months and an initial payment of Mx$480,000 within eight days to pay experts to conduct unspecified "technical studies" (*see* CPF ¶515; Ex. C-160). Vargas' request again lacked any specific information as to the nature of the studies he intended to conduct on Lot 39 or how they would have assisted in the preparation of the permit application. Claimants rejected Vargas' request and informed him that they were deferring consideration of his demands, in view of the pendency of the arbitration.

274.    There is no evidence that Vargas pursued the matter of the permit application any further with the Claimants or that he provided them with the requested specifications. Vargas' next move was to simply present his counterclaim in the arbitration proceedings, one year after his request to Claimants for the payment of Mx$480,000: in his Opening Memorial, submitted in January 2004, he argued that Claimants breached the SPA by failing to cover the costs of preparing a permit application for Lot 39 and to provide reasonable assistance in pursuing the application, and requested that the Tribunal order Onyx either to cooperate in obtaining the permit that Vargas was allegedly preparing, or to pay Vargas Mx$20,592,000 in damages, because the eventual lapse of the 5-year period was only attributable to Claimants' unreasonable stance and not to Respondents' lack of due diligence (*see* ROM ¶46).

275.    We do not agree with Respondents. As we have stated above, there are no indications of a genuine intent or a good faith effort on behalf of Vargas to pursue a landfill operation permit application either in September 2002 or in January 2003. At no point did Vargas furnish Claimants with a precise description of the studies he proposed to conduct on Lot 39, in order to convince Claimants of the necessity for those studies. Although, as we have found above, Claimants were not fraudulently induced into entering into the SPA by Respondents, nor did Respondents commit a material breach of the SPA that would automatically excuse Claimants from their further performance obligations under the SPA (*see* CPCL ¶196), Claimants' overall response to Vargas was not unreasonable under the

110

circumstances.    Taking the opposite stance (i.e., complying with Vargas' request and accepting to finance vague technical studies on Lot 39) would, at that time, have been unreasonable and, as Claimants pointed out in their response to Vargas (*see* Ex. C-161), "illogical". We therefore deny the relief sought in Respondents' counterclaim in its entirety.

## VIII.  LEGAL FEES AND COSTS

276.    Both Claimants and Respondents were ably represented by counsel. Although we are not unduly swayed by the amount of resources invested by Claimants in the representation of their claims in this arbitration, we conclude that an order for each party to bear its own attorneys' fees and arbitration costs, would be unfair and also contrary to an express SPA mandate: Section 10.9 of the SPA provides that where a "legal action or other proceeding is brought for the enforcement" of the SPA, "the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action." Article 31 of the Rules also vests the Tribunal with the power to "fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties".

277.    We interpret the key term "reasonable" in Section 10.9 of the SPA to mean that reasonable fees and other costs do not include compensation for time devoted to this arbitration by certain RIMSA officials, managers and executives. We know that a large amount of fees and costs asserted by Claimants to have been incurred by them in the prosecution of this case, and that they are represented as not being duplicative of any of the costs incurred by Claimants in a related arbitration against Waste Management involving a dispute under a contract understood to be similar to the SPA herein.    Notwithstanding the fact that this matter has involved complex and contentious issues, we find that the amount requested by Claimants for such costs to be reasonable for purposes of imposing on Respondents the burden of paying them to be one-half of those costs claimed. We believe, however, that Respondents should bear the entire burden of the costs of this arbitration as may be fixed by the ICC Court of Arbitration. In making this award, we take into account the fact and consequences of the Respondents' defiance of the Tribunal's procedural order by seeking the enforcement of the *pagarés* in the Mexican courts.

111

278.    We therefore order that Respondents, apart from bearing their own costs and attorneys' fees, cover one half (50%) of Claimants' attorneys' fees related to the present arbitration and thus to pay to Claimants the amount of €2,943,624.40, in euros, at the exchange rate on the day of payment, along with interest computed at the rate of five percent (5%) per annum from the date of the Award to the date of full payment. We also order Respondents to pay all of the costs of this arbitration, as determined by the ICC Court of Arbitration.

## IX.    SUMMARY

279.    In summary, Claimants' are hereby awarded the following relief:

(a)  For damages relating to 1. Respondents' failure to disclose the threat of the SECODAM investigation, 2. Claimants' environmental remediation claims and 3. the breach of financial warranties, Respondents are ordered to pay to Claimants the amount of US$2,398,037.38, plus simple (not compounded) interest at the rate of five percent (5%) per annum, to be calculated from the Closing date until the payment of this award by Respondents.

(b)  In connection with the EBITDA adjustment reflected in the November 2005 determination of the expert appointed by the Tribunal (Mr. Soto, of the firm of BDO Seidman Hernández Marrón y Cía, S.C.), Respondents are ordered to pay to Claimants the amount of US$3,889,062.50 plus simple (not compounded) interest at the rate of five percent (5%) per annum from December 9, 2005 to the date of payment;

(c)  For attorneys' fees and costs in connection with Claimants' pursuit of these proceedings, Respondents are ordered to pay to Claimants €2,943,624.40 plus simple interest (not compounded) at the rate of five percent (5%) per annum from the date of this Award until the date of payment to Claimants;

(d)  Respondents shall also pay to Claimants the amount of $280,000, representing 50 percent (50%) of the costs of arbitration as fixed by the International Court of Arbitration of the ICC, of US$560,000;

112

(e)  Claimants' outstanding payment obligations under the *pagarés* (in the face amount of US$4,290,000, plus any interest accrued pursuant to Section 1.1(a)(i)(D) of the SPA) are hereby cancelled. The amounts due and owing from the Respondents as set forth above shall thus be reduced by US$4,290,000 (representing the face amounts of the *pagarés* referred to in Section 1.1 (a)(i)(C) and (E) of the SPA as converted to US dollars at the contractually stipulated rate of 9.6 Mexican pesos per US dollar), plus any interest accrued pursuant to Section 1.1(a)(i)(D) of the SPA;

(f)  The amounts due and owing from the Respondents as set forth above shall be further reduced by such amount as is presently held in escrow pursuant to Section 1.2 of the SPA, which amount (Mx$46,800,000 or US$4,875,000, along with any interest accrued until the date of its actual release to Claimants) shall be immediately released to Claimants, upon the issuance of this Award. The parties are hereby instructed to take all appropriate measures to secure payment of this amount, including any accumulated earnings, to the Claimants in partial satisfaction of this Award.

(g)  Respondents are hereby instructed to take no action with respect to any enforcement of the *pagarés* in light of this Tribunal's determination hereby that the obligations underlying the *pagarés* are terminated and that the *pagarés* shall no longer be enforceable by Respondents.

(h)  Respondents' counterclaim is denied, and, all other claims for relief by any party are hereby denied.

113

Place of Arbitration: New York, New York, U.S.A.

Date: _April 5_ , 2007

_Lawrence W. Newman_

Lawrence W. Newman

Chairman of the Tribunal

_Steven Hammond_

Steven Hammond

Arbitrator

_Job Taylor III_

Job Taylor III

Arbitrator

114