# AGREEMENT FOR THE PURCHASE OF STOCK OF

# RESIDUOS INDUSTRIALES MULTIQUIM, S.A. DE C.V.

### DATED *Aug ust 24*, 2000

## BY AND AMONG

## COMPAGNIE GENERALE D'ENTREPRISES AUTOMOBILES S.A. / SARP INDUSTRIES S.A.

## AND

## HECTOR VARGAS GARZA

## AND

## VALORES ECOLOGICOS S.A. DE C.V.



10092927.2



ONYX / Vargas Arbitration
**Claimants'**
**Exhibit**
**C001**

CGEA0040449

# TABLE OF CONTENTS

Page

Recitals.................................................................................................................... 1

Agreements ............................................................................................................ 2

ARTICLE I TRANSFER; CLOSING ...................................................................... 2

Section 1.1    Transfer of Shares; Other Transactions; Closing Procedures. ........ 2
Section 1.2    Escrow
Section 1.3    Time and Place of Closing. ................................................................ 7
Section 1.4    Closing Delivery ................................................................................ 4

ARTICLE II REPRESENTATIONS AND WARRANTIES OF THE SELLER ...... 16

Section 2.1    Organization. .................................................................................... 16
Section 2.2    Agreements with Respect to the Shares. ........................................ 17
Section 2.3    Authority; Absence of Liens. ............................................................ 18
Section 2.4    Absence of Conflicts with Other Agreements................................... 19
Section 2.5    Capitalization;Title to the Shares. .................................................. 20
Section 2.6    Financial Statements. ...................................................................... 22
Section 2.7    Compliance with Laws by the Company. .......................................... 23
Section 2.8    Receivables of the Company; Inventory. .......................................... 25
Section 2.9    Tax and Social Security Matters. ...................................................... 26
Section 2.10  Licences, Permits and Proprietary Rights of the Company............... 29
Section 2.11  Adequacy of the Company's Assets: the Company's Relationships with its
              Customers and Suppliers. ................................................................ 32
Section 2.12  Liabilities of the Company: Net Worth of the Company. .................... 33
Section 2.13  Environmental Matters. .................................................................... 21
Section 2.14  Absence of Certain Acts or Events.................................................... 26
Section 2.15  No Adverse Change............................................................................ 27
Section 2.16  Real Property and Leases .................................................................. 27
Section 2.17  Personal Property .............................................................................. 29
Section 2.18  Employment ....................................................................................... 29
Section 2.19  Contracts, etc ..................................................................................... 31
Section 2.20  Litigation ............................................................................................ 34
Section 2.21  Affiliate Transactions ......................................................................... 34
Section 2.22  Liability for Services and Products .................................................... 35
Section 2.23  Insurance ........................................................................................... 35
Section 2.24  Brokers .............................................................................................. 36
Section 2.25  Omissions .......................................................................................... 36

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE BUYER ...... 51

Section 3.1    Organization. .................................................................................... 51
Section 3.2    Authority. ......................................................................................... 51
Section 3.3    Absence of Conflicts with Other Agreements................................... 38
Section 3.4    Brokers ............................................................................................. 38

10092927

ARTICLE IV ADDITIONAL AGREEMENTS OF THE SELLER AND THE COMPANY ..... 39

    Section 4.1   Access to Properties and Records of the Company ....................................... 39
    Section 4.2   Conduct of Business Pending the Closing. ................................................. 39
    Section 4.3   Liability for Expenses. ............................................................................... 41
    Section 4.4   Consultation and Notice of Developments. ................................................ 41
    Section 4.5   Exclusivity ................................................................................................. 41
    Section 4.6   Confidentialy .............................................................................................. 42

ARTICLE V ADDITIONAL AGREEMENT OF THE BUYER ....................................... 43

    Section 5.1   Liability for Expenses. ............................................................................... 43
    Section 5.2   Maintenance of Insurance and Bonds ....................................................... 43
    Section 5.3   Best Efforts After Closing .......................................................................... 43

ARTICLE VI ADDITIONAL AGREEMENTS OF ALL PARTIES ................................ 44

    Section 6.1   Commercially Reasonable Efforts .............................................................. 44
    Section 6.2   Public Announcements ............................................................................... 44
    Section 6.3   Termination by Mutual Agreement ............................................................ 55

ARTICLE VII INDEMNIFICATION .............................................................................. 46

    Section 7.1   Indemnification by Buyer ........................................................................... 46
    Section 7.2   Survival; Right to Indemnification Not Affected by Knowledge .............. 46
    Section 7.3   Indemnification by Seller ........................................................................... 47
    Section 7.4   Time Limitations ........................................................................................ 48
    Section 7.5   Limitations on Amounts. ............................................................................ 62
    Section 7.6   Procedure for indemnification. .................................................................. 49
    Section 7.7   Insurance. ................................................................................................... 50
    Section 7.8   Set Off. ....................................................................................................... 50
    Section 7.9   Joint and Several Liability .......................................................................... 50

ARTICLE VIII CONDITIONS PRECEDENT TO OBLIGATIONS OF THE SELLER .......... 51

    Section 8.1   Accuracy of Representations and Warranties. ........................................... 51
    Section 8.2   Compliance with Obligations. .................................................................... 51
    Section 8.3   Buyer's and Company's Certificate of Fulfillment. .................................. 51
    Section 8.4   Ancillary Stock Purchase Agreement ........................................................ 52
    Section 8.5   Releases. .................................................................................................... 52
    Section 8.6   Absence of Actions or Proceedings ........................................................... 52
    Section 8.7   Evidence of Insurance. ............................................................................... 53
    Section 8.8   Non-Competition Agreement. .................................................................... 53
    Section 8.9   Withholding ................................................................................................ 53
    Section 8.10 Mexican Federal Competition Commission ............................................... 53

ARTICLE IX CONDITIONS PRECEDENT TO OBLIGATIONS OF THE BUYER AND THE
COMPANY ..................................................................................................................... 54

    Section 9.1   Accuracy of Representations and Warranties. ........................................... 54
    Section 9.2   Compliance with Obligations. .................................................................... 54
    Section 9.3   No material Adverse Changes ..................................................................... 54
    Section 9.4   Seller's Certificate of Fulfillment. ............................................................. 55

100929217

CGEA0040451

Section 9.5   Ancillary Stock Purchase Agreement..................................................... 55
Section 9.6   Release........................................................................................................ 55
Section 9.7   Absence of Actions or Proceedings......................................................... 55
Section 9.8   Non-Competition Agreement................................................................. 56
Section 9.9   Other deliveries ........................................................................................ 56
Section 9.10  Satisfactory Action .................................................................................. 56
Section 9.11  Mexican Federal Competition Commission........................................ 56

ARTICLE X OTHER PROVISIONS............................................................................... 57

Section 10.1   Survival of Representations and Warranties. ...................................... 57
Section 10.2   Extension/Waiver. ................................................................................... 57
Section 10.3   Notices........................................................................................................ 57
Section 10.4   Governing Law........................................................................................... 58
Section 10.5   Binding Effect. .......................................................................................... 58
Section 10.6   Entire Agreement. .................................................................................... 59
Section 10.7   Severability of Provisions. ...................................................................... 59
Section 10.8   Execution in Counterparts. .................................................................... 59
Section 10.9   Attorney's Fees; Costs of Litigation. .................................................... 59
Section 10.10  Headings. ................................................................................................... 60
Section 10.11  Limitation of Rights to Parties. ............................................................ 60
Section 10.12  Arbitration................................................................................................. 60
Section 10.13  Payments in Dollars................................................................................. 61
Section 10.14  Succession and Assignment..................................................................... 61
Section 10.15  Interpretation............................................................................................ 61
Section 10.16  Further Requests. ..................................................................................... 63

EXHIBIT A Financial Statements

EXHIBIT B Form Of Ancillary Stock Purchase Agreement

EXHIBIT C Form Of General Release

EXHIBIT D Form Of Escrow or trustee agreement

EXHIBIT E Form Of Non-Competition Agreement

EXHIBIT F Map of the Land

EXHIBIT G Form of Shareholder agreement

EXHIBIT H RIMSA - Projected Profit & Loss for Year 2000

DISCLOSURE SCHEDULE

100929217

CGEA0040452

## AGREEMENT FOR THE PURCHASE OF STOCK OF
## RESIDUOS INDUSTRIALES MULTIQUIM, S.A. DE C.V.

THIS AGREEMENT (the "Agreement") dated this 25 day of August, 2000 is entered

into by and between Compagnie Générale d'Entreprises Automobiles, S.A. ("CGEA") and

SARP Industries S.A. ("SARPI"), corporations organized under the laws of France (collectively

the "Buyer"); Hector Vargas Garza ("Mr. Vargas") residing at Rio Papaloapan 450, Col. Mexico,

Monterrey NL CP 64740 and Valores Ecologicos S.A. de C.V. ("Valores"), a corporation

organized under the law of the United Mexican States ( collectively the "Seller").

