**Section 3.3    Absence of Conflicts with Other Agreements.**

(a) The execution, performance and consummation of this Agreement and the other documents and instruments contemplated hereby will not violate, conflict with, result in a breach of or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under

(i)    any charter, bylaw, agreement (oral or written), commitment, covenant, franchise, permit, license or other document to which the Buyer is a party or by which the Buyer is bound or to which any of the Buyer's assets is subject, or

(ii)    any decree, order or rule of any court or governmental authority, or statute, rule or regulation which is binding on the Buyer or on any of its property.

(b) The failure of any person not a party hereto to authorize or approve this Agreement or the transactions contemplated hereby will not give any person the right to (i) enjoin, rescind or otherwise prevent or impede the consummation of the transactions contemplated by this Agreement; (ii) or to obtain damages from, or any other judicial relief against, Seller as a result of the consummation of the transactions contemplated by this Agreement.

**Section 3.4    Brokers**

No broker, finder or investment banker or other person is entitled to any brokerage, finder's or other fee, expense or commission from the Company ~~or Seller in~~ connection with the transactions contemplated by this Agreement.

-52-

CGEA0040504

## ARTICLE IV
## ADDITIONAL AGREEMENTS OF THE SELLER

The Seller covenants and agrees with the Buyer as follows:

**Section 4.1    Access to Properties and Records of the Company.**

Until the Closing, the Sellers will cause each Confinamina and the Company to furnish, and each Confinamina and the Company will furnish, to the Buyer and its representatives full access to each Confinamina's and the Company's premises in order to better acquaint Buyer with all aspects of each Confinamina's and the Company's day-to day operations and business and full access to each Confinamina and the Company's book, records, financial statements, and all information with respect to the business and affairs of, each Confinamina and the Company that the Buyer may reasonably request for the purposes becoming acquainted with the business and operations of each Confinamina and the Company.

**Section 4.2    Conduct of Business Pending the Closing.**

Until the Time of Closing, each of Confinamina and the Company will, without making any new commitments on behalf of each of Confinamina and the Company, preserve its business organization and personnel intact, and maintain in good order its corporate existence and books and records, preserve the goodwill of all suppliers, customers, and others having a valuable relationship with each of Confinamina and the Company. In furtherance of the foregoing, until the Time of Closing or except as otherwise permitted by this Agreement or as consented to by the Buyer in writing:

(a) the business of each of Confinamina and the Company will be conducted only in the ordinary course diligently and substantially in the same manner as before which,

-53-

CGEA0040505

without limitation, shall include compliance with all applicable laws, regulations and administrative orders, and the maintenance in force of all insurance policies, fidelity bonds and performance bonds currently in force and effect;

(b) each of Confinamina and the Company will not:

(i)    declare or make any payments of dividends or other distributions;

(ii)    lend, advance or pay any monies to or on behalf of the Seller in connection with the transactions contemplated by this Agreement, or otherwise;

(iii)    purchase or redeem any shares of capital stock of each of Confinamina and the Company or evidences of indebtedness;

(iv)    sell, grant, issue or otherwise dispose of any shares of capital stock of each of Confinamina and the Company or other securities of each of Confinamina and the Company or rights therein;

(v)    merge or consolidate with any other business;

(vi)    amend or modify any existing employee benefit plans or adopt any new employee benefit plans;

(vii)    increase the compensation of any officer or key employee;

(viii)    amend its charter or bylaws;

(ix)    engage in any activities or transactions outside the ordinary course of business of each of Confinamina and the Company which in the aggregate

-54-

CGEA0040506

would be material including, without limitation, the sale of assets outside the ordinary course of business; or

(x)    permit any of the kinds of events referred to in Section 2.14 above to take place.

(xi)    make any commitments to take any of the actions specified in this Section 4.2.

**Section 4.3    Liability for Expenses.**

The Seller will pay all expenses incurred by the Seller in connection with the negotiation, execution and performance of this Agreement, whether or not the transactions contemplated hereby are consummated, including the fees and expenses of all agents, representatives, accountants and counsel for the Seller.

**Section 4.4    Consultation and Notice of Developments**

Seller and each of Confinamina and the Company will consult with Buyer (upon reasonable notice and at reasonable times) regarding the operations and performance of each of Confinamina and the Company, and will promptly notify and consult with Buyer before entering into any agreement or taking any action which is material to each of Confinamina and the Company. Seller and each of Confinamina and the Company will give prompt written notice to Buyer of any adverse development causing a breach of any of the representations and warranties in Article II. No disclosure pursuant to this Section 4.4 however, shall be deemed to amend or supplement and schedule hereto or to prevent or cure any misrepresentation, breach of warranty, or breach of covenant.

-55-

### Section 4.5    Exclusivity

Seller will not (i) solicit, initiate, or encourage the submission of any proposal or offer from any person relating to the acquisition of any capital stock or other voting securities, or any substantial portion of the assets, of either Confinamina or the Company (including any acquisition structured as a merger, consolidation, or share exchange), or (ii) participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, or facilitate in any other manner any effort or attempt by any Person to do or seek any of the foregoing.

### Section 4.6    Confidentiality

The Seller and his Affiliates, and their respective officers and directors acknowledge that all Confidential Information ("any information concerning the business and affairs of each of confinamina and the Company that is treated as Confidential or proprietary by each of Confinamina and by the Company and the contents of this Agreement") as of the Closing Date is the property of each of Confinamina and the Company, and will treat and hold as such all of the Confidential Information, refrain from disclosing or using any such Confidential Information except in connection with this Agreement, and will use reasonable best efforts to deliver promptly to each of Confinamina and the Company or destroy, at the request and option of either Confinamina, the Company or Buyer, all tangible embodiments (and all copies) of the Confidential Information which are in its possession. In the event, Seller or any of his or its Affiliates is required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, Seller will notify Buyer, Confinamina and the Company promptly

-56-

CGEA0040508

of the requirement so that such Person may seek an appropriate protective order or provide its limited waiver or compliance with the provisions of this Section 4.6. If, in the absence of a protective order or the receipt of a waiver hereunder, Seller of any of his or its Affiliates is, on the advice of counsel, compelled to disclose any Confidential Information to any tribunal or else stand liable for contempt, such person may disclose the Confidential Information to the tribunal; provided however, that Seller shall use its reasonable efforts to obtain, at the request of Buyer, Confinamina or the Company (and at the expense of the requesting party) an order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed as Buyer, Confinamina or the Company shall designate.

Confidential information does not include any items which are generally available to the public through no fault of the Seller or its affiliates.

Section 4.7    Fiscal year 2000 net earnings

Seller agrees that Buyer as 100% shareholder of Confinamina, and Buyer and Valores in their capacity as shareholders of the Company and in proportion to their shareholdings in the Company, after the Closing shall be entitled to the full benefit of all fiscal year 2000 net earnings. Accordingly, Seller agrees that it shall not be entitled to receive and that it shall refrain from receiving any technical fees, management fees, royalties, dividends or any other similar payments related to periods beginning. on January 1, 2000, except for fees, pro rata temporis to the Closing due under the agreement between the Company and Valores of January 2, 2000 providing for a $500,000 per year fee for management services.

CGEA0040509

**Section 4.8    Additional Land**

The Seller undertakes to cause the transfer and assignment to Confinamina of good and valid title of the approximately 1,800 hectares of the Land not currently owned by Confinamina within three years from the Time of Closing for nominal consideration and the Seller will pay all fees, acquisition tax an real property or expenses in connection therewith.

-58-

CGEA0040510

## ARTICLE V
## ADDITIONAL AGREEMENT OF THE BUYER

**Section 5.1    Liability for Expenses.**

The Buyer will pay all expenses incurred by the Buyer in connection with the negotiation, execution and performance of this Agreement, whether or not the transactions contemplated hereby are consummated, including the fees and expenses of all agents, representatives, accountants and counsel for the Buyer.

