6.    Conflict.Promisors hereby represent and warrant to the Company and to Buyer that Promisors and their Affiliates have not executed any written agreement with any other person or entity that would prohibit them from entering into this Agreement.

7.    Notices.Any notice to a party hereto pursuant to this Agreement shall be given by hand delivery, telecopier, certified or registered mail or a private courier service which provides evidence of receipt as a part of its service, addressed, if to the Company, to: Chairman of the Board, Residuous Industriales Multiquim, S.A. de C.V., Ave. Lazaro Cardenas 2400 B-21, Garza Garcia, Nuevo Leon C.P. 66260, telecopier number (8)152-21-90; or, if to Promisors or their Affiliates, to: Mr. Hector Vargas Garza residing at Rio Papaloapan 450, Col. Mexico, Monterrey NL CP 64740, or if to Buyer, to CGEA, Parc des Fontaines, 169 av. Georges Clémenceau 92735 Nanterre Cedex FRANCEtelecopier number (33) 1 46 69 33 63 with a copy to Kenneth Levine, 51 avenue Montaigne, 75008 Paris – France, telecopier number : (33)145632496.  Any notice given hereunder shall be deemed given on the date of hand delivery, transmission by telecopier, five day after deposit with the postal service or two days after delivery to a courier service, as appropriate.  In the event any proceeding, action or suit is commenced by any party to this Agreement against any other party to either enforce the performance of this Agreement or any right or obligation arising thereunder, Promisors each hereby appoint Mr. Hector Vargas Garza, Buyer hereby appoints its President, and the Company hereby appoints its Chairman of the Board, as their respective agents for service of process.  Any party may change the address to which notices are given by giving notice to the other parties in the manner indicated below.

8.    Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the United Mexican States applicable in the case of contracts made and to be performed in such jurisdiction.

9.    Binding Effect.  This Agreement shall inure to the benefit of, and be binding on and enforceable against the successors and assigns of the Buyer, Company, and Promisors.

10.    Entire Agreement.  This Agreement constitutes the entire Agreement and understanding between the parties, and supersedes any prior agreement and understandings relating to the subject matter hereof.  This Agreement may be modified or amended by a written instrument executed by all parties hereto.

11.    Severability of Provisions.  If at any time subsequent to the date hereof, any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement.

12.    Execution in Counterparts.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument

-5-

CGEA0040559

13.    <u>Attorney's Fees; Costs of Litigation.</u>  If any legal action or any other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

14.    <u>Headings.</u>  The subject headings of the paragraphs and sections of this Agreement are included for purposes of convenience only and shall not affect the construction or interpretation of any of its provisions.

15.    <u>Limitation of Rights to Parties.</u>  Nothing in this Agreement, whether expressed or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors, legal representatives and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provisions give any third persons any rights of subrogation or action over or against any party to this Agreement.

16.    <u>Arbitration.</u>  Any dispute, controversy or claim arising out of or relating to this Agreement or the breach thereof shall be finally settled by arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce ("ICC"). There shall be three arbitrators, one selected by the Buyer, one selected by the Promisors, and the third selected by the two arbitrators so selected. If a party fails to nominate an arbitrator within 30 days from the date of notification to it of the other party's request for arbitration, or if the two arbitrators fail within 30 days from the date of their appointment to reach agreement on the third arbitrator, then the Court of Arbitration of the ICC shall appoint the arbitrator that was not nominated by the failing party, or shall appoint a third arbitrator, as the case may be. The place of arbitration shall be New York City and the language used shall be English.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

CGEA SA

By:      _____
Name:  _____
Title:   _____

RESIDUOS INDUSTRIALES MULTIQUIM,
S.A. DE C.V.

By:      _____
Name:  _____
Title:   _____

-6-

CGEA0040560

HECTOR VARGAS GARZA


HECTOR VARGAS AGUIRRE


ALBERTO VARGAS AGUIRRE


EDUARDO VARGAS AGUIRRE


JOSE DE JESUS AGUIRRE


GUILLERMO VARGAS AGUIRRE


VALORES ECOLOGICOS SA de CV.

By: _____
Name: _____
Title: _____

10094089.2

-7-

CGEA0040561

<u>**EXHIBIT F**</u>
<u>Map of the Land</u>

[see attached]

