# ICC

**International Chamber of Commerce**

*The world business organization*

## International Court of Arbitration • Cour Internationale d'arbitrage

Edward B. Safran, Esq.
770 Lexington Avenue
New York, NY 10021-8165
U.S.A.

*By fax 00 1 212 308 1820*
*and mail*

Case N°: **12125/JNK**          7 May 2002
AMW/EP

Dear Sir:

We wish to acknowledge receipt of six copies of your Request for Arbitration dated 7 May 2002 and its exhibits submitted by you in the dispute between:

1. **CGEA ONYX, S.A.,**
   **formerly known as**
   **COMPAGNIE GENERALE D'ENTREPRISES AUTOMOBILES, S.A.** (France)

2. **SARP INDUSTRIES, S.A.**                                          (France)

3. **SARP INDUSTRIES MEXICO S.A. DE C.V.**                            (Mexico)

- and -

1. **MR. HECTOR VARGAS GARZA**                                        (Mexico)

2. **VALORES ECOLOGICOS S.A. DE C.V.**                                (Mexico)

This Request for Arbitration was received by us on 7 May 2002 and has been assigned the following reference: **12125/JNK**

The Counsel in the Secretariat of the ICC International Court of Arbitration who is in charge of the file is:
Ms. Jennifer Kirby                        (direct dial number: 33 1 49 53 28 32)

The Assistant Counsel are:
Ms. Lucy McGrath                          (direct dial number: 33 1 49 53 29 53)
Ms. Louise Reilly                         (direct dial number: 33 1 49 53 28 61)

The Secretaries are:
Ms. Daniela Gerbe                         (direct dial number: 33 1 49 53 29 82)
Ms. Nancy Novotny                         (direct dial number: 33 1 49 53 28 56)

.../...

**ICC International Court of Arbitration • Cour internationale d'arbitrage de la CCI**
38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28    Fax +33 1 49 53 29 29 / +33 1 49 53 29 33
Website www.iccarbitration.org    E-mail arb@iccwbo.org

**12125/JNK**  Page 2

---

Ms. Kirby will write to you soon concerning the notification of the Request for Arbitration and other relevant information.

Thank you for your payment of the non-refundable advance on administrative expenses of EUR 2 749.

Sincerely yours,

Anne Marie Whitesell
Secretary General
ICC International Court of Arbitration

Encl.: (By mail only)
1. 1998 ICC Rules of Arbitration
2. International Court of Arbitration Brochure

cc: Kenneth Levine, Esq.

# KL & ASSOCIATES
Law Offices

**KENNETH LEVINE**
*Avocat au Barreau de Paris*
*Member of the New York Bar*



By Hand Delivery

May 7, 2002

Secretariat of the Court
International Court of Arbitration of the
International Chamber of Commerce
38, Cours Albert 1er
75008 Paris, France

Gentlemen:

### Request for Arbitration Re:

Contract dated August 26, 2000 between Compagnie Générale d'Entreprises Automobiles, S.A./Sarp Industries, S.A. ("CGEA"), Mr. Hector Vargas Garza and Valores Ecologicos S.A. de C.V.

On behalf of Edward B. Safran, esquire, please find enclosed his cover letter and arbitration request of this date.

I am also enclosed an additional copy of the request of arbitration and ask you to acknowledge received of same and returned it to me.

Very truly yours,

Kenneth Levine



By Hand Delivery

May 7, 2002

Secretariat of the Court
International Court of Arbitration of the
International Chamber of Commerce
38, Cours Albert 1er
75008 Paris, France

Gentlemen:

> **Request for Arbitration Re:**
>
> Contract dated August 26, 2000 ("Stock Purchase Agreement") between Compagnie Générale d'Entreprises Automobiles, S.A./Sarp Industries, S.A. ("CGEA"), Mr. Hector Vargas Garza and Valores Ecologicos S.A. de C.V..

