

**International Chamber of Commerce**

*The world business organization*

**International Court of Arbitration** ● Cour internationale d'arbitrage



**ICC International Court of Arbitration** ● Cour internationale d'arbitrage de la CCI

38, Cours Albert 1er, 75008 Paris, France
Tel. +33 1 49 53 28 28   Fax +33 1 49 53 29 33
Web site www.iccarbitration.org     E-mail arb@iccwbo.org

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 12 125/JNK/EBS

1. VEOLIA PROPRETE (formerly known as CGEA ONYX S.A.) (France)

2. SARP INDUSTRIES, S.A.                          (France)

3. SARP INDUSTRIES MEXICO S.A. DE C.V.            (Mexico)

**vs/**

1. Mr. Hector Vargas Garza                        (Mexico)

2. VALORES ECOLOGICOS S.A. DE C.V.                (Mexico)

This document is an original of the Award rendered in conformity with the Rules of the ICC International Court of Arbitration.

**BEFORE THE
INTERNATIONAL COURT OF ARBITRATION OF THE
INTERNATIONAL CHAMBER OF COMMERCE**

Case Number 12 125/JNK/EBS

In the Matter of the Arbitration

BETWEEN

**VEOLIA PROPRETE S.A., formerly known as CGEA ONYX S.A. (France),
SARP INDUSTRIES, S.A. (France) and SARP INDUSTRIES MEXICO S.A.
DE C.V. (Mexico),**

Claimants,

and

**VALORES ECOLOGICOS S.A. de C.V. and HECTOR VARGAS GARZA,**

Respondents.

**AWARD OF THE ARBITRATORS**

**April 5, 2007**

**TABLE OF CONTENTS**

I.      Introduction: The Parties and the Arbitral Tribunal.................................................................2

II.     Procedural History ........................................................................................................3

III.    Factual Background and Summary of Claims ...........................................................11

        A.      The Background Of The Dispute: The Purchase Of RIMSA.................................11

        B.      The SECODAM Investigation.........................................................................14

        C.      The Environmental Irregularities.......................................................................18

        D.      The Pre-Closing Financial Liabilities.............................................................21

        E.      Claimants' Claims..........................................................................................25

        F.      Respondents'Position.....................................................................................27

IV.     Jurisdiction and Standing..........................................................................................29

        A.      Jurisdiction.....................................................................................................29

        B.      Standing.........................................................................................................32

V.      Substantive Analysis: Respondents' Breaches of the SPA .................................37

        A.      Breach of Warranties:Applicable Principles....................................................37

        B.      The SECODAM Investigation and the Resulting Declaration of
                Ineligibility .................................................................................................40

        C.      Environmental Non-Compliance .....................................................................48

        D.      RIMSA's Financial Condition .........................................................................64

VI.     The Requested Remedies.........................................................................................69

        A.      Rescission of the SPA....................................................................................69

        B.      Compensatory Damages ...............................................................................82

VII.    Respondents' Counterclaim .....................................................................................108

VIII.   Legal Fees and Costs ..............................................................................................111

IX.     Summary..................................................................................................................112

## I.    INTRODUCTION: THE PARTIES AND THE ARBITRAL TRIBUNAL

1.    The present arbitration arises out of disputes between the parties relating to the purchase by the Claimants from the Respondents of 100 % of the share capital of Confinamina S.A. de C.V. ("Confinamina"), a company registered in Mexico, which in turn owned 30 % of the share capital of Residuos Industriales Multiquim S.A. de C.V. (RIMSA), and 10,200 hectares of land contiguous to RIMSA's site for the treatment and confinement of industrial and hazardous waste at Mina, Nuevo Leon, Mexico. In particular, the arbitration relates to alleged breaches of certain representations, warranties and covenants made by respondents during the sale of RIMSA to Claimants, specifically those concerning the environmental conditions at RIMSA's Mina facility as well as other contractual and financial claims.

2.    The Claimants are: 1. Veolia Propreté, a company registered in France, formerly known as CGEA Onyx S.A. ("Onyx"), a company registered in France and formerly known as Compagnie Générale d'Enterprises Automobiles, S.A. (36/38 Avenue Kléber, 75799 Paris Cedex 16, France), 2. SARP Industries S.A. (SARPI), a company registered in France (Zone Portuaire, 427 Route Du Hazay, 78520 Limay, France) and 3. SARP Industries Mexico, S.A. de C.V. (SARPI Mexico), a company registered in Mexico (Lazaro Cardenas 2400 Pte, San Pedro Garza Garcia, Nuevo León, Mexico). The Claimants are represented in this arbitration by the law firm of Jones Day (51 Louisiana Avenue, N.W., Washington D.C. 20001-2113, USA) by the Paris office of that firm, the address of which is 120 rue de Faubourg-St. Honoré, 75008 Paris, France.

3.    The Respondents are: 1. Hector Vargas Garza (Rio Papaloapan 450, Col. Mexico, Monterrey NL CP 64740, Mexico) and 2. Valores Ecológicos S.A. de C.V. ("VESA"), a company registered in Mexico. The Respondents are represented by the law firm of Curtis, Mallet-Prevost, Colt & Mosle LLP (101 Park Avenue, New York, NY 10178, USA).

4.      The Claimants filed at the International Chamber of Commerce (ICC) a Request for Arbitration against the Respondents on May 7, 2002, which they amended on January 30, 2003, after the constitution of the Arbitral Tribunal.

5.      The Arbitral Tribunal consists of three members: Job Taylor III and Steven A. Hammond as co-arbitrators – nominated by the Claimants and the Respondents respectively, and confirmed by the Secretary General of the ICC International Court of Arbitration, in accordance with the ICC Rules of Arbitration (the "Rules"), on September 6, 2002 – and Lawrence W. Newman, as Chairman –jointly nominated by the co-arbitrators and confirmed by the Secretary General on December 18, 2002.

