March 1998. In May 2001, FNM demanded payment of an outstanding portion of the rent due under the lease contract. Respondents concede that this debt was both existing and undisclosed at the closing date, assuming responsibility therefore (*see* RPF ¶403). The matter was only settled in September 2002, upon payment by RIMSA (under the management of Claimants) of Mx$1,055,800 in total, consisting of unpaid rent and legal fees.

### 4.    *Land and Equipment Rental at Villahermosa*

55.    RIMSA's five-year land lease with the Government of the State of Tabasco, concerning the use of land for the Villahermosa site, required monthly payments in the amount of MX$40,000, as well as a variable payment based on the tons of waste processed and an annual inflation adjustment. RIMSA failed to pay the variable part of the rent, thus incurring liability under the lease contract of Mx$271,929 for the period from February 1999 to November 15, 2000, the Closing date. This amount was paid by RIMSA, then under Claimants' management, to the State of Tabasco in 2001 (*see* CPF ¶¶476-480).

56.    At the same time, RIMSA was under a lease agreement with Trans-Química Nacional, S.A. de C.V. (TQN) for the rental of roll-off bins used during 2000 in Villahermosa. Another unpaid rent bill was sent to and paid by RIMSA in April 2001, this time for Mx$495,000, which represented the portion of the unpaid rent from February 2000 to the closing date (November 15, 2000) (*see* CPF ¶¶481-484). As with the FNM lease agreement, Respondents concede the accrual of both of these liabilities prior to the Closing date (*see* RPF ¶¶404 – 405).

### 5.    *PCB Processing Costs*

57.    Between April 2000 and the closing date, RIMSA received over 100 transformers and drums filled with PCB (residual polychlorinated biphenyls) waste. Processing and treating this waste proved costly, requiring Claimants to incur post-closing

23

relevant expenditures in the amount of Mx$1,710,424. Respondents accept responsibility for this item as well, hence any further analysis is redundant (*see* RPF ¶407).

### 6.  *Accounts Receivable*

58.    At the closing date, a significant amount of collectible accounts receivable between 1998 and 2000, in the total amount of Mx$1,993,783, remained uncollected. Some accounts were registered as "unbilled cancelled," for want of adequate supporting documentation for the services, or because of RIMSA's inability to locate or obtain payment for services rendered. Credit notes were also issued by RIMSA in 2001 to cancel sales after not having received payment for two years. Pre-closing reserves in respect of such client accounts receivable were not adequate to reflect all amounts collectible (*see* CPF ¶¶785-788 and citations therein). Respondents are content to contest the *legal* validity (not the factual truth) of Claimants' allegations under the language of the pertinent section of the SPA, *see* SPA ¶ 2.8(a), arguing that the requirements for a breach of warranty have not been satisfied (*see* RPF ¶¶393-394).

### 7.  *Land Dispute*

59.    When Claimants assumed RIMSA's management and decided to build a rest area for truck drivers adjacent to the entrance at the Mina site, they encountered opposition from a farmer, Felix Treviño González, who claimed ownership by adverse possession of the two parcels of land involved, Lots 37 and 38, which he allegedly had occupied for years to graze his cattle. The Claimants, through Confinamina (their holding company), entered into litigation with the farmer regarding the ownership of parts of the land that they had bought and to which they seemingly had clear title (*see* CPF ¶¶493-504 and citations therein). Although the lawsuit was finally decided in favor of the Claimants (*see* Ex. C-223-24, 255, 307-309), they spent Mx$216,350 in legal fees to achieve that result and now claim these expenses in this proceeding.

*      *      *

NYCDMS/1005454. 14

**E.    Claimants' Claims**

60.    Claimants contend that, as a result of Respondents' misrepresentations, their initial confidence in the environmental compliance and financial condition of RIMSA, and in the future success of their investment in it, was fundamentally misplaced. As they put it, the business they received was "vastly different than the one for which they had bargained" (*see* CPF at p. 1), since post-closing discoveries about RIMSA's financial, legal and environmental condition have forced them to resolve problems, the causes of which date back to the pre-Closing period, when RIMSA was managed by Respondents. Claimants contend that Respondents made material misrepresentations about, and concealed from them, RIMSA's environmental, regulatory and financial problems – problems arising out of RIMSA's improper past practices regarding treatment and disposal of waste and waste residue and problems in its financial recordkeeping (especially as to the EBITDA of the crucial year 2000). Claimants also refer to the concealment of legal claims on the land surrounding the Mina site.

61.    Claimants also contend that Respondents mismanaged RIMSA, in violation of its permits and authorizations, from RIMSA's inception, thereby causing widespread and illegal contamination of the Mina site's soil (at the FGCs, the HTZ, the FTZ) and groundwater. They also contend that Respondents concealed the potentially devastating effect of a then-pending governmental investigation and that they failed to disclose the truth about RIMSA's financial condition, even going so far as to concoct an "audacious false-invoices scheme pursuant to which unearned income was injected into RIMSA through the payment of fake invoices by companies owned by Vargas" (*see* CPF at 4), so as to inflate artificially the 2000 EBITDA and exclude a purchase price decrease.

62.    Claimants further contend that Respondents actually knew of RIMSA's true condition, and that, therefore, Vargas's misrepresentations were not only breaches of the SPA's warranties (since the risks of pre-Closing operational, legal/ regulatory and financial problems were unambiguously allocated to Respondents in the SPA), but willful deceptions employed to induce Claimants to buy RIMSA. Claimants, therefore, seek relief in the form

25

of rescission of the contract.  Rescission, according to Claimants, would put them in the same position in which they would have been in the absence of the misrepresentations and breaches of warranties.  In the alternative, they seek either a substantial purchase price decrease under Section 1.5 of the SPA (based on alleged overpayment for RIMSA's true value), or indemnification under Article 7 of the SPA.

