difference between the value of the company as warranted and its actual value, we conclude that Claimants are not entitled to the interest payment reimbursement they are seeking.

*     *     *

170.    The Tribunal concludes that numerous warranties and representations in the SPA did not reflect the actual legal, financial and environmental condition of the company sold. We find that Sections 2.7(a), 2.8(a) and (c), 2.13(a) and (g), 2.15, 2.16 (a), 2.19, 2.20, 2.22 have been violated to the extent described above. We now proceed to the next step in our analysis – the consideration of the appropriate remedy for these violations.

## VI.    THE REQUESTED REMEDIES

### A.    Rescission of the SPA

#### 4.    *The Applicable Principles*

171.    The rescission of a contract amounts to the unmaking or undoing of the contract from the beginning (*see* Reilly v. Natwest Markets Group Inc., 181 F.3d 253, 264 (2d. Cir.1999)) and leaves the parties in the same situation they would have been in had no contract been made. *See* Symphony Space, Inc. v. Pergola Properties, Inc., 214 A.D.2d 66, 80 (1st Dep't 1995); D'Antoni v. Goff, 52 A.D.2d 973 (3rd Dep't 1976).

172.    Because of its drastic effect, granted only in extraordinary circumstances and, although the Tribunal does have the power to order rescission for fraud or material breach of the contract (*see* Chazin v. Parmet, 588 N.Y.S.2d 17, 17 (App. Div. 1992)), this power is an exceptional one. Therefore, caution and equity guide us in our evaluation of Claimants' rescission claim (*see* Canfield v. Reynolds, 631 F.2d 169, 178 (2d. Cir.1980)).

173.    The circumstances in which a party to a contractual dispute may elect to rescind a contract are limited – among them, the two bases invoked by Claimants here, namely the alleged fraudulent inducement of the Claimants into the contractual relationship, and a material breach of contract that substantially defeats its purpose. *See* Callahan v. Powers, 199 N.Y. 268, 284 (1910); Babylon Assocs. v. Suffolk County, 475 N.Y.S.2d 869,

69

874 (App. Div. 1984); Mina Inv. Holdings Ltd. v. Lefkowitz, 16 F. Supp. 2d 355, 362 (S.D.N.Y. 1998); New Paradigm Software Corp. v. New Era of Networks, Inc., 107 F.Supp.2d 325, 329 (S.D.N.Y. 2000). We focus on these two grounds for rescission of the SPA.

174.    A showing, however, of one or more of the substantive legal bases for the rescission of a contract does not suffice for a court of law or an arbitral tribunal to grant the recession remedy. The party seeking rescission must also demonstrate the absence of an adequate remedy at law (see Lichtyger v. Franchard Corp., 18 N.Y.2d 528, 277 N.Y.S.2d 377, 384 (1966); Rosewood Apartments Corp. v. Perpignano, 200 F.Supp.2d 269, 272 (F.D.N.Y.2002)) and a reasonable feasibility of return to the *status quo ante* (see K.M.L. Labs. Ltd. v. Hopper, 830 F.Supp. 159, 164 (E.D.N.Y. 1993) (citing Kamerman v. Curtis, 285 N.Y. 221, 33 N.E.2d 530 (1941)); Helprin v. Harcourt, Inc., 277 F.Supp.2d 327, 338 (S.D.N.Y.2003)), must pursue its claim without unreasonable delay (see Schenck v. State Line Telephone Co., 238 N.Y. 308, 313 (1924); Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 47 (2d Cir.1991)) and must make an election of remedy, *i.e.,* abstain from *both* affirming the contract and seeking to recover damages, as well as disavowing it and seeking to rescind it (see Morse/Diesel, Inc., v. Fidelity and Deposit Co. of Maryland, 768 F.Supp. 115, 117 (S.D.N.Y.1991)). Finally, we state the obvious: as with all equitable remedies, a party may not seek rescission for breach of contract in the absence of compelling equitable grounds (see H.B.L.R., Inc. v. Command Broadcast Associates, Inc., 156 A.D.2d 151 (1st Dep't 1989); Reilly v. Natwest Markets Group Inc., *supra*, 181 F.3d at 264).

175.    Each of the invoked rescission grounds (material breach and fraudulent inducement) is addressed in turn below. We then examine if the corollary requisite showings have been made.

5.    ***Material Breach***

176.    Rescission for a material breach of contract – one of the alternative theories on which Claimants base their request for rescission of the SPA—is appropriate only when the

breach is so substantial and fundamental as to defeat the object of the parties in making the contract and result in a substantial frustration of the entire agreement (*see* Callahan v. Powers, 199 N.Y. 268, 284 (1910); Canfield v. Reynolds, 631 F.2d 169, 178 (2d Cir.1980); Buffalo Builders' Supply Co. v. Reeb, 247 N.Y. 170, 175 (1928)). The test for determining whether a material breach justifies the remedy of rescission is whether the allegedly breached obligation may be said to go to the root of the parties' agreement and is of such nature and such importance that the contract would not have been made at all without it (*see* Septembertide Pub., B.V. v. Stein and Day, Inc., 884 F.2d 675, 678 (2d Cir.1989); Mina Inv. Holdings Ltd. v. Lefkowitz, 16 F.Supp.2d 355, 362 (S.D.N.Y.1998), on reconsideration in part, 184 F.R.D. 245 (S.D.N.Y.1999); Helprin v. Harbourt, Inc., 277 F.Supp.2d 327, 339 (S.D.N.Y.2003) (quoting Williston on Contracts §68:2 at 42 (4th ed. 1991); *also* General Motors Corp. v. Villa Marin Chevrolet, Inc., 2000 WL 271965 (E.D.N.Y.2000); K.M.L. Laboratories Ltd. v. Hopper, 830 F.Supp. 159, 163 (E.D.N.Y.1993)).

177.    The case law relied on by Claimants to substantiate their claim that a sufficiently grave breach occurred here is inapposite: K.M.L. Laboratories v. Hopper (830 F. Supp. 159 (E.D.N.Y.1993)) dealt with the rather rare phenomenon of the revocation of the sold company's operating license, which obviously would have rendered the company inoperative and which, apart from devastating its profitability, would have had catastrophic consequences for the company's capacity to operate. In that case, revocation of the company's licenses was held to vitiate the purpose of the agreement – to convey to the buyer "a company that was fully licensed and approved to incinerate and transport infectious biomedical waste." *Id* at 165.