### RECITALS

WHEREAS, Valores is the owner of 3,270,495 common shares (the "Confinamina

Shares") out of a total of 3,270,500 shares representing 100% of the outstanding capital stock of

Immobiliaria Confinamina S.A. de C.V. ("Confinamina"), a corporation organized under the

laws of the United Mexican States and Minera La Fé del Norte SA de CV ("CMN") is the owner

of 5 shares of the common stock of Confinamina ( the "Norte Confinamina Shares") and

Confinamina is the owner of 686 Series B shares of Residuos Industriales Multiquim, S.A. de

C.V., a corporation organized under the laws of the United Mexican States (the "Company") and

42 Series B-V shares of the Company, and of 1,672 Series P shares of the Company which,

collectively, represent 30% of the outstanding shares of common stock of the Company (all such

shares owned by Confinamina being referred to herein as the "Shares") and of approximately

10,200 hectares of land contiguous to the hazardous waste landfill site operated by the Company

in Mina, N.L., Mexico; as indicated on the map attached hereto as Exhibit F., and will within

three years of the Time of Closing own additional surfaces of land to reach an approximate total

of 12,000 hectares contiguous to such hazardous waste landfill site , as also indicated on such

map attached as Exhibit F (the "Land")

10092927.2

Whereas, Mr. Vargas is the owner of 99% or 495 shares out of a total of 500 shares representing 100% of the total outstanding shares of capital stock of Valores, one share each being held by each of Mssrs Hector Vargas Aguirre, Jose de Jesus Vargas Aguirre, Alberto Vargas Aguirre, Guillermo Vargas Aguirre and Eduardo Vargas Aguirre;

WHEREAS, the Seller desires to transfer the Confinamina Shares to the Buyer and the Buyer desires to purchase the Confinamina Shares from the Seller for the purchase price set forth herein;

WHEREAS, in connection with the foregoing, the Company wishes to terminate certain consulting services arrangements with Valores Ecologicos S.A. de C.V., (a complete list of which is indicated in Section 1.1 (ii) A) which the Seller is willing to do, on the terms and conditions set forth herein.

**AGREEMENTS**

In consideration of the premises and the mutual representations, warranties and covenants set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I**
**TRANSFER; CLOSING**

Section 1.1    **Transfer of Shares; Other Transactions; Closing Procedures.**

-2-

CGEA0040454

(a) Subject to the terms and conditions set forth in this Agreement, including fulfillment of the conditions set forth in Articles VIII and IX, the parties agree to take the following actions at the Time of Closing (as defined in Section 1.2):

(i)    Valores will sell, assign, transfer and deliver to the Buyer or its designee the Confinamina Shares embodied in share certificates n° 1 and 3 and will cause CMN to sell, assign, transfer and deliver to the Buyer or its designees the Norte Confinamina Shares embodied in share certificates n° 2 (Certificates 1, 2 and 3 being referred to as the "Certificates"), and all rights related to such Confinamina Shares and Norte Confinamina Shares including all dividend rights and the Buyer or its designees will purchase, and the Buyer or its designees will pay to the Seller therefor cash in the aggregate amount of Mexican Pesos 310,175,000 (the "Purchase Price) payable as follows;

A)   239,975,000 pesos payable in cash at the Closing;

B) an amount of Mexican Pesos 8,424,000 (the "Withholding Fund) will be paid to Seller, if and when due, under sub-section 1.5 (e) Price Adjustment;

C) 20,592,000 pesos on the 18 month anniversary of the Time of Closing, which payment will be evidenced by a promissory note delivered to the Seller at the time of closing by   an adequately capitalized  Mexican Affiliate of the Buyer;

-3-

CGEA0040455

D)  the amounts payable under subsection (C) above and sub-section (E) below shall bear interest from and including the Closing Date but excluding the date of payment at the rate per annum equal to the last published Interbank Equilibrium Interest Rate at  4 weeks (TIIE  28 dias) as calculated and published by Banco de México on the last day of each month minus 2 points . Such interest will be payable within 15 days following the expiration of each calendar month following the Closing Date and shall be calculated on the basis of a 365 day year and the actual number of days elapsed;

E)  20,592,000 pesos on the 36 month anniversary of the Time of Closing which payment will be evidenced by a promissory note delivered to the Seller at the time of closing by an adequately capitalized  Mexican Affiliate of the Buyer Group;

F)   20,592,000 pesos will be payable only when either the Company or Confinamina receive a permit(s) from the appropriate Mexican authorities permitting such entities to use and operate as a hazardous waste landfill at least 700 hectares of flat land comprised in Lot N° 39 which has a surface of 1,630 hectares (as indicated on the map annexed hereto as Exhibit F), which lot is a part of the Land, provided that said permit shall authorize the use of said 700 hectares either under the existing permit applying to the current Mina facility, if necessary decreasing the permitted landfill area of the current Mina facility by an equivalent amount of hilly land contained thereon or under a new permit issued on no less favorable

-4-

conditions than those applicable to the current permit on the Mina landfill, provided that if such permit is not received within 5 years from the Time of Closing, the payment due under this subsection F shall cease to be due, it being agreed that the Company and Confinamina will provide Sellers reasonable co-operation in pursuing the permit application and will be responsible for the costs incurred in preparing, filing, prosecuting and supporting the permit application.

(ii)    the Company will pay to the Seller cash   the amount of :

all unpaid fees as of the Time of Closing under the terms of the Technical Support, Consulting Services Agreement dated as of January 2, 1997, between Deproquim de Monterrey S.A. de C.V. Especializaciones en Ingenieria Ambiental S.A. de C.V., Construcciones e Ingenieria Ambiental S.A. de C.V. and Industrios Multiquim S.A. de C.V. and the Company, as supplemented and revised by addenda dated and assigned to Valores Ecologicos S.A. de C.V. on August 29, 1999 (the "Existing Consulting Services Agreement") due as of December 31, 1999;  provided further that the Company will also pay to the Seller the Value Added Tax (IVA) credited by the Company by reason of services rendered by Valores to the Company during period January-May 2000, the value of which services was capitalized by the Company on July 26, 2000, provided that KPMG confirms that the Company obtained a credit for said IVA and also confirms that the payment to Valores of said IVA presents no tax risks to the Company.

-5-

CGEA0040457

(iii)   the Buyer or its designee will pay to the Seller the amount of Mexican Pesos 18,720,000 as required by the Non-Competition Agreement (as hereinafter defined and annexed hereto as Exhibit E).

(b)    The payments made pursuant to Section 1.1(a)(i), Section 1.1(a)(ii) and Section 1.1(a)(iii) at the Closing shall be made by wire transfer of immediately available funds to such account as shall be specified in writing by the Seller. Valores shall be solely responsible for allocating the payments received among it and its Affiliates.

(c)    The Buyer may withhold the percentage of the price set forth in Section 1.1(a)(i) of this Agreement representing the minimum amount that is required to be withheld in accordance with the income tax laws of the United Mexican States, subject to applicability of such withholding and the Seller's right to review the calculation of any amount proposed to be withheld, if any; provided, that if at or prior to the Time of Closing, the Seller shall have furnished to the Buyer a tax accountant's certification as provided by Mexican income tax law to the effect that the Seller will recognize no gain on its disposition of the Shares pursuant to this Agreement, no amount whatsoever will be withheld by the Buyer.

**Section 1.2    Escrow**

Simultaneously with the closing, the Seller shall deposit, by instructing the Buyer to wire transfer a part of the Purchase Price referred to in Section 1.1 (a) (i) (A), in escrow at the Banco Mercantil Del Norte S.A. Institucion De Banca Multiple, Grupo Financiro Banorte  pursuant to an escrow agreement or trustee agreement fully similar in substance with the text contained in

-6-

CGEA0040458

Exhibit D, the sum of Mexican Pesos 46,800,000 for a duration of five years from the Closing, to serve as security for any claims that Buyer may have against Seller under the indemnification provisions of the Agreement.

Section 1.3   Time and Place of Closing.

The consummation of the transactions contemplated by this Agreement (the "Closing") will take place at 10:00 a.m., local time, on the fifth business day after all conditions set forth in Articles VIII and IX are satisfied (the "Time of Closing"), at the offices of Waste Management, Inc. ( WMI) in Houston, Texas, United States, or at such other time and place as the parties hereto may agree upon in writing. Failure to consummate the purchase and sale on the date, and time and at the place determined pursuant to this section will not result in the termination of this Agreement and will not relieve any party of any obligation under this Agreement.

-7-

**Section 1.4    Closing Deliveries**

(a) At the Closing, Seller will deliver to Buyer :

(i)    Duly executed stock certificates in valid form representing the Confinamina Shares and the Norte Confinamina Shares, duly endorsed.

(ii)    A certificate signed by the Seller, certifying that the representations and warranties of Seller contained herein are correct and complete in all material respects on and as of the Closing Date.

(iii)    Signed resignations and releases of the members of the Board of Directors of the Company and Confinamina named by Seller.

(iv)    A signed Non-Competition Agreement identical to Exhibit E hereto.

(v)    A release signed by Mr. Vargas, Valores, CMN, their Affiliates and all other shareholders of Confinamina and the Company releasing Confinamina, the Company, Chemical Waste Management and its Affiliates from all rights of action, claims, debts and obligations, and a release signed by Valores Ecologicos S.A. de C.V. releasing the Company from all obligations under the Existing Consulting Services Agreement.