**Section 5.2    Maintenance of Insurance and Bonds.**

The Buyer shall cause the Company to, and the Company shall, maintain in force after the Closing Date and for a commercially reasonable period of time thereafter insurance policies, fidelity bonds and performance bonds in accordance with the Company's customary practice.

**Section 5.3    Best Efforts After Closing.**

The Buyer and the Company shall use their best efforts and cooperate, on a commercially reasonable basis, with the Seller after the Time of Closing to cooperate in the investigation and defense of any claim or action against the Seller or any of its Affiliates, [other than relating to claims or actions made by the Buyer, Confinamina, the Company or the Waste Management and Affiliates], predicated in whole or in part upon the acts or omissions of each of Confinamina and the Company, its directors, officers, employees or agents, prior to the Time of Closing.

-59-

CGEA0040511

**ARTICLE VI**
**ADDITIONAL AGREEMENTS OF ALL PARTIES**

Section 6.1    **Commercially Reasonable Efforts.**

Upon the terms and subject to the conditions of this Agreement, each party will use its commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable consistent with applicable law to consummate and make effective the transactions contemplated hereby.  Seller will at its sole cost and expense prepare and file the request for approval of the Mexican Federal Competition Commission referred to in Section 2.3 and any other notices and filing with any person or governmental authority necessary to consummate the transaction contemplated by this Agreement.  The parties shall at any time at or after the Closing execute and deliver such other documents, certificates, agreements and other writings as may be necessary, proper or advisable consistent with applicable law to consummate and make effective the transactions contemplated hereby.

Section 6.2    **Public Announcements.**

The parties agree that after the signing of this Agreement, no party shall make any press release or public announcement concerning this transaction without the prior written approval of the other parties unless a press release or public amendment is required by law or any listing agreement with any national or international securities exchange.  Before any party makes any such announcement or other disclosure, it agrees to give the other parties prior notice and an opportunity to comment on the proposed disclosure.

-60-

CGEA0040512

**Section 6.3    Termination by Mutual Agreement.**

(a)  The parties may terminate this Agreement by mutual written consent at any time.

(b)  Buyer or Seller may terminate this Agreement by notifying the other party thereof if the Closing, through no fault of the terminating party or its Affiliates, has not taken place on or before October 31, 2000, or such later date as the parties may agree upon in writing. Any such termination shall be without prejudice to any other rights or remedies that may be available to the terminating party under applicable law.

(c)  Buyer or Seller may terminate this Agreement by notifying the other party if in its opinion after discussion with said other party, it determines that there has been a material misrepresentation or breach of warranty, obligation or covenant on the part of the other party.

(d)  The parties agree that termination of this Agreement pursuant this Section 6.3 shall not require a prior resolution by an arbitrator or judge.

(e)  If this Agreement is terminated all further obligations of the parties shall terminate and this Agreement shall become void and of no further force and effect, provided that nothing in this Section 6.3 shall be deemed to release any Party from any liability for any breach by such Party of the terms and provisions of this Agreement.

-61-

CGEA0040513

## ARTICLE VII
## INDEMNIFICATION.

### Section 7.1    Indemnification by Buyer

Subject to the limitations set forth in this Article VII, from and after the Time of Closing, the Buyer will indemnify and hold the Seller and his Affiliates, officers, directors, agents and employees harmless from and against any and all damage, loss, liability, expense, demand, claim, action, deficiency, tax, penalty, whether or not involving a third party claim (including attorneys' fees and court costs) (collectively, "Losses") incurred as a result of or in connection with the untruth, inaccuracy, violation or breach of any of the representations, warranties, agreements or obligations of the Buyer set forth in or made in connection with this Agreement.

### Section 7.2    Survival; Right to Indemnification Not Affected by Knowledge.

All representations, warranties, covenants, and obligations in this Agreement, the Disclosure Schedules and any other certificate or document delivered to Buyer pursuant to this Agreement will survive the Closing. The right to indemnification, payment of damages or other remedy based on such representations, warranties, covenants, and obligations will not be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or obligation. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect the right to indemnification, payment of damages, or other remedy based on such representations, warranties, covenants, and obligations.

-62-

**Section 7.3    Indemnification by Seller**

Subject to the limitations set forth in this Article VII, from and after the Time of Closing, the Seller will indemnify and hold the Buyer, Confinamina, the Company and each of Buyer's Affiliates, stockholders, officers, directors, agents, successors, assigns and employees harmless from and against any and all Losses, incurred as a result of or in connection with: (i) the untruth, inaccuracy, violation or breach of any of the Seller's representations, warranties, or contained in this Agreement, or in any schedules, exhibits, certificates or other documents   delivered to Buyer pursuant to this Agreement, (ii) any non-fulfillment or breach of any covenant or agreement on the part of Seller under this Agreement (iii) any action, demand, proceeding, investigation or claim by any third party or governmental agency, against the Buyer, Confinamina or the Company related to a breach of the Seller's representations, warranties, covenants or obligations of this Agreement; (iv) any claim by any person for payment of any fee, or expense of a broker or finder; (v) any liabilities of each of Confinamina and the Company having a cause or source prior to the Closing Date, , including without limitation liabilities for taxes, social security, litigation, contingencies and off balance sheet liabilities and undisclosed liabilities to the extent they exceed the corresponding provisions for such liabilities as reflected on the balance sheet as of December 31, 1999 included in the Financial Statements or those incurred other than in the ordinary course of business since such date unless consented by the Buyer; (vii) any action, demand, proceeding, claim, legal or administrative procedure concerning each of Confinamina, the Company or the Seller having its source prior to the Closing Date or which relates to a breach of any of the representations, warranties or covenants of Seller hereunder, but only to the extent the Losses therefrom exceed corresponding provisions for such

-63-

liabilities as reflected on the balance sheet as of December 31, 1999 included in the Financial Statements.

### Section 7.4    Time Limitations

Neither the Buyer, on one hand, nor the Seller, on the other hand, shall be liable to the other under this Article VII for any claim relating to a breach of any representation or warranty referred to in Section 7.1 or Section 7.3 unless the breach occurs or the claim is asserted by the party seeking indemnification hereunder, (i) in the case of any claim arising under any of Sections 2.6, 2.7, 2.8, 2.10, 2.11, 2.12, 2.13(i), 2.14, 2.15, 2.16 (provided that all representations and warranties in section 2.16 (a) applicable to the Land shall not be considered a "Specified Misrepresentation Claim" and Buyer may make any claim arising under this Agreement concerning the Land during the period of any applicable statute of limitations), 2.17, 2.18, 2.19, 2.20, 2.21, and 2.23 (each a "Specified Misrepresentation Claim"), no later than the second anniversary of the Closing, (ii) in the case of any claim arising under Section 2.9 (a "Tax Claim"), no later than three months after the expiration of the applicable statute of limitations with respect to the tax matter to which the Tax Claim relates, as such limitation period may be extended from time to time, and (iii) in case of any claim arising under Section 2.13 Environmental Matters ("Environmental Claims"), no later than the sixth anniversary of the Closing. Any claim for indemnification arising under Section 7.1 or Section 7.3 other than a Specified Misrepresentation Claim, a Tax Claim or an Environmental Claim may be made at any time in the future, subject to any applicable statute of limitations or repose. So long as a written notice is given on or prior to the expiration of the applicable survival period such representations, warranties, obligations and covenants shall continue to survive until such matter is resolved.