-98-

CGEA0040562

## "LAND TO BE DELIVERED AT THE TIME OF CLOSING"

| Lots | N. | Actual Surface | | |
|------|-----|-----------|-------|------------|
| | | Hectares | Areas | Cent.areas |
| La Popa lote # 37, area parcelada | 37 Z-5 P1/1 | 835 | 40 | 45.497 |
| La Popa lote # 38, area parcelada | 38 Z-5 P1/1 | 888 | 81 | 26.619 |
| La Popa lote # 39, area parcelada | 39 Z-5 P1/1 | 1625 | 68 | 71.26 |
| Suma | 37, 38, 39 | 3348 | 189 | 143.376 |
| **Sub-total parcelled area** | **37, 38, 39** | **3349** | **90** | **43.376** |
| **Santa Andrea** | | | | |
| Santa Andrea lote # 14 | 14 Z-1 P1/1 | 211 | 18 | 5.223 |
| Santa Andrea lote # 15 | 15 Z-1 P1/1 | 209 | 97 | 68.574 |
| Santa Andrea lote # 16 | 16 Z-1 P1/1 | 245 | 83 | 53.982 |
| Santa Andrea lote # 17 | 17 Z-1 P1/1 | 208 | 27 | 52.673 |
| Santa Andrea lote # 18 | 18 Z-1 P1/1 | 221 | 95 | 52.607 |
| Santa Andrea lote # 19 | 19 Z-1 P1/1 | 209 | 99 | 84.466 |
| Santa Andrea lote # 20 | 20 Z-1 P1/1 | 200 | 70 | 10.803 |
| Santa Andrea lote # 21 | 21 Z-1 P1/1 | 209 | 33 | 45.613 |
| Santa Andrea lote # 22 | 22 Z-1 P1/1 | 245 | 5 | 53.218 |
| Santa Andrea lote # 23 | 23 Z-1 P1/1 | 230 | 56 | 31.393 |
| Santa Andrea lote # 24 | 24 Z-1 P1/1 | 233 | 13 | 17.52 |
| Santa Andrea lote # 25 | 25 Z-1 P1/1 | 224 | 55 | 73.569 |
| Santa Andrea lote # 26 | 26 Z-1 P1/1 | 195 | 81 | 49.639 |
| Santa Andrea lote # 27 | 27 Z-1 P1/1 | 214 | 37 | 94.469 |
| Santa Andrea lote # 28 | 28 Z-1 P1/1 | 230 | 11 | 39.909 |
| Suma | | 3283 | 780 | 733.658 |
| **Sub-total Sta. Andrea** | | **3,290** | **87** | **33.658** |
| **El Divisadero** | 1 Z-1 P1/1 | 171 | 72 | 99.817 |
| Idem | 2 Z-1 P1/1 | 192 | 0 | 20.203 |
| Idem | 3 Z-1 P1/1 | 185 | 95 | 89.481 |
| Idem | 4 Z-1 P1/1 | 186 | 37 | 11.005 |
| Idem | 5 Z-1 P1/1 | 185 | 47 | 44.745 |
| Idem | 6 Z-1 P1/1 | 187 | 7 | 82.232 |
| Idem | 7 Z-1 P1/1 | 194 | 30 | 86.148 |
| Idem | 8 Z-1 P1/1 | 196 | 84 | 91.541 |
| Idem | 9 Z-1 P1/1 | 189 | 37 | 6.422 |
| Idem | 10 Z-1 P1/1 | 176 | 43 | 24.729 |
| Idem | 11 Z-1 P1/1 | 185 | 98 | 95.835 |
| Idem | 12 Z-1 P1/1 | 186 | 17 | 15.627 |
| Idem | 13 Z-1 P1/1 | 183 | 94 | 96.862 |
| Idem | 14 Z-1 P1/1 | 184 | 64 | 56.499 |
| Idem | 15 Z-1 P1/1 | 184 | 95 | 20.679 |
| Idem | 16 Z-1 P1/1 | 185 | 52 | 38.659 |
| Idem | 17 Z-1 P1/1 | 186 | 16 | 10.036 |
| Idem | 18 Z-1 P1/1 | 185 | 25 | 43.671 |
| Idem | 19 Z-1 P1/1 | 189 | 53 | 2.185 |
| Suma | | 3,528 | 966 | 936.376 |
| **Sub-total Divisadero** | | **3,537** | **75** | **36.376** |
| **Total Surface** | | **10,178** | **53** | **13.410** |
| Adjusted surface (fractions) | | 10176 | 252 | 113.410 |

1 - EXHIBIT F



CGEA00040564

## LAND TO BE DELIVERED WITHIN 3 YEARS AFTER THE TIME OF CLOSING"

| Lots | N° | Actual Surface | | |
|---|---|---|---|---|
| | | Hectares | Areas | Centi-areas |
| **Santa Andrea** | | | | |
| nta Andrea lote # 6 | 6 Z-5 P1/1 | 224 | 81 | 91.543 |
| nta Andrea lote # 7 | 7 Z-5 P1/1 | 196 | 1 | 4.136 |
| anta Andrea lote # 8 | 8 Z-1 P1/1 | 195 | 75 | 26.507 |
| nta Andrea lote # 9 | 9 Z-1 P1/1 | 266 | 21 | 87.204 |
| nta Andrea lote # 10 | 10 Z-1 P1/1 | 208 | 6 | 7.092 |
| anta Andrea lote # 11 | 11 Z-1 P1/1 | 190 | 62 | 91.322 |
| ma | | 1279 | 246 | 307.804 |
| **tal Sta. Andrea** | | **1,281** | **49** | **7.804** |

| | | | | |
|---|---|---|---|---|
| :0 | | 542 | | |

| | | | | |
|---|---|---|---|---|
| **tal Surface** | | **1,823** | **49** | **7.8040** |

**3 - EXHIBIT F**

CGEA0040565

CGEA00040566



4-EXHIBIT F

LOT 39-LANDFILL PERMIT EXTENSION



5-EXHIBIT F

CGEA0040567

<u>EXHIBIT G</u>
<u>Form of Shareholder Agreement</u>

[see attached]



CGEA0040568

# SHAREHOLDERS AGREEMENT

Agreement dated as of _____, 2000 among

Mr. Hector Vargas Garza ("Mr. Vargas), a citizen and resident of the United Mexican States having his domicile at Rio Papaloapan 450, Col. Mexico, Monterrey NL CP 64740and Valores Ecologicos SA de CV, ("Valores"), a corporation organized under the law of the United Mexican States(Hereinafter referred to collectively as "the Vargas Interests")

AND

SARP Industries, S.A. a corporation organized under the laws of the Republic of France, having its registered office at Zone Portuaire 427, route du Hazay 78250 Limay, represented by Mr._____, its _____. [SARP Industries may be replaced by a Mexican holding company]

(Hereinafter referred to as "SARPI")

(Mr. Vargas, the Vargas Interests, Valores and SARPI each referred to as a "Party" and collectively the "Parties").