CGEA ONYX, S.A., formerly known as Compagnie Générale d'Entreprises Automobiles, S.A., Sarp Industries, S.A., a wholly owned subsidiary of CGEA, both corporations organized under the laws of the Republic of France, and Sarp Industries Mexico S.A. de C.V., a Mexican corporation and wholly owned subsidiary of CGEA, all of which are together referred to herein for convenience as "CGEA", respectfully submits this Request for Arbitration to the Secretariat of the Court, International Court of Arbitration of the International Chamber of Commerce, pursuant to the Rules of Arbitration in force as from 1 January, 1998. CGEA, Mr. Hector Vargas Garza and his family owned holding company, Valores Ecologicos, S.A. de C.V. are parties to a contract dated August 26, 2000 pursuant to which CGEA purchased, and Mr. Hector Vargas Garza and Valores Ecologicos, S.A. de C.V. sold, shares of stock of Residuos Industriales Multiquim, S.A. de C.V. (hereinafter, "RIMSA"), and of Immobiliaria Confinamina S.A. de C.V. (hereinafter "Confinamina"), corporations organized under the laws of the United Mexican States.



**Introduction.**

Pursuant to the Stock Purchase Agreement, CGEA purchased thirty (30%) per cent of the outstanding shares of RIMSA, a Mexican company engaged in the collection, removal, treatment and disposition of hazardous waste. RIMSA is the owner and operator of a major landfill in Mina, N.L., Mexico, and one hundred percent of the outstanding shares of Confinamina which was the owner of a large tract of land contiguous to the Mina landfill. The total consideration paid by CGEA to Respondents at the Closing amounted US$ 31,527,268. Concurrently, pursuant to a separate agreement dated as of August 17, 2000, CGEA purchased an additional sixty (60%) per cent of the outstanding shares of RIMSA from Waste Management, Inc. and Chemical Waste Management, Inc.

Sarp Industries Mexico S.A. de C.V., a Mexican corporation and wholly owned subsidiary of CGEA was added as a "Buyer" pursuant to Amendment No. 2 of the Stock Purchase Agreement effective as of the closing.

Shortly following the closing of the agreements and due to pre-closing events, RIMSA found itself subject to a number of adverse administrative rulings causing it to lose a valuable contract with Mexico's premier oil company, Pemex, and was declared ineligible to receive publicly awarded contracts for a period of time. RIMSA lost its dominant market position, has become virtually excluded from government contracts, and as a result has suffered irrevocable damage to its business, reputation and prestige as an industry leader. Some of the reasons for such a devastating loss to its business and reputation, and its value as a going business, can be found in the findings of fact made on April 24, 2001, by the Ministry of Comptrollery and Administrative Development which determined that RIMSA:

(i) had failed to properly perform services under a prior contract No. STS-78-1-06/99 with Pemex and accordingly did not offer proper assurance that it could perform the 2001 Pemex contract;

(ii) could not properly perform the services without the sealed machines which were unavailable to RIMSA since they were sealed and did not have appropriate permits;

(iii) had not complied with previously similar contracts with Pemex, resulting in the imposition of fines and penalties against RIMSA.

Earlier, on April 6, 2001, the "Secodam" (Subsecretary of Regulations and Control of Public Administration) found evidence sufficient to establish fraud ("dolus") when RIMSA violated a contract by subcontracting certain services, violated its contract by failing to incinerate and destroy containers, and otherwise violated agreements resulting in the violation by RIMSA of Mexican law providing that governmental entities are prohibited from contracting with providers which are in violation of such laws. On July 11, 2001 the Deputy Secretary of Regulations and Control of Public Formalities found that RIMSA "acted with malice from the bidding process until

Page 3 of 10

the completion of the work provided for by Contract number CS-PA-809/97", fined RIMSA, and prohibited it from contracting with public entities for a period of two years.