## II.   PROCEDURAL HISTORY

6.      The Tribunal sees little purpose in reciting in detail the lengthy procedural history of the arbitration, which was initiated through the filing by the Claimants of their initial Arbitration Request; we highlight only the most important aspects of the long course of this arbitration.

7.      The arbitration was instituted pursuant to the arbitration clause included in the Agreement for the Purchase of Stock of RIMSA, dated August 26, 2000, by and between the Claimants and the Respondents ("the Stock Purchase Agreement" or "SPA" or "the Agreement"). The clause reads as follows:

"Section 10.12 Arbitration

Any dispute, controversy or claim arising out of or relating to this Agreement or the breach thereof shall be finally settled by arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce ("ICC"). There shall be three arbitrators, one selected by the Buyer, one selected by the Seller, and the third selected by the two arbitrators so selected by the Buyer and the seller. If a party fails to nominate an arbitrator within 30 days from the date of notification to it of the other party's request for arbitration, or if the two arbitrators fail within 30 days from the date of their appointment to reach agreement on the third arbitrator, then the Court of Arbitration of the

NYCDMS/1005454. 14

ICC shall appoint the arbitrator that was not nominated by the failing party, or shall appoint a third arbitrator, as the case may be. The place of arbitration shall be New York City and the language shall be English."

8.     The Terms of Reference were agreed upon between the parties and established by the parties and the Arbitral Tribunal on March 24, 2003. Section D states that "The issues to be determined by the Arbitral Tribunal shall be those resulting from the parties' submissions, including forthcoming submissions, and which are relevant to the adjudication of the parties' respective claims and defenses, without prejudice to the provision of Article 19 of the 1998 ICC Rules". Section G of the Terms of Reference determined that hearings would be held at the offices of Baker & McKenzie LLP, at 805 Third Avenue, 29th Floor, New York (New York 10022 – USA). (The address of Baker & McKenzie has since changed to 1114 Avenue of the Americas, New York, New York 10036.) The hearings were, in fact, held at the offices of Jones Day in New York with the consent of the parties.

9.     The parties did not make, in the Terms of Reference, an explicit choice of the law to be applied to the merits of the dispute, although, according to the SPA (Section ¶10.4), it is to be "governed by and construed in accordance with the laws of the State of New York ..., without giving effect to any conflict of laws rules,..."  Accordingly, the Tribunal applies New York law in construing the SPA and in deciding all matters arising therefrom, but in general applies the rules of law that it determines to be "appropriate" (*see* Article 17(1) of the Rules).

10.     In the course of the proceedings, the Tribunal has issued various procedural orders and decisions, concerning time extensions, the production of documents and other evidence, the scope and process of discovery, hearing schedules, a change in the law firm acting as counsel for the Claimants (by which the law firm of Jones Day was substituted for Freshfields Bruckhaus Deringer as counsel for the Claimants), of which we took note in Procedural Order No. 16, the appointment of an administrative secretary to the Tribunal (on February 16, 2006), and other procedural matters.

4

11.    By Procedural Order No. 5 (April 2, 2003), the Tribunal established its initial timetable for the proceedings and required generally that all documents bearing on the issues in this proceeding be disclosed by the parties to one another.

12.    After considering the Claimants' request for interim relief (dated April 23, 2003) relating to certain promissory notes ("*pagarés*") issued by the Claimants in furtherance of rights and obligations provided for under the SPA and payable to the Respondents as part of the stock purchase transaction (*see infra* at ¶31), as well as the Respondents' response to the Claimants' request (submitted on May 23, 2003), and further correspondence from the parties on the same subject, the Tribunal issued Procedural Order No 7 on August 19, 2003. The Tribunal ordered the "Respondents to take no further action in the Mexican courts with respect to the first *pagaré* and to take no action to seek payment or any other adjudication with respect to the second *pagaré*, pending the final award to be issued by the Tribunal." The Tribunal went on to order that: "Should there come a time prior to the issuance of the final award when the Respondents believe that they will not be able to preserve any rights they might have to proceed, under applicable statutes of limitation or otherwise, in the Mexican courts under the second *pagaré*, the Respondents may apply to this Tribunal for appropriate interim relief – providing that they have previously made efforts in good faith to negotiate an appropriate stipulation or agreement with the Claimants under which the Respondents' rights to proceed under the second *pagaré* are preserved pending the outcome of this arbitration."

13.    On October 21, 2004, the Claimants sought relief related to an alleged violation by Respondents of Procedural Order No. 7. The Claimants provided evidence that Respondent VESA had attempted to advance the Mexican court proceedings related to the first *pagaré* in November 2003; furthermore, on August 26, 2004, the Claimants alleged that Respondent VESA had petitioned the court to "admit" evidence submitted by it and "schedule a date and time for the examination of all evidence." Claimants requested the Tribunal to order Respondents to "take all necessary steps to immediately bring to a halt the proceedings in the Mexican court, including a stay of those proceedings and a withdrawal of

5

all submissions to the court," as well as to impose "any appropriate sanctions for Respondents' actions."

14.    Claimants submitted a second application on March 23, 2006 concerning a further violation by Respondents of their obligation under Procedural Order No. 7 to avoid collateral litigation in the Mexican courts as to the enforcement of the *pagarés*.  The letter informed the Tribunal about a lawsuit instituted by Respondents in Mexico of which Claimants apparently learned on February 15, 2006. Claimants' letter requested that the Tribunal order Respondents to provide complete information regarding the complaint filed in Mexico and to withdraw immediately any existing proceedings; Claimants also requested the imposition on Respondents of "sufficient sanctions" for their allegedly egregious conduct "to impress upon Respondents that breach of the Tribunal's Orders bears some consequence."