63.    In sum, Claimants request that the Tribunal (*see* CPF at pp. 242-243):

"**I.** Declare that Vargas fraudulently induced Onyx to enter the SPA and materially breached the SPA, and

"**A.** Order rescission of the SPA and all ancillary agreements; order Vargas to return the consideration thereof paid by Onyx to Vargas, net the sum paid to Onyx by RIMSA, for a total amount of $25,572,212, together with the appropriate exchange-rate adjustment, and interest computed at the rate of nine percent per annum from the date of the Closing to the date of full payment; and cancel Onyx's remaining obligations under the SPA of $7,311,891,

*or, in the alternative*

"**B.** Order Vargas to pay damages to Onyx consisting of

"**1.** $18,438,452, which constitutes Vargas's share of the benefit-of-the-bargain damages (including Mina remediation costs), together with the appropriate exchange-rate adjustment and interest computed at the rate of nine percent per annum from the date of the Closing to the date of full payment; and cancel Onyx's remaining obligations under the SPA of $7,311,891;

*"or, in the alternative,*

"**a.** $13,698,625, which constitutes Vargas's share of the benefit-of-the-bargain damages (excluding Mina remediation costs), together with the appropriate exchange-rate adjustment and interest computed at the rate of nine percent per annum from the date of the Closing to the date of full payment; and cancel Onyx's remaining obligations under the SPA of $7,311,891;

"*and*

26

"**b.** Vargas's share of the costs associated with the remediation of the contamination of the Mina site, with this share to be between $10.12 million and $17.88 million, together with appropriate interest computed at the rate of nine percent per annum;

"**2.** $2,699,919, which constitutes Vargas's share of the indemnity damages, together with interest computed at the rate of nine percent per annum from the date of the Closing to the date of full payment;

"**3.** $4,578,482, which constitutes Vargas's share of the EBITDA damages, or such other amount as determined by the neutral accountants, together with the appropriate exchange rate adjustment on the amount of these damages as of June 7, 2001, and interest computed at the rate of nine percent per annum from June 7, 2001, to the date of full payment;

"*and*

"**4.** Additional compensation constituting Waste Management's (60%) share of the damages, for which Vargas is jointly and severally liable.

"**II.** Deny Vargas's counterclaim in its entirety;

"**III.** Order Vargas, in accordance with Section 10.9 of the SPA and Article 31 of the ICC Rules, to pay Onyx's fees and costs, for a total amount of €5,887,248.80 together with interest computed at the rate of nine percent per annum from the date of the Award to the date of full payment; *and*

"**IV.** Award Onyx such other relief that the Tribunal deems appropriate."

### F.    Respondents' Position

64.    In response, Respondents reject Onyx's claims in their entirety and attribute whatever failure RIMSA has suffered in the post-Closing period to mismanagement by Claimants and to outside forces, rather than to undisclosed pre-closing shortcomings or acts or omissions by Respondents. They reject allegations of mismanagement or "sloppy practices" in the pre-Closing period and disclaim responsibility for the SECODAM investigation, the environmental issues and the looming financial liabilities, while seeking

27

payments of amounts due to them under the SPA, namely under the *pagarés* and through payment of the amount in the escrow account.

65.      Respondents also submit a counterclaim, invoking Section 1.1(a)(i)(f) of the SPA, which provides for a payment of US$ 2,144,821 to Respondents, if, within five years of the closing date, they succeed in acquiring a permit to use a plot of land (Lot 39) as a landfill, and also dictates that RIMSA under Claimants furnish "reasonable cooperation" in the pursuit of the application, as well as pay "the costs incurred in preparing, filing, prosecuting, and supporting the permit application." Respondents point to the Claimants' admitted refusal to offer any assistance in the process, pending the outcome of this arbitration, and claim that the amount of US$2,144,821 has become due and should be promptly paid to them.

66.      In sum, Respondents request that (*see* RPCL ¶78):

"1.      Based upon the Findings of Fact and Conclusions of Law, the following award should be made in favor of respondents:

"(a)      denying claimants' requests for relief in their entirety;

"(b)      directing claimants to make the remaining payments due on the pagarés in favor of respondents under Section 1.1(a)(i)(C) and (E) of the SPA;

"(c)      directing claimants to pay to respondents the payment due pursuant to Section 1.1(a)(i)(F) of the SPA;

"(d)      directing the escrow agent to release to respondents the funds held in escrow pursuant to the Escrow Agreement in Annex "n" of the SPA;

"(e)      pursuant to Section 12.5(e) of the SPA, in the event the independent accountants conducting the EBITDA 2000 calculation pursuant to Section 1.5 of the SPA determine that Actual EBITDA equals or exceeds

28

Target EBITDA, directing claimants to pay to respondents the full amount of the Withholding Fund referred to in Section 1.1(a)(i)(B) of the SPA; and

"(f)    pursuant to Section 10.9 of the SPA, directing claimants to pay the costs of this arbitration incurred by respondents, including reasonable attorneys' fees in an amount to be determined by the Tribunal after submissions of the parties."

67.    The above summaries of the relief sought by the parties are contained in the Proposed Findings of Fact and Conclusions of Law submitted in May 2005. *See supra* at ¶¶24-25.

68.    We now proceed to consideration and resolution of the legal and factual issues presented to us. After deciding the jurisdictional issues raised by the parties, the Tribunal analyzes the substantive legal issues, namely: (a) if Respondents have violated the extensive warranties and representations made under the SPA; and (b) in the event the answer is in the affirmative, the appropriate form of relief necessary to redress Claimants' injury. Issue-specific factual details and findings are brought into the analysis where appropriate and necessary to clarify the Tribunal's conclusions.

## IV.    JURISDICTION AND STANDING

### A.        Jurisdiction

69.    The general jurisdiction of this Tribunal to decide the controversy between the parties as a controversy or dispute "arising out of or relating to" the SPA is based on the arbitration clause in Section 10.12 of the SPA (*see supra* at ¶7) and is not contested.

70.    We acknowledge that Respondents have raised various jurisdictional objections in the Terms of Reference and have challenged the Tribunal's jurisdiction to: a. award an EBITDA Price Adjustment; b. grant interim relief related to the promissory notes; and c. consider Claimants' claim relating to the non-competition agreement annexed to the

29

SPA. The Respondents' objection to the Tribunal's jurisdiction to award an EBITDA award Price Adjustment was not pursued by the Respondents. Rather, the EBITDA Price Adjustment was, by agreement of the parties, submitted for determination to an independent expert jointly agreed to by the parties. The Respondents' objections to the Claimant's claim relating to the non-competition agreement was not pursued in the proceedings. The Tribunal notes that the non-competition agreement (Exhibit E to the SPA) contains its own arbitration clause (Clause 16). In their October 2004 Motion to Preclude (*see supra* at ¶18), Respondents also invited the Tribunal to reject three allegedly "new and unauthorized" claims by Claimants, as well as the "resurrected" EBITDA claim. The issue of Tribunal's authority to hear new or amended claims by either party has been resolved in previous sections of this award by reference to Article 19 of the ICC Rules (*see supra* at ¶¶24-25).