178.    The circumstances here are different, as evidenced by the financial statements submitted by Claimants and carefully reviewed by the Tribunal. They demonstrate that RIMSA remains a profitable company (despite the lower profitability recorded for the year 2003 and the profit reduction upheavals and disturbances that are in part attributable to its prolonged conflict with SECODAM over the debarment). RIMSA, in addition, does not seem to have borne enormous expenditures in connection with the remediation of the environmental and operational problems that were pointed to by the Claimants as presenting

71

a case of severe and almost irreversible environmental contamination (*see* CPF ¶¶529-532). Claimants have, since the Closing, demonstrated a reluctance to initiate anything resembling the kind of across-the-board remediation plan that they have argued must be carried out under the SPA. Claimants' inactivity is therefore inconsistent with their contentions as to the occurrence of a fundamental breach that can only be remedied by the extraordinary remedy of rescission.

6. ***Fraud in the Inducement***

179. Rescission is an appropriate remedy for fraud in the inducement. *See* Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Group, LLC, 19 A.D.3d 273 (1st Dep't 2005); Pilarczyk v. Morrison Knudsen Corp., 965 F.Supp. 311, 322, Fed. Sec. L. Rep. (CCH) P 99502 (N.D.N.Y. 1997), judgment aff'd, 162 F.3d 1148 (2d Cir.1998). A cause of action for rescission based on fraud must set forth circumstances showing that one party made a *material* misrepresentation and that the other party reasonably relied on it to its detriment in entering into the contract. *See* Albany Motor Inn and Restaurant, Inc. v. Watkins, 85 A.D.2d 797, 445 N.Y.S.2d 616 (3d Dep't 1981); Curtis v. Curtis, 1992 WL 212411 (S.D.N.Y. 1992), on reconsideration, 1992 WL 331291 (S.D.N.Y. 1992); Citgo Petroleum Corn v. Panther Oil Corp., 1997 WL 168589 (E.D.N.Y.1997). We emphasize that a claim of fraud in the inducement is premised upon one party's making a misrepresentation that causes the other party to *enter into* a contract (*see* Revak v. SEC Realty Corp., 18 F.3d 81, 91 (2d Cir. 1994) (quoting Generale Bank, New York Branch v. Choudhury, 779 F. Supp. 306, 310 (S.D. N.Y. 1991)). Reliance upon the misrepresentation must have been reasonable and justifiable, *see* Rush v. Oppenheimer & Co., Inc., 681 F.Supp. 1045 (S.D.N.Y.1988), in the sense that the true facts should not have been discoverable through the exercise of ordinary intelligence. *See* Shultis v. Reichel Shultis, 1 A.D.3d 876 (3d Dep't 2003).

180. Here, Claimants contend that they have satisfied these threshold requirements: they claim to have demonstrated —as we have indeed found above— the falsehood and inaccuracy of Respondents' statements as to RIMSA's financial, environmental and legal situation. Claimants also argue that they relied upon these representations and warranties not

NYCDMS/1005454. 14

only in assessing the value of RIMSA, but in entering the transaction itself; in fact, Claimants contend that they would not have proceeded with the purchase of RIMSA at all, had they known its actual condition (*see* CPCL ¶¶108-110; CPF ¶185).

181.    Claimants have established the existence of inconsistencies, to the extent we have determined in this award, between the actual and the warranted condition of the business they were purchasing.    Their claim for rescission of the SPA, based on these inconsistencies, does not, however, pass muster under the applicable rules of New York contract law, as set out above, and therefore fails for the reasons set forth below.

182.    First, a party seeking to avoid contractual obligations on the basis of a fraud in the inducement claim must show a *material* misrepresentation – i.e. the type of misrepresentation that is likely to have influenced the defrauded party's decision to *enter into* the contract (*see* Energy Capital Co. v. Caribbean Trading and Fidelity Corp., 1996 WL 157498 (S.D.N.Y. 1996); Leasing Service Corp. v. Graham, 646 F. Supp. 1410, 1416 (S.D.N.Y. 1986)).    In the present case, there is not sufficient evidence of materiality: although we have found that Respondents' misrepresentations as to RIMSA's actual condition were false or inaccurate statements of existing or past facts as to the actual condition of their company, and are thus sufficient to support and even establish a *prima facie* fraud claim, Claimants have not satisfactorily shown that they have attached to those facts crucial importance in determining their overall course of action in entering into the contract (*see* Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir.1994)).

183.    Moreover, as we elaborate below, there is some evidence of a strategic component in the acquisition of RIMSA by Claimants (*see infra* at ¶210); this evidence indicates that the transaction represented for Claimants a strategic expansion into the Latin American waste treatment industry. Because of this strategic value of the venture in Claimants' overall business plan, it is not unreasonable to assume that they might have entered into the SPA even if Respondents had disclosed the true extent of RIMSA's pre-closing financial liabilities or operational problems, including the threat of a SECODAM investigation.

NYCDMS/1005454. 14

184.    Some disclosure took place before the signing of the agreement, when the parties negotiated a US$6 million purchase price reduction for the expenditures and additional costs that Claimants would undertake to remedy specified problems and anomalies in RIMSA's operations (*see* CPF ¶¶144-146). The fact that this partial disclosure simply led to a reduction of the purchase price, reinforces our finding that Claimants were not induced by Respondents' disclosures and statements to *enter into* the contract. Respondents' statements, as contained in the warranties of the SPA, might have been relied upon by the parties in determining the price to be paid to the sellers, but Claimants were most likely to have completed the acquisition of the RIMSA even if they had known the actual condition at the Mina site and the true extent of its risks and problems.

185.    Even if the materiality element is assumed to be satisfied, Claimants have not shown that their alleged reliance on Respondents' "material misrepresentations" was justifiable or reasonable (*see* Continental Airlines, Inc. v. Lelakis, 943 F. Supp. 300, 305 (S.D.N.Y. 1996), aff'd 129 F.3d 113 (2d Cir. 1997)). Showing justifiable or reasonable reliance is a separate requirement under the fraud-in-inducement test, independent of the materiality element that requires us to examine the impact on Respondents' misstatements on Claimants' decision to conclude the transaction.