(vi)    Minutes of a meeting of the Shareholders of the Company naming four persons chosen by the Buyer, and one person chosen by the Seller and their alternates to the Board of Directors of the Company which shall thereafter be

CGEA0040460

composed of five persons, and minutes of a meeting of the shareholders of Confinamina naming the persons chosen by Buyer to the Board of Directors of Confinamina which shall thereafter be composed only of persons named by the Buyer.

(vii)    Signed Shareholder Meeting minutes validly deciding the modification of the charter documents of the Company in form and substance satisfactory to the Buyer and giving a person chosen by Buyer power of attorney to formalize these minutes before a notary and to record them in a public deed.

(viii)    Minutes of meetings of the Board of Directors and Shareholders of the Company authorizing the sale of the Shares from Mr. Vargas to Valores and from Valores to Confinamina, waiving pre-emptive shareholder rights to acquire the Shares, revoking all existing proxies and granting new proxies as determined by the Buyer, and minutes of a meeting of the Shareholders confirming all prior action taken by the Shareholders and minutes of meetings of the Board Directors and Shareholders of Confinamina authorizing the sale of the Confinamina Shares to Buyer, revoking all existing proxies and granting new proxies as determined by the Buyer.

(ix)    The Stock Register Book of the Company and a Certificate signed by the Secretary of the Company attesting the inscription of the Shares in the name of Confinamina and the Stock Register Book of Confinamina and a certificate signed by the Secretary of Confinamina attesting the inscription of the

-9-

CGEA0040461

Confinamina Shares and Norte Confinamina Shares in the name of Buyer or its designee, as well as the originals of the stock certificates of the Shares in the name of Confinamina.

(x)    A certificate signed by the chief financial officer of the Company attesting to the amount of all debts owed to and all payments made to Seller or other shareholders and their Affiliates between January 1, 2000 and the date of the Closing.

-10-

(xi)    A duly executed Shareholders Agreement identical to Exhibit G.

(xii)    A duly executed Escrow Agreement or trustee agreement fully similar in substance with the text comtained in Exhibit D.

(xiii)    Any other items required to be delivered by Seller, as appropriate under the terms and provisions of this Agreement.

(xiv)    A certified copy of the notice or any applicable document provided to the Company pursuant to the terms of article 26 paragraph XI of the federal Mexican Tax code (Codigo fiscal de la federacion") which releases the Company from potential liability set forth in such article 26 paragraph XI by reason of the recording of Valores and Confinamina as a shareholders of the Company.

(b) At the Closing, Buyer shall deliver to Seller:

(i)    A certificate signed by an executive officer of Buyer, certifying that the representations and warranties of Buyer contained herein are correct and complete in all material respects on and as of the Closing Date.

(ii)    Confirmation of the wire transfer of same day funds as required by clause 1.1(b) above to Seller

(iii)    The promissory notes referred to in Section 1.1 (a) (i) (C) and (E).

(iv)    Any other items required to be delivered by Buyer or other persons, as appropriate under the terms and provisions of this Agreement.

(v)    A signed Non-Competition Agreement identical to Exhibit E hereto.

(c) At the Closing, the Company shall deliver to Seller

(i)    The executed release provided for in Section 8.5

. VG.

-11-

CGEA0040463

      (ii)     Signed agreements in form and substance reasonably satisfactory to Buyer and Seller between the Company and the following Seller Affiliated companies: Operadora Industrial Administrativa SA de CV (Personnel administration), Trans Quimica National SA de CV ("TQN") (Freight services), Valores (Management services – 400 000 $US per year from the Closing), Operaciones Inmobiliarias Orva SA de CV (Backhoe rental) and Mr. Vargas (Warehouse rental).

### Section 1.5    Adjustment to Purchase Price based on Fiscal Year 2000 EBITDA

(a) If Earnings Before Interest, Taxes, Depreciation and Amortisation ("EBITDA") of the Company for the calendar year 2000 ("Actual EBITDA") are less than Mexican Pesos 170,409,500 ("Target EBITDA") as per ExibitH, then the amount paid by the Buyer for the Confinamina Shares pursuant to Section 1.1 (a) (i) shall be decreased by an amount equal to 30% of five (5) times the difference between Target EBITDA and Actual EBITDA (the "Price Decrease").

(b) As promptly as practicable, but no later than 180 days after the Closing Date the Company will cause to be prepared and delivered to each the Buyer and the Seller, an audited statement of the results of the operations of the Company for the twelve months ended December 31, 2000, the Company's calculation of Actual EBITDA as derived from such statement together with a certificate of an officer of the Company attesting to the accuracy of said calculation, which shall be made in accordance with Mexican GAAP applied on a basis consistent with prior periods and with Exhibit H hereto – "RIMSA-Projected Profit & Loss for Year 2000". the column labeled "Sub-Total 2000 Projected".

-12-

CGEA0040464

For purposes hereof, EBITDA shall mean the sum of (i) Earnings Before Interest and Taxes (without deducting any amount for profit sharing expense ) plus, (ii) the amounts recorded by the Company for cell amortization, and for depreciation, and shall not take into account any inflation escalation. All EBITDA figures referred to in this paragraph will be calculated to include a 2% technical support fee, but to exclude all other business development and technical assistance fees due to Shareholders, and to exclude any extraordinary expenses associated with remediation of the lagoon, the drum area (also known as distribution center) and the truck park, the first generation cells and the Physico-Chemical treatment and solvent recovery installations and any other expenses due to a major unbudgeted and unnecessary change to the way of doing business (for example: change of corporate logo or consulting services not related to current business) , but shall include payments to Confinamina for raw material such as water, clay and calcium carbonate starting July 1st, 2000, provided that Buyer agrees not to increase any price for the transfer of such raw materials at least until December 31, 2000;

(c) Notice of Disagreement. If either Buyer or Seller disagrees with the Company's calculation of Actual EBITDA delivered pursuant to subsection (b) above, the disagreeing party may, within thirty (30) days after receipt of the documents referred to in subsection (b) above, deliver a notice to the Company and the other party disagreeing with such calculation and setting forth the disagreeing party's calculation of such amount. Failure to deliver such notice of disagreement within such thirty (30) day period shall be deemed to constitute an acceptance of the calculation. Any such notice of disagreement shall specify those items or amounts as to which the party disagrees, and

-13-

CGEA0040465

the party shall be deemed to have agreed with all other items and amounts contained in the calculation of Actual EBITDA delivered pursuant to subsection (b) above.

(d) Settlement of Disagreement. If a notice of disagreement shall be delivered pursuant to subsection (c) above, Buyer, the Company and Seller shall, during the 30 days following such delivery, use their best efforts to reach agreement on the disputed items or amounts in order to determine the amount of Actual EBITDA, which amount shall not be less than or more than the amount thereof shown in the Company's calculations delivered pursuant to sub-section (b) or the disagreeing party's calculations delivered pursuant to subsection (c) above. If, during such period, Buyer, Seller and the Company are unable to reach agreement, they shall promptly thereafter cause the company's firm of independent accountants, Arthur Andersen, to promptly review this Agreement and the disputed items or amounts for the purpose of calculating Actual EBITDA. In making such calculation, such independent accountants shall consider only those items or amounts in the Company's calculation of Actual EBITDA as to which the disagreeing party has contested. Such independent accountants shall deliver to Buyer, the Company and Seller as promptly as practicable, a report setting forth such calculation. Such report shall be final and binding upon Buyer, the Company and Seller. The cost of such review and report shall be borne by Buyer and Seller equally.

(e) If Actual EBITDA equals or exceeds Target EBITDA, the Buyer shall pay the full amount of the Withholding Fund referred to in sub-section 1.1 (a)(i)(B) to the Seller. If Actual EBITDA is less than Target EBITDA, the Price Decrease as defined in sub-section (a) above shall first be debited to the Withholding Fund, the amount so debited shall be retained by the Buyer, and the balance if any shall be paid by the Buyer to the

-14-

CGEA0040466

Seller. If the Withholding Fund is not sufficient to cover the Price Decrease Seller shall pay the difference between the Price Decrease and the Withholding Fund to the Buyer.

(f)  Any amounts payable either by Buyer or Seller shall be due within seven (7) business days from the earliest of :

(i)      A mutual agreement evidenced in writing between Buyer and Seller determining the amount of the Price Decrease;

(ii)     The expiration of the thirty (30) days period for delivery a notice of disagreement referred to in sub-section (c) above without such a notice having been sent by any party;

(iii)    The receipt by Buyer and Seller of the report of the independent accountants referred to in sub-section (d) above.

-15-

CGEA0040467

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer that the statements contained in this Article II are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article II), except as set forth in the disclosure schedule accompanying this Agreement and initialed by the Buyer and the Seller (the "Disclosure Schedule"). The Disclosure Schedule will be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Article II.