-64-

Section 7.5     **Limitations on Amounts**

Neither Seller on the one hand, nor Buyer on the other hand, will be liable for Losses incurred pursuant to subsection 7.1 or 7.3 (i), (iii), (v) and (vi) respectively, unless the aggregate amount of all such Losses suffered by the other party exceeds $ 500,000, and if the aggregate amount of all such Losses exceeds $ 500,000, then such party shall be liable for the total amount of such Losses (including the first $ 500,000), provided, however, that for purposes of determining whether the $ 500,000 threshold has been met, no effect shall be given to any individual Loss of less than $ 20,000. Subject to the foregoing, but solely as concerns the Company and not as concerns Confinamina, the Seller's liability under Section 7.3 for untruth, inaccuracy, violation or breach of any of the Seller's representations or warranties with respect to the Company shall be equal to 40% of the total Losses with respect to that Claim provided that Seller shall be liable for 100% of the loss with respect to any claim for breach by Seller of its covenants and obligations provided however that for purposes hereof any failure of the Seller or the Company notify Buyer as contemplated by the second sentence of Section 4.4 will not be treated as a breach of Seller's covenants and obligations. For example, assuming that the aggregate amount of all Losses exceeds $ 500,000, if the total Losses with respect to a single Claim are US $100,000, the Seller's liability under Section 7.3shall be equal to US $40,000 with respect to that Claim, if it is based on a breach of warranty in respect of the Company, and US $ 100,000 if it is based on a breach of the Seller's covenants.

Section 7.6     **Procedure for indemnification**

(a) Any party seeking indemnification hereunder (the "Indemnified Party") shall promptly notify the other party hereto obligated to provide indemnification hereunder

-65-

(the "Indemnifying Party") of any action, suit, proceeding, demand, facts, liability or breach (a "Claim") with respect to which the Indemnified Party claims indemnification hereunder, provided that failure of the Indemnified Party to give such notice shall not relieve any Indemnifying Party of its obligations under this Article 7 except to the extent, that the Indemnifying Party demonstrates that the defense of the Claim is materially damaged as a result of such failure to give notice. If such Claim relates to any action, suit, proceeding or demand instituted against Confinamina or the Company by a third party (a "Third Party Claim") except for criminal proceedings, upon receipt of such notice from the Indemnified Party, the Indemnifying Party may appoint lead counsel of such defense with a recognized reputable counsel reasonably acceptable to the Indemnified Party provided that prior to assuming control of such defense it shall first verify to the Indemnified Party in writing, that Indemnifying Party shall be fully responsible, without reservation for all liabilities and obligations relating to such claim for indemnification.

(b) The Indemnified Party shall retain the right to employ its own counsel and to participate in the defense of any Third Party Claim, the defense of which has been assumed by the Indemnifying Party pursuant hereto, but the Indemnified Party shall bear and shall be solely responsible for its own costs and expenses in connection with such participation incurred subsequent to the date the Indemnifying Party effectively assumes control of such defense.

(c) In the event the Indemnifying Party does not accept the defense of any Third-Party Claim as provided above, the Indemnified Party shall have the full right to defend such Third-Party Claim and shall be entitled to negotiate, compromise and settle such Third-Party Claim. In any event, the Indemnifying Party and the Indemnified Party shall

CGEA0040518

reasonably cooperate with each other in the defense of any matter arising under this section.

(d) If the Indemnifying Party has assumed control of the defense of a Third Party claim, it may negotiate, settle and compromise such claims provided that notwithstanding the foregoing, (i) no Indemnifying Party shall be entitled to settle any Third Party Claim without the Indemnified Party's prior written consent unless as part of such settlement (a) the Indemnified Party is released in writing from all liability with respect to such Third Party Claim, (b) there is no finding or admission of violation of any law, rule, or regulation or any violation of the rights of any person, and (c), the sole relief provided is monetary damages that are paid in full by the Indemnifying Party and (ii) no Indemnified Party shall be entitled to settle any Third Party Claim without the Indemnifying Party's prior written consent unless as part of such settlement the Indemnifying Party is released in writing by the Third Party from all liability with respect to such Third Party Claim.

(e) In the event one party hereunder should have a claim for indemnification that does not involve a Third-Party Claim, the party seeking indemnification shall promptly send notice of such Claim to the other party; provided that failure to give such notice shall not relieve any Indemnifying Party of its obligations under this Article VII except to the extent, if at all, that such Indemnifying Party shall have been prejudiced thereby.

**Section 7.7    Insurance**

If an Indemnified Party is entitled to insurance proceeds, the amount for which such Indemnified Party is entitled to indemnification under this Article VII shall be reduced by the amount of such proceeds, actually received, less all expenses related to such insurance recovery.

-67-

CGEA0040519

In the event an Indemnified Party receives insurance proceeds after being paid by the Indemnifying Party with respect to an indemnifiable matter under this Article VII, the Indemnified Party will remit such proceeds to the Indemnifying Party, up to the amount previously paid by the Indemnifying Party with respect to such matter less all expenses related to such insurance recovery. Nothing in this Section 7.7 shall be deemed to waive or limit the subrogation rights of any insurer.

Section 7.8    Set Off

Each of the Buyer, Confinamina and the Company shall be entitled to set-off any amounts due or payable from the Seller under this Article VII, against any amount otherwise due and payable by either the Buyer, Confinamina or the Company to the Seller or any of his Affiliates.

Section 7.9    Joint and Several Liability

Mr. Vargas and Valores shall be jointly and severally liable for all obligations, covenants debts, representations, warranties, indemnification and breaches arising pursuant to this agreement.

-68-

CGEA0040520

## ARTICLE VIII
## CONDITIONS PRECEDENT TO OBLIGATIONS OF THE SELLER

The obligations of the Seller to effect the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Time of Closing of each of the following conditions:

### Section 8.1    Accuracy of Representations and Warranties.

All representations and warranties of the Buyer contained in this Agreement or otherwise made in writing pursuant to this Agreement shall be true and correct as of (i) the date hereof and (ii) the Time of Closing, with the same force and effect as though made at and as of the Time of Closing.

### Section 8.2    Compliance with Obligations.

The Buyer shall have performed and complied with all the agreements, obligations and conditions required by this Agreement to be performed or complied with by him at or prior to the Time of Closing.

### Section 8.3    Buyer's and Company's Certificate of Fulfillment.

The Buyer shall have delivered to the Seller a closing certificate, executed, on its behalf by one of its officers, dated the Time of Closing, as to the fulfillment of the conditions set forth in Sections 8.1 and 8.2 hereof.

-69-

CGEA0040521

**Section 8.4     Ancillary Stock Purchase Agreement.**

The Buyer and the Seller shall have executed and delivered an ancillary stock purchase agreement, in the form attached hereto as <u>Exhibit B</u> (the "Ancillary Stock Purchase Agreement"). In the event of any inconsistency or controversy, this Agreement shall prevail over the Ancillary Stock Purchase Agreement.

**Section 8.5     Releases.**

The Seller shall have received a general release executed by the Company, in the form attached hereto as <u>Exhibit C</u> (the "Release"), but which shall exclude any liabilities of Seller arising under this Agreement.

**Section 8.6     Absence of Actions or Proceedings.**

There shall be in effect no preliminary or permanent injunction or other order issued by any court or other governmental or regulatory authority, domestic or foreign, nor any statute, rule, regulation, decree or executive order promulgated or enacted by any governmental entity, that declares this Agreement invalid or unenforceable in any respect or which prevents the consummation of or seeks to obtain damages or other relief in connection with the transactions contemplated hereby; and no action or proceeding shall have been instituted or threatened by or before any court, other governmental body or arbitration tribunal, domestic or foreign, which shall seek to restrain, prohibit or invalidate this Agreement or seeks to obtain damages or other relief in connection with the transactions contemplated hereby.

-70-

CGEA0040522

**Section 8.7     Evidence of Insurance.**

The Seller shall have received evidence satisfactory to the Seller of the existence of insurance required to be maintained pursuant to Section 5.2.