CGEA0040569

## IT HAS BEEN AGREED AS FOLLOWS:

### Article I – Preliminary Statements

1.1    Pursuant to an agreement (the "Agreement") of even date entitled "Agreement for the Purchase of Stock of Residuos Industriales Multiquim, S.A. de C.V. ("RIMSA" or the "Company") among Mr. Vargas, Valores , Compagnie Générale d'Entreprises Automobiles, SA ("CGEA") through it wholly owned subsidiary designee SARPI (the "Buyer") as defined in that Agreement acquired 100% of the authorized issued and outstanding stock of Immobiliaria Confinamina S.A. de C.V. which is the owner of 30% of the authorized, issued and outstanding capital stock of RIMSA (686 Series B shares, 42 Series B-V Shares and 1,672 Series P shares) and of the Land as defined in that Agreement. The Buyer also acquired 60% of the authorized issues and outstanding stock of RIMSA from Chemical Waste Management, Inc.. Mr. Vargas continues to own 10 % of the authorized, issued and outstanding capital stock of RIMSA (the "Shares"). (229 Series B shares, 14 Series B-V Shares and 557 Series P shares) through Valores, a company in which he owns the quasi-totality of the shares, i.e. 495 shares out of a total of 500

1.2    The Parties desire to enter into this Agreement for the purpose of defining their future relations as the sole remaining shareholders of RIMSA. The parties acknowledge that all of their undertakings here under are subject to compliance with the legal requirements of the United Mexican States.

### Article II – RIMSA's Business

2.1    RIMSA's actual current business activities consist mainly of the collection, storage, transportation, treatment and final disposal of solid or liquid hazardous waste in the United Mexican States, including but not limited to reuse, recycling, blending, thermal treatment, bioremediation, confinement, importation, exportation and also has some industrial waste activities..

2.2    During the term of this agreement, RIMSA's activities may be expanded to include incineration, transportation, thermal

2

CGEA0040570

treatment and bioremediation of solid or liquid hazardous waste in the United Mexican States. Additional facilities and sites for the conduct of the business defined in 2.1 and 2.2 may be acquired, constructed and/or operated by RIMSA.

2.3    Extensions of the activities of RIMSA beyond those defined in 2.1 and 2.2 above shall require the unanimous approval of the parties.

## Article III – Management of RIMSA

### 3.1    Board of Directors

(a)    The Board of Directors of RIMSA shall have the general supervision of the business and operations of RIMSA, and shall be composed of at least 5 Directors who shall be elected by the shareholders;

(b)    Mr. Vargas through Valores shall be entitled to nominate 1 member and SARPI shall be entitled to nominate 4 members. Each party shall nominate its proposed members and their alternates of the Board, and the Parties agree to elect all such nominees at the annual ordinary meeting of shareholders of RIMSA, and at the meeting of shareholders of RIMSA held on this date. If the Shareholders decide to increase the number of directors, the proportions set forth in this section (Vargas : 1, SARPI : 4) shall be maintained;

(c)    Any director (or alternate) elected as provided above may be removed from office without cause only upon the initiative of the Party which originally nominated such director (or alternate). In such event, the other Party agrees to vote for the removal of such director (or alternate). Any Party may propose the removal of a director not originally nominated by it only for cause;

(d)    In the event there is any vacancy on the Board arising out of death, disability, removal, resignation or otherwise, the Party which originally nominated the director (or alternate) vacating such office shall nominate a new director (or alternate) to the Board.

(e)    Any Board action may be taken by the affirmative vote of a majority of directors present or represented at the meeting.

3

CGEA0040571

**3.2   Officers**

(a)     The Board of Directors shall elect the officers who shall consist of a President, a Chief Executive Officer, a Vice-President of Business development, a Secretary, and other officers as may determined by the Board, provided however that for as long as Mr. Vargas, directly or indirectly owns any share participation in RIMSA the director appointed by him will be entitled to propose candidates for such positions, and one of such positions shall be occupied by one of the candidates proposed by such director;

(b)     Mr. Hector Vargas Garza will be named President by the Board of Directors' meeting held shortly after the signature of this agreement and the organization chart annexed hereto as Exhibit A, will be adopted at that meeting. The President will not have a casting vote.

(c)     The following actions will require the affirmative vote of the Board of Directors :

➢      Approval or modification of the yearly Budget, Business Plan, or Capital Investment Program,

➢      Approval of capital expenditures per item and per period in excess of an amount to be determined by the Board;

➢      Purchase, sale or lease of assets with a value exceeding an amount to be determined by the Board other than in the ordinary course of business;

➢      Approval of or amendment to any contract with a value in excess of an amount to be determined by the Board;

➢      Incurrence of any item of indebtedness in excess of an amount to be determined by the Board;

➢      Commencement or settlement of any material litigation in excess of an amount to be determined by the Board;

➢      Approval of any contract or amendment with any shareholder or an Affiliate thereof;

4

CGEA0040572

> Undertaking to guarantee payment or performance of the obligations of any third party or granting credit to any third party (other than in the ordinary course of business);

> Creation, acquisition or disposition of any subsidiary of RIMSA or of any shares in any such subsidiary;

> Acquisition, purchase or subscription for any interest, shares, debentures or other securities in any company (other than subsidiaries of RIMSA);

> Creation of any encumbrance of any kind whatsoever upon assets, other than purchase money encumbrances in connection with authorized purchases or encumbrances arising by operation of law;

> Change of accounting policies;

> Requesting any material permits, authorizations or licenses from governmental authorities;

> Any agreements, licenses, operations, or action which may render the continuation of the operations of the Company difficult or impossible;

> Hiring or firing any persons having a salary in excess of an amount to be determined by the Board;

> Material changes in labor policies.

**3.3    Shareholders**

(a)    The following actions shall require the affirmative vote of all outstanding shares:

(i)

> Mergers, spin-offs (escision) or sales of substantially all of the assets of the business.

CGEA0040573

> Extension of the activities of the Company outside its area of business as defined in Section 2.1 and 2.2.

> Issuance of Preferred Shares.

> Increase or decrease of capital, share split-up or spin-off.

> Appointment and removal of the Examiner of the Company, provided that if SARPI and the Vargas Interests cannot agree on the Examiner, each Party may elect an Examiner.

> Change of the nationality of the Company.

> Dissolution of the Company.

> Amendments to the charter or by-laws in connection with any of the above provide matters.