In acquiring RIMSA, CGEA was at the mercy of the Respondents, which controlled and operated RIMSA and were possessed of confidential and otherwise unobtainable information concerning the company and its affairs. Accordingly, CGEA negotiated and paid for the broad warranties and representations contained in the Stock Purchase Agreement to insure that RIMSA was not only in compliance with all applicable rules governing its ability to do business, but possessed the ability to continue as a major factor in the hazardous waste business in Mexico, including its relationships with governmental agencies, as well as municipal and private companies. Unfortunately the Respondents have so egregiously, completely and substantially breached the representations, warranties, promises and covenants of the Stock Purchase Agreement as to totally defeat the object of the parties in making the contract, infect the entire consideration received by Claimant, and consequently mandate rescission of the contract.[1] Claimant will tender all shares of stock of RIMSA and Confinamina which it purchased pursuant to the Stock Purchase Agreement in exchange for the consideration paid by it therefor so that the parties will be placed in *status quo ante* as if the Stock Purchase Agreement never existed.

CGEA ONYX, S.A., formerly known as Compagnie Générale d'Entreprise Automobiles, S.A., Sarp Industries, S.A. and Sarp Industries Mexico S.A. de C.V. hereby request arbitration under the Rules of the International Court of Arbitration of the International Chamber of Commerce (the "Rules") in force as from January 1, 1998.

As provided by Article 4 (3) of the Rules, CGEA provides the following information:

A.   **Parties to the Dispute**

Claimants:          CGEA ONYX, S.A., a French corporation (formerly Compagnie Générale d'Entreprises Automobiles, S.A.), with offices at Parc des Fontaines, 169 avenue Georges Clemenceau, 92735 Nanterre Cedex, France.

Sarp Industries, S.A., a French corporation with offices at Zone Portuaire de Limay, Porcheville, Route de Hazay, 78520 Limay, France.

Sarp Industries Mexico S.A. de C.V., a Mexican corporation, with offices at Av. Lazaro Cardenas, Pte. 2400, Office N° PD6D, Residential San Agustin, San Pedro Garza Garcia, N.L. 66260 Mexico.

---

[1] A separate arbitration proceeding of even date is concurrently being brought against Chemical Waste Management, Inc. and Waste Management, Inc., the sellers of the additional 60% ownership interest in RIMSA arising from breaches of substantially similar warranties and representations contained in their agreement.

**Respondents:**   Mr. Hector Vargas Garza, Avenue Lazaro Cardenas 2400 PB 7, Col. Residencial San Agustin, Garza Garcia, NL CP66260.

Valores Ecologicos S.A. de C.V., a corporation organized under the laws of the United Mexican States with offices at Avenue Lazaro Cardenas 2400 PB 7, Col. Residencial San Agustin, Garza Garcia, NL CP66260.

**B.   Nature and Circumstances of the Dispute Giving Rise to the Claims:**

The Respondents, Mr. Hector Vargas Garza and Valores Ecologicos, S.A. de C.V. breached the express warranties, representations and covenants contained in the Stock Purchase Agreement and the implied covenant of good faith and fair dealing. For instance, a judicial finding of RIMSA's ineligibility to receive publicly awarded contracts resulted from a breach of the representations and warranties contained in ¶¶ 2.7(a), 2.7(b), 2.11(a), 2.14, 2.15, 2.19, and 2.20 of the Stock Purchase Agreement. Similarly, the closing and sealing of RIMSA's equipment for not being properly permitted violated a number of the express warranties contained in the Stock Purchase Agreement. The finding by the Ministry of Comptrollery and Administrative Development which judicially determined that RIMSA intentionally misrepresented material facts sufficient to establish fraud in obtaining the Pemex contract violated the express warranties contained in ¶¶ 2.7(a), 2.7(b), 2.13(c), 2.14, 2.15, 2.19, and 2.20 of the Stock Purchase Agreement, among others. RIMSA's contamination of the Hexachloride treatment zone, its stock of untreated catalyst materials at the Mina site, and its false declaration concerning the toxic materials found to have been confined in "First Generation Cells" similarly violated the express warranties and representations of the Stock Purchase Agreement.