15.    The Tribunal has considered both of those applications and on May 26, 2006 (by means of Procedural Order 27) decided that, since the proceedings complained of by Claimants had been dismissed by the Mexican courts and were no longer pending (according to Claimants' own March 2006 communication), there was no need for the imposition of any sanctions. We deal with the payment obligations underlying the two *pagarés* and Respondents' independent enforcement actions in the Mexican courts below, in the appropriate sections of this Award (*see infra* under VI.B.6).

16.    On October 8, 2004, the Tribunal was informed by counsel for Respondents that a warrant had been issued by a Mexican court for the arrest of Mr. Hector Vargas Garza, one of the Respondents, and certain other persons, along with Mr. Vargas's two sons, in the context of a criminal proceeding commenced on December 18, 2003 by SARP Industries Mexico, S.A. de C.V., a subsidiary of Onyx S.A., one of the Claimants.  The Respondents subsequently requested interim relief, including an adjournment of the scheduled hearings. Following extensive written submissions and a conference call with the parties on October 13, 2004, the Tribunal ruled, by Procedural Order No. 22, that hearings would not be held in accordance with the previously established schedule, because "the Respondents would suffer from an inability to present, as effectively as they would have, had the Claimants not taken

the actions that they have with respect to the criminal proceedings, the argument and presentation of their case."

17.   Pursuant to Procedural Order No. 22, the Tribunal conducted another conference call with representatives of the Claimants and Respondents regarding the Respondents' application for a further adjournment of the arbitral proceedings for the duration of the criminal proceedings against Mr. Vargas and his sons in Mexico. The Tribunal ruled, in Procedural Order No. 23 (December 13, 2004), that the Respondents' application would be deferred until after the first phase of hearings, devoted to Claimants' case, scheduled for January 2005, since there would not necessarily be any need for either of the two Garzas to testify before the Tribunal during that phase. After the completion of the first phase of hearing in January, the Tribunal considered Claimants' adjournment requests, and eventually scheduled, with the agreement and consent of the parties, the second phase of hearings for the month of March 2005.

18.   On October 1, 2004, the Tribunal received Respondents' Motion to Preclude: (a) three allegedly "new and unauthorized" claims by Claimants, as well as the "resurrected" EBITDA claim (Earnings Before Interest, Taxes, Depreciation and Amortization – henceforth EBITDA), namely the claim that Claimants were defrauded by the artificial inflation by Respondents of RIMSA's year-2000 EBITDA: (b) Claimants' supplemental expert report of PriceWaterhouseCoopers ("PwC") dated September 13, 2004, regarding the quantification of the economic impact of the alleged breaches of the SPA by Respondents on Claimants' interest in RIMSA; and (c) additional documents offered in evidence by Claimants allegedly in violation of Procedural Orders of the Tribunal. After receipt of additional submissions by both parties on these issues (Claimants' Opposition to Motion to Preclude, Respondents' Reply in Support of Motion to Preclude), the Tribunal reserved resolution of the issues covered by (a) above for the final award (*see infra* at ¶25). As to the matters covered by (b) and (c), the Tribunal ruled in Procedural Order No. 23 (December 13, 2004) that the documents in question would be received and not precluded, considering that the passage of time since the originally scheduled hearing in June 2004, should have allowed Respondents to understand, analyze and "prepare defenses with respect to these new

7

documents." The Tribunal warned the parties, however, that it would not accept the addition to the record of any further documentary exhibits, other than those to be used for purposes of impeachment in cross-examination of witnesses.

19.    The Tribunal has received extensive additional submissions from the parties, including memorials, witness statements, expert reports and other exhibits, and held a number of telephone conference call hearings on procedural matters. Hearings on the merits of the case were finally held in New York, New York, from January 10 to January 14, from March 7 to March 9 and from March 14 to March 15, 2005. At the hearings, the Tribunal received the testimony of the parties' witnesses, heard oral arguments by their counsel and received additional evidence.

20.    At the end of the first week of hearings in January 2005, the Tribunal requested that Claimants contact Dr. Juan Antonio Cuéllar with a view toward securing his attendance as a Tribunal witness at the second series of hearings in March 2005. In the course of the first hearings the Tribunal had heard testimony regarding Dr. Cuéllar's role in the creation of the fraudulent invoices allegedly issued by RIMSA in late 2000 to inflate the year-2000 EBITDA income and avoid a purchase price adjustment, as well as other testimony regarding his actions during the period of time when RIMSA was owned by Respondents and Waste Management, Inc. At the time of the Tribunal's requests, Dr. Cuéllar was an employee of RIMSA (having been reinstated in his position as part of a labor proceeding initiated by Dr. Cuéllar against RIMSA) and therefore, arguably, under its control. The Claimants later reported to the Tribunal, however, that despite repeated communications by them to Dr. Cuéllar (through his attorney in the labor proceedings or directly to him) at the Tribunal's request, the Claimants had been unsuccessful in securing his attendance to give testimony in the March 2005 hearings. The Claimants reported that, as they stated in their letter to the Tribunal on March 2, 2005, they had been unable to grant to Dr. Cuéllar the written assurances that he was seeking -- namely, immunity arising out of his testimony before the Tribunal and assurance that there would be no negative consequences for him under Mexican law from his involvement in the arbitration.

8

21.    Between the first and second round of hearings, the Tribunal accorded, by Procedural Order No. 24 (February 8, 2005), the opportunity to the Parties to file written submissions following completion of final oral arguments. The Tribunal further requested that the Parties provide it with Proposed Findings of Facts and Conclusions of Law. These were submitted on May 27, 2005.