71.    As to the other jurisdictional objections contained in the Terms of Reference, we reiterate here (*see supra* at ¶¶24-25, 67) that given the significant changes in the parties' claims throughout the present arbitration, we consider that it was clearly understood by the parties that claims and contentions not preserved in the procedural Order No. 25 submissions were abandoned.

72.    We make only two observations with respect to the *pagarés* and our jurisdiction to order interim relief or a discontinuance of enforcement proceedings initiated in national courts with respect to those instruments. *First,* we note that, despite our invitation to Respondents in Procedural Order No. 7 (August 2003) to seek appropriate interim relief before the Tribunal, if necessary to preserve their rights under the second *pagaré* (*see supra* at ¶12), Respondents never applied for such relief to the Tribunal and thus the Tribunal has not been called upon to order any interim relief relating to those instruments.

73.    *Second,* regarding Respondents' repeated attempts to enforce both *pagarés* in the Mexican courts (*see supra* at ¶¶12-14), Respondents have challenged the Tribunal's authority to order a discontinuation of those enforcement proceedings. According to Respondents, the *pagarés*, as Mexican commercial paper, are subject only to the jurisdiction of Mexican courts. Even though Respondents did not include this jurisdictional challenge in

their post-hearing Proposed Findings, as required by Procedural Order 25, the Tribunal considers it appropriate to clarify that, although the *pagarés* are indeed Mexican promissory notes, they evidence and are premised on certain outstanding payment obligations under the SPA (*see* Sections 1.1(a)(i)(C) and (E) of the SPA). These obligations represent portions of the purchase price payable by Claimants (as buyers of 90% of RIMSA's stock) to Respondents (as sellers under the SPA). Although the Tribunal may not decide the validity of the promissory note itself as the instrument incorporating those payment obligations, there is no doubt that the Tribunal has subject matter jurisdiction over the substantive underpinnings of the *pagarés*, i.e. the underlying payment obligations, as well as personal jurisdiction over the parties. The controversy over Claimants' payments obligations under the *pagarés* is clearly a "dispute, controversy or claim arising out of or relating to" the SPA (*see* Section 10.12 of the SPA) and as such, is an arbitrable matter over which the Tribunal properly exercised jurisdiction.

74.     Under the longstanding principle of *Kompetenz-Kompetenz*, Article 6(2) of the ICC Rules ("...any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself") this Tribunal has the authority to determine its own jurisdiction. International arbitrators, including the members of this Tribunal, have the authority to consider and decide the reach of their own jurisdiction. *See inter alia* Final Award in Case No. 8938 of 1996, XXIVa Y.B. Comm. Arb. 174, 176 (1999); ICC Case No. 6268 of 1990, XVI Y.B. Comm. Arb. 119, 122 (1991); ICC Case No. 6162 of 1990, XVI Y.B. Comm. Arb. 153 (1990).   Under US and New York law in particular, broad arbitration clauses, encompassing "any" dispute or claim "arising out of or relating to" an international contract –such as Section 10.12 of the SPA— require that arbitrators decide disputes over the scope of the clause (*see* Prudential Lines, Inc. v. Exxon Corp., 704 F.2d 59, 64 (2d Cir. 1983); Paine Webber, Inc., v. Bybyk, 81 F.3d 1193 (2d Cir. 1996); McAllister Bors., Inc., v. A & S Transp. Co., 621 F.2d 519, 522 (2d Cir. 1980)) and resolve those disputes, whenever appropriate, in favor of arbitration (*see* United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-583 (1960); Mitsubishi Motors Inc. v. Soler Chrysler-Plymouth Inc., 473 U.S. 614 (1985) (reinforcing this "pro-arbitration" bias in interpreting

31

international arbitration agreements)). In the Supreme Court's words, "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration [and] any doubts should be resolved in favor of arbitration" (*see* <u>Moses H. Cone Mem. Hosp. v. Mercury Construction Corp., 460 U.S 1, 24-25 (1983)</u>). The Second Circuit has stressed that "the policy in favor of arbitration is even stronger in the context of international business transactions" (*see* <u>David L. Threlkeld & Co. v. Metallgesellschaft Ltd., 923 F.2d 245, 248 (2d Cir. 1991)</u>).

75.    We therefore find that the parties' broad arbitration agreement extended to all disputes over outstanding payment obligations under the SPA, including the payment obligations represented by the *pagarés*, and vested this Tribunal with authority, if necessary and appropriate, to order that the parties abstain from seeking to enforce those promissory notes and the payment obligations incorporated therein in national courts, in order to prevent actions in derogation of the arbitration agreement and in defiance of the Tribunal's plenary jurisdiction over the dispute.

**B.    Standing**

76.    Unlike jurisdiction, the issue of standing, which we now consider, is hotly contested. Respondents have repeatedly challenged Claimants' standing to assert their claims under the SPA and recover for losses or expenses incurred by RIMSA itself (*see* RPCL ¶¶4 – 8, 73, Respondents' October 2004 Motion to Preclude, Respondents' Letter to the Tribunal dated June 17, 2005). Claimants have preferred to deal with the issue only peripherally, consigning it to footnotes (*see* CPCL ¶126, at fn. 12; and Claimants' Letter to the Tribunal dated June 10, 2005, at fn. 31). After careful examination of the applicable legal principles, the Tribunal rejects Respondents' challenge to Claimants' standing.

77.    We note at first that it is, indeed, as Respondents recite, axiomatic that a stockholder, as such, may not pursue an action on his or her own behalf against one who has injured a corporation in which he or she is a shareholder, however much the wrongful acts may have depreciated the value of the shares, if the alleged damages were incurred solely by

32

the corporate entity. *See* <u>Lawrence Ins. Group, Inc. v. KPMG Peat Marwick, L.L.P., 5 A.D.3d 918, 919 (3d Dep't 2004)</u>; <u>Elenson v. Wax, 215 A.D.2d 429 (2d Dep't 1995)</u>. Redress for injury can only be sought by the party injured. "Where there is but one loss and one loser, there can be but one suit, and that must be by the party who has suffered the loss." *See* <u>General Rubber Company v. Elias C. Benedict, 215 N.Y. 18, 31 (1915), Colin. J. dissenting</u>, and cases mentioned therein; internal quotations omitted.