186.    Analysis of what constitutes reasonable reliance is a fact-intensive process that focuses on the circumstances that existed at the time the parties entered into the contract (*see* Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91,98 (2d Cir. 1997)). Courts, however, do take into account the ease with which the party claiming fraud could have learned the true facts (*see* Banque Franco-Hellenique de Commerce Intern. et Maritime, S.A. v. Christophides, 106 F.3d 22, 26 (2d cir. 1997)) –especially when it had hints of the falsity of the information provided to it (*id.* at 27), or if it is a sophisticated party entering into a major transaction (*see* UST Private Equity Investors Fund, Inc. v. Salomon Smith Barney, 288 A.D.2d 87, 88 (1st Dep't 2001)). In particular, a party cannot claim reasonable reliance upon a misrepresentation when that party knew the true facts at the time of contracting (*see* Fayard v. Henry Holt & Co., Inc., 726 F. Supp. 438, 448 (S.D.N.Y. 1989)), or had readily available means to ascertain the truth by the exercise of *ordinary* intelligence (*see* Schumaker v.

74

Mather, 133 N.Y. 590, 596 (1892); Mehta v. Mehta, 196 A.D.2d 842 (2d Dep't 1993); Duane Thomas LLC v. 62 Thomas Partners, LLC, 300 A.D.2d 52, 52 (1st Dep't 2002); Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1542 (2d Cir. 1997)).

187.    In this case, as we have noted above, Respondents disclosed during negotiations some problematic aspects of RIMSA's operations as to which a US$6 million price reduction was agreed upon by the parties (see CPF ¶¶144-146). As far as RIMSA's non-disclosed liabilities and environmental non-compliance were concerned, Claimants opted for comprehensive coverage in the SPA, by including therein extensive warranties to protect themselves if the rest of the facts, as represented to them by Respondents, turned out to be different from what they were represented to be. Section 7.2 of the SPA also formed part of the far-reaching protection extended to Claimants: the parties agreed there that "[t]he right to indemnification, payment of damages or other remedy based on such representations, warranties, covenants... will not be affected by any investigation conducted with respect to, or any knowledge acquired (*or capable of being acquired*) at any time, whether before or after the execution and delivery of this agreement or the Closing Date, with respect to the . . . inaccuracy of any such representation [or] warranty. . ." (SPA ¶7.2, emphasis added). Although Claimants do not elaborate much on the reasonableness of their reliance (see CPCL ¶¶97-98), they seem to argue (see CPF ¶¶131-134, 136-137) that their reliance on Respondents' representations in the SPA was not unjustifiable, in light of the extensive web of contractual protections and in view of the overall positive findings of the due diligence they conducted prior to the purchase (see CPF ¶¶139-141).

188.    Claimants' propositions fail for several reasons. We first of all disagree with their interpretation of Section 7.2 of the SPA. That Section –included in the SPA as a sub-section of Article VII, under the heading "Indemnification"– only refers to the parties' claims for damages and indemnification-related remedies. Section 7.2 shields those remedies from "prior knowledge"-based defenses likely to be asserted by a defendant. Section 7.2 does not encompass or contemplate claims for rescission.   Rescission claims are equity claims premised on cessation, rather than continuation through enforcement of claims of the contract in question. Such claims, if based on fraud, fail if the claimant is not able to show

that its reliance on the false statements was reasonable, because it did not know the true quality of the subject of the representation, or could not have discovered the true facts by making additional inquiries and exercising ordinary diligence (see Abrahami v. UPC Const. Co., Inc., 224 A.D.2d 231 (1st Dep't 1996); Fabozzi v. Coppa, 5 A.D.3d 722 (2d Dep't 2004)). Thus, Claimants' actual or potential knowledge of the truth or negligent failure to discover it *does not* affect their right to indemnification, but *does* certainly affect their rescission claim.

189.    We now turn to the factual question of whether Claimants had some hints about the true facts or could have discovered the falsity of Respondents' statements without having had to exert extraordinary effort. The record before us indeed suggests that Claimants were either not unaware of the actual situation at the Mina site, or at the least not ordinarily diligent in checking the accuracy of the facts represented by Respondents. In particular:

190.    *First*, Claimants' own account of the environmental conditions at the Mina site and the surrounding area, depicts some aspects of the contamination as almost visible to the naked eye (see CPF ¶¶122 and 435); similarly, the groundwater contamination would have resulted in illnesses or even deaths among the livestock grazing in the area. These aspects of the contamination at Mina, in combination with the partial disclosure that took place in the context of the $6 million purchase price reduction, would and ought normally to have given rise to at least *some* suspicions about the existence of certain irregularities at the Mina site. Although our factual findings do not entirely coincide with Claimants' descriptions, it is inconsistent, from the Claimants' point of view, to argue on the one hand that some of RIMSA's environmental problems were of such a magnitude that they would normally have put Claimants on notice of them, while insisting on the other hand on their complete ignorance of those conditions.

191.    We emphasize again that the $6 million purchase price reduction was associated with the disclosure by Respondents of certain problematic conditions at the Mina site and the increased expenditures that Claimants would have to undertake post-Closing to rectify those problems; Claimants concede this disclosure (see CPF ¶¶144-146). What

76

Claimants fail to explain is why they decided to enter into a transaction concerning a business with ostensible pollution problems, part of which had already been brought to their attention, or why they did not intensify their due diligence efforts to at least complete their knowledge of RIMSA's actual condition. That Respondents are barred from proving the content and the effect of their pre-Closing price-reduction negotiations to contradict the SPA, pursuant to the parol evidence rule, does not prevent us from taking into account this agreement –especially Claimants' understanding of it (*see* CPF ¶¶144-146)— in deciding Claimants' fraud in the inducement claim.