**Section 2.1    Organization.**

(a) Valores and CMN are corporations duly organized and legally existing in good standing under the laws of the  United Mexican States, with all requisite corporate power and authority to own, lease and operate their properties including, without limitation, the Confinamina Shares and the Norte Confinamina Shares and to carry on their business as now being conducted and to perform all their obligations under this Agreement and the documents and other transactions contemplated hereby.

(b) Each of Confinamina and the Company is a corporation duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation, the United Mexican States, with full corporate power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use (including the Shares and the Land in the case of Confinamina), and to perform all its obligations under this Agreement and the documents and other transactions contemplated hereby. Each of Confinamina and the Company is duly

-16-

qualified to do business as a foreign corporation and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification.

(c) Each of Confinamina and the Company does not own or control, directly or indirectly, and stock, partnership, joint-venture, equity participation or other interest in any entity or person, except for the Shares of the Company owned by Confinamina.

(d) The books, minute books, stock record books, and other records of the Company and Confinamina, all of which have been made available to Buyer, are complete and correct other than for immaterial errors and have been maintained in accordance with sound business practices. The minute books of the Company and Confinamina contain accurate and complete records of all meetings held of, and corporate action taken by, the stockholders, the Boards of Directors, and committees of the Boards of Directors of the Company and Confinamina, and no meeting of any such stockholders, Boards of Directors, or committee has been held for which minutes have not been prepared and are not contained in such minute books. At the Closing, all of those books and records will be in the possession of the Company and Confinamina.

**Section 2.2    Agreements with Respect to the Shares.**

Other than this Agreement, the letter agreement dated February 15, 1997 between Seller and Waste Management, Inc. regarding the issuance of certain preferred stock, the Stock Purchase Agreement dated January 21, 1994 among Chemical Waste Management, the Seller and certain members of the Seller's family thereto (the "Prior Stock Purchase Agreement"), and

-17-

CGEA0040469

the By-laws of the Company, there are no existing contracts, commitments, understandings, arrangements, or agreements of any nature to which the Seller, Confinamina or the Company is a party or by which it is bound, relating to the sale, delivery or transfer of the Shares or the Confinamina Shares.

Section 2.3    Authority; Absence of Liens.

(a) The Seller, Confinamina and the Company have all necessary power, authority and capacity to execute, deliver and perform this Agreement and each of the other documents and instruments to be delivered by the Seller, Confinamina and the Company pursuant to this Agreement, and to consummate the sale of the Confinamina Shares , the Norte Confinamina Shares and all other transactions contemplated hereby and thereby, and the preceding have been duly authorized by all necessary corporate action on the part of the Seller, Confinamina and the Company. This Agreement has been, and the other documents and instruments to be delivered by the Seller, Confinamina and the Company pursuant to this Agreement will be, duly and validly executed and delivered by the Seller, Confinamina and the Company and each constitutes or will constitute a legal, valid and binding agreement of the Seller, Confinamina and the Company respectively, enforceable against the Seller, Confinamina and the Company in accordance with its terms.

(b) At the Time of Closing, the Confinamina Shares, the Norte Confinamina Shares and the Shares will be free and clear of all liens, claims, pledges, encumbrances, security interests or other rights or restrictions ("Liens"). Except for notification to the Mexican Federal Competition Commission (*Comisión Federal de Competencia*), and the

-18-

CGEA0040470

consent of the shareholders and the Board of Directors of the Company and Confinamina contemplated by the By-laws of the Company and Confinamina, no approvals or consents of any nature of any party or entity are necessary in connection with the transactions contemplated hereby.

**Section 2.4   Absence of Conflicts with Other Agreements.**

(a) The execution, performance and consummation of this Agreement and the other documents and instruments contemplated hereby does not and will not:

(i)   violate, conflict with, result in a breach of or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under:

A) any charter, by-law, agreement (oral or written), organizational documents, corporate resolutions, commitment, covenant, franchise, permit, license or other document to which either the Seller, Confinamina or the Company is a party or by which either the Seller, Confinamina or the Company is bound or to which any of the Seller's or the Company's assets is subject; or

B) any decree, order or rule of any court or governmental authority, or statute, rule or regulation which is binding on the Seller, Confinamina or the Company or on any of their property; or

(ii)   result in the creation of any lien, charge, encumbrance or claim upon any property of the Seller, Confinamina or the Company (including, without

-19-

CGEA0040471

limitation, the Confinamina Shares, the Norte Confinamina Shares or the Shares), or give to others any interest or right in any such property including, but not limited to, a right to purchase such property.

(b) The failure of any person not a party hereto to authorize or approve this Agreement or the transactions contemplated hereby will not give any person the right to (i) enjoin, rescind or otherwise prevent or impede the consummation of the transactions contemplated by this Agreement; (ii) terminate, modify in any respect, or impose a lien under, any agreement, lease, contract, instrument, mortgage, permit, license or franchise to which the Company or Confinamina is a party or by which any of their respective properties are bound; (iii) or to obtain damages from, or any other judicial relief against, Buyer, Confinamina or the Company as a result of the consummation of the transactions contemplated by this Agreement.

Section 2.5    Capitalization; Title to the Confinamina Shares , the Norte Confinamina Shares and the Shares.

(a) The authorized equity securities of Confinamina consist of 3,270,500 common shares, nominative in form and having a par value of Mexican Pesos 100.00 and of the Company consist of 2,000 Series "B" shares, 428 Series "B-V" shares, and 5,572 Series "P" shares. All of the equity securities of the Company and Confinamina have been duly authorized and validly issued and are fully paid and non assessable. There are no contracts, options, rights, or securities of any kind relating to the issuance conversion, sale, or transfer of any equity securities or other securities of the Company or Confinamina.

-20-

CGEA0040472

(b) Valores is the sole owner of record of 3,270,495 common shares of Confinamina and CMN is the sole owner of record of 5 shares of Confinamina, which together represent 100% of the issued and outstanding equity securities of Confinamina. Confinamina is the sole owner of record of 686 Series "B" shares and 42 Series "B-V" shares of the Company which collectively represent 30% of the issued and outstanding shares of common stock of the Company. Valores is the sole owner of record of 229 Series "B" shares and 14 Series "B-V" shares of the Company which collectively represent 10% of the issued and outstanding shares of common stock of the Company. Confinamina is the sole owner of record of 1,672 Series P shares of the Company which represent 30% of the issued and outstanding preferred stock of the Company and Valores is the sole owner of record of 557 Series P shares of the Company, which represent 10 % of the issued and outstanding shares of preferred stock of the Company. Chemical Waste Management, Inc. is the sole owner of record of: 1,085 Series "B" shares and 372 Series "B-V" shares of the Company, which collectively represent 60% of the issued and outstanding shares of common stock of the Company. and Chemical Waste Management, Inc. is the sole owner of 3 343 Series "P" shares of the Company which represent 60% of the issued and outstanding shares of preferred stock of the Company. The said shares constitute all of the issued and outstanding shares of the Company. All of such Confinamina Shares, Norte Confinamina Shares and the Shares have been subscribed and fully paid for and are owned by the Seller, CMN and Confinamina free and clear from any liens, restrictions, options, pledges, encumbrances, charges, assessments, and claims of every kind whatsoever.

-21-

CGEA0040473

(c) The Seller has full power to transfer or cause to transfer absolute title to the Confinamina Shares and the Norte Confinamina Shares, and will at the Closing have full power to transfer or cause the transfer of absolute title to all the Confinamina Shares and the Norte Confinamina Shares to Buyer, free and clear of all restrictions, options, liens, pledges, encumbrances, charges, assessments and claims of every kind whatsoever.

Section 2.6    **Financial Statements.**

Attached hereto as Exhibit A are the following financial statements (collectively the "Financial Statements"): (i) audited balance sheets of the Company and related statements of results of operations and of changes in financial position of the Company as of and for the fiscal years ended December 31, 1997, December 31, 1998 and December 31, 1999, together with the notes relating thereto and the  balance sheet of Confinamina and related statements of results of operations and changes in financial position of Confinamina as of and for the end of the fiscal year ended December 31, 1999, together with notes relating thereto; and (ii) unaudited balance sheets of the Company and Confinamina and related statements of results of operations (the "Most Recent Financial Statements") as of and for the six months ended June 30, 2000, (hereinafter referred to as the "Most Recent Fiscal Month End"). The Financial Statements (including the notes thereto) have been prepared in accordance with  United Mexican States generally accepted accounting principles (hereinafter referred to as "Mexican GAAP") applied on a consistent basis in accordance with past practice throughout the periods covered thereby, except as may be otherwise noted therein.  A reconciliation (the "Reconciliation") between Mexican and U.S. GAAP for the Financial Statements provided by Seller attached hereto as part of Exhibit A, indicates all appropriate adjustments necessary to transform the Financial Statements from being presented in accordance with Mexican GAAP to U.S. GAAP. The

-22-

CGEA0040474

Financial Statements and the Reconciliation fairly present Confinamina's and the Company's financial condition and results of operations as of the dates and for the periods set forth therein (subject, in the case of unaudited statements, to notes and normal year-end audit adjustments), are correct and complete except in immaterial respects and are consistent with the books and records of Confinamina and the Company, which books and records are accurate and complete except in immaterial respects.