**Section 8.8     Non-Competition Agreement.**

The Buyer, and the Company shall have executed and delivered a non-competition agreement, in the form attached hereto as Exhibit E (the "Non-Competition Agreement").

**Section 8.9     Withholding.**

The Seller shall have consented to the calculation of the amount to be withheld by the Buyer pursuant to Section 1.1(c).

**Section 8.10     Mexican Federal Competition Commission.**

The parties shall have received the written authorization of the Mexican Federal Competition Commission to the transactions contemplated by the Agreement.

**Section 8.11     Seller Affiliate contracts.**

The Company shall have executed the contracts referred to in Section 1.4 (c) (ii) from and substance reasonably satisfactory to Seller.

-71-

**ARTICLE IX**
**CONDITIONS PRECEDENT TO OBLIGATIONS OF THE BUYER**

The obligations of the Buyer to effect the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Time of Closing of each of the following conditions:

**Section 9.1    Accuracy of Representations and Warranties.**

All representations and warranties of the Seller, Confinamina and the Company contained in this Agreement shall be true and correct as of (i) the date hereof and (ii) the Time of Closing, with the same force and effect as though made at and as of the Time of Closing except for changes contemplated or permitted by this Agreement.

**Section 9.2    Compliance with Obligations.**

The Seller, Confinamina and the Company shall have performed and complied with all the agreements, obligations and conditions required by this Agreement to be performed or complied with by it at or prior to the Time of Closing.

**Section 9.3    No Material Adverse Changes.**

Since December 31, 1999, there shall have been no material adverse changes in the business, operating results, financial condition, assets, or operations of the Company or Confinamina.

-72-

CGEA0040524

**Section 9.4    Seller's Certificate of Fulfillment.**

The Seller shall have delivered to the Buyer a closing certificate dated the Time of Closing, executed on its behalf by one of its officers, as to the fulfillment of the conditions set forth in Sections 9.1 and 9.2 and 9.3 hereof.

**Section 9.5    Ancillary Stock Purchase Agreement.**

The Buyer and the Seller shall have executed and delivered the Ancillary Stock Purchase Agreement. In the event of any inconsistency or controversy, this Agreement shall prevail over the Ancillary Stock Purchase Agreement.

**Section 9.6    Release.**

The Company and Chemical Waste Management and its Affiliates shall have received a general Release executed by the Seller in the form attached hereto as Exhibit C.

**Section 9.7    Absence of Actions or Proceedings.**

There shall be in effect no preliminary or permanent injunction or other order issued by any court or other governmental or regulatory authority, domestic or foreign, nor any statute, rule, regulation, decree or executive order promulgated or enacted by any governmental entity, that declares this Agreement invalid or unenforceable in any respect or which prevents the consummation of or seeks to obtain damages or other relief in connection with the transactions contemplated hereby; and no action or proceeding shall have been instituted or threatened by or

-73-

CGEA0040525

before any court, other governmental body or arbitration tribunal, domestic or foreign, which shall seek to restrain, prohibit or invalidate this Agreement or seek to obtain damages or other relief in connection with the transactions contemplated hereby.

-74-

**Section 9.8    Non-Competition Agreement.**

The Buyer, the Seller, and the Company shall have executed and delivered the Non-Competition Agreement in the form attached hereto as Exhibit E.

**Section 9.9    Other deliveries**

Buyer shall have received all of the certificates, documents, and instruments required to be delivered pursuant to Section 1.3 above.

**Section 9.10    Satisfactory Action**

All actions to be taken by the Company or Seller in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to Buyer.

**Section 9.11    Mexican Federal Competition Commission**

The parties shall have received the unconditional written authorization of the Mexican Federal Competition Commission to the transactions contemplated by the Agreement, reasonably satisfactory in form and substance to the Buyer.

**Section 9.12    Seller Affiliate contracts.**

The Company shall have executed the contracts referred to in Section 1.4 (c) (ii) in from and substance reasonably satisfactory to Buyer.

-75-

**Section 9.13 Purchase of Chemical Waste Management shares.**

Simultaneously with the purchase of the Shares hereunder the Buyer shall close the purchase of the acquisition of all of the shares of the Company owned by Chemical Waste Management.

**Section 9.14 Employment Agreements**

The employment agreements between the Company and employees Juan Antonio Cuellar and Roberto Salazar shall have been modified to the satisfaction of the Buyer.

-76-

CGEA0040528

## ARTICLE X
## OTHER PROVISIONS

### Section 10.1   Survival of Representations and Warranties.

All of the respective representations and warranties of the parties to this Agreement shall

survive the Time of Closing and the consummation of the transactions contemplated by this

Agreement; provided, that such representations and warranties shall expire on the last day (if

any) on which a claim for indemnification may be made pursuant to Article VII for a breach

thereof, unless such representation or warranty is the subject of a pending claim pursuant to

Article VII on such date, in which case it shall expire upon resolution of such claim.

### Section 10.2   Extension/Waiver.

The Buyer or the Seller may extend the time for or waive the performance of any of the

obligations of the other, waive any inaccuracies in the representations or warranties by the other,

or waive compliance by the other with any of the covenants or conditions contained in this

Agreement.  Any such extension or waiver shall be in writing and signed by any officer of the

Buyer, or by any officer of the Seller.  No such waiver shall operate or be construed as a waiver

of any subsequent act or omission of the parties hereto.

### Section 10.3   Notices.

Any notice to a party hereto pursuant to this Agreement shall be given by hand delivery,

telecopier, certified or registered mail or a private courier service which provides evidence of

receipt as a part of its service, addressed, if to the Company, to: Chairman of the Board,

Residuos Industriales Multiquim, S.A. de C.V., Ave. Lazaro Cardenas 2400 B-21, Garza Garcia,

-77-

CGEA0040529

Nuevo Leon C.P. 66260, telecopier number (8) 152-21-90; or if to the Buyer, to: President,

CGEA S..A. , Parc des Fontaines, 169 Ave, Georges Clemenceau, 92735 Nanterre Cedex, France

telecopier number 33.1.46.69.33 63. with a copy to Kenneth Levine, Levine & Okoshken, 51

avenue Montaigne, 75008 Paris, tel. : 33.1.44.13.69.21, fax : 33.1.45.63.24.96; or, if to the

Seller, o:Mr. Hector Vargas Garza, Presidente Valores Ecologicos SA de CV  Ave.  Lazaro

Cardenas 2400 PB 7, Col. Residencial  San Agustin, Garza Garcia, NL   CP 66260.  Any notice

given hereunder shall be deemed given on the date of hand delivery, transmission by telecopy,

five days after deposit with the postal service or, two days after delivery to a courier service, as

appropriate.  In the event any proceeding, action or suit is commenced by any party to this

Agreement against any other party to either enforce the performance of this Agreement or any

right or obligation arising thereunder, the Seller hereby appoints the President of Valores, the

Company hereby appoints its Chairman of the Board, and the Buyer hereby appoints its

President as their respective agents for service of process. Any party may change the address to

which notices are given by giving notice to the other parties in the manner indicated herein.

### Section 10.4    Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the

State of New York applicable in the case of contracts made and to be performed in such

jurisdiction, without giving effect to any conflict of laws rules, provided that matters concerning

the form and validity of the transfer of shares shall be determined by the law of the United

Mexican States and provided that in determining whether there has been an untruth, inaccuracy,

violation or breach of a representation or warranty, if there is a national or local law exclusively

applicable to the status, act or action which is the subject matter of the representation or warranty

-78-

CGEA0040530

then said national or local law shall be applied to determine if the particular representation or warranty is untrue, inaccurate or has been violated or breached..

### Section 10.5   Binding Effect.

This Agreement shall inure to the benefit of, and be binding on and enforceable against the successors and assigns of the Buyer, the Company and the Seller.