(ii)

> Executing or amending any contract or agreement with any shareholder or affiliate which is not in the ordinary course of business; It being agreed that an agreement with SARPI or affiliate for the providing of administrative services in consideration of the payment of a fee of 2% of the sales of Rimsa, and billings by Confinamina for the providing of raw materials beginning June 26, 2000 at fair market values no less than current values, and the agreement with Valores or affiliates for the providing of management services to Rimsa for three years from the Closing or until Valores sells its Shares in Rimsa, whichever is earlier, shall each be deemed to be agreements in the ordinary course of business.

> Making any capital expenditures which in the aggregate or in a single transaction exceeds U.S. $ 10 million per fiscal year;

> Sale of any assets for an aggregate amount or in a single transaction exceeding U.S. $ 1 million per fiscal year ;

> Obtaining any loans or credit facilities which singly or cumulatively exceed U.S. $ 10 million per fiscal year;

> Granting of any liens, mortgages or pledges of assets in an amount which exceeds singly or cumulatively U.S. $ 10 million.

6

CGEA0040574

(b)    All other actions by the shareholders shall be taken by the affirmative vote of the majority customary required by law for ordinary meetings and for extraordinary (special) meetings.

(c)    If SARPI proposes any decision requiring the Vargas' Interests shareholder approval under Section 3.3(a) and the Vargas Interests vote against such proposal which for purposes of this agreement shall include abstaining to vote or failing to be present at a meeting at which a vote is taken on a section 3.3 (a) question , the Vargas Interest and SARPI shall meet over a period not to exceed 30 days in an attempt to find a mutually agreeable solution. If SARPI maintains its proposed decision a second shareholders meeting to decide on said decision shall be held and if the Vargas Interests vote against such proposal for a second time, each of the parties may exercise the Put/Call arrangement of Section 6.3 below.

### Article IV – Financial statements

The Board of Directors shall cause the management of RIMSA to distribute to the Board and to the parties for internal management purposes, no later than 30 days after the end of each quarter, unaudited financial statements for such quarter prepared in accordance with U.S. GAAP.

### Article V – Financing

The parties may make additional capital investments or shareholder loans available to RIMSA on terms, conditions, and interest rate to be determined by the Board, or may borrow from external sources.

### Article VI – Transfer of Shares – Put and Call

6.1    Valores shall not during the term of this agreement sell, assign, or encumber any Shares except as provided for below.

6.2    For a period of three years from the date of this agreement Valores may only sell, assign, encumber or transfer Shares under the following put and call agreement.

6.3    If SARPI proposes any decision requiring the Vargas Interests shareholder approval under Sections 3.3(a)(i) or (ii) and if the

7

CGEA0040575

Vargas Interests vote against said decision for a second time at a second shareholders meeting called to decide on said decision as provided for in sub-paragraph 3.3 (c) then SARPI shall have the right and option to purchase ("the Call") all of the Shares owned by the Vargas Interests at the Exit Price defined below and the Vargas Interests shall have the obligation to sell such shares at that price, and (ii) the Vargas Interests shall have the right and option to sell ("the Put") all of the Shares owned by the Vargas Interests and SARPI will have the obligation to purchase all of the Shares at the Exit Price defined below. SARPI shall exercise its Call and the Vargas Interests shall exercise their Put, as the case may be, within sixty days after the holding of the second shareholders meeting referred to in subsection 3.3 (c) by delivery of a written notice ("the Exercise Notice") to the other Party during such sixty days. The price for the shares shall be the Exit Price as determined below, which shall be payable in cash at the Closing. The Vargas Interests upon written notice of the exercise of such option ("Exercise Notice") shall deliver all Shares owned by them against payment of the Exit Price at the Closing.

6.4    Should Mr. Vargas sell all or part of his 95% share interest in Valores, then SARPI shall have a Call on all of the Shares owned by the Vargas Interests. SARPI may exercise its call by sending a written notice ("Exercise Notice") to the Vargas interest within 60 days of being notified by the Vargas Interests of the change in Mr. Vargas participation in Valores or within 60 days  of learning of such change whichever is the latest.  The price for the shares shall be the Exit Price as determined below, which shall be payable in cash at the Closing.

6.5    Commencing on October 1, 2003 and at any time during the ninety (90) day period thereafter:

-    The Vargas Interests  shall have the right, but not the obligation, to sell ("the Put") to SARPI all of the Shares owned by them and SARPI will have the obligation to purchase such Shares, and

-    SARPI shall have the right, but not the obligation, to purchase ("the Call") all of the Shares owned by the  Vargas  Interests and the  Vargas Interests shall have the obligation to sell such Shares;

8

CGEA0040576

- by delivering a written notice ("the Exercise Notice") to the other party during such period. The price for the shares shall be the Exit Price as determined below, which shall be payable in cash at the Closing.

6.6    Exit Price :

The Exit Price for each share to be sold shall de determined as follows:

- If the Exercise Notice is sent subsequent to October 1, 2003, the Exit Price shall be average EBITDA of RIMSA for the years 2001, 2002 and 2003, multiplied by five less any financial or shareholder indebtedness at the time of the Exercise Notice, and divided by the total number of shares outstanding at the time of exercise;

- If the Exercise Notice is sent subsequent to December 1, 2002, the Exit Price Shall be average net EBITDA of RIMSA for the years 2000, 2001, 2002, multiplied by five less any financial or shareholder indebtedness at the Time of the Exercise Notice, and divided by the total number of shares outstanding at the time of exercise;

- If the Exercise Notice is sent subsequent to December 1, 2001, the Exit Price Shall be the EBITDA of RIMSA for the years 1999, 2000 and 2001, multiplied by five less any financial or shareholder indebtedness at the time of the Exercise Notice, and divided by the total number of shares outstanding at the time of exercise;

- If the Exercise Notice is sent subsequent to December 1, 2000, the Exit Price Shall be the EBITDA of RIMSA for the years 1999 and 2000, multiplied by five less any financial or shareholder indebtedness at the time of the Exercise Notice, and divided by the total number of shares outstanding at the time of exercise;

EBITDA for purposes hereof shall mean the Earnings Before Interest, Income Taxes, Depreciation and Amortization, deducting any amount of profit sharing payable to employees, and shall not take into account any inflation escalation. Payments to, or expenses incurred in favor of shareholders or affiliates not in the ordinary course of business shall not be deducted for determining

9

CGEA0040577

EBITDA unless they have been unanimously agreed to between the parties.