Without limiting the foregoing and Claimants' right to add, amend and modify their allegations, which is expressly reserved, it is claimed that the Respondents materially breached each of the following warranties, representations and covenants of the Stock Purchase Agreement mandating rescission and a restoration of the *status quo ante*:

1.   At ¶ 2.7(a) the Respondents represented and warranted that RIMSA was in compliance with "all applicable laws and legal regulations, permits and orders applicable to ... the Company or [its] assets, properties or business." Respondents further certified that the Company had not received notification of any "past or present ... failure" to comply in all material respects with any laws, etc., applicable to its assets, properties or business, which it has not substantially rectified.

2.   At ¶ 2.7(b) the Respondents represented and warranted that RIMSA possesses, and immediately following the closing, will possess, "all licenses, permits and other governmental approvals with and under all laws", etc., required to carry on its business and operate its properties and assets. In the same provision the Respondents further represented and warranted that the Company "is not in violation of any Governmental Approval where such violation could have any adverse effect on the ... Company's business."

3. At ¶ 2.8(c) the Respondents represented and warranted that the stock of collected but unprocessed waste "can be treated in the ordinary course of business without unusual delays."

4. At ¶ 2.10(d) the Respondents represented and warranted that the Company has taken all reasonable steps to protect its confidential information and trade secrets.

5. At ¶ 2.11(a) the Respondents represented and warranted that the "assets and properties owned, or leased or licensed by ... the Company constitute ... all of the property necessary for the continued conduct of the Company's business...", and ¶ 2.11(b) that there is no communication, fact, event, or action which to the Sellers or the company's knowledge, exists or has occurred which would indicate that any current customer ... will terminate its business relation with the Company.

6. At ¶ 2.13(a) the Respondents represented and warranted that RIMSA possessed all environment permits necessary to operate its business, all of which are in full force and effect and that RIMSA is in compliance with all conditions of such permits and with environmental and safety laws.

7. At ¶ 2.13(b) the Respondents represented and warranted that RIMSA had no aboveground or underground storage tanks, and surface impoundments for hazardous materials on any of its property, whether owned or leased.

8. At ¶ 2.13(c) the Respondents represented and warranted that there were no negotiations or agreements with any governmental authority relating to potential liability of RIMSA under any environmental law, that RIMSA has received no notices or demands with respect to any environmental or safety law, and to the knowledge of the Respondents, there is no basis for RIMSA being held liable for violation of any environmental or safety law.

9. At ¶ 2.13(d) the Respondents represented and warranted that the Agreement or the closing of the transaction will not trigger any obligation for site investigation or cleanup, or notification to or consent of government agencies.

10. At ¶ 2.13(g) the Respondents represented and warranted that other than for matters listed on Disclosure Schedule 2.13(g), no materials have been stored, handled, leaked, etc., or disposed of which would give rise to any liability under any environmental or safety law.

11. At ¶ 2.13(h) the Respondents represented and warranted that RIMSA has no liabilities under any environment or safety law with respect to its facilities and activities and its properties and assets.

12. At ¶ 2.14 the Respondents represented and warranted that RIMSA (a) had not

Page 6 of 10

had any contract, license or franchise terminated or modified, and (b) had not acted or failed to act which *could result* in the adverse modification or cancellation of any license, permit, franchise.

13. At ¶ 2.15 the Respondents represented and warranted that to their knowledge there is not any threatened or prospective event or condition of any character whatsoever which would have a material adverse effect upon the Company's financial condition, assets, liabilities or results of operations.

14. At ¶ 2.16 the Respondents represented and warranted that all of the Company's property (owned or leased) conform with all applicable laws.

15. At ¶ 2.19 the Respondents represented and warranted that RIMSA is not in default under any of its contracts. The Respondents further represented and warranted that none of the contracts disclosed contain any obligations which RIMSA could not reasonably perform in the normal course of business without incurring penalties.