22.    On March 16, 2005, shortly after the completion of the hearings, the Tribunal appointed Mr. Bernardo Soto Peñadiel, CPA, a partner in the firm of BDO Seidman Hernández Marrón y Cía, S.C., as the independent account to perfom the year 2000 EBITDA calculation, as contemplated by Section 1.5 of the SPA. Mr. Soto was to be assisted in the performance of his duties, to the extent he would deem it necessary, by Mr. Carlos Ancira, CPA, of the BDO Seidman Audit Group. The Tribunal reached its decision after considering extensive correspondence on the subject from the parties and after holding several discussions with them in the course of the hearings.

23.    By Procedural Order No. 25 (April 26, 2005), the Tribunal requested that the parties submit copies of the audited financial statements of RIMSA for the year ended on December 31, 2004. After receiving financial statements for RIMSA covering the fiscal years 2002–2004, the Tribunal requested that the Parties supplement their submissions with translations of the statements from Spanish into English (Procedural Order No. 26, May 10, 2005). The parties were also requested to submit information as to "the nature and extent of any provisions, in the form of reserves or similar treatment" that had been made by RIMSA management in said financial statements for the purpose of remediation of environmental conditions for which damages or other relief had been sought by Claimants. The parties complied with the Tribunal's requests and delivered the requested information, along with comments on the financial statements, prior to the deadline for the submission of the Proposed Findings of Fact and Conclusions of Law (May 27, 2005).

24.    In Procedural Order No. 25 (April 26, 2005), the Tribunal also requested the parties to indicate in their Proposed Findings of Fact and Conclusions of Law which of the claims set forth in the Terms of Reference were still being pursued. The Tribunal made this

9

request because of the considerable adjustments that were made, in the course of this arbitration, to the parties' original claims, notably the claims of the Claimants, who changed counsel during the course of the proceedings; the changes are attributable to the nature of the present case, involving ongoing environmental investigations and governmental reviews that were crystallized only at a later stage in the arbitration, well after Claimants' initial Arbitration Request. The parties' Proposed Findings were, therefore, submitted with Procedural Order No. 25 in mind and were accepted by the Tribunal as reflecting the parties' outstanding claims and arguments to be considered by the Tribunal. Thus, while the Tribunal has considered the full record in issuing this Award, it has not adjudicated claims not preserved in the submissions made pursuant to Procedural Order no. 25.

25.    We believe that, over the course of these proceedings –which have only recently been formally closed (see Procedural Order No. 28) — the parties have had a full and fair opportunity to respond to all claims made and positions taken. To the extent that changes have been made in the parties' initial claims after the Terms of Reference have been signed, the Arbitral Tribunal has considered the nature of the case, the stage of the arbitration and other relevant circumstances and, through Procedural Order No. 25, has authorized the submission of modified claims (*see also* Article 19 of the Rules). Accordingly, the objections made by Respondents in their Motion to Preclude (dated October 12, 2004) to the Claimants' allegedly "new and unauthorized" claims and the EBITDA claim are denied.

26.    By Procedural Order No. 28 (December 5, 2006), the Tribunal, having afforded ample opportunity to the parties to present their case, officially declared the arbitration proceedings closed, pursuant to Article 22 of the Rules. Pursuant to Article 24(2) of the Rules, the International Court of Arbitration has periodically extended the time limit for rendering the Final Arbitral Award, that limit currently being June 30, 2007.

27.    The principal written submissions by the Parties, which are also referred to in this Award, include the following:

- Claimants' Initial Memorial, dated January 16, 2004 ["CIM"]
- Respondents' Opening Memorial, dated January 26, 2004 ["ROM"]

10

- Claimants' Reply Memorial, dated September 17, 2004 ["CRM"]
- Respondents' Reply Memorial, dated September 17, 2004 ["RRM"]
- Claimants' Post-hearing Proposed Findings of Fact ["CPF"] and Conclusions of Law ["CPCL"], dated May 27, 2005
- Respondents' post-hearing Proposed Findings of Fact ["RPF"] and Conclusions of Law ["RPCL"], dated May 27, 2005.

## III.    FACTUAL FINDINGS AND SUMMARY OF CLAIMS

### A.    The Background of the Dispute: the Purchase of RIMSA

28.    In 1985, Respondent Hector Vargas Garza founded RIMSA in Monterrey, Mexico for the purpose of providing hazardous and industrial waste treatment and confinement services at a site in the state of Nuevo Leon, Mexico. RIMSA commenced operations in 1987. RIMSA received permission from the Mexican Secretary for Urban Development and Ecology ("SEDUE"), and thereby became the first and only licensed hazardous waste landfill in Mexico (*see* Ex. C-9; CPF ¶¶1-4; RPF ¶¶5-8). In 1994, Waste Management, Inc. ("WMI") purchased from Mr. Vargas and his family 60% of the shares of RIMSA. Mr. Vargas Garza retained 40% of RIMSA's shares through Respondent VESA (*see* CPF ¶¶22, 30-31; RPF ¶11).

29.    In mid-1999, WMI contacted Jerome LeConte, a former WMI employee, who then owned his own consulting firm, and informed him that WMI was interested in selling its 60% interest in RIMSA. Claimant Onyx, a subsidiary of Vivendi Environment, then part of the worldwide Vivendi Group, soon learned of this business opportunity and entered into negotiations with WMI. The negotiations began in earnest in early 2000 and were extended in April 2000 to include Mr. Vargas (*see* CPF ¶¶123-127; RPF ¶¶ 12-13; Transcript at 472-473 (LeConte)).