78.    Nevertheless, as Judge Taft wrote for the Sixth Circuit in <u>Ritchie v. McMullen, 79 Fed. Rep. 522, 533 (6th Cir.1897)</u>, "this principle [that a shareholder cannot recover for damages incurred only by the corporation] has no application where the wrongful acts are not only wrongs against the corporation, but are also violations by the wrongdoer of a duty arising from contract or otherwise, and [owed] directly by him to the stockholders," quoted by Judge Cardozo in <u>General Rubber Company v. Elias C. Benedict, 215 N.Y. at 22</u>; *see also* <u>Abrams v. Donati, 66 N.Y.2d 951, 953 (1985)</u>. If a claimant is asserting individual damage as a result of the wrongdoer's breach of contractual and/or fiduciary duties owed to the claimant, then he or she is not required to initiate an action as a shareholder. *See* <u>Chalmers v. Eaton Corp., 71 A.D.2d 721, 723</u>; <u>Weiss v. Salamone, 116 A.D.2d 1009 (1986)</u>. Thus, where the defendant made promises directly to the plaintiff-shareholder, the breach of the promises would give rise to a personal, and not derivative, cause of action. *See* <u>Buschmann v. Professional Men's Ass'n, 405 F.2d 659 (7th Cir.1969)</u>.

79.    The breach of express warranties contained in a contract for the sale of stock exemplifies the direct action paradigm: since warranties are express "promises" or guarantees given to the purchaser by the seller before the purchaser became a shareholder (*e.g.*, guarantees that the financial condition of the corporation is as represented by financial statements or balance sheets of the corporation, or that there is no pending or threatened legal, administrative, or governmental proceeding or investigation against the corporation that could adversely change its financial position, etc.), the purchaser may, if the seller breaks his or her promises, maintain an action for damages, or under some circumstances even rescind the contract and defeat an action for the price. *See* <u>Galli v. Metz, 973 F.2d 145 (2d Cir.1992)</u> (reversing district court's rejection of buyer's breach of warranty claims);

33

Combustion Engineering, Inc. v. Imetal, 235 F.Supp.2d 265 (S.D.N.Y.2002); Weaver Organization, Inc. v. Manette, 41 A.D.2d 138, 341 N.Y.S.2d 631 (1973) (rescission of purchase agreement for failure to reveal pertinent items in furnished inventory statement); J.A.O. Acquisitions Corp. v. Stavitsky, 192 Misc 2d 7, 745 N.Y.S.2d 634 (2001); Goewey v. Sanborn, 277 Mass. 168, 179 N.E. 237 (1931) (applying New York contract law and holding that, where a seller of all the stock of a corporation covenants with the purchaser to pay any taxes due from the corporation, the purchaser has such a direct pecuniary interest in the performance of the covenant that he may sue in his own name for breach). The theory is that a person who has purchased another's promise should be able to sue for its breach regardless of whether or not it was reasonable for him to rely on the promise. See MSA Inv. II LLC v. Seranova, Inc., 227 F.Supp.2d 200 (D.Mass.2002) (applying New York law and holding that it was sufficient to show that buyer believed the warranty was part of the contract).

80.    In two decisions relevant to the case at hand, the district court for the Southern District of New York allowed direct actions by the buyer of a corporation's stock to proceed against the seller for alleged breach of representations and warranties under a stock purchase agreement, without even touching upon the issue of plaintiffs' standing to assert their claims and recover for damages. In REA Express Inc. v. Interway Corporation, et al., 410 F.Supp. 192 (S.D.N.Y.1976), rev'd on other grounds, 538 F.2d 953 (2d Cir.1976), the court found for the defendants, who asserted that plaintiffs had breached their warranties as to the collectibility of the corporation's accounts receivable and the absence of any liabilities not reflected or reserved against in its audited financials as of a certain date. The court then ruled for the defendants on their counterclaim and awarded them, individually, damages for the breaches of the warranties. In Russell-Stanley Holdings, Inc. v. Buonnanno, 327 F.Supp.2d 252 (S.D.N.Y.2002), the court similarly refused to dismiss the plaintiff's claims based on breaches by the stock seller of certain representations and warranties concerning the company's current and potential environmental liabilities.

81.    In Russell-Stanley, the defendant had agreed to indemnify the plaintiff-purchaser of stock for any losses arising out of any inaccuracies in a stock purchase agreement or under any environmental law for any prior existing conditions. After the

34

closing of the purchase and sale, the plaintiff-buyer was notified by the US Environmental Protection Agency that the property on which the sold company was operating was contaminated and that the company *itself* (*not* the plaintiff-buyer) had been designated as a potentially responsible party under US law for environmental contamination. The plaintiff then brought an action against the defendant-stock-seller, alleging, *inter alia,* fraud under the securities laws and under common law, as well as breaches of express environmental warranties in the purchase agreement, and requesting, *inter alia*, rescission of the agreement. The court let the various causes of action stand. In that case, which involved many factual similarities with the case at bar, neither the parties nor the court expressly addressed the issue of plaintiff's standing to assert its claims against the defendant, even though, here, environmental liabilities were to be incurred by the sold company itself, and not the plaintiffs themselves. It was also the company itself that was under governmental investigation and under the threat of sanctions – yet the plaintiff was allowed to pursue its claims pursuant to the separate stock purchase agreement, in which the defendant had warranted the company's compliance with all applicable environmental laws and regulations. The agreement was held to give rise to a distinct, contractual duty owed by the defendant to the plaintiff and it was the violation of this duty that was the undisputed basis of plaintiff's direct standing.