192.   *Second*, even if we were to accept the sufficiency of Claimants' due diligence investigations prior to the purchase of RIMSA, Claimants have not convinced us that, despite the exercise of ordinary intelligence on their part, and despite all the reports that were prepared at the end of the process (*see* CPF ¶139; RPF ¶23; Exs. R-2, 3, 8, 9, 10, 11, 78; C-79, 83, 84), they did not discover the truth about RIMSA's financial conditions and environmental irregularities. In fact, Claimants themselves acknowledge that, when entering into negotiations with Respondents, they were "aware of the risks in purchasing a hazardous waste facility, particularly the pollution and contamination risks" (*see* CPF ¶129). To put it differently, if Claimants' allegations about the performance of due diligence to the extent customarily required in the industry (*see* CPF ¶141) are true, then they *should* have been able to find out the truth about RIMSA, either because some of its problems were sufficiently visible (according to Claimants' own allegations), or because of the alleged depth of their own review. Claimants did not convincingly argue both that they were unaware of the truth *and* that they could not have discovered it in the exercise of ordinary due diligence.

193.   *Third*, although we lack the necessary expertise and specialized knowledge that would allow us to assess the risks inherent in a transaction involving a waste management facility, we are skeptical in the first place about the sufficiency of the due diligence conducted by Claimants prior to the signing of the SPA. The total amount of time that Claimants' expert teams spent on the Mina site, examining its environmental condition and RIMSA's overall financial health and governmental compliance, does not seem to have exceeded some days –one day during the preliminary round of due diligence, and 10 to 14

77

days during the second round (*see supra* at ¶30; CPF ¶¶125 and 139; RPF ¶¶18 and 22; Transcript at 480, 498-499 (LeConte)). Given the complexity of the transaction, the nature of the industry and the business on sale, the geographical distance between Claimants' headquarters and RIMSA's operational area, as well as the differences in the business culture between Mexico and France, in combination with the fact that it was Claimants' first venture into South America, the duration and the speed of the due diligence phase does not point to the conduct of a reasonably prudent person under the circumstances.

194.    Claimants implicitly acknowledge the insufficiency of their pre-signing investigations, but argue that they substituted the all-inclusive warranties inserted in the SPA for a more rigorous due diligence process, because, in their view, the conduct of their own studies on the site would have been extremely costly, time-consuming and would in the end prove uneconomical and inefficient (*see* CPF ¶¶139-141). By including protective clauses in the SPA, Claimants allege that they have taken adequate measures against the possibility of false statements by Respondents (*see* CPF ¶¶131-134, 136-137). In opting, however, for a set of robust contractual protections instead of exercising ordinary diligence in trying to ascertain the truth, Claimants consciously chose remedies based on the *affirmation* and *enforcement* of the SPA.

195.    We finally note that a sophisticated party (like the Claimants) entering a major transaction has a greater burden to check the truthfulness of the statements included in the contract it is about to sign. Where sophisticated business entities engage in major transactions and enjoy access to critical information during the due diligence phase, but fail to take advantage of that access, New York courts are disinclined to entertain claims of justifiable reliance (*see* Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d at 98); Primedia enthusiast Publication Inc. v. Ashton Intern. Media, Inc., 2003 WL 22220375 (S.D.N.Y. 2003); Manley v. AmBase Corp., 126 F. Supp. 2d 743, 758 (S.D.N.Y. 2001) (where "sophisticated parties are engaged in arm's length negotiations and the party claiming reliance had an opportunity to discover the information allegedly relied upon, New York courts are wary of finding that such reliance was reasonable")). Claimants were a sophisticated party that, instead of using the means of verification of Respondents'

78

statements available to them, elected to simply protect themselves through the all-inclusive language of Respondents' warranties, exempting, at the same time, their knowledge from the array of defenses Respondents could propose to their indemnification claims. We find in the circumstances that Claimants did not justifiably rely on Respondents' misrepresentations.

196.    In light of the foregoing, we find that –notwithstanding the presence of numerous misrepresentations by the Respondents—Claimants have not made out a fraud in the inducement.

*       *       *

197.    In any event, even if we were to accept Claimants' allegations and find that they were indeed defrauded as to any category of Respondents' misstatements, such a finding does not automatically entitle Claimants to rescission of the contract. To have the contract rescinded on the ground of fraudulent inducement, Claimants must establish additional elements. We now proceed to the discussion of those additional elements. We find that Claimants have failed to make several of the requisite additional showings, and, for this reason, their rescission claim — even assuming the existence of fraud in the inducement — must be denied.

7.    *__Restoration of the status quo.__*

198.    First, we have serious reservations about the feasibility of restoring the parties to the *status quo ante*, especially since, as we have noted several times, and as Respondents correctly point out, Claimants have acted to remediate various of RIMSA's operational problems. Since we would be obliged, were we to rescind the SPA, to place the parties where they were before they entered into the vitiated contract, *see* Vitale v. Coyne Realty, Inc., 66 A.D.2d 562 (4th Dep't 1979), we would be confronted with the daunting task of apportioning responsibility for RIMSA's present environmental condition to Claimants' post-Closing activities, or inactivity, on the one hand, and to Respondents' pre-Closing activities on the other. Apportioning the purchase price in a way that would be fair to both parties and restoring the parties' 2000 pre-SPA status would be impracticable under the

79

circumstances. *See* Sokolow, Dunaud, Mercadier & Carreras LLP v. Lacher, 747 N.Y.S.2d 441, 446 (App. Div. 2002).

199.    We agree with Claimants that "[t]he rule that rescission is unavailable where a party cannot be returned to the status quo ante will not be strictly enforced where the party against whom rescission is sought is a wrongdoer who is exploiting its change of position to shield its wrongdoing." Sokolow, 747 N.Y.S.2d at 447. Yet the issue here is not a "change in the position of the wrongdoer," but the inherent impossibility of restoration because of the complex nature of the pre-closing liabilities and post-closing transactions involved.

8.    *Delay in requesting Rescission and Election of Remedy.*

200.    Nevertheless, even if we were willing to sidestep the question of the practical possibility of restoration of the *status quo ante*, a second barrier to Claimants' rescission claim would be their failure to make timely demand for rescission of the SPA. Before the Request for Arbitration was filed in May 2002, and therefore before the rescission claim was raised for the first time, in May 2002, Claimants repeatedly sought, beginning in June 2001 to enforce the indemnification provisions of the SPA, invoking the extensive coverage afforded to them by Respondents' generous warranties (*see* RPF ¶¶41-43; Exs. C-113, 117, 124, 145; R-67). Claimants concede that, despite a series of post-Closing communications with Respondents as to the existence of various environmental and financial improprieties (*see* CPF ¶¶506-509), they requested rescission for the first time in their Request for Arbitration, without any reference to it in prior notifications/letters sent to Respondents concerning the ongoing discovery of alleged environmental irregularities at the Mina site (*see* CPF ¶510).