Section 2.7    **Compliance with Laws by Confinamina and the Company.**

(a)  Each of Confinamina and the Company has complied with all applicable laws and legal regulations, permits and orders applicable to Confinamina, the Company or their assets, properties or business.  Each of Confinamina and the Company has not at any time received notification of any past or present alleged failure by each of Confinamina and the Company to comply in all material respects with any laws, regulations, permits or orders applicable to each of Confinamina and the Company or its assets, properties or business, which each of Confinamina and the Company has not subsequently rectified, or concerning any actual or potential obligation of each of Confinamina and the Company to undertake or bear costs related to remedial action of any nature.

(b) Each of Confinamina and the Company possesses, and immediately following the Closing each of Confinamina and the Company will possess, all licenses, permits and other governmental approvals with and under all laws, rules and regulations having the force and effect of law required to carry on the business of each of Confinamina or the Company and hold and operate its properties and assets (the "Governmental Approvals").

-23-

CGEA0040475

Schedule 2.7(b) sets forth a list of all Governmental Approvals referred to in the foregoing sentence. All such Governmental Approvals are in full force and effect and will be in full force and effect immediately following the Closing. Each of Confinamina and the Company is not in violation of any Governmental Approval where such violation could have any adverse effect on each of Confinamina's or the Company's business. Except as set forth on Schedule 2.7(b), no proceeding is pending, or to the Knowledge of Confinamina or the Company threatened, to revoke, suspend, materially modify, or require any expense under, any Governmental Approval or deny any renewal or transfer thereof.

-24-

CGEA0040476

**Section 2.8    Receivables of the Company; Inventory.**

(a) Set forth in <u>Section 2.8(a)</u> of the Disclosure Schedule is a complete and accurate list of all receivables of Confinamina or the Company, as May 31, 2000, including accounts receivable, notes receivable and insurance proceeds receivable. All of the receivables either listed thereon or set forth or reflected in the balance sheet as of December 31, 1999 included in the Financial Statements arose in the ordinary course of business and are, as of the dates as of which the information is given therein, valid accounts receivable which have been or will be, within 180 days (or such longer period of time as is customary for the particular account or type of account) after the date thereof, collected in full (less normal early payment discounts) without any set off, except to the extent of any reserve for uncollectible receivables in the balance sheet as of December 31, 1999 included in the Financial Statements. Each of the accounts receivable represents a valid, bona fide, and existing claim, legally enforceable according to its terms, regarding which there is no contest, claim or right of set-off. For purposes of determining whether a receivable of a particular customer has been collected, payments received from that customer shall be applied on a first-in, first-out basis, except for cash on delivery payments and except as otherwise directed by the customer in the case of disputed accounts.

(b) The inventory of Confinamina and the Company consists of raw materials and supplies, manufactured and purchased parts, all of which is merchantable and fit for the purpose for which it was procured or manufactured, and none of which is slow-moving, obsolete, damaged, or defective, subject only to the reserve for inventory writedown set



-25-

CGEA0040477

forth on the face of the Most Recent Financial Statements (rather than in any notes thereto). The values at which the various items of inventory are carried on the books reflect normal inventory valuation policy consistently applied. The quantity of each item of inventory is reasonable in the present circumstances of Confinamina and the Company.

(c) The stock of collected but unprocessed waste held by Confinamina or the Company can be treated in the ordinary course of business without unusual delays.

**Section 2.9    Tax and Social Security Matters.**

(a) Each of Confinamina and the Company has timely filed all Tax Returns required to be filed by it or any affiliated entities for which Confinamina or the Company may become liable for the Taxes thereof, including, without limitation, all federal, state, local and foreign Tax Returns, and such returns are accurate and complete in all material respects. Disclosure Schedule 2.9(a) contains a complete and accurate list of all such Tax Returns filed since January 1, 1997 and Seller has delivered a copy of such Tax Returns to Buyer. Each of Confinamina and the Company has paid in full all Taxes and other charges which have become due and has accrued on its books all Taxes that it is customary to accrue in accordance with Mexican GAAP,

(b) there are no Tax Liens upon any property or assets of Confinamina or the Company,

(c) Each of Confinamina and the Company has made all payments of estimated Taxes when due in an amount sufficient to avoid the imposition of any penalty,





-26-

(d) there are no adjustments proposed by any Tax authority and no audits, investigations, administrative proceedings or court proceedings presently pending, proposed or threatened against Confinamina or the Company in any jurisdiction that could affect the liability for Taxes of Confinamina or the Company and no notification has been received by either Confinamina or the Company that such an adjustment, audit, investigation or other proceeding is pending or threatened. Disclosure Schedule 2.9(d) contains a complete and accurate list of all such adjustments, audits, investigations and proceedings occurring since January 1, 1995,

(e) all Taxes and other assessments and levies which either Confinamina or the Company were required by law to withhold or to collect have been duly withheld and collected, and have timely been paid over to the proper governmental entity,

(f) there are no outstanding agreements, waivers or comparable consents extending the statute of limitations or agreeing to an extension of time applicable to any income Tax or Tax Return of Confinamina or the Company for any period,

(g) Each of Confinamina and the Company is not a party to, is not bound by and does not have an obligation under any Tax sharing agreement, Tax indemnification agreement or similar contract or arrangement (including any agreement, contract or arrangement providing for the sharing or ceding of credits or losses) or has a potential liability or obligation to any person as a result of or pursuant to any such agreement, contract, arrangement or commitment, and

-27-

CGEA0040479

(h) no agreement has been entered into by or on behalf of each of Confinamina or the Company in relation to the liability for any Tax of each of Confinamina or the Company. and

(i) the Company and Confinamina at the time of recording Valores and any other person as one of their shareholders in their respective stock registry book, complied with the terms of article 26 paragraph IX of the Mexican Federal Tax Code ("Código Fiscal de la Federación) and, therefore, neither the Company nor Confinamina have a potential tax liability as a result of having made such recording.

(j) Confinamina was not obliged to withhold any income tax as a result of the acquisition of the Land and Confinamina made a full and timely payment of the Acquisiton Tax on Real Property in regard to the Land, and all expenses and fees related to such acquisition and its registration at the Public Registry of Property were paid in full.

(k) the transaction by which Valores and Confinamina aquired the Shares, complied with all applicable tax legal provisions and  all due taxes resulting therefrom were timely and fully paid.

For purposes of this Agreement, the following terms shall have the meanings set forth herein below:

"Tax" means (i) any federal, state, local or foreign mandatory contribution (including, without limitation, any taxes, social security quotas, duties, fees, tariffs, improvement contributions (*contribuciones de mejoras*) *aprovechamientos*, and products, including those pursuant to articles 2 and 3 of the Mexican Federation's Tax Code (*Código Fiscal de la*

-28-

*Federación*)) payable to any level of government or to any government authority, agency or office and including, without limitation, to the Mexican Treasury of the Federation (*Tesorería de la Federación*) and to any state or local treasury) including, without limitation, any employees' social security quotas (*Instituto Mexicano del Seguro Social or IMSS*) employees' housing quotas (*Instituto del Fondo Nacional de la Vivienda para los Trabajadores* or *INFONAVIT*), mandatory employees' pension fund quotas (*Sistema de Ahorro para el Retiro or SAR*), as well as any participation (*participación*) (contractual or otherwise), real property, personal property, assets, sales, use, transfer, registration, value added, or other tax of any kind whatsoever, including any interest, actualization and/or penalty; or (ii) any other taxes, charges, fees, levies or other assessments, including, without limitation, all net income, gross income, gross receipts, sales, use, *ad valorem*, goods and all services, capital, transfer, franchise, profits, license, withholding, payroll, employment, employer health, excise, severance, stamp, occupation, real and personal property, social security, estimated, recording, gift, windfall profits or other taxes, customs duties, fees, assessments, or charges of any kind whatsoever, whether computed, on a separate, consolidated, unitary, combined or other basis, together with any interest, fines, penalties, updates or actualizations, additions to tax or other additional amounts imposed by any taxing authority.

"Tax Return" means any return, declaration, report, estimate, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof required to be filed with any tax authority in any jurisdiction with respect to a Tax.

Section 2.10  Licenses, Permits and Proprietary Rights of the Company.

-29-

Each of Confinamina or the Company owns all right, title and interest in and to all patents, trade secrets, technology, know-how, copyrights, trademarks, trade names, and rights to any of the foregoing needed to operate its business as now being operated, without conflict with valid proprietary rights of others.

(a) Attached hereto as Schedule 2.10(a) is a complete list of all software, patents, patent applications, trademarks, trademark registrations, applications for trademark registrations, models (or design patents) registrations and applications therefor, copyrights, copyright registrations, applications for copyright registrations, tradenames, secrets, know-how, technology and other intellectual property (hereinafter called the "Intellectual Property") and any licenses of rights in or to any Intellectual Property owned or used by each of Confinamina or the Company in any country in the operation of their business, or in which they have any interest and which indicates all ownership interests in the Intellectual Property. Except as set forth in Schedule 2.10, each of Confinamina and the Company owns and has the exclusive right to use all of the Intellectual Property free and clear of any lien, encumbrance, charge, security interest or claim, subject to any rights granted to third parties in the commercial agreements described in Schedule 2.19.