### Section 10.6   Entire Agreement.

This Agreement (including the Exhibits hereto) and the documents and schedules delivered pursuant hereto constitute the entire Agreement and understanding between the parties, and supersedes any prior agreement and understandings relating to the subject matter hereof. This Agreement may be modified or amended only by a written instrument executed by all parties hereto.

### Section 10.7   Severability of Provisions.

If at any time subsequent to the date hereof, any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement.

### Section 10.8   Execution in Counterparts.

This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

-79-

**Section 10.9   Attorney's Fees; Costs of Litigation.**

If any legal action or any other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

**Section 10.10 Headings.**

The subject headings of the paragraphs and sections of this Agreement are included for purposes of convenience only and shall not affect the construction or interpretation of any of its provisions.

**Section 10.11 Limitation of Rights to Parties.**

Nothing in this Agreement, whether expressed or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors, legal representatives and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provisions give any third persons any rights of subrogation or action over or against any party to this Agreement.

**Section 10.12 Arbitration.**

Any dispute, controversy or claim arising out of or relating to this Agreement or the breach thereof shall be finally settled by arbitration in accordance with the Rules of Conciliation

-80-

CGEA0040532

and Arbitration of the International Chamber of Commerce ("ICC"). There shall be three arbitrators, one selected by the Buyer, one selected by the Seller, and the third selected by the two arbitrators so selected by the Buyer and the Seller. If a party fails to nominate an arbitrator within 30 days from the date of notification to it of the other party's request for arbitration, or if the two arbitrators fail within 30 days from the date of their appointment to reach agreement on the third arbitrator, then the Court of Arbitration of the ICC shall appoint the arbitrator that was not nominated by the failing party, or shall appoint a third arbitrator, as the case may be. The place of arbitration shall be New York City and the language used shall be English.

**Section 10.13 Payment in Dollars.**

Except to the extent already expressed in U.S. dollars, all payments to be made hereunder, and all amounts on which payments are to be based hereunder, shall be in the form of United States dollars calculated at the peso-dollar exchange rate applicable to liabilities denominated in foreign currency and payable in Mexican Pesos within Mexican territory (the "Exchange Rate Fix 48 Hours"), as determined by reference to such rate as published in the "Diario Oficial de la Federacion" on the business day immediately preceding the Closing Date.

**Section 10.14 Succession and Assignment.**

This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and assigns; except as otherwise provided herein, no Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of each other Party; provided, however, that Buyer may (i) assign any

-81-

or all of its rights and interests hereunder to one or more of its wholly owned Affiliates and (ii) designate one or more of its wholly owned Affiliates to perform its obligations hereunder.

### Section 10.15 Interpretation.

(a)        Schedule : Any schedules attached hereto are deemed to be incorporated in and to form an integral part of this Agreement. All schedules are deemed to express monetary amounts in Mexican pesos unless otherwise specifically indicated in writing on the schedule.

(b) Titles        Titles to the provisions of this Agreement are including for convenience only and shall not be deemed to affect the meaning of any such provision.

-82-

CGEA0040534

(c) <u>Reference to law</u>: Any reference to a statute or statutory provision includes a reference to that provision as amended, re-enacted or replaced and any regulations or orders made under such provisions from time to time whether before or after the date of this Agreement and any former statutory provision replaced (with or without modification) by the provision referred to except to the extent that any amendment, re-enactment or replacement coming into force after the date of this Agreement would increase or extend the liability of the Parties to one another :

(d) <u>Entities</u> :Any reference to persons includes a reference to firms, corporations or unincorporated associations.

(e) <u>Gender - Plural</u> :Any reference to the singular includes a reference to the plural and vice versa; and any reference to the masculine includes a reference to the feminine and vice versa.

(f) <u>Disclosure</u> : Nothing contained in any schedule hereto shall be deemed adequate to disclose an exception to a representation or warranty made herein, unless the schedule identifies the exception with particularity and describes the relevant facts in reasonable detail, except that cross-references to exceptions that adequately disclose facts relevant to more than one representation shall be deemed adequate, and except that Seller shall not be in breach of a representation if the factual basis for such claimed breach is unambiguously disclosed elsewhere in a schedule hereto and is reasonably related to such representation. Without limiting the generality of the foregoing, the mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein, unless the representation or

-83-

CGEA0040535

warranty has to do with the existence of the document or other item itself and except as is otherwise reasonably apparent from the schedule.

(g) Representations Independent : The parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any party has breached any representations, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the party has not breached shall not detract from or mitigate the fact that the party is in breach of the first representation, warranty, or covenant.

(h) Knowledge: The words have « knowledge » or is « aware » shall include a warranty that the person concerned has made due and careful inquiry. As used in this Agreement, "Knowledge" or "To the Seller's Knowledge" or similar knowledge qualifications shall mean such facts which are known to Hector Vargas Garza, Hector Vargas Aguirre, Jose de Jesus Vargas Aguirre, Guillermo Vargas Aguirre or Juan Antonio Cuellar,

(i) "Affiliate" shall mean, with respect to a specified person, any other person that directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified.

**Section 10.16  Further Requests**

The Seller agrees, at any time and from time to time after the date hereof, upon the request of Buyer, to do, execute, acknowledge and deliver or cause to be done, executed,

-84-

CGEA0040536

acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney as may be required to perfect the sale of the Shares and carry out the transactions contemplated by this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

COMPAGNIE GENERALE D'ENTREPRISES
AUTOMOBILES S.A.

By: _____

Name: _Pascal Gau Kier_

Title: _Vice President_

SARP INDUSTRIES S.A.

By: _____

Name: _Pascal Gau Kier_

Title: _Vice President_

HECTOR VARGAS GARZA

VALORES ECOLOGICOS SA DE CV

By: _____

Name: _HECTOR VARGAS GARZA_

Title: _ADMINISTRADOR UNICO_

V

-85-

CGEA0040537

-86-

CGEA0040538

## EXHIBIT A
### Financial Statements

[see attached to Disclosure Schedule]

CGEA0040539

## EXHIBIT B
## Form Of Ancillary Stock Purchase Agreement

This Stock Purchase agreement is made and entered into by and among, on one part,

Compagnie Générale d'Entreprises Automobiles, S.A., a corporation organized under the laws

of the Republic of France (the "Buyer"), herein represented by _____; and on

another part, Hector Vargas Garza ("Mr. Vargas") residing at

_____ and Valores Ecologicos S.A. de C.V.

("Valores"), or CMN, as the case maybe, a corporation organized under the law of the United

Mexican States ( collectively the "Seller") and represented by                    pursuant to the

following recitals and clauses:

## RECITALS

I.    Seller States:



CGEA0040540

(a) That Seller is the lawful owner of 3,270,495 shares of Immobiliaria Confinamina SA de CV, a corporation organized under the laws of the United Mexican States (the "Company"), (all such shares being, collectively, the "Shares"), as evidenced by stock certificates number ___, ____ and ____ issued by the Company.

(b) That Seller wishes to sell and transfer to the Buyer, under the terms and conditions herein established, all of the Shares.

(c) That the Shares are fully paid and free of any lien, encumbrance, obligation or any other limitation whatsoever that may restrict or impair the rights of the Buyer as shareholder in the Company.

(d) That Seller is duly represented herein by _____, who has full power and authority to execute this Agreement, which power and authority has not been limited or revoked.

II.    Buyer states:

-89-

CGEA0040541

(a) That Buyer wishes to acquire from Seller the Shares, under the terms and conditions herein established.

(b) That Buyer has full power and authority to execute this Agreement, which power and authority has not been limited or revoked.

(c) That Buyer is duly represented herein by _____, who has full power and authority to execute this Agreement, which power and authority has not been limited or revoked.