6.7    Closing

Within thirty (30) days following sending of an Exercise Notice by either the Vargas Interests or SARPI, subject to the terms and conditions hereof, the Vargas Interests shall sell and SARPI shall purchase the Vargas Interests Shares in RIMSA at a mutually agreeable time and place (the "Option Closing"). At the Option Closing, the Vargas Interests deliver all instruments and certificates duly endorsed necessary to effect the transfer of the interests contemplated hereby free and clear of all liens and encumbrances, and SARPI shall deliver to the Vargas Interests an amount equal to the Exit Price by cashier's or certified check or wire transfer of immediately available funds to an account designated by the Vargas Interests.

6.8    Right of First Refusal

(a)    For periods subsequent to January 1, 2004 if the Vargas Interests continue to own Shares, and if the Vargas Interests desire to sell, assign or otherwise transfer Shares, the Vargas Interests shall first offer to sell all of the Shares owned by them to SARPI. The Vargas Interests shall deliver a notice (the "Sale Notice") to SARPI of their intention to sell, assign, or otherwise transfer such shares, identifying the proposed purchaser, assignee or transferee and indicating the per share price and other terms and conditions.

(b)    In a period of 30 days following the Sale Notice, SARPI shall have the option to purchase all of the Shares  owned by the Vargas Interests, by delivering a notice stating that it has elected to purchase such shares on the same per share price as stipulated in the Sale Notice.

(c)    In the event that SARPI does not exercise its option, then the Vargas Interests shall be free to sell, assign or transfer all of their Shares to the purchaser, assignee, or transferee identified in the Sale Notice at the price and on the terms and conditions specified



10

CGEA0040578

therein for a period of 30 days. If the transfer to such purchaser, assignee or transferee is not effected within such time period, then the Vargas Interests must again follow the procedure set forth in this section 6.8 in order to sell assign or transfer shares.

(d)    If SARPI elects to purchase the shares, a Closing as defined in sub-section 6.7 shall take place within 30 days after the notice of election refered to in (b) above has been delivered by SARPI.

6.9    Co-sale

(a)    Should SARPI propose to accept an offer (the "Purchase Offer") from any person, (the "Offeror") to purchase a majority of RIMSA's shares from SARPI (either directly or indirectly by the sale of Confinamina Shares), then SARPI shall promptly notify the Vargas Interests of the terms of such Purchase Offer (the"Notice of Purchase Offer").

(b)    The Vargas Interests shall have the right, exercisable upon written notice to SARPI with 15 days after receipt of the Notice of Purchase Offer to elect to sell all of their Shares in RIMSA at the same price per share and on the same terms and conditions described in the said Notice of Purchase Offer .

(c)    Should SARPI deliver a Notice of Purchase Offer to the Vargas Interests pursuant to sub-section (a) above, it may deliver to the Vargas Interests a notice with respect to said Purchase Offer obligating the Vargas Interests to sell all of their Shares in RIMSA to the Offeror at the same price per share and on the same terms and conditions as described in the Notice of Purchase Offer and the Vargas Interests agree to sell said Shares.

(d)    A Closing as defined in sub-section 6.7 above shall take place on the date indicated in the Purchase Offer.

6.10    O.I.A.    (Operedora    Industrial    Administrativa    SA    de    CV Valores )owns more than a 99%    stock interest in O.I.A. a company organized under the laws of the United Mexican States and which provides personnel administrative services to RIMSA. Valores agrees to sell to SARPI or its designee at SARPI's option,

11

CGEA0040579

exercised at any time prior to January 31, 2004, all of the shares of O.I.A. at a price equal to the tax cost of the shares. SARPI may exercise this right by sending an exercise notice following which a Closing as defined in subparagraph 6.7 will be held.

## Article VII – Corporate Charter

To the extent appropriate the agreements and undertakings contained in this Agreement shall be reflected in the corporate charter of RIMSA.

## Article VIII – Termination

(a)    This Agreement shall terminate on the earlier to occur of :

(i)    a written agreement of the parties to that effect;

(ii)    the dissolution, insolvency or bankruptcy, of RIMSA under the laws of the United Mexican States;

(iii)    all of the shares are transferred by one party to the other party.

(b)    Articles II, III, IV, V and sub-sections 6.2 to 6.6 shall terminate on January 31, 2004.

## Article IX – General Notices

9.1    Notices.

Any notice to a party hereto pursuant to this Agreement shall be given by hand delivery, telecopier, certified or registered mail or a private courier service which provides evidence of receipt as a part of its service, addressed, if to RIMSA, to: Chairman of the Board, Residuos Industriales Multiquim, S.A. de C.V., Ave. Lazaro Cardenas 2400 B-21, Garza Garcia, Nuevo Leon C.P. 66260, telecopier number (8) 152-21-90; or if to SARPI,: President, CGEA, Parc des Fontaines, 169 av. Georges Clémenceau 92735 Nanterre Cedex FRANCEtelecopier number (33) 1 46 69 33 63with

12

a copy to Kenneth Levine, Levine & Okoshken, 51 avenue Montaigne, 75008 Paris, tel. : 33.1.44.13.69.21, fax : 33.1.45.63.24.96; or, if to the Vargas Interests, to: Valores Ecologicos, S.A. de C.V. , Ave. Lazaro Cardenas 2400 PB-7, Garza Garcia, Nuevo Leon C.P. 66260

. Any notice given hereunder shall be deemed given on the date of hand delivery, transmission by telecopier, five days after deposit with the postal service or, two days after delivery to a courier service, as appropriate. In the event any proceeding, action or suit is commenced by any party to this Agreement against any other party to either enforce the performance of this Agreement or any right or obligation arising thereunder, the Vargas Interests hereby appoints Mr. Hector Vargas Garza , RIMSA hereby appoints its Chairman of the Board, and SARPI hereby appoints its President as their respective agents for service of process. Any party may change the address to which notices are given by giving notice to the other parties in the manner indicated herein.