16. At ¶ 2.20 the Respondents represented and warranted that "there is no instance in which" RIMSA or its business is subject to any outstanding injunction, judgment, etc. The Respondents further represented and warranted that "The Company has [not] committed and is not liable for any criminal, illegal, or unauthorized act or any breach of contract ... except with respect to matters that will not have an adverse effect on the operations, assets or business of the Company." Moreover, the Respondents warranted that except as disclosed in the schedules, the Respondents had no reason to believe that any action, suit, proceedings, hearing or investigation of, in or before any court or quasi-judicial or administrative agency may be brought or threatened.

17. At ¶ 2.25 the Respondents represented and warranted that its representations and warranties and exhibits do not contained any untrue statement of material fact and *to their knowledge* do not omit the statement of a material fact necessary to prevent the statements contained in the Agreement to be misleading.

18. At ¶ 4.2(a) the Respondents agreed that RIMSA would, following the signing of the Agreement and up to the closing, comply with all applicable laws, etc.

19. At ¶ 4.6 the Respondents agreed that they and their affiliates would maintain the confidentiality of all of RIMSA's confidential and proprietary information.

20. At ¶ 8.8 and pursuant to ancillary agreement made pursuant to and incorporated in the Stock Purchase Agreement, the Respondents covenanted not to compete with RIMSA.

C. **Statement of the Relief Sought:**

1.  Claimants seek rescission of the Stock Purchase Agreement and ancillary agreements executed pursuant thereto and a restoration of the total consideration and collateral expenses paid therefor. Claimants will tender to Respondents all shares of stock of RIMSA and Confinamina received from Respondents upon a return of the total consideration and collateral expenses paid.

2.  In the alternative, Claimants seek damages, including consequential damages, for breach of the Stock Purchase Agreement and the ancillary agreements executed pursuant thereto in a sum or sums not yet ascertained but subject to proof.

3.  Reasonable attorneys' fees and other costs incurred in connection with this proceeding and appropriate interest on any monetary award.

4.  Claimants reserve their right to amend or modify the relief sought.

5.  For such other and further relief as may be just and proper under the circumstances.

D.  **The Relevant Agreements and the Arbitration Agreement:**

Contract dated August 26, 2000 ("Stock Purchase Agreement") between Compagnie Générale d'Entreprises Automobiles, S.A. ("CGEA"), Chemical Waste Management, Inc. and Waste Management, Inc., as amended, and the ancillary agreements executed in connection therewith, including but not limited to the Non-Competition Agreement.

The Stock Purchase Agreement, at ¶ 10.12, provides for arbitration as follows:

"Any dispute, controversy or claim arising out of or relating to this Agreement or the breach thereof shall be finally settled by arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce ("ICC"). There shall be three arbitrators, one selected by the Buyer, one selected by the Seller, and the third selected by the two arbitrators so selected by the Buyer and the Seller. If a party fails to nominate an arbitrator within 30 days from the date of notification to it of the other party's request for arbitration, or if the two arbitrators fail within 30 days from the date of their appointment to reach agreement on the third arbitrator, then the Court of Arbitration of the ICC shall appoint the arbitrator that was not nominated by the failing party, or shall appoint a third arbitrator, as the case may be. The place of arbitration shall be New York City and the language used shall be English."

E.  **Relevant Particulars Concerning Arbitrators and Their Choice:**

Page 8 of 10

As provided at ¶ 10.12 of the Stock Purchase Agreement, "there shall be three arbitrators, one selected by the Buyer, one selected by the Seller, and the third selected by the two arbitrators so selected by the Buyer and the Seller."

Claimants nominate as their arbitrator the following person:

**Robert Abrams, Esq.**
180 Maiden Lane
New York, New York 10038
USA
Tel: (212) 806-5546
Fax: (212) 806-6006
e-mail: rabrams@stroock.com

F.   **Place of Arbitration, Rules of Law and Language:**

At provided at ¶ 10.12 of the Stock Purchase Agreement, the place of arbitration shall be New York City and the language of the arbitration shall be English.