30.    Apparently satisfied with the results of two rounds of due diligence (*see* RPF ¶¶16-24; also Transcript at 502 (LeConte)) –the first in early March 2000 (*see* CPF ¶¶125-126) and a second, more detailed one, in May 2000 (*see* ¶¶139-143; Transcript at 498-99

11

(LeConte)) —which indicated that "RIMSA appeared to be a well-run company with a promising future in the Mexican hazardous waste market, and appeared to be operating in accordance with [WMI's] established practice of stringent environmental compliance" (*see* Ex. C-63; Gauthier Statement ¶18; CPF ¶140)– and after receiving a $6 million reduction in its original purchase offer for RIMSA, in order to address certain issues at the Mina landfill and RIMSA's Villahermosa site (*see* ¶¶144-148), Onyx executed separate share purchase agreements ("SPAs") with WMI and Vargas on August 26, 2000. In one SPA, Onyx agreed to acquire the whole of WMI's stake in RIMSA (representing a 60% share in the company) and in the other SPA (the one in question here) three-quarters of Respondents' shares in RIMSA, *i.e.*, a 30% stake in the company. Mr. Hector Vargas retained 10% of the company. At the transaction on November 14, 2000, Onyx acquired, through a subsidiary holding company (Claimant SARPI Mexico), 90% of the shares of RIMSA, while the Respondents retained a 10% stake, held through Respondent VESA (*see* RPF ¶¶32-34).

    31.    Onyx's purchase offer was based on an evaluation report by its investment bank Lazard Frères that estimated RIMSA's value to be US$100 million (*see* Ex. C-65; CPF ¶126; Transcript at 512-513 (LeConte)). The final purchase price for the 30% Vargas interest was Mx$310,175,000 (around US$ 31,527,268 at the time) payable as follows (*see* RPF ¶¶30-31; CPF ¶¶203-206):

- Mx$239,975,000[1] pesos to the Respondents at Closing;
- Mx$20,592,000 18 months after Closing, evidenced by a promissory note ("*pagaré*"), due and payable on May 14, 2002;
- Mx$20,592,000 36 months after Closing, evidenced by another promissory note ("*pagaré*") due and payable on November 14, 2003;
- Mx$8,424,000 if RIMSA's earnings for the year 2000 reached a defined target. Payment of this amount was withheld by Claimants and deposited into a Withholding Fund, subject to a post-closing confirmation of EBITDA for the year 2000;

---

[1] In this Award, the abbreviation "Mx$," where used before amounts, denotes Mexican pesos. United States dollars are preceded with "US$."

- Mx$20,592,000, payable only upon issuance of a permit allowing the 700 hectares parcel of land ("lot 39") adjacent to the Mina landfill to be operated as a hazardous waste landfill. Payment of this amount is sought in the Respondents' Counterclaim and is opposed by Claimants, who say that it is no longer payable, in that no such permit has so far been issued and in light of the alleged futility or "inappropriateness" of RIMSA's making any application in the future.

32.    At the closing of the transaction, Onyx paid around US$22,363,032 for Respondents' 30% share of RIMSA. In addition, a portion of the total purchase price (Mx$46,800,000) was placed in an escrow account, pursuant to an Escrow Agreement dated November 14, 2000, to serve as security for any claims by the Claimants against the Respondents under the SPA. The disposition of this escrow account, along with payment of the outstanding *pagarés*, and the Mx$20,592,000 amount relating to the lot 39 permit, are considered by the Tribunal (*see infra* under VI.B.7 and VII). Claimants also paid Mx$18,720,000 (around US$ 1,949,838) to various members of the Vargas family for the execution of a separate non-competition agreement concluded between Respondents and Claimants and annexed to the SPA (*see* RPF ¶¶30-31; CPF ¶¶203-206).

33.    The purchase agreement that the parties negotiated was premised on the understanding that the Respondents would retain responsibility for all operational, regulatory, legal and financial risks and liabilities arising out of the conduct of business or conditions of RIMSA prior to Claimants' purchase of RIMSA. This contractual arrangement is clearly reflected in the broad language of the contractual warranties and representations provided by Respondents with respect to, *inter alia*, RIMSA's pre-closing financial condition [for instance, *see* SPA Sections ¶¶ 2.6, 2.8, 2.19, 2.22], business and operation [SPA Section ¶¶ 2.11, 2.15], compliance with environmental laws and regulations [SPA Sections ¶¶ 2.7, 2.13], and absence of any ongoing and of any threat of governmental investigation [SPA Section ¶ 2.20]. Our interpretation is consistent with the intention of the Claimants in

13

entering into the SPA, as expressed by one of its representatives at the hearing, Pascal Gauthier, whose testimony the Tribunal finds credible in this respect:

> "… my aim throughout the negotiations of the SPAs was to obtain wide representations and warranties backed by generous indemnification provisions, which would provide Onyx with watertight cover . . . in the event of problems arising at RIMSA following Onyx's acquisition of the company." Gauthier Stmt. Para. 54.

34.    The parties' evident understanding was that Respondents would be able to avoid exposure to liability under the contractual web of comprehensive representations and warranties only to the extent that they disclosed, in written schedules annexed to the SPA, facts inconsistent with those warranties prior to Closing (November 14-15, 2000).

### B.    The SECODAM Investigation

35.    Not long after the Closing, and the transfer to Claimants of operational control of RIMSA, problems arose.  In April 2001, almost five months after the Closing, RIMSA received a formal notification that SECODAM (the "Secretaría de la Contraloría y Desarrollo Admininstrativo," a Mexican government inspector general for government contracts with private entities) was commencing an official administrative proceeding concerning RIMSA's performance of a 1997 contract with Petroquímica Pajaritos ("Petroquímica", a subsidiary of Pemex, the Mexican national oil company, both public entities), for the discharge, incineration and management of highly carcinogenic hexachloride-contaminated waste (*see* Ex. C-109).  Respondents offer a range of conjectural scenarios as to SECODAM's genuine motivations in ordering and promptly completing the investigation against RIMSA in 2001 (*see* RPF ¶¶104 – 107).  Yet, for the reasons set forth below, we conclude that they have no relevance to this dispute.