82.    In applying the foregoing legal principles to the factual particularities of their case, the Tribunal concludes that Claimants may pursue against Respondents their claims relating to the environmental problems at the RIMSA site and the SECODAM investigation and other alleged breaches of warranties (about RIMSA's financial, environmental and legal condition) and undertakings by Respondents directly to Claimants under the SPA. Claimants argue that the shares they bought were overvalued ('Onyx was itself injured when it overpaid for RIMSA', *see* CPCL ¶126, at fn. 12). Accordingly, we deny the Respondents' objections to Claimants' standing, irrespective of whether RIMSA was the direct target of the SECODAM proceedings or the subject of the environmental remediation program.

83.    A careful reading of the language of the contract supports our finding for the Claimants. The *chapeau* (introductory paragraph) to Article II of the SPA, entitled "Representations and Warranties of the Seller," affirms this conclusion:

35

"The Seller represents and warrants *to the Buyer* that the statements contained in this Article II are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date . . ." (emphasis added).

84.    Section 7.3 of the SPA also states in pertinent part:

"7.3. Indemnification by Seller. ...[F]rom and after the time of closing, *the Seller will indemnify and hold the Buyer*, Confinamina, the Company [i.e. RIMSA] and each of Buyer's Affiliates, stockholders, officers, directors, agents, ... *harmless from and against any and all Losses, incurred as a result of or in connection with*: (i) *the* untruth, inaccuracy, *violation* or *breach of any of the Seller's representations, warranties* ..., (iii) any action, demand, proceeding, investigation or claim by any third party or governmental agency, against the Buyer, Confinamina or the Company related to a breach of the Seller's representations, warranties, covenants or obligations of this Agreement, (v) *any liabilities of each of Confinamina* and the Company *having a cause or source prior to the Closing Date, including* without limitation liabilities for taxes, social security, litigation, contingencies and off balance sheet liabilities and *undisclosed liabilities* to the extent they exceed the corresponding provisions for such liabilities as reflected on the balance sheet as of December 31, 1999 included in the Financial Statements or those incurred other than in the ordinary course of business since such date unless consented by the Buyer, (vi) *any* action, demand, *proceeding*, claim, legal *or administrative procedure concerning* each of *Confinamina*, the Company or the Seller *having its source prior to the Closing Date. . .*" (emphasis added).

85.    By subscribing to the above sections of the SPA, Respondents warranted directly to the Buyers/Claimants the truth and accuracy of certain statements, and additionally undertook the obligation to indemnify them for *any and all* (direct or indirect) losses that they would incur as a result of or in connection with, *inter alia*, the breach of those representations and warranties under the SPA [Section 7.3.i], any administrative and legal proceedings initiated against RIMSA [Section 7.3.vii] and any of RIMSA's liabilities [Section 7.3.v] having a source prior to the Closing Date. Claimants were the recipients of

36

explicit warranties as to RIMSA's financial liabilities and legal and environmental condition as of the Closing date, and are therefore entitled to compensation for any breach by the Respondents of these contractual undertakings, even if the subject of those breaches was primarily the company sold, RIMSA.

86.    For the above reasons, we deny Respondents' standing arguments and find that Claimants may assert before this Tribunal their claims for breach of Respondents' express warranties.

## V.    SUBSTANTIVE ANALYSIS: RESPONDENTS' BREACHES OF THE SPA

87.    Claimants' statement of claim contains two causes of action. One is for the equitable remedy of rescission of the SPA ordering the parties to return to the status quo prior to the Closing date and the second, alternative, cause of action arises at law and seeks recovery in the form of damages for breaches by Respondents of their SPA warranties and representations of fact. Their equitable claim is premised on two grounds – the alleged fraudulent inducement of Claimants into the contract with Respondents, on the one hand, and/or the material and fundamental breach by Respondents of the SPA that goes to the heart of the contractual relationship forged thereby, on the other.

88.    The Tribunal declines, for the reasons set forth below, to order rescission of the SPA and therefore denies the request for rescission of the SPA, but grants, to the extent described herein, Claimants' alternative request for damages. Since a discussion of Respondents' failure to comply with their contractual warranties and representations is central to an analysis of both remedies sought by Claimants, we begin by addressing the threshold issue of whether the facts of the case at hand support a finding that RIMSA's actual condition at the Closing date and Respondents' overall conduct constituted a breach of Respondents' factual assurances as reflected in the SPA.

## A.    Breach of Warranties:  Applicable Principles

89.    The first relates to Respondents' array of defenses which contains a recurring theme – that there was allegedly knowledge on the part of the Claimants/Buyers of the events

37

that Claimants label as breaches of Respondents' warranties under the SPA (*e.g.*, the SECODAM investigation that resulted in the declaration of RIMSA's ineligibility to contract with the government, the environmental conditions at the RIMSA site and the financial liabilities). As Claimants correctly point out (*see* CPCL ¶20), their rights as beneficiaries of the warranties and representations of fact provided by Respondents are not affected by any doubts they might have entertained, or by any knowledge they might have acquired of the inaccuracy of the warranted factual statements.

90.     Section 7.2 of the SPA unambiguously provides that the Seller's duty to indemnify the Buyer for a breach of warranty survives any actual or constructive knowledge of the falsity of a warranty that the Buyer might have at the time of Closing.  This provision states:

"... The right to indemnification, payment of damages or other remedy based on such representations, warranties, covenants, and obligations *will not be affected by any investigation' conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time*, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or obligation . . . ." (emphasis added).

91.     Accordingly, Claimants may pursue their claims based on breaches of the factual assurances provided by Respondents, irrespective of any information received by the Claimants as to the inaccuracy of the warranties, whether they gained it through their own efforts, through "common knowledge" or through third-party communications – any source other than Respondents/Sellers themselves. Simply put, Respondents expressly guaranteed to Claimants under Article II of the SPA the completeness and truth of specific factual representations as of the Closing Date, "except as set forth in the disclosure schedule accompanying this Agreement" (*see* Art. II of the SPA, opening paragraph). As such, knowledge "acquired" (or "capable of being acquired") by Claimants concerning the inaccuracy of certain warranties is immaterial (*see* Schwan-Stabilo Cosmetics GmbH & Co. v. Pacificlink Intern. Corp., 401 F.3d 28, 32 (2d Cir.2005) (quoting CBS Inc. v. Ziff-Davis

38

Pub. Co., 75 N.Y.2d 496, 503-504 (1990); Promuto v. Waste Management, Inc., 44 F.Supp.2d 628, 648-49 (S.D.N.Y.1999); Rogath v. Siebenmann, 129 F.3d 261, 265 (2d Cir.1997)).