201.    Because of these communications and the considerable delay between the Closing and the assertion of any rescission right (almost 18 months after the Closing), Claimants were estopped from asserting the right to seek rescission of the SPA at the latest by November 19, 2001, the date of Claimants' last written "complaint" to Respondents and their last effort to obtain indemnities (*see* Ex. R-67), a year after the Closing. By that date,

80

Claimants had time to assess the value of the company they had bought and their options. After year-long on-site inspections of the conditions at Mina and extensive investigations into RIMSA's financial condition, Claimants should have been able to ascertain whether the purpose of their purchase had been defeated and whether the inconsistency between warranted and actual value was so great that rescission would be the only desirable outcome from the deal they had made. The SECODAM investigation had been in the spotlight since July 2001, and its alleged devastating potential could have been foreseen by Claimants. However, Claimants did not request rescission of the SPA, opting instead "to protect their rights under the share purchase agreement." *See* Transcript at 726 (Gauthier). Claimants have, in other words, *elected*, by means of their own actions, the suitable remedy for the injury they allegedly suffered.

202.    It is the conclusion of the Tribunal that, under New York law, Claimants could not "put off an action to rescind in favor of waiting to evaluate whether the better option is to keep the business or rescind the contract." *See* Roll International Corp. v. Unilever United States, Inc., 2001 WL 1345012 at *9. In view of the fact that Claimants sought, in various communications to the Respondents prior to May 2002, enforcement of the indemnification provisions of the SPA, and raised rescission for the first time in their May 2002 Arbitration Request, we find that Claimants unreasonably delayed in seeking to rescind the SPA and in fact opted for an affirmation and enforcement of the contract they now seek to annul. *See* New York Tel. Co. v Jamestown Tel. Corporation, 282 N.Y. 365, 372 (1940); R&A Food Services, Inc. v. Halmar Equities, Inc., 278 A.D.2d 398 (2d Dep't 2000). It is worth noting that the requirement of prompt action to rescind the contract is not an affirmative defense to the rescission claim but an element of a prima facie claim for that relief. *See* Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank, 850 F.Supp. 1199, 1211 (S.D.N.Y.1994), judgment aff'd, 57 F.3d 146 (2d Cir.1995). Claimants have not met this threshold test.

9.    *Availability and Adequacy of Legal Remedies.*

81

203.    Claimants' rescission claim likewise fails because of the adequacy of the legal remedies available in this case. Because of its nature as an equitable remedy, rescission of a contract may not be ordered when an adequate remedy at law is available. *See* Rudman v. Cowles Communications, Inc., 30 N.Y.2d 1, 13 (1972); Bristol Oaks, L.P. v. Citibank, N.A., 272 A.D.2d 258 (1st Dep't 2000); Reznor v. J. Artist Management, Inc., 365 F.Supp.2d 565 (S.D.N.Y.2005); Kamfar v. New World Restaurant Group, Inc., 347 F.Supp.2d 38 (S.D.N.Y.2004). Based on the availability of the breach-of-warranty/ benefit-of-the-bargain damages adequate to place Claimants in the same position they would have been in, had the contract been properly performed, and considering the totality of the circumstances before us, we conclude that rescission is not an appropriate or justified remedy in this case and therefore reject Claimants' request for rescission of the SPA in its entirety.

### B.    Compensatory Damages

### 10.    *The Applicable Theory of Damages*

204.    Breach of warranty claims are measured by the benefit-of-the-bargain rule – the difference between the actual value of the property and the value that it would have had if it had been as warranted. *See* Clearview Concrete Products Corp. v. S. Charles Gherardi, Inc., 8 A.D.2d 461, 468-9 (2d Dep't 1982); Bennett v. U.S. Trust Co. of New York, 770 F.2d 308, 316 (2d Cir.1985). As a general matter, prospective damages, such as profits that a party would have made in the future had the warranty been accurate, are not to be included, *see* Sucrest Corp. v. United Brands Co., 57 A.D.2d 751 (1st Dep't 1977), unless (as in all contract cases) they were within the reasonable contemplation of both parties at the time of the contract and arise naturally from such breach. Benefit-of-the-bargain damages consist of "the difference between the value of what was contracted for and the value of what was received." *See* Faller Group, Inc. v. Jaffe, 564 F. Supp. 1177, 1183 (S.D.N.Y. 1983); Mathes v. McCarthy, 87 N.E. 768, 769 (N.Y. 1909).

205.    The application of this doctrine in the case at bar provides redress for the direct losses incurred by Claimants as a result of their overpayment for an enterprise that was

82

not as warranted and represented by its sellers. These losses can be compensated for by an award of damages in the amount of the differential between the actual and the promised value of the company's controlling stock that Claimants acquired in 2000. To the calculation of this differential we now proceed. We begin by laying out the method that the Tribunal, after considering the numerous alternative computation models proposed by the Claimants, has deemed most appropriate for this case.

206.    As a preliminary observation, we emphasize that by "value of the company's controlling stock" we mean the value of the *whole* 90% stake purchased by Claimants, including the 60% ownership stake of Waste Management. Claimants have purchased from Respondents only three-quarters of their original 40% stake in RIMSA, yet this transaction was part of an overall plan for the acquisition of RIMSA – Claimants were simultaneously negotiating with both Waste Management and Vargas for the purchase of RIMSA, and the two stock purchase agreements were concluded at approximately the same time. Given the fact that the parties have already limited Respondents' liability to 40% of Claimants' *total* losses in connection with the breach of the SPA (SPA Section 7.5), our initial inquiry at this point is not confined to the determination of the *partial* losses Claimants suffered with respect to the specific purchase of Respondents' 30% stake. On the contrary, we apply the contractually agreed 40% rate to the differential between the total warranted and the total actual value of 90% of RIMSA acquired by Claimants at the Closing date. The Tribunal follows this course because it is precisely this differential that represents Claimants' overpayment for RIMSA's 90% controlling stake as a whole, and, thus, their "total Losses" from the "untruth, inaccuracy, violation or breach of …the Seller's representations or warranties with respect to the Company" (SPA Section 7.5). The 40% rate representing Respondents' specific liability applies to Claimants' *total losses* (i.e., what they paid for the *whole* 90% controlling interest in RIMSA, in excess of its actual value) (*see also infra* at ¶225); the calculation of those *"total Losses"* ought, therefore, to be the first step in our analysis.