(b) All registrations which are part of the Intellectual Property are valid and in full force; all applications for registration required in order to protect each of Confinamina's or the Company's full rights to any of the Intellectual Property in any country have been duly filed and pursued. Except as indicated in Schedule 2.10(b), no legal or administrative proceedings are pending, or are threatened as of this date, which challenge either Confinamina's or the Company's sole and exclusive right to the

-30-

CGEA0040482

ownership and use of the Intellectual Property, or which claim the Intellectual Property infringes the rights of another party. In the conduct of their business, each of Confinamina and the Company does not interfere with infringe upon, misappropriate, violate or otherwise come into conflict with any intellectual property rights of third parties. No third party has contested the validity, enforceability, use of ownership of any of the Intellectual Property. To the Seller's Knowledge, none of the Intellectual Property is being infringed, misappropriated or being used without permission by any other person.

(c) All license agreements necessary for the operations of each of Confinamina's and the Company's business and sale of their services and products are in full force and effect.

(d) Each of Confinamina and the Company have taken reasonable steps in accordance with normal industry practice to protect the its rights in its confidential information and trade secrets of and each of Confinamina or the Company have taken all reasonable steps to protect its Intellectual Property.

-31-

CGEA0040483

**Section 2.11    Adequacy of the Company's Assets: the Company's Relationships with its Customers and Suppliers.**

(a)    The assets and properties owned, or leased or licensed by Confinamina or the Company constitute, in the aggregate, all of the property necessary for the continued conduct of the Company's business in the manner in which and to the extent to which it is currently being conducted. The said assets and properties have been maintained in accordance with customary industry practice, are adequate for the uses to which they are being put, and are not in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost.

(b)    There is no communication, fact, event, or action which to the Seller or the Company's knowledge exists or has occurred, which would indicate that (i) any current customer of the Company that accounted for over 1% of the total net sales of the Company for the year ended December 31, 1999 or (ii) any current supplier to the Company of items essential to the conduct of its business, which items cannot be replaced by the Company at comparable cost to the Company, will terminate its business relationship with the Company. Set forth on Disclosure Schedule 2.11(b) is a list of all customers of the Company generating $ 500,000 or more of revenues in 1999.

(c) Except as set forth on Disclosure Schedule 2.11(c), neither the Seller nor any of its Affiliates (other than the Company), nor any of the officers or directors of the Seller or of any of its Affiliates, has any direct or indirect interest in any customer or supplier of the Company or in any person from whom or to whom the Company leases real or personal property, or in any other Person with whom the Company is doing business.

-32-

CGEA0040484

**Section 2.12   Liabilities of Confinamina and the Company: Net Worth of Confinamina and the Company.**

Each of Confinamina and the Company has no debts, liabilities or obligations, either accrued, absolute, contingent, unquantified, disputed, unliquidated, indeterminable or otherwise, except: (i) to the extent specifically reflected and reserved against in the balance sheet as of December 31, 1999 included in the Financial Statements and not heretofore paid or discharged and (ii) normal liabilities incurred in the ordinary course of business (consistent with prior practice) after December 31, 1999 . At the time of execution hereof and at the Time of Closing, the net worth of each of Confinamina and the Company, determined in a manner consistent with the determination of net worth in the Financial Statements, is not and will not be less than the amount thereof as shown on the most recent audited balance sheet included in the Financial Statements excluding the impact of the changes due to the capitalization of Indebtedness to the Shareholders (as defined below) which was reflected in the issuance of additional preferred shares. At December 31, 1999, the time of execution hereof and at the Time of Closing, Confinamina had and will have no debts, liabilities or obligations of any kind and the Company has and will have no financial indebtedness to any person other than the Shareholders of the Company. "Indebtedness to the Shareholders" shall mean any loans or credit facilities from shareholders and Affiliates, any amounts due to shareholders for technical assistance (6%)consulting services in strategic development, market penetration (4%) or other amounts due for reasons not in the ordinary course of business; but shall exclude amounts due to shareholders in the ordinary course of business, consistent with past practice (hereinafter "Ordinary Course Shareholder Expenses"), for technical support, transportation, rent under leases, lease of backhoes, lease of containers, supply and administration, raw materials, management services,

-33-

and counseling for the filing of public or private bids, pursuant to agreements indicated in Disclosure Schedule 2.21. The Indebtedness to the Shareholders and any amount due to Shareholders for any reason including services rendered and materials supplied as of December 31, 1999, and as of May 31, 2000 (but not including payments in June 2000 to an affiliate of Waste Management in the approximate amount of Mexican Pesos $12,000,000 and to Seller or an entity controlled by him in the approximate amount of Mexican Pesos $8,000,000) and as of the date of this Agreement is listed in Disclosure Schedule 2.12. At the Closing, said Indebtedness to Shareholders plus any amount paid to the Shareholders on said Indebtedness to the Shareholders between December 31, 1999 and the Closing shall not exceed an amount equal to Mexican Pesos 49,637,000. The Seller's affiliates have not and will not invoice the Company for raw materials such as water, clay and calcium carbonate from June 26th, 2000..

Section 2.13   Environmental Matters.

(a)       Each of Confinamina and the Company (i) possesses all Environmental Permits necessary to operate its business, as now being operated, all of which Environmental Permits are in full force and effect; and (ii) is in compliance with all terms and conditions of such Environmental Permits and with the Environmental or Safety Laws except with respect to matters that will not have an adverse effect on the operations, assets or business each of Confinamina and the Company  a list of all such Environmental Permits is set forth in Section 2.13(a) of the Disclosure Schedule;.

(b)       Except as set forth in Disclosure Schedule 2.13 (b) there are no (i) aboveground or underground storage tanks, (ii) surface impoundments for Hazardous Materials, or (iii) wetlands as defined under Environmental or Safety Laws, located

-34-

CGEA0040486

within any portion of the real property presently owned, leased, controlled or operated by or on behalf of each of Confinamina and the Company;

(c)    Except for matters that have been finally resolved a copy of which are annexed hereto in Disclosure Schedule 2.13, neither the Seller, Confinamina, nor the Company (i) has had any ongoing negotiations with or agreements with any Governmental Authority relating to any actual or alleged liability of either Confinamina or of the Company under any Environmental or Safety Laws; (ii) has submitted notice to any Governmental Authority under any Environmental or Safety Laws reporting a release by either Confinamina or by the Company of Hazardous Materials into the environment or an actual or suspected violation by either Confinamina or by the Company of Environmental or Safety Laws; or (iii) has received any notice, claim, demand, suit or request for information from any Governmental Authority, or any person or entity with respect to any violation or any liability or alleged violation or liability of either Confinamina or of the Company under any Environmental or Safety Laws or in connection with the conduct of the business of either Confinamina or of the Company as related to the Environmental or Safety Laws or has received any notice, claim, demand, suit or request which seeks to revoke, suspend or limit any Environmental Permits; or has received any correspondence alleging nuisances, injuries or property damage arising from odors, noise, pollution or contamination associated with the operations of either Confinamina's or of the Company's business nor to the Knowledge of Confinamina, the Company or the Seller is there any basis for either Confinamina or the Company being held responsible for or subject to any of the liabilities or actions referred to in (iii) above;

-35-

CGEA0040487

(d)    neither this Agreement nor the consummation of the transaction contemplated hereby will result in any obligations for site investigation or cleanup, or notification to or consent of government agencies or third parties; and

(e)    each of Confinamina and the Company has not, either expressly or by operation of law, assumed or undertaken any liability, including any obligation for corrective or remedial action, of any other person under any Environmental or Safety Laws.

(f) the Seller has delivered to the Buyer access to all available environmental assessments, reports, studies, analyses, tests or monitoring pertaining to each of Confinamina's and the Company's business, any environmental reports required to be sent to the Mexican government and all available environmental impact statements pertaining to each of Confinamina's and the Company's business as listed in Disclosure Schedule 2.13.

(g) Except for such matters as are explicitly set forth in the reports listed on Disclosure Schedule 2.13 (g) hereto, no person has generated, collected, manufactured, refined, produced, processed, treated, stored, handled, transported, disposed of, discharged, emitted, poured, emptied, leached, leaked, spilled, injected, dumped, accumulated, buried, transported, released or used any hazardous material at any site or facility owned or operated by each of Confinamina or by the Company or any other site used by or to which any form of waste has ever been transported or caused to be transported by each of Confinamina or by the Company, in violation of, or in a manner that would give rise to liabilities under, any Environmental or Safety Laws.

-36-

CGEA0040488

(h) Each of Confinamina and the Company, and any other person for whose conduct either is or may be held responsible, has no liabilities under the Environmental or Safety Laws with respect to the facilities or activities of each of Confinamina or the Company, or with respect to any other properties and assets (whether real, personal, or mixed) in which each of Confinamina or the Company (or any predecessor), has or had an interest or at which it at any time in the past used in connection with its activities, or at any property geologically or hydrologically adjoining the facilities or any such other property or assets.