NOW, THEREFORE, the parties hereby agree as follows:

## CLAUSES

### FIRST - PURCHASE OF SHARES

Based on the representations of Seller and Buyer and the promises and agreements herein contained and subject to the terms and conditions of this Agreement, Seller hereby sells and transfers the Shares to Buyer, and Buyer hereby purchases the Shares from Seller, including all dividend rights, free and clear of all liens, claims, pledges, encumbrances, security interests or other rights or restrictions.

### SECOND - CONSIDERATION

As total consideration for the purchase of the Shares, the Buyer covenants and agrees to pay Seller, on the date hereof and against delivery of the corresponding share certificates, duly endorsed in ownership, the amount of mexican Pesos [insert amounts and dates]:

-90-

THIRD - <u>TAXES</u>

Seller covenants and agrees that Buyer may withhold any percentage of the total price set forth in this Agreement, representing the minimum amount that is required to be withheld in accordance with the laws of the Republic of Mexico, subject to Seller's right to review and consent to the calculation of any amount so withheld provided, that if at or prior to the closing, the Seller shall have furnished to Buyer a tax accountant's certification to the effect that Seller will recognize no gain on its disposition of the Shares, no amount will be withheld by Buyer.

FOURTH - <u>MISCELLANEOUS</u>

4.1    <u>Notices</u>. Any notice to a party hereto pursuant to this Agreement shall be given by certified or registered mail addressed as follows:

To Buyer:       _____
                _____
                _____
                _____
                Attention:_____

To Seller:

4.2    <u>Assignment</u>. No party may assign this Agreement or its rights hereunder. Nothing contained in this Agreement shall constitute either of Buyer or Seller a partner, agent or representative of each other.

4.3    <u>Paragraph Headings</u>. The paragraph headings contained in this Agreement have been inserted for reference purposes only and shall not, in any way, affect the meaning or interpretation of this Agreement.

4.4    <u>Governing Law</u>. This Agreement shall be governed and construed in accordance with the domestic laws of the Republic of Mexico.

-91-

4.5    <u>Amendments</u>.  No amendment or revision hereof shall have any force or effect unless the same is put in writing and executed by the parties hereto.

**(SIGNATURE PAGE FOLLOWS)**

-92-

CGEA0040544

IN WITNESS WHEREOF, the parties have executed this Agreement on the _____ day of

_____, 2000.

COMPAGNIE GENERALE D'ENTREPRISES
AUTOMOBILES S.A

By:_____

     Name:

     Title:

WITNESS:

_____


VALORES ECOLOGICA SA de CV

By:_____

     Name:

     Title:

WITNESS:

_____

-93-

EXHIBIT C
Form Of General Release

This Release is executed in connection with that certain Agreement for the Purchase of Stock dated _____, 2000 (the "Stock Purchase Agreement") by and among Compagnie Générale d'Entreprises Automobiles, S.A., , a corporation organized under the laws of the Republic of France  (the "Buyer"); Hector Vargas Garza ("Mr. Vargas") residing at _____ and Valores Ecologicos S.A. de C.V. ("Valores"), a corporation organized under the law of the United Mexican States ( collectively the "Seller") and represented by _____ (other capitalized terms used and not otherwise defined herein shall have the meanings assigned thereto in the Stock Purchase Agreement).

1.    For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, _____, for himself or itself and his or its heirs, successors and assigns (the "Releasing Parties"), does hereby fully and forever release and discharge _____ and its Affiliates, successors and assigns of and from any and all claims, demands, accounts, debts, proceedings, liabilities, actions, causes of action, suits, agreements, losses, damages, costs, expenses, sums of money, obligations, judgments, executions and controversies of every kind and description, whether in law or equity and whether known or unknown, accrued or unaccrued, matured or unmatured, liquidated or unliquidated, contingent or otherwise, which any of the Releasing Parties now have, may now have, have had or which may exist or be claimed to exist at or prior to the date of this Release; provided, however, that nothing contained herein shall be deemed to release _____ or its successors or assigns from any of _____ obligations under the Stock Purchase Agreement.

-94-

2.    This Release shall be binding on the undersigned and his or its heirs, successors and assigns and all those claiming through or under all or any of them.

3.    This Release shall be governed by and construed in accordance with the laws of the Republic of Mexico.

IN WITNESS WHEREOF, the undersigned has executed this Release as of the ___ day of _____, 2000.

_____
Name:_____
Address:_____
_____

WITNESS:

_____

-95-

CGEA0040547

## EXHIBIT D
### Form Of escrow or trustee agreement

[see attached]

-96-

CGEA0040548

## ESCROW AGREEMENT – PURCHASE PRICE

Between the undersigned:

Mr. Hector Vargas Garza ("Mr. Vargas") residing at
_____ and Valores
Ecologicos S.A. de C.V. ("Valores"), a corporation organized under the law of the United
Mexican States, with offices at

_____

(herein called the "Seller" when referred to collectively)


And

Compagnie Générale d'Entreprises Automobiles S.A., ("CGEA") having offices at Parc des
Fontaines, 169 avenue Georges Clémenceau, 92735 Nanterre and SARP Industries, S.A.
(SARPI) having offices at Zone Portuaire, 427 rue du Hazay, 78250 Limay.



(herein called "Buyer" when referred to collectively)



And


The        Bank



(Hereinafter referred to as the "Escrow Agent")

Represented by Mr. _____, duly empowered to execute this agreement.

1

CGEA0040549

## NOW THEREFORE, IT HAS BEEN AGREED AS FOLLOWS:

1. Reference is made to an agreement, dated _____ 2000 (hereinafter called the "Sale Agreement") between Buyer and the Sellers relating to the purchase of certain shares in Confinamina SA de CV, a company organized under the laws of the United Mexican States, having its registered office at _____ (hereinafter called "Confinamina"), in which it is provided that a portion of the purchase price paid to Seller shall be placed in escrow to serve as security for any claims Buyer may have against Seller or any of them.

2. Simultaneously with the execution of this Escrow Agreement, the Buyer has deposited with the Escrow Agent on behalf of Sellers, and the Escrow Agent acknowledges receipt thereof, the sum of Mexican Pesos 46,800,000 hereinafter referred to as the "Escrow Fund".

3. The Escrow Agent shall hold the Escrow Fund during the period specified in this agreement and shall administer and deliver such Escrow Fund in accordance with the terms hereof.

4. The Escrow Fund shall be retained by the Escrow Agent under the terms hereof to serve as security for any claims that the Buyer may have to be held harmless or indemnified under the Sale Agreement (the "Claim(s)").

5. a) At any time or times on or before [          ], 2005 Buyer shall have the right directly or through its legal counsel to notify the Seller of any and all claims which it may have against any or all of the Sellers under the Sale Agreement, such "Notice of Claim" to specify the type of claim, the amount thereof, the relevant facts, and the provisions of the Sale Agreement and/or law on which the claims are based and a copy of the notice of claim so served, shall be delivered to the Escrow Agent.

   (i) Upon receipt by the Escrow Agent of such a Notice of Claim it shall pay to Buyer out of the Escrow Fund or the remaining balance thereof the amount of the claim specified in such Notice of Claim which can be satisfied therefrom, promptly after the earlier of the following:

   A/ Receipt by the Escrow Agent of a written authorization from the Sellers to make such payment;

2

CGEA0040550

B/ Expiration of thirty days after receipt of such Notice of Claim provided that the Escrow Agent shall not have received a written statement from the Seller objecting to such payment, in all or part. If the objection of the Seller relates only to part of a claim, the Escrow Agent shall pay to Buyer out of the Escrow Fund that amount of the Claim to which Sellers have not objected and for which there are sufficient funds in the Escrow Fund.