9.2    Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the    United Mexican States  applicable in the case of contracts made and to be performed in such jurisdiction, without giving effect to any conflict of laws rules.

9.3    Binding Effect.

This Agreement shall inure to the benefit of, and be binding on and enforceable against the successors and assigns of the Buyer, the Company and the Seller.

9.4    Entire Agreement.

This Agreement (including the Exhibits hereto) and the documents and schedules delivered pursuant hereto constitute the entire Agreement and understanding between the parties, and supersedes any prior agreement and understandings relating to the subject matter hereof.  This Agreement may be modified or amended only by a written instrument executed by all parties hereto.

M. J G

CGEA0040581

9.5    Severability.

If at any time subsequent to the date hereof, any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement.

9.6    Execution in Counterparts.

This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

9.7    Attorney's Fees; Costs of Litigation.

If any legal action or any other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

9.8    Headings.

The subject headings of the paragraphs and sections of this Agreement are included for purposes of convenience only and shall not affect the construction or interpretation of any of its provisions.

9.9    Arbitration.

Any dispute, controversy or claim arising out of or relating to this Agreement or the breach thereof shall be finally settled by arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce ("ICC"). There shall be three arbitrators, one selected by the Buyer, one selected by the Seller, and the third selected by the two arbitrators so selected by the Buyer and the Seller.  If a party fails to nominate an arbitrator within 30 days from the date of notification

14

CGEA0040582

to it of the other party's request for arbitration, or if the two arbitrators fail within 30 days from the date of their appointment to reach agreement on the third arbitrator, then the Court of Arbitration of the ICC shall appoint the arbitrator that was not nominated by the failing party, or shall appoint a third arbitrator, as the case may be. The place of arbitration shall be New York City and the language used shall be English.

9.10    Succession and Assignment.

This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and assigns; except as otherwise provided herein, no Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of each other Party; provided, however, that  SARPI may (i) assign any or all of its rights and interests hereunder to one or more of its wholly owned Affiliates and (ii) designate one or more of its wholly owned Affiliates to perform its obligations hereunder.; provided that SARPI guaranties to the Vargas Interests the performance by the assignee of the obligations of SARPI hereunder.

In witness Whereof, the parties have executed this agreement on the date first written above.

Mr. Hector Vargas Garza                    SARP Industries SA

                                           By:
                                           Name:
VALORES Ecologica SA de CV                 Title:
By:
Nama:
Title:

CGEA0040583

15

### EXHIBIT H
### RIMSA – Projected Profit & Loss for Year 2000

[see attached]

-100-

CGEA0040584

## Annual / Projected Profit & Loss for Year 2000

(Thousands of Pesos)

EXHIBIT E

### Rimsa Consolidated Results

Excluding Potential Projects benefit on Exhibit C)

| Description | Not Audited Jan - May | % | Projected Jun - Dec | % | Sub-Total 2000 Projected | % | Non-recurring Expenses | Total 2000 Projected | % |
|---|---|---|---|---|---|---|---|---|---|
| Disposal Mina (2) | 150,633.1 | 60.0% | 270,776.8 | 54.2% | 421,409.9 | 56.1% | | 421,409.9 | 56.1% |
| Disposal 3rd parties | 13,684.3 | 5.5% | 20,481.8 | 4.1% | 34,166.1 | 4.6% | | 34,166.1 | 4.6% |
| Incineration | 18,662.0 | 7.4% | 90,960.0 | 18.2% | 109,622.0 | 14.6% | | 109,622.0 | 14.6% |
| Freight | 49,565.3 | 19.7% | 117,386.5 | 23.5% | 166,951.8 | 22.2% | | 166,951.8 | 22.2% |
| Services | 6,495.2 | 2.6% | | 0.0% | 6,495.2 | 0.9% | | 6,495.2 | 0.9% |
| Unbilled (1) | 12,045.8 | 4.8% | | 0.0% | 12,045.8 | 1.6% | | 12,045.8 | 1.6% |
| Total Revenue | 251,085.7 | 100.0% | 499,605.0 | 100.0% | 750,690.7 | 100.0% | 0.0 | 750,690.7 | 100.0% |
| | | | | | | | | | |
| Operating Cost | | | | | | | | | |
| Production Cost | 12,652.7 | 5.0% | 25,176.1 | 5.0% | 37,828.8 | 5.0% | | 37,828.8 | 5.0% |
| Maintenance Cost | 7,648.5 | 3.0% | 15,218.8 | 3.0% | 22,867.3 | 3.0% | | 22,867.3 | 3.0% |
| Environmental Salaries | 748.4 | 0.3% | 1,047.6 | 0.2% | 1,796.2 | 0.2% | | 1,796.2 | 0.2% |
| Environmental Costs | 2,654.8 | 1.1% | 5,282.5 | 1.1% | 7,937.3 | 1.1% | | 7,937.3 | 1.1% |
| Disposal Cost 3rd parties | 4,566.6 | 1.6% | 23,463.6 | 4.7% | 28,032.6 | 3.7% | | 28,032.6 | 3.7% |
| Freight | 46,134.4 | 18.4% | 105,647.8 | 21.1% | 151,782.2 | 20.2% | -1,182.5 | 150,599.7 | 20.1% |
| Labour Operating Expense | 16,084.6 | 6.4% | 23,644.7 | 4.7% | 39,729.5 | 5.3% | | 39,729.5 | 5.3% |
| Equipment Operating Expense | 30,566.5 | 12.2% | 60,820.6 | 12.2% | 91,387.1 | 12.2% | -11,616.0 | 79,771.1 | 10.6% |
| Labour Maintenance Expense | 1,247.6 | 0.5% | 1,746.6 | 0.3% | 2,994.2 | 0.4% | | 2,994.2 | 0.4% |
| Well Amortization | 2,562.8 | 1.0% | 5,099.4 | 1.0% | 7,662.2 | 1.0% | | 7,662.2 | 1.0% |
| Job expenses | 2,272.0 | 0.8% | 4,520.8 | 0.9% | 6,792.8 | 0.9% | | 6,792.8 | 0.9% |
| Depreciation | 2,853.8 | 1.1% | 4,394.5 | 0.9% | 7,248.1 | 1.0% | | 7,248.1 | 1.0% |
| Other Operating Expenses | 10,279.2 | 4.1% | 20,453.3 | 4.1% | 30,732.5 | 4.1% | -11,022.0 | 19,710.5 | 2.6% |
| Technical Support | 5,021.7 | 2.0% | 9,992.1 | 2.0% | 15,013.8 | 2.0% | | 15,013.8 | 2.0% |
| Total Operating Cost | 145,285.8 | 57.9% | 306,508.8 | 61.4% | 451,804.6 | 60.2% | -23,820.5 | 427,984.1 | 57.0% |
| | | | | | | | | | |
| Operating Margin | 105,769.9 | 42.1% | 193,096.2 | 38.6% | 298,886.1 | 39.8% | 23,820.5 | 322,706.6 | 43.0% |
| | | | | | | | | | |
| Sales Salaries Expense | 9,938.1 | 4.0% | 13,913.3 | 2.8% | 23,851.4 | 3.2% | | 23,851.4 | 3.2% |
| Sales Expenses | 16,918.8 | 6.7% | 29,607.9 | 5.9% | 46,526.7 | 6.2% | | 46,526.7 | 6.2% |
| Administration Salaries Expense | 8,709.6 | 3.5% | 12,193.7 | 2.4% | 20,903.5 | 2.8% | | 20,903.5 | 2.8% |
| Administrative Expenses | 15,685.9 | 6.2% | 27,450.3 | 5.5% | 43,136.2 | 5.7% | -5,000.0 (3) | 38,136.2 | 5.1% |
| Total S,G&A expenses | 51,252.6 | 20.4% | 83,165.3 | 16.6% | 134,417.9 | 17.9% | -5,000.0 | 129,417.9 | 17.2% |
| | | | | | | | | | |
| IT | 54,337.3 | 21.7% | 109,931.0 | 22.0% | 164,468.2 | 21.9% | 28,820.5 | 193,288.7 | 25.7% |