At ¶ 10.4 of the Stock Purchase Agreement the applicable rules of law are to be as follows:

"This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable in the case of contracts made and to be performed in such jurisdiction, without giving effect to any conflict of laws rules, provided that matters concerning the form and validity of the transfer of shares shall be determined by the law of the United Mexican States and provided that in determining whether there has been an untruth, inaccuracy, violation or breach of a representation or warranty, if there is a national or local law exclusively applicable to the status, act or action which is the subject matter of the representation or warranty then said national or local law shall be applied to determine if the particular representation or warranty is untrue, inaccurate or has been violated or breached."

G.   **Notice pursuant to New York Civil Practice Law & Rules § 7503(c):**

Unless Respondents make application to stay the arbitration within twenty (20) days after service of this Request to Arbitrate they shall thereafter be precluded from objecting that a valid agreement was no made or has not been complied with and from asserting in court the bar of a limitation of time.

### H. Request for Consolidation and Joinder.

Prior to the acquisition by CGEA, RIMSA was in effect jointly owned by Chemical Waste Management, Inc. and Waste Management, Inc.. By contract dated as of August 17, 2000, CGEA purchased an additional 60% ownership interest in RIMSA from Chemical Waste Management, Inc. and Waste Management, Inc (the "Waste Agreement") so that its ownership of RIMSA would aggregate 90% of the issued and outstanding stock. It had been the stated the intention of the parties that CEGA acquire 90% of the outstanding shares of RIMSA - both the Respondents' and the Waste's interests, and the closing of the Stock Purchase Agreement was expressly contingent on the closing of the Vargas Agreement.[2] Both the Stock Purchase Agreement and the Waste Agreement were in fact simultaneously closed on November 14 and 15, 2000.

The terms, conditions, covenants, representations and warranties (other than the financial terms and the terms pertaining to the acquisition of the adjacent tract of land owned by the Vargas interests) of the Stock Purchase Agreement and the Waste Agreement are virtually identical, and both contracts were elements of a single acquisition and transaction. Specifically, both contracts contain identical arbitration provisions (including place and language of arbitration), and, with minor modification, both contracts require that the "Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable in the case of contracts made and to be performed in such jurisdiction."

There is a commonality of context - both of facts and of law, as well as relief sought - between the claim herein brought pursuant to the Stock Purchase Agreement, and the claim brought by Claimants against Chemical Waste Management, Inc. and Waste Management, Inc. under the Waste Agreement. The disputes are interrelated, and there is a need for consistency in the two proceedings and the awards to be rendered in each.

New York law, as expressed by its highest court in the case of *County of Sullivan v. Edward L. Nezelek, Inc.*, 42 NY2d 123 (1977), invests its courts with the power to order

---

[2] Section 9.13 of the Stock Purchase Agreement provides in substance that the obligation of CGEA to effect the transactions contemplated by the Stock Purchase Agreement are subject to, among other matters, the simultaneous closing of the Waste Agreement.

consolidation of arbitration proceedings, and parties signing an agreement to arbitrate must be held to do so in contemplation of the announced authority of the courts in proper cases to direct consolidation. Fully reserving its rights under New York law, and without waiving same, Claimants shall request that the arbitration requested herein be consolidated and joined with the arbitration requested by Claimants against Chemical Waste Management, Inc. and Waste Management, Inc. under the Waste Agreement.

**Arbitration Demand**

Claimants request that the International Court of Arbitration of the International Chamber of Commerce commence arbitration of this dispute. This request is being provided in six (6) counterparts as required by Article 3(1) of the Rules, and the required advance payment of US$2,500 (countervalue in Euros) pursuant to Appendix III, Article 1(1) of the Rules.

Very truly yours,
CGEA ONYX, S.A.

By: _____Bruno Masson_____
       General Counsel

Enclosures:   Stock Purchase Agreement
              Amendments n°1 and 2 to
              Stock Purchase Agreement