36.    It should be noted parenthetically that investigation into the performance by RIMSA of the 1997 contract had previously been undertaken by Petroquímica's Internal Comptroller (ICO), in 1998 (*see* Exs. C-48; C-50; C-51; and CPF ¶¶78-79).  As of the fall of 2000, the ICO investigation was not focused on RIMSA's direct role in performing the 1997

14

contract – although, on October 23, 2000, severe penalties, including dismissal and substantial fines, had been imposed on the five Petroquímica employees who had supervised RIMSA's work. Those sanctions were imposed as a result of findings that the employees had committed extensive irregularities with respect to the administration of the contract, notably in their failure to identify and avoid overpayments to RIMSA and in permitting improper confinement by RIMSA of the hexachloride drums, on the one hand, and RIMSA's subcontracting part of the project on the other (*see* Ex. C-97; Transcript at 1252 (Cantú)). The internal ICO finding of October 23, 2000 triggered, in its turn, the 2001 investigation phase by SECODAM concerning RIMSA directly, because Mexican law requires that the ICO, as the internal auditor of a public entity, report findings by it of any irregularity to SECODAM (*see* Internal Regulation of the Secretariat of Public Function, art. 63 VI (Reply L.A. Ex. 33); Transcript at 1220-21 (Cantú) and 1593 (Sanchez); Exs. C-3 at 8; C-98; and CPF ¶¶83 & 107).

37.     During the pre-Closing period, however, RIMSA was the subject of only one uncontestedly pending dispute with the Mexican authorities relating to the 1997 contract (*see* RPF ¶¶67-78) –the over-payment, as asserted by Petroquímica in 1999 of RIMSA's compensation for the project. In particular, after the alleged completion of the contract, Petroquímica requested from the bond issuer a partial refund of RIMSA's paid compensation, in the amount of Mx$9,497,000, representing the alleged discharge (*see* Ex. C-276). Petroquímica's allegations regarding overpayment were based on the same 1998 ICO audit report that had started the internal investigation against its five employees who had overseen the performance of the contract. The ICO's assertions concerning excessive payment to RIMSA were thus premised on the same grounds of deficient performance as those for which the employees had been faulted – confinement of hexachloride drums instead of incineration, faulty weight-measuring methods and overall mishandling of the waste (*see* RPF ¶73). When RIMSA refused to provide security to the bond issuer for the amount of the dispute with Petroquímica, the bonding company filed a lawsuit against RIMSA, in April 2000. Only this pending litigation was disclosed to the Claimants in SPA's Disclosure Schedule 2.20 (*see* Ex. C-1, Disclosure Schedule ¶2.20).

15

38.    Later, in July 2001, SECODAM concluded that RIMSA's actions in subcontracting services and confining the hexachloride compounds at the Mina site instead of incinerating them were in direct violation of the 1997 contract. RIMSA was consequently ordered to pay a fine of Mx$246,000, and, most importantly, was debarred from bidding on and entering into contracts with public entities, both directly and indirectly (through private companies working for the government), for a period of two years, later reduced to one year, effective from July 25, 2001 (*see* Ex. C-118). Athough this ban was ultimately overturned by the courts, it had a significant impact on RIMSA's business, since the Mexican government was RIMSA's single most important customer, as acknowledged in the SPA (*see* Disclosure Schedule ¶ 2.11(b)).

39.    Until the ban on RIMSA's participation in governmental contracts was definitively declared a nullity by a federal court in Mexico on March 1, 2004 (*see* Ex. C-198), RIMSA and the Claimants were entangled in a series of appeals, revocations, suspensions and re-issuances of the debarment (*see* CPF ¶¶227-250). On August 27, 2001, the declaration of ineligibility for government contract bidding was revoked, following an appeal by RIMSA; on September 18, 2001 it was re-issued, this time for one year, beginning September 27, 2001 (*see* Exs. C-134, 135); on January 15, 2002 the ban was suspended pending final resolution of the dispute (*see* Ex. C-146); on May 9, 2003, a court decision allowed the ban to stand – RIMSA was notified on June 16, 2003 (*see* Ex. C-164; Pouget Stmt., ¶ 61); on July 3, 2003, the appellate court suspended the ban and permitted RIMSA to participate in public bids (*see* Ex. C-203); on August 15, 2003, RIMSA was notified that a regional tribunal had refused to suspend its ineligibility (*see* Ex. C-172); on September 11, 2003, SECODAM confirmed the ban and informed Pemex that RIMSA was still ineligible to bid on government contracts (*see* Ex. C-175). As mentioned above, the ban was definitively lifted on March 1, 2004 (*see* Ex. C-198).