92.    The contractual language in Section 7.2 of the SPA does not distinguish between knowledge of the Buyer and knowledge acquired by the Seller as to the falsehood or incompleteness of the Seller's factual warranties: it merely states that "The right to indemnification . . . *will not be affected by. . . any knowledge acquired (or capable of being acquired) at any time* [and evidently, *by any party* to the transaction], . . . with respect to the accuracy or inaccuracy of. . . any representation [or] warranty" (emphasis added).

93.    Second, the Buyer, claiming a breach of an express warranty of fact, does not have to demonstrate his actual reliance upon the truth and accuracy of the representation reflected in the express warranty, by taking action to change his position in reliance upon the warranted fact. *See* CBS Inc. v. Ziff-Davis Pub. Co., 75 N.Y.2d 496, 502-504, 554 N.Y.S.2d 449, 452-3 (1990) (where the Court of Appeals rejected the seller's argument that a claim alleging breach of an express warranty of the truthfulness of previously supplied financial information, would have to be accompanied by a showing of reliance by the buyer on the warranty). The right to be indemnified does not depend upon proof that the buyer believed in the truth of the assurance of fact asserted in the warranty, because the right to indemnification depends only upon establishing the breach of warranty itself, *i.e.*, that the warranted fact was not true. *See* Donald v. Shinn Fu Co. of America, 2002 WL 32068351 (E.D.N.Y.2002); Delta Holdings, Inc. v. National Distillers and Chemical Corp., 1988 WL 36330 (S.D.N.Y.1988) (holding that a reliance requirement would create uncertainty in a commercial context).

94.    In short, to support a cause of action for breach of warranty, Claimants simply have to show: (a) the existence of the express warranty – that the Seller/Respondents affirmed the truthfulness of a factual statement that had the tendency to induce the Buyer to enter into the transaction – and its inclusion as part of the bargain between the parties, and (b) the breach of the warranty – that the warranty was false or misleading *when made* and its

39

falsehood was the proximate cause of a loss by the Claimants.  *See* <u>Morgan Guaranty Trust Co. of New York v. Bay View Franchise Mortg. Acceptance Co., 2002 WL 818082 (S.D.N.Y.2002)</u>; <u>Utility Metal Research, Inc. v. Generac Power Systems, Inc., 2004 WL 2613993 (E.D.N.Y.2004)</u>.  Therefore, the Tribunal's examination of the record is for the purpose only of determining whether the warranties and factual representations made by Respondents to Claimants were correct and accurate, at the date of the Closing.

95.    For the reasons discussed with more particularity below, we conclude that Claimants have met their burden of proof in establishing Respondents' liability for breaches of their express warranties under the SPA, as a matter of New York law, which governs the construction of the SPA (*see* Section 10.4).

## B.    The SECODAM Investigation and the Resulting Declaration of Ineligibility

96. In Section 2.20 of the SPA, Respondents warranted to Claimants that:

"Except as set forth on Disclosure Schedule 2.20 hereto, there is no instance in which each of Confinamina or the Company or its business . . . (ii) is a party or is *threatened to be made a party, to any* action, suit, proceeding, hearing, or *investigation* of, in, or before any . . . administrative agency of any Mexican federal . . . jurisdiction . . . Neither Confinamina, the Company [*i.e.*, RIMSA] nor the Seller *has reason to believe* that any such . . . proceeding, hearing, or investigation *may be brought or threatened*" (emphasis added).

97.    In addition, Section 2.15 of the SPA reads, in pertinent part:

"To the Seller's Knowledge, there is not *any threatened* or prospective *event* or condition *of any character whatsoever* which would have a material adverse effect upon each

40

of Confinamina's or the Company's financial condition, assets, liabilities, business or results of operations" (emphasis added)[2].

98.     Under New York law, which governs the SPA, in interpretations of a written contract, its terms should be given their ordinary meaning. *See* Terwilliger v. Terwilliger, 206 F.3d 240 (2d Cir.2000) (citing multiple New York cases). The ordinary meaning of "threat," a key term in both of these warranties, is well established in the English language as either an expression of an intention to inflict pain, injury, or evil, or an indication of impending danger or harm (*see* CPCL ¶4). The above-quoted warranties concerning threats of an investigation by a Mexican administrative agency and the warranty contained in Section 2.15 of the SPA provided assurance to the Claimants that, as of the Closing date, to sellers' knowledge there was no indication there was any danger of an investigation of RIMSA by a Mexican agency/authority that could affect RIMSA's financial condition.

99.     The Tribunal concludes that Respondents violated both these express warranties, since as of the Closing date the accuracy of these statements was inconsistent with events that foreshadowed an investigation by SECODAM into the performance by RIMSA of the 1997 Hexachlorides Contract. The factual record reveals not only the objective (and undisclosed) existence of signs that portended a SECODAM investigation, but also the issuance and the notification to RIMSA, in October 2000, of the ICO decision finding that RIMSA had in fact violated the 1997 contract – a finding that made the ensuing investigations virtually inevitable.

100.     As has been described above, the ICO of Petroquímica had announced in October 1998 – long before the negotiations began between Respondents and Claimants – that it would conduct an audit of RIMSA's performance of the 1997 Hexachlorides Contract (*see* Ex. C-48; CPF ¶¶78 & 80). The direct targets of this initial investigation were the Mexican government employees who supervised or were otherwise involved in the

---

[2] We have referred to Mexican law, whenever necessary and consistent with the parties' agreement (Section 10.4 of the SPA), regarding the status, acts or actions that are the subject matters of particular representations or warranties, especially the ones relating to the environmental condition of RIMSA's site of operations.

41

performance of the 1997 contract. However, it was clear to all interested parties, RIMSA included, that the finding of the employees' culpability and liability was directly related to a correlative finding that the contract had in fact been violated by RIMSA.

101.    The active involvement, as detailed below, of RIMSA officers in the initial investigation, especially during the summer of 2000, with the conceded purpose of preventing any findings inimical to the company's interests and protecting its future dealings with the Mexican government, reflects awareness by RIMSA's management of the worrisome implications of the investigation (*see* CPF ¶¶79-98).