11.    *The Warranted Value of the 90% Stake*

83

207.    The departure point is the ascertainment of the controlling stake's value as bargained for by the parties and as warranted by the sellers. In that regard, Claimants must show a stable foundation for a reasonable estimate of the value of the bargain made for the acquisition of the company, *see* Ostano Commerzanstalt v. Telewide Systems, Inc., 794 F.2d 763, 767 (2d Cir.1986), and, in the absence of convincing testimony and other evidence to the contrary, it is the purchase/ contract price that approximates the actual worth of the sold company, since the deal struck by the parties best represents the fair market value of the acquired company. *See* City of New York v. Pullman Inc., 662 F.2d 910, 916 (2d Cir. 1981); Samuel Schlossman & Sons v. Gotte, 13 N.Y.S.2d 413, 414 (App. Term 1939) (per curiam) and Faller Group, 564 F. Supp. at 1183.

208.    Claimants had no motive to over-value RIMSA, or to pay any more than what they believe RIMSA to be worth at the closing date, based on the extensive warranties and factual guarantees provided by Respondents and their partners (Waste Management) in their respective stock purchase agreements (*see also* CPF ¶146). Therefore, the Lazard Frères report prepared for the Claimants during the RIMSA purchase negotiations evidences *at least* the price Claimants were willing to pay at the beginning of negotiations for the acquisition of 100% of RIMSA's stock (*see* CPF ¶126); thus, Claimants' original assessment of the 90% stake they eventually bought did not exceed US$90 million.

209.    This said, the price paid by Claimants for the purchase of the 90% share in RIMSA reflected an already negotiated and agreed-upon price reduction of US$6 million, representing the costs that Claimants would have to incur for the remediation of certain operational problems brought to the attention of the Claimants during negotiations (*see* CPF¶¶ 144-146). In calculating the warranted value of the 90% share sold to Claimants, the Tribunal must take into account this US$6 million departure from Claimants' original assessment of the company's value.

210.    In addition, there is evidence that the purchase price had a significant subjective component that Claimants would have been willing to pay in any case: Claimants were appreciative of the transaction's strategic value in providing a "jumping-off point" for

84

Onyx to enter the market for waste disposal and oil sludge treatment in Latin America and elsewhere (*see* RPF ¶¶20, 381; Ex. C-83 at p. 3). Already in May 2000, while the negotiations with RIMSA's partners were going on, Onyx was simultaneously negotiating with Waste Management for the sale of two other hazardous waste facilities, one in Brazil and another in Hong Kong (*see* CPF ¶129; Le Conte Statement ¶¶ 10-11). It appears that the acquisition of RIMSA may have been part of a more general business strategy by Onyx to enter the waste treatment industry.

211.    Quantifying this element and discounting appropriately the value which the Claimants initially attached to the 90% interest in RIMSA pose a challenging question for the Tribunal – especially in light of Respondents' anecdotal evidence that the whole of RIMSA's stock was worth no more than $60 million (*see* RPF ¶20; Vargas Garza Stmt., § IV, ¶ 1). We, nevertheless, place some weight in our damages analysis on this subjective element by discounting the purchase price, to the extent necessary to avoid over-compensation of Claimants, and to assure that the calculated differential between RIMSA's actual and warranted value represents as fairly as possible Claimants' direct damages.

212.    In sum, after considering the strategic importance that Claimants attached to the transaction, and taking into account the US$6 million purchase price reduction already agreed by the parties, the Tribunal determines that the total value of the purchased 90% controlling share in RIMSA, as warranted by Respondents at the Closing date, most probably did not exceed US$ 80 million.

213.    In striving to achieve fairness, we also bear in mind that the purchase price paid by Claimants was not actually paid in total to Respondents at the Closing of the transaction, but included two additional crucial components –the two *pagarés* in the amount of Mx$20,592,000 each, payable to Respondents on dates following the Closing, as well as a significant amount (Mx$46,800,000) placed in an escrow account at a Mexican financial institution to serve as security for potential claims Claimants may have against Respondents under the indemnification provisions of the SPA, as provided for under Section 1.2 of the SPA and pursuant to an Escrow Agreement executed at Closing. These amounts constitute

85

portions of the purchase price agreed to by the parties. Even if not actually paid to Respondents, they represent a component of RIMSA's agreed-upon value. In other words, the assumption by Claimants of the obligation to make payment under the two *pagarés* and the Mx$46,800,000 placed in the escrow account were part of the original purchase price and therefore part of RIMSA's *warranted* value as reflected in the contract price (reached after the negotiated US$6 million purchase price reduction and subject to a discount for the strategic transaction component).

214. Thus, Claimants' request that the Tribunal "cancel Onyx's remaining obligations under the SPA of $7,311,891", as it appears in Sections I(B)(1) and I(B)(a) of their request for damage relief (quoted *supra* at ¶63), is unreasonable as presented to this Tribunal: Claimants do not have a separate entitlement to the cancellation of their remaining obligations, *beyond* the benefit-of-the-bargain damages that are to be awarded to them. If we were to order the cancellation of Claimants' pending obligations under the *pagarés*, and the return to Claimants of the amount held in escrow, we would simply be ordering the return to Claimants of a portion of the original purchase price under the SPA. Such a return would set off any award of damages Claimants would be entitled of; it would not be granted as additional compensation separate from Claimants' benefit-of-the-bargain losses. The fate of the escrow account and the *pagarés* will necessarily have to be decided in the context of an inclusive benefit-of-the-bargain damage award.