(i) The hazardous waste landfill currently operated by the Company in Mina, N.L. Mexico, on Company owned land comprised of approximately 1,284. hectares has a remaining useful life for disposal of hazardous wastes of more than twenty years, based on 1999 volumes received.

(j) Annexed to this Agreement as Schedule 2.13 (j) is a true and complete list as of this date of all locations to which any form of waste has ever been transported or caused to be transported by the Company.

For purposes of this Agreement, the following terms shall have the meanings set forth herein below:

(i)    "Environmental or Safety Laws" means, without limitation, federal, state and local laws, norms, ordinances, rules, regulations, official standards, codes, orders, compacts, treaties, agreements or common law obligations, as required in Mexico and any other country whose law is applicable,

-37-

the principal purpose of which is to protect the environment, human health and safety, and worker health and safety, including without limitation, those relating to or otherwise imposing liability or legally effective standards of conduct concerning pollution or protection of human health or the environment, including those covering worker health and safety, relating to emissions, discharges, releases or threatened releases of Hazardous Materials, whether solid, liquid or gaseous in nature into the environment (including, without limitation, ambient air, surface water, ground water, mining or reclamation or mined land, land surface or subsurface strata) or otherwise relating to the processing, generation, distribution, use, treatment, storage, disposal, cleanup, transport or handling of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or wastes, whether solid, liquid or gaseous in nature, including without limitation any law relating to reporting, licensing, permitting, investigation and remediation of any of the foregoing, provided the principal purpose of such laws is to protect human health or the environment, including worker health and safety.

(ii)    "Environmental Permits" means all permits, licenses, approvals, authorizations, consents or registrations required by Environmental Laws,

(iii)    "Governmental Authority" means, without limitation, any governmental department, commission, panel, board, bureau, agency, tribunal, court or other instrumentality of any country, jurisdiction, municipality or other political subdivision.

CGEA0040490

(iv)   "Hazardous Materials" means any substance, material, waste, constituents, compound, chemical, natural or man-made element or force (in whatever state of matter) (a) the presence of which requires investigation or remediation under any applicable Environmental or Safety Law; or (b) that is defined as a "hazardous waste" or "hazardous substance" under any Environmental or Safety Law; or (c) that is toxic, explosive, corrosive, etiologic, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous and is regulated by any applicable Governmental Authority or subject to any Environmental or Safety Law; or (d) the presence of which on the real property owned, used or leased by the Company causes or threatens to cause a nuisance upon any such real property or the adjacent properties or poses or threatens to pose a hazard to the health or safety of persons on or about any such real property; or (e) the presence of which on adjacent properties could constitute a trespass by the Company; or (f) that contains gasoline, diesel, fuel or other petroleum hydrocarbons, or any by-products or fractions thereof, natural gas, polychlorinated biphenyls and PCB-containing equipment, radon or other radioactive elements, lead, asbestos or asbestos-containing materials, or urea formaldehyide foam insulation.

Section 2.14   Absence of Certain Acts or Events.

Since December 31, 1999, each of Confinamina and the Company has not: (a) authorized or issued any of its shares of capital stock (including any held in its treasury) or any other securities others than as described in Schedule 2.14 (a); (b) declared or paid any dividend or made any other distribution of or with respect to its shares of capital stock or other securities; (c)

-39-

paid any bonus or increased the rate of compensation of any of its salaried employees other than the regularly scheduled annual increases and bonuses or entered into or modified any collective bargaining agreement; (d) sold or transferred any of its assets other than in the ordinary course of business; (e) made or obligated itself to make any individual capital expenditures in an amount of more than US$40,000 per item; (f) incurred any material obligations or liabilities (including any indebtedness) or entered into any material transaction, except for this Agreement and the transactions contemplated hereby; or (g) suffered any theft, damage, destruction or casualty loss in excess of US$50,000; (h) made any change in accounting or financial methods or practices; (i) had any strike or work stoppage or slowdown or threat thereof; (j) had any material agreement, contract, license, lease, instrument or franchise terminated or modified; (k) taken any action or failure to act which could result in the adverse modification or cancellation of any license, permit, franchise; (l) entered into any transaction or acted other than in the ordinary course of business; (m) mortgaged, pledged or subjected to lien, charge or encumbrance any asset; (n) made any loans, or advances to, or guaranties for the benefit of or entered into any transaction with any employee, officer, director or shareholder in an amount in excess of $ 1,000; (o) amended or authorized the amendment of the by-laws and or organizational documents of either Confinamina or the Company, (p) made any payments to Seller, Waste Management, Inc., or their respective Affiliates other than Ordinary Course Shareholder Expenses; (q) the amount of Indebtedness to the Shareholders has not increased beyond the amount due on December 31, 1999 as listed in Disclosure Schedule 2.12 nor have any payments been made to shareholders on account thereof or (r) made any commitment to do any of the foregoing.

**Section 2.15   No Adverse Change.**

CGEA0040492

Since December 31, 1999, there has not been any material adverse change in the financial condition, assets, liabilities, business, or results of operations each of Confinamina or of the Company. To the Seller's Knowledge, there is not any threatened or prospective event or condition of any character whatsoever which would have a material adverse effect upon each of Confinamina's or the Company's financial condition, assets, liabilities, business or results of operations.

**Section 2.16   Real Property and Leases**

(a) Annexed to this Agreement as Schedule 2.16, is a true and complete list as of this date of all real property anywhere used by the Company or in which each of Confinamina or the Company has any ownership interest including the Land, in the case of Confinamina, and all outstanding leases or tenancy agreements to which it is a party (the "Leases"), whether as lessor or lessee or in any other capacity, together with the name of the title holder, and a brief description of such property and (as well as all buildings and structures located thereon). Except as specifically set forth in this Agreement, each of Confinamina and the Company has good valid marketable title ("Title") to all said real property, buildings, structures and leases, free and clear in each case of all mortgages, liens, options, pledges, encumbrances, charges, assessments, leases, subleases, licenses, concessions, contract rights or other rights except such as may be specifically indicated in said Schedule 2.16 or elsewhere herein, provided that at the Time of Closing the Confinamina will have Title to approximately 10,200 hectares of the Land and within three years from the Time of Closing will have Title to the approximate total amount of 12,000 hectares. All procedures needed to acquire the Land were properly followed in accordance with applicable Mexican law, including Agrarian law,

-41-

and prior to such acquisition, notice for the preferential and/or first refusal rights, and all other applicable procedures and formalities contemplated in such Agrarian law were properly given and followed and their beneficiaries expressely waved such rights or did not exercise them in due time. Mssrs Hector Vargas Aguirre, and Jose de Jesus Aguirre were properly named as representatives of the communal owners selling the parcels comprising the Land and were granted full powers to sell and transfer such parcels to Confinamina free and clear of any lien, mortgage or encumbrance. The powers they received to that effect were properly granted to them and were not revoked or limited in any manner at the time they exercised said powers. All of the Company's current operating needs for raw materials such as water, clay and calcium carbonate can being extracted at no purchase price from the part of the Land owned by the Company at the Time of Closing. The current right of way from the public highway to the Mina facility runs entirely on the part of the Land owned by the Company at the Time of Closing.

(b) Each of Confinamina and the Company has delivered to Buyer a true, correct, complete and accurate copy of each of the Leases. Each of the Leases is valid and in full force and effect and neither Confinamina nor the Company, nor to the Knowledge of each of Confinamina and the Company or the Seller any other party to a lease is in breach or default thereunder.

(c) Except as specifically stated in Schedule 2.16 or elsewhere herein, all such real property, leased property and the buildings, structures and equipment there located have been maintained in accordance with customary industry practice and conform with all applicable laws, regulations, instruments, covenants, agreements, easements and restrictions in force except where a failure to comply would not have an adverse effect on

-42-

the operations, assets or business of each of Confinamina or the Company. All certificates, licenses and permits required for the lawful construction, use and occupancy of such real property, buildings and structures and obtainable by each of Confinamina or the Company have been obtained and are in full force and effect. To the Knowledge of each of Confinamina and the Company, there is no change pending or planned in any zoning or building ordinances affecting each of Confinamina's or the Company's properties, and no pending claims of building, zoning or like violations and no pending claims for eminent domain.

### Section 2.17    Personal Property

Each of Confinamina and the Company has absolute title to or exclusive rights to use all personal property and assets that it purports to own including all such property located at the facilities owned or operated by each of Confinamina and the Company, or reflected in the Financial Statements, free of all liens, options, pledges, encumbrances, charges or assessments. All currently used personal property has been maintained in accordance customary industry practice.

### Section 2.18    Employment

(a) Each of Confinamina and the Company has complied with all applicable labour and social security or related laws and rules, except where a failure to comply would not have an adverse effect.

(b) All employees of each of Confinamina and the Company are listed in Disclosure Schedule 2.18(b), which indicates, age, date of entry, current salary, and all

-43-

CGEA0040495

advantages or specific terms of employment. A copy of all contracts with employees, officers, directors, sales people, consultants or independent contractors providing services of individual personnel is contained in Disclosure Schedule 2.18.