(ii) In case the Seller shall object to such payment in respect of any claim or claims made in any Notice of Claim, the Sellers and Buyer shall attempt in good faith to come to an agreement with respect to each of such claims, during a period of 30 days from receipt of the Notice of Claim. If the Seller and Buyer so agree a written memorandum setting forth such agreement shall be prepared and signed by both parties and shall be furnished to the Escrow Agent. The Escrow Agent shall be entitled to rely on any such memorandum and distribute the Escrow Fund in accordance with the terms thereof. If no such agreement can be reached after good faith negotiations, the dispute shall be decided by arbitration as provided in paragraph 7 below. The Escrow Agent is authorized and directed to retain in its possession without liability to anyone all or the remaining balance of the Escrow Fund until such dispute shall have been settled by a decision of the arbitrator(s), but it shall be under no duty whatsoever to institute or defend any such proceeding. The final decision of the arbitrator(s) is binding also upon the Escrow Agent.

b)    On [    ], 2005, the Escrow Agent shall pay the balance of the Escrow Fund, if any, to the Sellers, less an amount sufficient to cover any claims of Buyer specified in any Notice of Claim delivered to the Escrow Agent, which may still give rise, under the provisions of paragraph 5(a), to an obligation on the part of the Escrow Agent to pay such an amount to the Buyer, provided that the Escrow Agent cannot be required to retain an amount greater than the balance of the Escrow Fund.

6.    It is understood that nothing in the present Escrow Agreement shall be deemed to limit the right of Buyer to pursue Seller for the full amount of any claims which the former may have against the Seller or any of them, whether or not the total amount of such claims exceeds the amount of the Escrow Fund and regardless of the time when any such claims may have arisen.

7.    It is understood by the parties hereto that all disputes arising in connection with the Sale Agreement and with this Agreement shall be finally settled by arbitration in New

3

CGEA0040551

York under the Rules of Conciliation and Arbitration of the International Chamber of Commerce, by one or more arbitrators appointed under those Rules. All written briefs and pleadings and all oral proceedings shall be in the English language. The Escrow Agent may rely conclusively upon and shall be protected in acting upon any order, decree, certificate, notice, request, consent, statement or instruction of the above indicated arbitrator or arbitrators or of a competent court or tribunal believed by it to be genuine and to have been signed and presented by the proper persons.

8.  The Escrow Agent shall bear no responsibility with respect to the covenants and agreements contained in the Sale Agreement and shall have no obligation to Buyer and Sellers other than the performance of its duties as expressly set forth herein. Except in the event of its gross negligence or willful misconduct, the Escrow Agent shall not be liable or responsible for anything done or omitted to be done by it hereunder and the Buyer and the Seller agree jointly and severally to indemnify it and hold it harmless against any and all losses, claims, damages or liabilities incurred by it hereunder, and all expenses incurred by it in connection herewith or any action in respect hereof.

9.  The Escrow Agent shall not be bound by any notice of, or demand with respect to, any waiver, modification, amendment, termination, cancellation, rescission or supersession on of this Escrow Agreement, unless in writing and signed by the Buyer, Seller and the Escrow Agent.

10. The Sellers and the Buyer agree jointly and severally to pay the Escrow Agent in annual fee of _____ (plus all expenses incurred by the Escrow Agent in connection herewith, including without limitation the reasonable fees and disbursements of its counsel or governmental charges incurred by the Escrow Agent) for its services in connection with this Escrow Agreement. Simultaneously with the execution hereof, the Buyer and Sellers have delivered to the Escrow Agent a check in the amount of _____ representing such annual fee for the first year (plus its expenses in connection with the preparation and execution hereof). The annual fee for each successive year shall be payable on each anniversary date hereof, and the aforesaid expenses shall be reimbursed when requested by the Escrow Agent. The Buyer and Seller agree between themselves (without affecting their joint and several obligation to the Escrow Agent) that the Buyer and Seller shall each bear one half of such annual fee (plus the aforesaid expenses).

4

CGEA0040552

11. In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder and shall receive instructions from any of the other parties hereto, which in the Escrow Agent's opinion are in conflict with any of the provisions of this Agreement, the Escrow Agent shall be entitled to refrain from taking any action in writing by all of the other parties hereto or by a final decision of an arbitration proceeding as described in paragraph 7.

12. The Escrow Agent shall have no duties or responsibilities except those expressly set forth herein.

13. In the event that Buyer shall assign all or any part of the Sale Agreement or shall cause any of the shares to be purchased by a designee, the terms of this Escrow Agreement shall apply mutatis mutandis to such assignee or designee.

14. Any notices, requests, demands, claims or other communications hereunder (hereinafter called "Notices") shall be in writing and shall be deemed sufficiently given upon dispatch if mailed (airmailed if mailed outside the country of destination) by registered mail, postage prepaid, return receipt requested, to the parties at their respective address set forth on the first page of this agreement, pending written designation of another address. Any notices to be given by the Sellers shall be valid only if they are signed personally by all the Sellers. Any notices to be given by the Buyer shall be valid if they are signed by its president or any of its officers.

Executed this _____ day of _____ 2000

Mr. Hector Vargas Garza                                    CGEA S.A.


Valores Ecologicos S.A. de C.V.                            SARPI S.A.


Bank

5

CGEA0040553

## EXHIBIT E
### Form Of Non-Competition Agreement

[see attached]

-97-

CGEA0040554

<u>EXHIBIT E</u>

## NON-COMPETITION AGREEMENT

THIS NON-COMPETITION AGREEMENT (the "Agreement") is entered into this __ day of _____, 2000, by and among Mr. Hector Vargas Garza, Hector Vargas Aguirre, Alberto Vargas Aguirre, Eduardo Vargas Aguirre, Jose de Jesus Aguirre, and Guillermo Vargas Aguirre residing at Rio Papaloapan 450, Col. Mexico, Monterrey NL CP 64740_____ and Valores Ecologicos SA de CV acting jointly and severally (collectively known as "Promisors"); Residuos Industriales Multiquim, S.A. de C.V. (the "Company"), a corporation organized under the laws of the United Mexican States; and CGEA SA and its subsidiary SARP Industries , corporations organized under the laws of the Republic of France (the "Buyer").

W I T N E S S E T H:

WHEREAS, pursuant to that certain Stock Purchase Agreement dated _____, 2000 (the "Stock Purchase Agreement") by and among Mr. Hector Vargas Garza ("HVG"), Valores Ecologicos SA de CV ("Valores") and Buyer, Buyer has agreed to purchase from HVG and Valores 75% of the shares of common and preferred stock of the Company owned by HVG and Valores, pursuant to the terms and conditions described therein;

WHEREAS, Buyer has required that the parties hereto enter into this Agreement as a condition to the consummation of the transactions contemplated in the Stock Purchase Agreement; and

WHEREAS, All of the Promisors will derive substantial benefit as a result of the performance by all of the Promisors of their obligations under the Stock Purchase Agreement:

NOW, THEREFORE, in consideration of the promises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are mutually acknowledged by each party, it is agreed as follows:

1.    <u>Defined Terms.</u>  Capitalized terms used herein without definition have the meanings assigned to them in the Stock Purchase Agreement.

2.    <u>Restrictive Covenant.</u>  (a) Promisors agree that for a period commencing at the Time of Closing and ending three and a half (3.5) years after HVG and Valores cease to own or hold any shares of common stock of the Company (the "Period"), Promisors and their Affiliates will not directly or indirectly engage in any business or activity that competes with or falls within the definition of the Business (as defined below) anywhere in the United Mexican States including but not limited to the owning of (except as specifically provided for in sub-paragraphs (b) and (d) below), investing in, managing, operating, controlling, assisting, counseling, or providing services to any person or entity and will not solicit business, directly or indirectly, that competes with or

CGEA0040555

falls in the definition of the Business anywhere in the United Mexican States. For the purposes of this Section 2, the "Business" shall mean the business of performing, with respect to Hazardous Waste (as defined by the Environmental and safety laws of the United Mexican States) and non-hazardous and non hazardous waste, importation and exportation, collection (other than collection that results in services performed by the Company), transportation, transfer, storage, treatment, reuse, recycling, solidification, stabilization, physico-chemical treatment, biological treatment, thermal desorption, tank cleaning, lab pack and repackaging services, reactive chemical management, brokerage services, inplant environmental administration services, remedial services, chemical cleaning, high pressure water blasting services and technology, incineration, deepwell injection, blending, solvent distillation, disposal, confinement and final disposal services, landfill, waste to energy, radioactive waste services (including any subsequently developed technology related to the foregoing).