Unbilled not reflected in accounting books for Jan-May 00, however recognized on management internal reporting for measuring performance of operations.

Freight revenues reclassified from disposal to represent allocation of unitary pricing for same customers.

Related to business development agreement with IPA.

Does not include profit sharing which is reflected on Projected vs. Budget Schedule.

CGEA0040585

-101-

CGEA0040586

## DISCLOSURE SCHEDULE

[to be prepared by Seller]



CGEA0040587

DISCLOSURE SCHEDULE
TO
AGREEMENT FOR THE PURCHASE OF STOCK


By and Among

CGEA, S.A./SARP INDUSTRIES, S.A.

INMOBILIARIA CONFINAMINA, S.A. DE C.V.
AND
RESIDUOS INDUSTRIALES MULTIQUIM, S.A. DE C.V.


Initials:

CGEA, S.A.

INMOBILIARIA CONFINAMINA, S.A. DE C.V.

~~RESIDUOS INDUSTRIALES MULTIQUIM, S.A. DE C.V.~~
VALORES ECOLOGICOS

QR HECTOR VARGAS GARZA

CGEA0040588

<u>Section 2.1</u>
<u>Organization</u>

No exceptions.

CGEA0040589

## Section 2.2
### Agreements with Respect to Shares

No exceptions.

CGEA0040590

**Section 2.3**
**Authorization; Absence of Liens**

In accordance with the laws of the Republic of Mexico and the by-laws of the Company, only the shareholders of the Corporation must consent to the transactions contemplated by the Agreement.

Section 2.4
Conflicting Agreements

Section 2.4(a)

No exceptions

Section 2.4(b)

No exceptions.

CGEA0040592

## Section 2.5
### Capitalization; Title to the Shares

No exceptions.

CGEA0040593

<u>Section 2.6</u>
<u>Financial Statements</u>

CGEA0040594

# INMOBILIARIA CONFINAMINA, S.A. DE C.V.

## ESTADO DE SITUACIÓN FINANCIERA

### AL 31 DE JULIO DEL 2000

#### Cifras en Pesos M.N.

**ACTIVO**

| | | |
|---|---|---|
| Efectivo en caja y bancos | $ | 11,815 |
| Impuestos por recuperar | | 4,550 |
| **Total Activo** | **$** | **16,365** |

**PASIVO** $ -

**CAPITAL CONTABLE**

| | | |
|---|---|---|
| Capital Social | $ | 50,000 |
| Utilidades (pérdidas) retenidas | | (30,000) |
| Utilidad (pérdida) del ejercicio | | (3,635) |
| **Total Capital Contable** | **$** | **16,365** |

| | | |
|---|---|---|
| **Total Pasivo y Capital Contable** | **$** | **16,365** |

CGEA0040595

**INMOBILIARIA CONFINAMINA, S.A. DE C.V.**

ESTADO DE SITUACIÓN FINANCIERA

**PROFORMA AL 05 DE SEPTIEMBRE DEL 2000**

**Cifras en Pesos M.N.**

**ACTIVO**

| | | |
|---|---|---:|
| Efectivo en caja y bancos | $ | 11,815 |
| Impuestos por recuperar | | 4,550 |
| Terrenos | | 245,000,000 |
| Inversión en acciones de subsidiarias | | 82,000,000 |
| **Total Activo** | **$** | **327,016,365** |

| | | |
|---|---|---:|
| **PASIVO** | **$** | - |

**CAPITAL CONTABLE**

| | | |
|---|---|---:|
| Capital Social | $ | 327,050,000 |
| Utilidades (pérdidas) retenidas | | (30,000) |
| Utilidad (pérdida) del ejercicio | | (3,635) |
| **Total Capital Contable** | **$** | **327,016,365** |
| **Total Pasivo y Capital Contable** | **$** | **327,016,365** |

CGEA0040596

**INMOBILIARIA CONFINAMINA, S.A. DE C.V.**

ESTADO DE SITUACIÓN FINANCIERA

PROFORMA AL 05 DE SEPTIEMBRE DEL 2000

Cifras en Pesos M.N.