40.    Despite the parties' differing interpretations as to the number of days during which the ban was actually –*see* RRM ¶88; RPF ¶¶112-118) or "effectively" (as Claimants would have it –*see* CPF ¶230) in force, from July 25, 2001 until at least July 3, 2003, RIMSA was ineligible to bid on government contracts for approximately 163 days. The last

16

period of debarment in fact seems to have extended beyond the July 3, 2003 termination date for which the Respondents argue, since in August of the same year a court refused to suspend the ban, while in September of that year, SECODAM confirmed its validity in a communication to Pemex (*see* Ex. C-175). In any case, there is evidence that between July 2001 and September 2003 (if not March 2004), RIMSA was denied participation in bidding contests –for instance, in September 2001 (*see* Ex. C-207), June 2002 (*see* Ex. C-202), April 2002 (*see* Ex. C-150), and September 2003 (*see* Ex. C-389)— under the unfounded belief by public or private entities that RIMSA was still ineligible, even though the ban had by this time been suspended and therefore ought not to have posed any obstacle. Additional confusion was caused by SECODAM's failure to keep its circulars or website information up to date with the judicial developments, its failure on occasion to publish rulings favorable to RIMSA and its erroneously listing RIMSA as non-eligible (*see* CPF ¶¶244-249). Negative publicity also resulted from the declaration of ineligibility (ironically in 2002, during much of which the ban was, in fact, ineffective –*see* Ex. C-147; C-148; C-222; CPF ¶¶215-216). It is indicative of the sensation caused that Halliburton, a drilling company and potential customer of RIMSA, would urge its employees in June 2004 to be cautious about dealing with RIMSA and in fact abstain therefrom precisely because of the pending dispute with the governmental entities over the debarment (*see* Ex. C-386; CPF ¶240).

41.     All in all, a precise determination of the exact period of the ban's practical effectiveness presents a challenging task that the Tribunal is reluctant to undertake. The Tribunal does accept, however, that there is persuasive evidence of *some* actual spillover effect, resulting in prejudice to Claimants in periods during which it was legally not in force.

## C.    The Environmental Irregularities

42.     Another source of major problems for the Claimants was the environmental condition of RIMSA's operating sites. Starting in June 2001, Respondents received repeated notifications by Claimants concerning alleged environmental problems at the Mina landfill (*see* Exs. C-117, 124; R-67; RPF ¶42). Delegations of PROFEPA (the Mexican

17

government agency responsible for compliance with Mexican environmental laws)
performed general inspections at the Mina site in May, July and October 2001, as well as in
January 2002, in order to determine the compliance status of the Mina facility with regard to
applicable provisions of the General Law of Ecological Balance and Environmental
Protection ("LGEEPA") and regulations and official standards –see Ex. R-19; RPF ¶¶32-33;
Transcript at 644 (Roussel)). On February 26, 2003 Claimants also notified PROFEPA of
certain aspects of the waste treatment operations at the Mina site, which, according to them,
constituted a grave threat of severe environmental contamination (see Ex. C-162). The
February 26 letter was sent shortly after Claimants' Amended Request for Arbitration on
January 30, 2003, and was the first official communication to the Mexican authorities as to
the environmental conditions at the Mina site. This communication consisted of a
description of the same conditions set forth by the Claimants as the basis for their
environmental claims in this proceeding. Thus, they reported to PROFEPA on
contamination of the First Generation Cells (FGC), the Hexachloride Treatment Zone
(HTZ), the First Treatment Zone (FTZ), the groundwater, as well as other areas at and
adjacent to the Mina site, all of which the Claimants have presented as the basis for their
environmental-based claims in this arbitration.

43.     In response to Claimants' letter, the RIMSA Sampling and Analysis Protocol
(submitted to PROFEPA on May 12, 2003 –see Exs. C-165, R-24) and its own on-site
inspection report (issued in April 2003 –see Ex. R-22), PROFEPA issued a resolution dated
May 20, 2003 requiring RIMSA to take certain measures as required under applicable
Mexican Law, namely Article 167 of the LGEEPA (see Ex. R-23). The measures ordered
concerned the first treatment zone, the treatment of hexachlorides, the lagoons, the catalyst
materials and the first generation cells. RIMSA complied with the order and PROFEPA

18

issued a resolution on August 29, 2003 closing the administrative proceeding (*see* Ex. C-174), "[t]here being no irregularities existing with respect to that indicated in the referred inspection certificate and taking into account the proof provided by the company" (*see* CPF ¶372; Ex. C-174 at 2).

44.     Apart from the black-letter law requirements of Mexican environmental legislation, Mexico established in 1992 a voluntary Industria Limpia ("Clean Industry") program, for the purpose, among other things, to encourage companies to make continuous improvements in their environmental performance beyond the strict requirements of Mexican law, pursuant to the terms and conditions of special agreements concluded between the interested parties and the Mexican authorities (*see* LGEEPA Article 38; for a description of the program, *see* RPF ¶¶366-369; Claimants' L.A., Vol. II, Ex. 10, pp. 32-34). Under this program, independent auditors assess the environmental performance of a company and produce a diagnostic report, following which the company develops an action plan to address the issues identified in the report and submits the plan to PROFEPA (*see* RPF ¶¶367-8). The award of a "Clean Industry" certificate by the Mexican government certifies the progress made and lauds the company for it. Benefits come in the form of public acknowledgement of the company's environmental-friendly practices, positive publicity and recognition of a general commitment to social service. The certificate is also an additional positive factor in any dealings with the Mexican government (*see* RPF ¶369; Transcript at 396-97 (Basurto)). As stated in a February 4, 2004 letter to Claimants, PROFEPA's policy was to promote environmental performance that *exceeded* Mexican environmental law requirements – although such performance was not obligatory (*see* Ex. R-75 at 2; RPF ¶373).

45.     RIMSA had participated in the Industria Limpia program since 1994 and intended to continue, as shown in a letter it sent in August 2003 to PROFEPA, in which it expressed its commitment to the improvement of its environmental performance –*see* Ex. C-173; CPF ¶361). As part of the re-certification process, PROFEPA had agreed to incorporate into RIMSA's Industria Limpia diagnostic report and relevant action plan commitments a

Sampling and Analysis Protocol submitted to PROFEPA on May 12, 2003 (*see* CPF ¶365; Ex. C-165; Exs. R-22, 23). In this regard, PROFEPA stated in its June 2003 communication to RIMSA that it "*does not have any objection to* the company carrying out the sampling and analysis *voluntarily proposed.*" *See* Ex. C-169 (emphasis added). Similar language was also used in the final August 2003 PROFEPA resolution putting an end to the administrative proceeding against RIMSA: "this Authority determines that the Protocol of Sampling and Analysis, *presented in a voluntary manner* dated May twelve of two thousand three, be included in its Diagnostic Report for the authorization of the Clean Industry Certificate." *See* Ex. C-174 (emphasis added) and Ex. R-25.