- In 1999, Mr. Rojas, RIMSA's environmental compliance officer, participated in a joint audit with Petroquímica to analyze RIMSA's performance of the contract, and submitted, with the approval of Dr. Cuéllar, then Director of Business Development of RIMSA, and Mr. Sánchez, then its in-house counsel, a technical report to Petroquímica with RIMSA's defenses (*see* Ex. C-50; CPF ¶79).

- In the summer of 2000, Mr. Rojas, Mr. Sánchez and RIMSA's Director of Sales and Parastatal Projects, Mr. Espinosa, met with Petroquímica officers in Mexico City to defend RIMSA's performance of the contract (*see* Ex. C-50; CPF ¶81).

- In June or July 2000, Mr. Cantú, RIMSA's Manager for Special Projects, attended a meeting with Mr. Huitron Vázquez, a legal officer at the Petroquímica ICO, to seek clarification of the ICO's position on RIMSA's performance (*see* Transcript at 1208-1209, 1216-18 (Cantú); Ex. C-3; RPF ¶83-84). At this meeting Mr. Cantú was made aware of the seriousness of the charges against RIMSA, since a finding that RIMSA had violated its obligations would activate the mandate of Article 41 of the Law of Acquisitions and Public Works, which prohibits agencies and entities from accepting bids from a company that has been found by SECODAM not to have complied with its contractual duties, or to have provided false information or acted with fraud or in bad faith under the contract, causing serious prejudice to the other contracting party (*see* L.A. Ex. 2). At the same meeting, the two parties even discussed the possibility of a settlement of any disputes between RIMSA and Petroquímica (*see* Transcript at 1219-1221 (Cantú)). Such was the preoccupation of RIMSA officers with the

42

ramifications of the on-going investigation that Mr. Cantú prepared a presentation on the matter, which he delivered to Dr. Cuéllar, referring to "the possibility of an investigation against RIMSA" (*see id.* at 1209, 1221-1222; Ex. C-3 at 9; RPF ¶86).

- In August 2000, only a few days after the execution of the SPA by Respondents and Claimants, Mr. Cantú and Mr. Rojas appeared formally before the ICO to testify at the ICO's request about RIMSA's performance of the 1997 Hexachlorides Contract (*see* Ex. C-95; Transcript at 1230-1232 (Cantú)).

- In September 2000, Mr. Rojas, Mr. Espinosa and Mr. Olguín, RIMSA's Public Relations Manager, met again with the ICO to inquire "whether SECODAM intended to bring any kind of a case against RIMSA" (*see* Ex. C-287; R-34; RPF ¶91).

102.    The unease of these RIMSA officers over the potential collateral effect of this investigation and their apprehensiveness about the likelihood of a follow-up proceeding against RIMSA proved justified: on October 23, 2000 (a month before the Closing date, the date as of which Respondents had declared and guaranteed the truthfulness of their warranties to Claimants), the ICO issued a decision concluding the internal Petroquímica investigation and levying heavy fines and other penalties on the Mexican officials found to have abetted RIMSA's breach of the 1997 contract (*see* Ex. C-97). The condemnation of RIMSA's practices under the 1997 contract was a major setback to RIMSA.

103.    Dr. Cuéllar and Mr. Sánchez, RIMSA's in-house counsel, among others, were notified by Mr. Rojas about the decision on October 30, 2000 (*see* Ex. C-99; Transcript at 1563 (Sanchez)). Mr. Sánchez admitted to reading the ICO decision at the time and to having the understanding that the next step in the process would be for the ICO decision to be reported and passed on to SECODAM (*see* Transcript at 1566-1567 and 1593 (Sanchez)). Respondent Mr. Héctor Vargas and Mr. Vargas Aguirre also conceded knowledge of the decision (*see* Vargas Aguirre Stmt., § XI ¶ 10; Vargas Garza Stmt., § VIII ¶ 5; Aguirre Reply, § X ¶ 8; Garza Reply, § VIII ¶ 1).

104.    Mr. Aguirre testified that, following the decision, Dr. Cuéllar and a lobbyist sought, and managed to obtain, assurances from SECODAM officials that SECODAM

43

would not investigate RIMSA (*see* RPF ¶95; *see* CPF ¶¶108-109; Aguirre Reply, § X ¶¶ 9 – 10). The documentary record, however, is devoid of any evidence corroborative either of the meeting itself or of the "assurances" allegedly received. The Tribunal therefore rejects Mr. Aguirre's testimony on this point. Nor has any governmental official confirmed the validity of these statements and Dr. Cuéllar's unavailability during the hearings has obliged the Tribunal to conclude that no such assurances were in fact received.

105.    In sum, the Tribunal finds that, at the Closing date, on November 14, 2000, there was an objective threat of a SECODAM investigation against RIMSA concerning the violation of the 1997 Hexachlorides Contract. Respondents had "reasons to believe that [a] proceeding, . . . or investigation may be brought or threatened." SPA ¶2.20. The October 2000 determination in the ICO decision that RIMSA had breached its 1997 contract with Pemex substantiated the earlier premonitions and made more likely the possibility of a RIMSA-directed investigation. That decision signaled that the governmental inquiry into the 1997 contract had reached a point of "no return." The initiation of a direct proceeding against RIMSA was only a matter of time and even its likely negative outcome, in view of the prior ICO finding, must have been contemplated by RIMSA officers.

106.    Despite all the interaction and the exchanges between RIMSA and SECODAM, which intensified during the summer of 2000 and despite the issuance of the October 2000 administrative decision condemning RIMSA's performance under the 1997 contract, nothing relating to this activity, including the ICO decision itself, was ever communicated to Claimants.

107.    Respondents maintain that the 1997 Contract and RIMSA's confinement of the drums at the Mina landfill (instead of their incineration elsewhere) were brought to the attention of the Claimants during the due diligence stage of the negotiations and in the SPA disclosure schedule in which there was reference made to the dispute between RIMSA and Petroquímica concerning the performance bond for the project (see RPF ¶ 78). The basic aspects of the disclosed bond dispute have already been described (*see supra* under III.B; *also* RPF ¶¶67-78). Indeed, the bond litigation and Petroquímica's assertions that RIMSA

44

was allegedly overpaid were disclosed to Claimants, both during the due diligence process (*see* Transcript at 1553-1554, 1658 (Sanchez); RPF ¶¶73-76) and in the SPA Disclosure Schedule, at ¶ 2.20, but no breach of warranty is alleged as to this dispute. Hence, the legal costs that Claimants incurred in defending RIMSA against the bond issuer in the disclosed litigation are not recoverable as contractual damages under the SPA and accordingly we reject Claimants' characterization of those fees as having "resulted" from "Vargas' breaches of warranty" (*see* CPF ¶505(b)).