12.    ***The Actual Value of the 90% Stake: the Flaws in Claimants' Analysis***

215. In determining the most appropriate model for the purchase price adjustment that would most accurately indicate the premium paid by Claimants in excess of the actual value of the purchased stake, we must apply a standard of reasonable certainty, as is applicable under New York law to any award of contractual damages. *See* <u>Kenford Co. v. County of Erie, 67 N.Y.2d 257, 261 (1986)</u>; <u>Ashland Mgmt., Inc. v. Janien, 82 N.Y.2d 395, 403 (1993)</u> and <u>Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Group, N.V., 28 F. Supp. 2d 126, 132-134 (S.D.N.Y.1998)</u>. Respondents correctly state, "While contract damages need not be proved with "mathematical precision," they must "be capable of

86

measurement based upon known reliable factors without undue speculation." See Ashland Mgmt., Inc. v. Janien, 82 N.Y. 2d at 403. Although Claimants did incur losses in the form of overpayment for RIMSA's stock, this finding does not oblige us to accept the premise that Claimants incurred the *specific* losses as quantified by Claimants on the basis of various speculative hypotheses and contingencies.

216.    We have analyzed and considered the various damage models presented by Claimants' experts, PriceWaterhouseCoopers ("PwC"), and conclude, in the light of the evidence, that they do not provide us with an appropriate basis for a damage calculation that we believe fairly reflects the losses incurred by Claimants by reason of the breaches that we find were committed by Respondents. Claimants propose several models, based on multiple *ex ante* and *ex post* scenarios, each of which has different components or values for components; yet not all of those components and hypothetical risks entered into Claimants' calculus withstand scrutiny under the no-undue-speculation standard we have outlined above. The Tribunal is particularly skeptical about the four fundamental assumptions underpinning Claimants' *entire* benefit-of-the-bargain analysis, assumptions that we do not in all respects find warranted by the evidence. There are, however, other problematic aspects of Claimants' analysis, which we enumerate below and which cause us to decline Claimants' invitation to rely on and apply any one of the PwC models to the computation of their injury.

217.    Claimants' basic four assumptions are the following (*see* CPF ¶534):

1.    Closure of the Mina site for two years due to severe contamination (*see* CPF ¶¶564-567);

2.    A 5% reduction in the profit margin reduction for the life of the Mina site (corresponding to the understatement of RIMSA's actual costs of doing business in general, by reason of its poor record of "environmental compliance" and its historical failure to incur certain rental expenses in the pre-Closing period) (*see* CPF ¶¶573-580);

3.    A two-year 40% to 60% profit margin reduction in all revenues from government contracts (because of the effect of a SECODAM declaration of RIMSA's ineligibility to bid for government contracts for a two-year period) (*see* CPF ¶¶545-583); and

4.    Environmental remediation expenditures in the amounts stated in the Golder Reports (within the range of $30.5 and $39.1 million, representing the average high and the average low future remediation costs calculated by Golder) (*see* CPF ¶¶568-572).

218.    The Tribunal agrees with the logic underlying Claimants' third and fourth assumptions: in computing the actual value of RIMSA's purchased stock at the Closing date, we must indeed pay due regard to the significant risk of an imminent SECODAM investigation and the resulting risk of a final SECODAM resolution adverse to RIMSA's interests, as well as to the possibility of RIMSA's incurring certain remediation costs to rectify the environmentally problematic aspects of its operations. The warranted value of RIMSA's 90% stake (which we have calculated at approximately US$ 80 million, *see supra* at ¶212) should thus be adjusted to account for these risks that, according to our prior findings, existed at the Closing date. Nonetheless, we are unable to find any support in the record for Claimants' quantification of these existing risks and the range of options they provide us under their otherwise acceptable assumptions (i.e. a two-year 40% to 60% profit margin reduction, attributable to the SECODAM investigation, and a range of $30.5 and $39.1 million for the remediation costs). Similarly, we cannot find any basis for Claimants' other two basic assumptions, namely the 5% profit margin reduction and the risk of closure of the Mina site. In particular:

219.    *First*, we find no adequate basis in the record for the assumptions made by PwC relating to a 5% reduction in RIMSA's profit margin (assumption (1) above). RIMSA's financial statements through 2004, reflect recent profitability and, more importantly, there has been no convincing evidence presented in support of PwC's projections that RIMSA's past business practices and its historical failure to incur remediation costs and rental expenses will oblige it in the future to incur additional operating costs in the amount of 5% of its revenues for the entire twenty-year lifespan of the Mina landfill. The moderate amounts

88

that RIMSA has thus far invested in, or even reserved for, environmental remediation concerning the areas at issue in this arbitration (*see* CPF ¶¶529-533) are not indicative of a significant increase in future operating costs and a corollary decrease in profits. It is noteworthy that Claimants have decided to defer the bulk of the now claimed remediation costs to a later stage, after the completion of the present arbitration, based on the conviction that the entirety of their claims would be granted by the Tribunal (*see* note 2 to RIMSA's 2003 and 2004 Financial Statements, at p. CGEA 0078063; Respondents' letter to the Tribunal, of May 26, 2005).

220.   *Second*, despite our finding that Claimants suffered injury as a result of the RIMSA's debarment by SECODAM and that there were certain environmental problems at the Mina site that had to be remediated, there has never been a suspension or revocation of RIMSA's operating licenses, nor has the continued operation of the Mina site ever been jeopardized.   There is therefore no basis in the evidence for assumptions that the Mina mine would be or will be closed or forced to close as a consequence of the incremental and other problems that underlie our findings of breaches of warranties, despite Claimants' allegations to the contrary (*see* CPF ¶¶564-567). This assumption was implausible under the circumstances and, although it has been included in many PwC hypothetical scenarios, is rejected.

221.   *Third*, we do not agree with the range of $30.5 to $39.1 million allegedly representing "necessary" remediation costs; this range is not supported by the evidence and is disproportionate to the amounts Claimants have actually expended so far for the correction of RIMSA's environmental problems: although the existence of environmental abnormalities at Closing is irrefutable, it is reasonable to assume that, given the absence of any serious fine or enforcement action against RIMSA by the Mexican authorities, operating RIMSA at a profit could have been feasible under Mexican environmental laws and regulations. In fact, what the low level of post-closing remediation expenditures indicates (*see* CPF ¶¶529-533) is that, under the Industria Limpia program the remediation can be done at a relatively low cost, readily absorbable into RIMSA's day-to-day expenses. Claimants' estimated future remediation costs are exorbitant and, in light of the record before us, simply not

89

commensurate with their actual remediation efforts. Claimants' respective fourth assumption is equally rejected.