(c) Each of Confinamina and the Company is not bound by any employee share schemes, employee share option schemes, profit related pay schemes or other employee benefit or fringe benefit schemes of any kind, other than minimum legally required plans, and has no liability with regard to the aforesaid.

(d) Except as per Disclosure Schedule 2.18 (d), there are no contracts of service or consultancy or for services with officers, directors, sales people or employees or consultants or independent contractors providing the services of individual personnel of each of Confinamina and the Company which cannot be terminated by three months'notice of less, or (where no notice period is specified) by reasonable notice, without giving rise to any claim for damages or compensation (other than a statutory redundancy payment or statutory compensation for unfair dismissal, if applicable).

(e) Nothing is owed to any present or former managers, directors or shareholders or independent contractors providing the services of individual personnel of each of Confinamina and the Company, or for any other reason, other than normal recurrent expenses in the ordinary course of business.

(f) Each of Confinamina and the Company has in relation to each of the employees (and, where relevant, to each of its former employees) complied in all material respects with all material obligations, awards and codes of conduct and practice relevant to conditions of service and to the relations between it and its employees and has in all

-44-

material respects maintained adequate and suitable records regarding the service of each of its employees.

(g) Each of Confinamina and the Company is not a member of any private pension scheme, and has no outstanding liabilities in connection with any such scheme.

(h) There are no existing claims whether or not made as of this date by current or past employees or under applicable labour and social security laws and rules and no circumstances exist which could give rise to the aforegoing, concerning each of Confinamina and the Company or any independent contractor, person, or entity providing the service.

(i) For the past five years, no labor strike, work stoppage, or other material labor dispute has occurred and none is underway or to the knowledge of the Seller is threatened.

**Section 2.19    Contracts, etc.**

Attached hereto as Disclosure Schedule 2.19 is a list of the following agreements in force on the date of this Agreement, whether written or oral, to which each of Confinamina or the Company is a party (a true and complete copy of which has previously been delivered to Buyer), by which it is bound or in which it has any interest, including without limitation:

(a) All employment contracts and other contracts with officers, consultants, directors, shareholders, employees, sales persons or agents;

-45-

CGEA0040497

(b) All plans, contracts or arrangements providing for bonuses, pensions, options, deferred compensation, housing allowances, retirement payments, profit sharing or the like;

(c) All contracts or agreements including any Collective Bargaining Agreements with any labor unions or with or affecting the rights of any group of employees or which have been extended to cover the activities of each of Confinamina or the Company.

(d) All contracts or agreements for the purchase by or from each of Confinamina or the Company of any products, materials, equipment or services for a total amount in excess of U.S. $ 25,000 per annum or which extends beyond December 31, 2000, except for contracts or agreements in the ordinary course of business of each of Confinamina or the Company relating to the purchase of supplies or the sale of products which in any one case does not exceed U.S. $ 25,000 , or contracts or agreements for the sale of services by each of Confinamina or the Company which in any one case does not exceed $ 100,000 per annum.

(e) All powers of attorney given by or to each of Confinamina or the Company.

(f) All lease or lease-purchase agreement, or personal property leases.

(g) All contracts, agreements, or arrangements containing covenants limiting each of Confinamina or the Company's freedom to compete in any line of business or with any person or firm in any area.

(h) All license, research and development, distributorship or agency agreements (whether as grantor or grantee);

-46-

CGEA0040498

(i)  All agreements involving each of Confinamina or the Company in a partnership, joint venture, or business collaboration.

(j)  All loan or credit agreements and all other instruments evidencing or related to indebtedness for money borrowed or loaned by each of Confinamina or the Company in excess of $ 1,000.

(k)  All insurance contracts and policies and fidelity and performance bonds in the form of a complete list of the policies indicating the type of guaranty and the amount of the guaranty, the name of the insurer, the policy number and period of coverage, and other relevant details, and a list of all insurance claims made in the last three years; and

(l)  All guaranties under which each of Confinamina or the Company are a guarantor or otherwise liable for any liability, obligation, or indebtedness of another person, or vice versa.

(m) All other obligations, written or verbal, to which each of Confinamina and the Company are a party or by which it is bound, involving expenditures by or payments to each of Confinamina and the Company in excess of fifty thousand U.S. dollars ($50,000) or which are not terminable by each of Confinamina and the Company, without penalty, before June 30, 2001.

(n)  Any agreement under which the consequences of a default or termination (whether or not presently expected) could have a material adverse effect on the assets, liabilities, condition (financial or otherwise), operating results, employee, customer or supplier relations or business activities of each of Confinamina and the Company,

-47-

CGEA0040499

The Seller further represents and warrants that, except as specifically mentioned in Disclosure Schedule 2.19, all such contracts, agreements, commitments, obligations, plans, leases, licenses and instruments are valid and in full force and neither Confinamina or the Company nor to the knowledge of the Company or the Seller any other party thereto is in default with respect to any provision thereof.

Seller represents and warrants that none of the contracts and other items mentioned above contains obligations on the Company's part which cannot reasonably be performed by Confinamina or the Company in the normal course of business, and without incurring any penalties, late fees or similar, charges in relation to any contract signed or in existence on the Date of Closing.

### Section 2.20    Litigation

Except as set forth on Disclosure Schedule 2.20 hereto, there is no instance in which each of Confinamina or the Company or its business (i) is subject to any outstanding injunction, judgment, order, decree, ruling, settlement, or charge, or (ii) is a party, or is threatened to be made a party, to any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi judicial or administrative agency of any Mexican federal, state, local, or foreign jurisdiction or before any arbitrator. Except as set forth on Disclosure Schedule 2.20, none of the actions, suits, proceedings, hearings, and investigations set forth (or required to be set forth) on Disclosure Schedule 2.20 would reasonably be expected to have any adverse effect on each of Confinamina or the Company or its business. Neither Confinamina, the Company nor the Seller has reason to believe that any such action, suit, proceeding, hearing, or investigation may be brought or threatened. Neither Confinamina nor the Company has committed and is not liable for

-48-

any criminal, illegal, or unauthorized act or any breach of contract, covenant, or statutory duty, except with respect to matters that will not have an adverse effect on the operations, assets or business of the Company..

### Section 2.21    Affiliate Transactions

Set forth on Disclosure Schedule 2.21 hereto is a summary of each arrangement (a true and complete copy of which has previously been delivered to Buyer) pursuant to which any shareholder or any Affiliate of a shareholder of each of Confinamina or the Company and their respective employees, officers or directors (or any person related by blood or marriage to any of the foregoing) directly or indirectly provides services to, or otherwise transacts business with, or in any way has a contractual relation with each of Confinamina or the Company.

### Section 2.22    Liability for Services and Products

As of the Closing, each of Confinamina or the Company will have no liability or obligation (and to the Seller's Knowledge there is no basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand) arising out of any contractual commitment or express or implied warranty or any injury to individuals or property as a result of any service provided by each of Confinamina or the Company.

### Section 2.23    Insurance

Each of Confinamina and the Company maintains insurance policies and fidelity and performance bonds (the "Insurance Policies") against all risks of a character and in such amounts as are usually insured against by similarly situated companies in the same or similar business. Each Insurance Policy is in full force and effect and is valid, outstanding and enforceable and all

-49-

CGEA0040501

premiums due thereon have been paid in full. None of the Insurance Policies will terminate or lapse (or be affected in any other materially adverse manner) by reason of the transactions contemplated by this Agreement. Each of Confinamina and the Company has complied in all material respects with the provisions of each Insurance Policy under which it is the insured party. No insurer under any Insurance Policy has canceled or generally disclaimed liability under any such policy or, indicated any intent to do so or not to renew any such policy. All material claims under the Insurance Policies have been filed in a timely fashion.

**Section 2.24    Brokers**

No broker, finder or investment banker or other person is entitled to any brokerage, finder's or other fee, expense or commission from Confinamina, the Company or Buyer in connection with the transactions contemplated by this Agreement.

**Section 2.25    Omissions**

The foregoing representations, warranties and related exhibits do not contain any untrue statement of material fact and do not to the knowledge of Confinamina, the Company or the Seller omit the statement of any material fact necessary to prevent the statements contained in this Agreement from being misleading.

-50-

CGEA0040502

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller that the statements contained in this Article III are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article III), except as set forth in the Disclosure Schedule. The Disclosure Schedule will be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Article III:

**Section 3.1    Organization.**

The Buyer is a corporation duly organized and legally existing in good standing under the laws of the Republic of France.

**Section 3.2    Authority.**

The Buyer has all necessary power, authority and capacity to execute and deliver this Agreement, and each of the other documents and instruments to be delivered by the Buyer pursuant to this Agreement, and to consummate the purchase of the Shares, and all other transactions contemplated hereby and thereby. This Agreement has been duly authorized by all necessary corporate action on the part of the Buyer. This Agreement has been, and the other documents and instruments to be delivered by the Buyer pursuant to this Agreement will be, duly and validly executed and delivered by the Buyer and constitutes (or will constitute) valid and binding agreements of the Buyer, fully enforceable against the Buyer in accordance with their terms.

-51-

CGEA0040503