(b)    Nothing in this Agreement shall limit on prevent the right of Promisors to hold the ownership of less than 5% of any class of issued and outstanding securities of any publicly held corporation listed on a national stock exchange, engaged in the Business.

(c)    Without the Buyer's written consent, Promisors and their Affiliates shall not, and shall cause their Affiliates not to, for the duration of the Period, (i) make, offer, solicit or induce to enter into, any written or oral arrangement, agreement or understanding regarding employment or retention as a consultant or independent contractor with any person who was, on the date hereof or who becomes during the Period, a full-time employee of the Company, and (ii) enter into any such written or oral arrangement, agreement or understanding with any person who was, on the date hereof, or who becomes during the Period a full-time employee of the Company.

(d)    Nothing in this agreement shall prevent the Promissors from continuing to hold a 99 % voting interest in Inginieria de Proceso Ambiental SA de CV (IPA) a company engaged in the business of Bio remediation and water treatment and a 99 % voting interest in Trans Quimica National SA de CV ("TQN") a transportation company, provided that: (i) as to IPA, if Buyer or any of its affiliates enters the Bioremediation or the water treatment business in the United Mexican States, Promissors agrees to immediately cause IPA to cease from undertaking any new Bioremediation or water treatment project and to solicit offer from the Buyer for the sale of all of their shares in IPA as provided for in Section 5 below, (ii) as to TQN, not more than 10% of the sales of TQN shall be derived from sources having an activity in competition with the definition of the Business and provided that Promissors grant first negotiation last refusal rights to Buyer as provided for in section 5 below.

(e)    Promisors and their Affiliates recognize and agree that a breach by Promisors and their Affiliates of any of the covenants and agreements in this Section 2 would cause irreparable harm to the Company and the Buyer, that the Company's and the Buyer's remedies at law in the event of such breach may be inadequate, and that, accordingly, in the event of such breach by Promisors and their Affiliates, in addition to any other rights and remedies that may be available under applicable law to the Company

-2-

CGEA0040556

or Buyer, the Company or Buyer may seek injunctive relief in a court of competent jurisdiction. Promisors and their Affiliates covenant that they will not contest the fairness and reasonableness of the restraints imposed by this Section 2, or the appropriateness or availability of temporary or permanent injunctive relief without the necessity of proving actual damages, or posting bond. If this Section 2 is more restrictive than permitted by the laws of the jurisdiction in which the Company or Buyer seek enforcement hereof, this Section 2 shall be limited to the extent required to permit enforcement under such laws. The rights and benefits contained in this Section 2, shall inure to the benefit of and be enforceable by any successor or assignee of the Buyer that may hereafter acquire the Shares.

3.   Joint and Several Liability. Promisors shall be jointly and severably liable for the full and prompt performance of the obligations of Promisors and their Affiliates herein.

4.   Payment. As consideration for this Agreement, Buyer shall pay to Promisor the sum of Mexican Pesos 18,720,000, which sum shall be payable on the date of Closing by wire transfer of immediately available funds to such account as may be specified by Promisor in writing.

5.   First Negotiation, Last refusal rights

(a) In the event that either Promissors or an Affiliate of any of them (in any such case, the "Offeror") wishes to sell in a transaction with an independent third party all or any portion of the shares of common stock of IPA or TQN, owned by the Offeror (the "Shares"), the Offeror shall first, and prior to soliciting any third parties, notify the Buyer (the "Offeree") in writing (the "Notice of Intended Sale") of the number of Shares for sale by the Offeror (the "Offered Shares") and the material proposed terms of sale, including the purchase price per share if the Offeror has received an unsolicited offer from an independent third party to buy the Offered Shares.

(b) The Offeror shall engage in exclusive discussions with the Offeree if the latter so desires, for a period not to exceed 30 days from the date of receipt by the Offeree of the Notice of Intended Sale, to mutually agree on a purchase price per share for the Offered Shares. Not later than the end of such 30 day period, the Offeree shall notify the Offeror in writing either of its offer (the "Offer") to buy all and not less than all of the Offered Shares at a specified price per share (the "Offeree Proposed Price") and on all other material terms proposed by the Offeror subject to confirmatory due diligence, negotiation of definitive transaction documents and any other customary conditions, or that the Offeree does not wish to purchase any of the Offered Shares.

(c) Within 30 days after the date of receipt by the Offeror of the notice of the Offeree Proposed Price, the Offeror shall notify the Offeree in writing in accordance with the following provisions:

(i) If either (x) the Offeree Proposed Price is equal to or greater than the proposed purchase price per share for the Offered Shares contained in the

-3-

Notice of Intended Sale, or (y) the Notice of Intended Sale did not contain any proposed purchase price for the Offered Shares but the Offeror wishes in its discretion to sell the Offered Shares to the Offeree at the Offeree Purchase Price, then (z) the Offeree and the Offeror shall, as promptly as practicable, negotiate in good faith in order to enter into a definitive stock purchase agreement and execute and deliver such documents to one another as shall be necessary for the sale of shares as contemplated hereby to be consummated within 90 days after the date of receipt by the Offeree of the notice of the Offeror under this sub-section (c). The Offeror shall be afforded the opportunity to conduct confirmatory due diligence during this 90 day period.

(ii) If either (x) the Offeree Proposed Price is less than the proposed purchase price per share for the Offered Shares contained in the Notice of Intended Sale, or (y) the Notice of Intended Sale did not contain any proposed purchase price for the Offered Shares and the Offeror in its discretion does not wish to sell the Offered Shares to the Offeree at the Offeree Proposed Price (or if the Offeree has notified the Offeror that it does not wish to purchase any of the Offered Shares), then (z) the Offeror shall be free, for a period of 90 days after the date of receipt by the Offeree of the notice required by paragraph (c), to consummate a sale of the Offered Shares to any Person at a price equal to or greater than the proposed purchase price per share contained in the Notice of Intended Sale refered to in (x) above and on substantially the same material terms as set forth in the Notice of Intended Sale; provided, however, that in the event the Notice of Intended Sale did not contain any proposed purchase price for the Offered Shares and during such 90 day period the Offeror receives an offer from an independent third party to buy the Offered Shares, the Offeror shall so advise the Offeree in writing and shall afford the Offeree one opportunity for a period not to exceed 30 days to notify the Offeror in writing of its Offer as defined in (b) above to buy all and not less than all of the Offered Shares at a purchase price per share (the "Revised Offeree Proposed Price") that is equal to or greater than the purchase price per share contained in, and on all other material terms of, such third party offer, whereupon the Offeree and the Offeror shall, as promptly as practicable, negotiate in good faith in order to enter into a definitive stock purchase agreement and execute and deliver such documents to one another as shall be necessary for the sale of shares as contemplated hereby to be consummated within 90 days after the date of receipt by the Offeror of the notice of the Revised Offeree Proposed Price. ;the Offeree shall be afforded the opportunity to conduct confirmatory due diligence during this 90 day period. To the extent that a sale is not consummated by the Offeror within the periods contemplated by this subparagraph (ii), without any fault on the part of the Offeree, the Offered Shares shall thereafter again be subject to the provisions of this Section 5.

-4-

CGEA0040558