**ACTIVO**

| | | |
|---|---|---:|
| Efectivo en caja y bancos | $ | 11,815 |
| Impuestos por recuperar | | 4,550 |
| Terrenos | | 245,000,000 |
| Inversión en acciones de subsidiarias | | 82,000,000 |
| **Total Activo** | **$** | **327,016,365** |

**PASIVO** $ -

**CAPITAL CONTABLE**

| | | |
|---|---|---:|
| Capital Social | $ | 327,050,000 |
| Utilidades (pérdidas) retenidas | | (30,000) |
| Utilidad (pérdida) del ejercicio | | (3,635) |
| **Total Capital Contable** | **$** | **327,016,365** |

**Total Pasivo y Capital Contable** $ **327,016,365**

CGEA0040597

**Section 2.7**
**Compliance With Laws**

**Section 2.7(a)**

No exceptions.

**Section 2.7(b)**

1.   No exceptions.

2.   No exceptions

CGEA0040598

### Section 2.8
### Receivables of the Company's Inventory

No exceptions.

CGEA0040599

### Section 2.9
### Tax Returns

**(a)List of Tax Returns**

Tax ID # ICO-990826-U79

Fiscal Year 1999
Month:
     August
     November

Annual Tax Return   (august- december)

Fiscal Year 2000

Month:
     January

**(b)** List of Tax Liens
No exceptions.

**(c)Payments of Estimated Taxes**

No exceptions see 2.9 (a)

**(d)** No exceptions

Section 2.10
Intellectual Property

No exceptions

CGEA0040601

Section 2.11
Adequacy of Assets; Relationships with Customers and Suppliers

No exceptions.

CGEA0040602

<u>Section 2.12</u>
<u>Liabilities; Net Worth</u>

No exceptions.

CGEA0040603

<u>Section 2.13</u>
<u>Environmental Matters</u>



(a)    No exceptions.
(b)    No exceptions.
(c)    No exceptions.
(d)    No exceptions.
(e)    No exceptions.
(f)    No exceptions.
(g)    No exceptions
(h)    No exceptions
(i)    No exceptions
(j)    No exceptions

CGEA0040604

## Section 2.14
### Absence of Acts of Events

Section 2.14(a)    No exceptions other than the increase in the capital stock in the Company in the amount of $327,000,000 and the issuance of 3,270,000 shares in favor of VALORES ECOLOGICOS, S.A. DE C.V. that will be in force before the Closing of the transaction.

Section 2.14(b)    No exceptions.

Section 2.14(c)    No exceptions.

Section 2.14(d)    No exceptions.

Section 2.14(e)    No exceptions

Section 2.14(f)    No exceptions, other than any items that have been disclosed elsewhere in this Disclosure Schedule.

Section 2.14(g)    No exceptions.

Section 2.14(h)    No exceptions.

Section 2.14(i)    No exceptions.

Section 2.14(j)    No exceptions

Section 2.14(k)    No exceptions

Section 2.14(l)    No exceptions, other than any items that have been disclosed elsewhere in this Disclosure Schedule.

Section 2.14(m)    No exceptions.

Section 2.14(n)    No exceptions
Section 2.14(o)    No exceptions.

Section 2.14(p)    No exceptions.

Section 2.14(q)    No exceptions.

CGEA0040605

<u>Section 2.15</u>
<u>No Adverse Change</u>

No exceptions.

CGEA0040606

## Section 2.16
## Real Property

1. With respect to the land, Hector Vargas Garza purports to be the current beneficial owner of the right of way to land. The Company has been accessing via his land, but he has not granted a written right of way for this use.

2. No exceptions other than number 1 above.

There follows a list of real property per Section 2.16(a).

Section 2.16(a)

**REAL PROPERTY OWNED BY THE COMPANY**

(ITEM PENDING)

CGEA0040608

### Section 2.17
### Personal Property

No exceptions

CGEA0040609

<u>Section 2.18</u>
<u>Employment</u>

(a)   No exceptions.
(b)   No exceptions
(c)   No exceptions
(d)   No exceptions
(e)   No exceptions
(f)   No exceptions
(g)   No exceptions
(h)   No exceptions
(i)   No exceptions

 

CGEA0040610

**Section 2.19**
**Contracts**

(a)  No excpetions
(b)  No exceptions
(c)  No exceptions
(d)  No exceptions
(e)  No exceptions
(f)  No exceptions, other than as disclosed elsewhere in this Disclosure Schedule.
(g)  No exceptions.
(h)  No exceptions
(i)  No excpetions
(j)  No exceptions
(k)  No exceptions
(l)  No exceptions
)  No exceptions
(n)  No exceptions

CGEA0040611

CGEA0040612



## Section 2.19(e)

| Attorney(s) In-fact | Type of Power | Grantor | Date Granted | Instrument | Limitations |
|---|---|---|---|---|---|
| Eduardo Baker Arjona | A,B II | | | | |
| Abelardo Raul Cavazos Garza | A,B,C,D, G | Shareholders meeting | August 04, 99 | 5442 | |

**TYPES OF POWERS OF ATTORNEY**

A.- Lawsuits and collections
B.- Acts of Administration
C. - Execution of Negotiable Instruments
D.- Acts of Ownership (Domain)
B.- Special
F.- Limited
G.- Authority to Delegate
H.- Acts of Labor management

**Section 2.20**
**Litigation**

No exceptions .

CGEA0040613