46.     In October 2003, at the end of another administrative proceeding, regarding the First Treatment Zone and RIMSA (*see* CPF ¶375-77; Exs. C-176, C-379), RIMSA's Industria Limpia program was further extended to incorporate PROFEPA's remediation proposals. PROFEPA's October 23, 2003 resolution required that "the remediation to be performed in the [FTZ] be carried out in conformity to the procedures established in said Program." *See* Ex. C-379 at 6.

47.     RIMSA's diagnostic report, and the proposed action plan addressing remediation of environmental problems at certain areas of the Mina site, were completed by February 4, 2004 and submitted to PROFEPA for approval. The submission, nonetheless, did not prevent PROFEPA from revoking, on March 17, 2004, RIMSA's Industria Limpia certification, pursuant to an announcement that it would only be restored if the action plan proposals were fully carried out by March 2006 (*see* CPF ¶¶384-5; Ex. C-289). RIMSA obtained the required permits and authorizations from Mexican authorities in May 2005 and has since embarked upon the implementation of the action plan (*see* CPF ¶¶387-89; Exs. C-388, C-391). The Tribunal has received no information on the action plan that was to have been completed by March 2006.

48.     Pleased with RIMSA's commitment and investment in the corrective actions approved under the action plan, PROFEPA congratulated RIMSA, in a letter dated May 17, 2004, for taking on an ambitious remediation program "without any legal or technical

20

requirement." *See* Exs. C-121 and R-62E. Claimants maintain that, despite these communications and "notwithstanding any directives or conclusions previously reached, PROFEPA remains free to re-inspect RIMSA," which exposes RIMSA and its management to the threat of "future administrative proceedings, corrective and safety measures", "severe sanctions", "civil and criminal liability" (*see* CPF ¶¶390-401). The Tribunal is, however, unable to find in the record any evidence of any threat, imminent or remote, of governmental action – let alone imposition of actual penalties of the sort contemplated by Claimants – against RIMSA or its management.

**D.    The Pre-Closing Financial Liabilities**

49.    A third area of major concern for Claimants was the financial soundness of the company. Just months after the Closing, a series of financial liabilities – arising out of outstanding pre-closing contractual obligations and still unpaid penalties – and legal disputes emerged. In particular:

1.    ***The 1999 Villahermosa Contracts***

50.    In 1999, RIMSA entered into two contracts with Pemex for the thermal destruction of drilling-mud waste, at Pemex's drilling sites at the Villahermosa facility. RIMSA began treating the muds through direct incineration, but encountered a series of operational problems, because of the muds' high moisture content (*see* CPF ¶¶446-447; ROP at 40-41; Ex. C-305). A backlog in processing the waste ensued, for which, as Claimants concede, a reserve of Mx$2.3 million was created by Respondents and which was brought to the Claimants' attention in the course of the due diligence process (*see* CPF ¶¶448, 457).

51.    As a result of the delay in performance of the contract, however, RIMSA was fined Mx$9,860,129 in October 1999 (*see* Exs. C-52, 53), an amount that RIMSA tried later to reduce through negotiations. Evidence for negotiations' having taken place in that regard exists at least for the months of January and February 2001 (*see* Pouget Rebuttal Stmt. ¶¶63-66).

52.    To speed up the process and eliminate the backlog, RIMSA imported and started using equipment from United States manufacturers (OnSite and Bethlehem). On February 15, 2001, however, PROFEPA ordered that both the Bethlehem and OnSite equipment be sealed for lack of permits for their use (*see* Ex. C-290). A temporary authorization was issued on April 23, 2001 and a full permit followed two months later, on June 27, 2001 (*see* Exs. C-284, 285), despite Respondents' pre-Closing assurances that the operational problems at the site and the complications of the permit application process would be definitely resolved within the months preceding the closing of the purchase transaction (*see* Ex. C-78, at 6-7; C-84, at 46; CPF ¶¶448-450). Shortly thereafter, RIMSA stopped processing the mud stockpiles altogether, as a matter of business priorities (deadlines had to be met under a 2001 waste-processing contract with Pemex), since the accumulated drilling-mud piles to be treated under the 1999 contract were exceeding RIMSA's handling capacity at the time (*see* CPF ¶¶459-460).

2.    ***The Dos Bocas Contract***

53.    In 1998, RIMSA entered into another contract with Pemex for the restoration, transportation and final disposal of toxic waste at Pemex's maritime terminal of Dos Bocas. RIMSA began its performance under the contract on August 26 – eight days later than the date stipulated in the contract – and completed the project by the end of 1998. On August 20, 2001, however, Pemex notified RIMSA that it was levying a Mx$719,955 penalty because of RIMSA's delay in assigning certain insurance proceeds to Pemex (*see* Ex. C-128; CPCL ¶¶462-467). Although the record is not clear on this point, it seems that RIMSA had received some notification of this penalty earlier in 1998, (*see* Ex. C-225), and had in fact paid a part of it, and had accrued the remainder of Mx$663,959 as "a liability in the books from 1998," as Respondents concede (*see* RPF ¶400)– although they never actually paid it.

3.    ***The FNM Lease Agreement***

54.    In September 1997, RIMSA entered into a lease agreement with Ferrocarriles Nacionales de Mexico (FNM) for the use of 82 railway gondolas from October 1997 through

22