108.    However, the disclosure of the pending litigation between RIMSA and the bonding company did not cover the objective threat of the initiation of *another* proceeding against RIMSA, this time by a Mexican administrative agency and not by a private party. The increasing contacts and communications between RIMSA officers and Mexican officials vis-à-vis the pending investigation into the 1997 contract, the escalating fears of RIMSA officers about RIMSA's eventual direct involvement, the October 23, 2000 ICO resolution, and all the developments that gave rise to a heightened risk (*i.e.*, a threat) of a SECODAM investigation against RIMSA were not disclosed.

109.    Section 10.15(f) of the SPA reinforces Claimants' argument that the essence of the existing peril was never disclosed by Respondents (*see* CPF ¶¶190-193). That clause unambiguously states that an event qualifies as an exception to a warranty only if the SPA's disclosure schedules "identi[fy] the exception with particularity and describe . . . the relevant facts in reasonable detail." The record reveals that this was not done.

110.    Respondents argue that the initial ICO audit and the subsequent ICO investigation against the Petroquímica employees were disclosed to Claimants (*see* RPF ¶82; *also* Transcript at 1550-51, 1553-54 (Sanchez) and 1659-63 (Kingham Opening)). Neither the authenticity nor, in some cases, the source of some of the documents allegedly provided to Claimants has been proved (*see* Ex. R-79; Ex. C-276; Transcript at 1553-54 and 1621 (Sanchez)), let alone their delivery to Claimants' due diligence team. We find it significant that the list of documents reviewed by Claimants' legal counsel in the negotiations between the parties in 2000 does not include the alleged documents (*see* Santos Due Diligence Report

45

of 6/2/00, Annex A, Ex. R-78; *also* CPF ¶¶194 – 199). Nor have we been presented with reliable evidence proving that discussions took place between Mr. Sánchez or Dr. Cuéllar and Claimants' due diligence team.

111.   Moreover, even if these pre-Closing disclosures and communications did indeed take place, none of them is reflected on the SPA Disclosure Schedule (*see* ¶2.20 thereof]. The sole exceptions to Respondents' liability under the SPA warranties were the disclosures made in the corresponding provisions of the SPA Disclosure Schedule (*see* SPA Article II, *chapeau* ("The Seller represents and warrants to the Buyer that the statements contained . . . are correct and complete. . . , except as set forth in the disclosure schedule accompanying this Agreement. . . ") and ¶2.20 (beginning with the statement: "Except as set forth on Disclosure Schedule 2.20 hereto . . ")). If Respondents had sought in earnest to shield themselves from future liability for breach of the SPA warranties, they could have simply disclosed to Claimants, at the very least, the evidence of the October 2000 ICO resolution and ICO's obligations, under Mexican law, to forward the resolution to the competent branch of SECODAM in reasonable detail, as mandated by Section 10.15(f) of the SPA (*see* CPF ¶202).

112.   Respondents' arguments focus on whether Mr. Cantu's 2000 presentation was made to anyone other than Dr. Cuellar (*see* RPF ¶ 87) –according to Mr. Cantu, it was not (*see* Cantu Stmt., § II, ¶ 11; Transcript at 1209 (Cantu))— and on whether Mr. Sanchez, after studying the October 2000 decision, discussed "the risks of a SECODAM investigation or a strategy to deal with the ICO decision" – (Mr. Sanchez also denied this (*see* Transcript 1574-75, 1596-97 (Sanchez)). Nevertheless, the parties' individual beliefs or personal assessments of the situation are simply irrelevant in determining whether the SPA warranties were breached.

113.   Respondents' comprehensive description of the factual background to the 1997 contract and RIMSA's performance thereunder (*see* CPF ¶¶51-66) misses the point. This Tribunal has not been charged with second-guessing the decisions of Mexican administrative agencies. Whether RIMSA actually breached the 1997 contract is not the

46

concern of this Tribunal. It is sufficient for our analysis that the ICO of Petroquímica made that determination in its October 2000 resolution and referred the case for further proceedings to SECODAM, which later agreed with the determination and declared RIMSA ineligible to participate in or bid on government contracts.

114.    Our inquiry here is confined to asking whether, at the Closing date, there was an objectively discernible threat of a SECODAM investigation against RIMSA, whether Respondents had at least one reason to believe that an adverse SECODAM-initiated proceeding could be anticipated and whether the threat was disclosed to Claimants. Our answer to the two former questions is in the affirmative and to the last is in the negative.

115.    We are persuaded that high-ranking officers of RIMSA were conscious of the critical importance of the October 2000 resolution, although they downplayed their concerns and conspicuously refrained from raising them before the Closing date, all in manifest contravention of the representations in sections 2.20 and 2.15 of the SPA. The "Seller's knowledge" requirement in the latter warranty is satisfied by virtue of the interpretative statement in Section 10.15 of the SPA ("Definitions") that the definition of the phrase "Seller's knowledge" would cover knowledge by Dr. Cuéllar, who was clearly involved in RIMSA's communications with SECODAM more than any other RIMSA employee, and whose knowledge and participation must be attributed to Respondents.

116.    On the other hand, Claimants' argument that these facts also make out a breach of the Section 2.11(b) warranty (*see* CPCL ¶18) is unpersuasive. Pursuant to section 2.11(b) of the SPA, the seller warranted that there is no fact, event, or action which exists or has occurred, which would indicate that any of RIMSA's significant customers (defined as current customers "that accounted for over 1% of the total net sales of the Company for the year ended December 31, 1999") "*will* terminate its business relationship with the company" (emphasis added). This provision alludes to a degree of certainty in Respondents' beliefs about the prospect of a customer termination that in our case is wanting: according to the wording of the clause, Respondents must have been aware of an event that would indicate, with absolute certainty, that a significant customer *will* terminate its business relationship

47