222. *Fourth,* in calculating the differential between the actual and warranted value of the purchased controlling stake in RIMSA, PwC did not take into consideration the company's pre-Closing undisclosed and unreserved-for financial liabilities: there is no separate accounting in the PwC financial models for those undisclosed pre-Closing financial liabilities and claims (Dos Bocas contract, 1999 Villahermosa contract, un-collectible accounts receivable, etc.). As we have already found (*see supra* under Section V.D), the possibility that RIMSA would incur future liabilities as a result of those unreserved-for liabilities, was substantial at the Closing date. Respondents themselves concede the existence of certain such undisclosed liabilities and assume responsibility therefore (*see supra* at ¶¶54-57). Claimants, however, did not factor them separately into their benefit-of-the-bargain calculus –although, admittedly, the non-disclosure of those looming financial liabilities and the absence of any reserves in RIMSA's financial statements did deprive Claimants of the benefit of their bargain.

223. The PwC models have only counted in RIMSA's undisclosed default on rental payments (excluding pre-Closing contractual penalties, failure to reserve for uncollectible accounts receivable or the PCB processing costs) under the 5% profit reduction assumption (assumption (2) above). As to the other unreserved-for pre-Closing financial liabilities, Claimants have requested separate relief under the rubric of "indemnification damages" to which they claim entitlement pursuant to Section 7.3 of the SPA (*see* CPCL ¶¶172-177). These "indemnification damages" constitute a distinct part of their request for relief in addition to their benefit-of-the-bargain damages: Claimants request that the Tribunal order Respondents to pay "$2,699,919, which constitutes Vargas's share of the indemnity damages" (*see* Section I(B)(2) of their Request for Relief, quoted *supra* at ¶63). Claimants arrive at this number by applying the contractually agreed 40% rate (representing Vargas' share of Claimants' losses, *see* Section 7.5 of the SPA) to the total amount of RIMSA's pre-Closing outstanding financial liabilities.

90

224. There are three problems with Claimants' "indemnity" claim. *First and foremost,* we are troubled by this division of damages into two categories – the "benefit-of-the-bargain" damages and the undiscounted "indemnity" damages. Section 7.3 of the SPA simply provides that "...the Seller will indemnify and hold the Buyer ... harmless from and against any and *all Losses, incurred* as a result of or in connection with: (i) the untruth, inaccuracy, violation or breach of any of the Seller's representations, warranties..., (v) any liabilities of ... [RIMSA] having a cause or source prior to the Closing Date, including ...undisclosed liabilities..." (emphasis added). As we have explained above (*see supra* under Section IV.B), the direct loss that Claimants *incurred* as a result of Respondents' breaches of warranties was the premium they overpaid for the 90% share in RIMSA –the amount that they paid in excess of this stake's actual value, under the assumption that its condition was as warranted by Respondents. It is this overpayment that represents the benefit of their bargain and it is this overpayment that they are entitled to recover from Respondents as their benefit-of-the-bargain damages. The SPA does not make any distinction between benefit-of-the-bargain and indemnification damages. Indeed, the damages that are awarded to Claimants by the Tribunal under the "indemnification" provisions of the SPA *are* the benefit-of-the-bargain damages. Claimants are not entitled to a separate category of damages called "indemnity damages" –the only indemnity they have a right to seek is the amount they paid for RIMSA's stock beyond its actual value. RIMSA's outstanding financial liabilities are taken into account in determining the benefit-of-the-bargain damages (i.e. the actual v. warranted value differential), but Claimants cannot claim them as a separate item of their request for relief.

225. *Second,* we also disagree with the method Claimants apply to assess their alleged "indemnity damages". Claimants, as we have noted above, apply the 40% rate directly to the total amount of RIMSA's outstanding financial liabilities. However, according to Section 7.5 of the SPA, "the Seller's liability under Section 7.3 for untruth, inaccuracy, violation or breach of any of the Seller's representations or warranties with respect to the Company shall be equal to 40% of the *total Losses with respect to that Claim...*" (emphasis added). In other words, the 40% rate only applies to *Claimants'* total

91

losses, which in a breach of warranties scenario consist in the lost benefit of their bargain, i.e. the differential between the actual and warranted value of the 90% stake acquired by Claimants. The 40% rate does not apply directly to the total amount of *RIMSA's* post-Closing financial liabilities. These liabilities burden the *Company* –not Claimants. Claimants suffered an injury by paying a price that did not correspond to the actual value of the 90% controlling block they bought; they, thus, have a right of redress in the form of benefit-of-the-bargain damages. Claimants' analysis on the one hand disregards that they only acquired 90% in RIMSA, and, on the other hand, fails to consider that the 40% rate applies to the losses suffered by them (not RIMSA). The actual amount of expenses that RIMSA had to incur as a result of unsettled pre-Closing financial problems and contractual defaults is certainly a factor in our assessment of the actual value of the purchased stock at the Closing Date, but does not reflect Claimants' *direct* total losses under the SPA.

226. *Third,* we point to another flaw in Claimants' bifurcated damage analysis: both benefit-of-the-bargain models and the indemnification damages take into account RIMSA's default on rental payments (*cf.* CPCL ¶¶156 and 175). On the one hand, the 5% profit margin reduction rate in the PwC benefit-of-the-bargain analysis (assumption (2) above) which we have rejected as unwarranted and unjustifiable, is based on RIMSA's historical failure to incur certain remediation costs and rental expenses (*see* CPCL ¶156). On the other hand, Claimants request "indemnification" for RIMSA's outstanding financial liabilities, including (again) its failure to reserve for unpaid rent due to (1) Ferrocariles Nacionales de Mexico, (2) the state of Tabasco, and (3) Trans-Quimica Nacional, S.A. de C.V. (*see* CPCL ¶¶174 and 175(d),(e) and (f)). This double-counting of unpaid rental expenses is inconsistent and illogical.

\*    \*    \*

227. In summary, we reject Claimants' request for relief, as far as the "indemnification damages" are concerned. The Tribunal allows only recovery of their benefit-of-the-bargain damages, which remedies Claimants' total losses under the SPA. In that regard, Respondents' financial misrepresentations are taken into account in evaluating

92