**ARTICLE IX**
**CONDITIONS PRECEDENT TO OBLIGATIONS OF THE BUYER**

The obligations of the Buyer to effect the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Time of Closing of each of the following conditions:

**Section 9.1    Accuracy of Representations and Warranties.**

All representations and warranties of the Seller, Confinamina and the Company contained in this Agreement shall be true and correct as of (i) the date hereof and (ii) the Time of Closing, with the same force and effect as though made at and as of the Time of Closing except for changes contemplated or permitted by this Agreement.

**Section 9.2    Compliance with Obligations.**

The Seller, Confinamina and the Company shall have performed and complied with all the agreements, obligations and conditions required by this Agreement to be performed or complied with by it at or prior to the Time of Closing.

**Section 9.3    No Material Adverse Changes.**

Since December 31, 1999, there shall have been no material adverse changes in the business, operating results, financial condition, assets, or operations of the Company or Confinamina.

-72-

CGEA0040524

**Section 9.4    Seller's Certificate of Fulfillment.**

The Seller shall have delivered to the Buyer a closing certificate dated the Time of

Closing, executed on its behalf by one of its officers, as to the fulfillment of the conditions set

forth in Sections 9.1 and 9.2 and 9.3 hereof.

**Section 9.5    Ancillary Stock Purchase Agreement.**

The Buyer and the Seller shall have executed and delivered the Ancillary Stock Purchase

Agreement. In the event of any inconsistency or controversy, this Agreement shall prevail over

the Ancillary Stock Purchase Agreement.

**Section 9.6    Release.**

The Company and Chemical Waste Management and its Affiliates

shall have received a general Release executed by the Seller in the form attached hereto as

Exhibit C.

**Section 9.7    Absence of Actions or Proceedings.**

There shall be in effect no preliminary or permanent injunction or other order issued by

any court or other governmental or regulatory authority, domestic or foreign, nor any statute,

rule, regulation, decree or executive order promulgated or enacted by any governmental entity,

that declares this Agreement invalid or unenforceable in any respect or which prevents the

consummation of or seeks to obtain damages or other relief in connection with the transactions

contemplated hereby; and no action or proceeding shall have been instituted or threatened by or

-73-

CGEA0040525

before any court, other governmental body or arbitration tribunal, domestic or foreign, which shall seek to restrain, prohibit or invalidate this Agreement or seek to obtain damages or other relief in connection with the transactions contemplated hereby.

CGEA0040526

**Section 9.8    Non-Competition Agreement.**

The Buyer, the Seller, and the Company shall have executed and delivered the Non-Competition Agreement in the form attached hereto as Exhibit E.

**Section 9.9    Other deliveries**

Buyer shall have received all of the certificates, documents, and instruments required to be delivered pursuant to Section 1.3 above.

**Section 9.10    Satisfactory Action**

All actions to be taken by the Company or Seller in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to Buyer.

**Section 9.11    Mexican Federal Competition Commission**

The parties shall have received the unconditional written authorization of the Mexican Federal Competition Commission to the transactions contemplated by the Agreement, reasonably satisfactory in form and substance to the Buyer.

**Section 9.12    Seller Affiliate contracts.**

The Company shall have executed the contracts referred to in Section 1.4 (c) (ii) in from and substance reasonably satisfactory to Buyer.

CGEA0040527

Section 9.13 Purchase of Chemical Waste Management shares.

Simultaneously with the purchase of the Shares hereunder the Buyer shall close the purchase of the acquisition of all of the shares of the Company owned by Chemical Waste Management.

Section 9.14 Employment Agreements

The employment agreements between the Company and employees Juan Antonio Cuellar and Roberto Salazar shall have been modified to the satisfaction of the Buyer.

-76-

CGEA0040528

## ARTICLE X
## OTHER PROVISIONS

### Section 10.1   Survival of Representations and Warranties.

All of the respective representations and warranties of the parties to this Agreement shall survive the Time of Closing and the consummation of the transactions contemplated by this Agreement; provided, that such representations and warranties shall expire on the last day (if any) on which a claim for indemnification may be made pursuant to Article VII for a breach thereof, unless such representation or warranty is the subject of a pending claim pursuant to Article VII on such date, in which case it shall expire upon resolution of such claim.

### Section 10.2   Extension/Waiver.

The Buyer or the Seller may extend the time for or waive the performance of any of the obligations of the other, waive any inaccuracies in the representations or warranties by the other, or waive compliance by the other with any of the covenants or conditions contained in this Agreement.  Any such extension or waiver shall be in writing and signed by any officer of the Buyer, or by any officer of the Seller.  No such waiver shall operate or be construed as a waiver of any subsequent act or omission of the parties hereto.

### Section 10.3   Notices.

Any notice to a party hereto pursuant to this Agreement shall be given by hand delivery, telecopier, certified or registered mail or a private courier service which provides evidence of receipt as a part of its service, addressed, if to the Company, to: Chairman of the Board, Residuos Industriales Multiquim, S.A. de C.V., Ave. Lazaro Cardenas 2400 B-21, Garza Garcia,

-77-

CGEA0040529

Nuevo Leon C.P. 66260, telecopier number (8) 152-21-90; or if to the Buyer, to: President,
CGEA S..A. , Parc des Fontaines, 169 Ave, Georges Clemenceau, 92735 Nanterre Cedex, France
telecopier number 33.1.46.69.33 63. with a copy to Kenneth Levine, Levine & Okoshken, 51
avenue Montaigne, 75008 Paris, tel. : 33.1.44.13.69.21, fax : 33.1.45.63.24.96; or, if to the
Seller, o:Mr. Hector Vargas Garza,  Presidente Valores Ecologicos SA de CV  Ave.  Lazaro
Cardenas 2400 PB 7, Col. Residencial  San Agustin, Garza Garcia, NL   CP 66260.  Any notice
given hereunder shall be deemed given on the date of hand delivery, transmission by telecopy,
five days after deposit with the postal service or, two days after delivery to a courier service, as
appropriate.  In the event any proceeding, action or suit is commenced by any party to this
Agreement against any other party to either enforce the performance of this Agreement or any
right or obligation arising thereunder, the Seller hereby appoints the President of Valores, the
Company hereby appoints its Chairman of the Board, and the Buyer hereby appoints its
President as their respective agents for service of process. Any party may change the address to
which notices are given by giving notice to the other parties in the manner indicated herein.

### Section 10.4   Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the
State of New York applicable in the case of contracts made and to be performed in such
jurisdiction, without giving effect to any conflict of laws rules, provided that matters concerning
the form and validity of the transfer of shares shall be determined by the law of the United
Mexican States and provided that in determining whether there has been an untruth, inaccuracy,
violation or breach of a representation or warranty, if there is a national or local law exclusively
applicable to the status, act or action which is the subject matter of the representation or warranty

-78-

CGEA0040530

then said national or local law shall be applied to determine if the particular representation or warranty is untrue, inaccurate or has been violated or breached..

### Section 10.5  Binding Effect.

This Agreement shall inure to the benefit of, and be binding on and enforceable against the successors and assigns of the Buyer, the Company and the Seller.

### Section 10.6  Entire Agreement.

This Agreement (including the Exhibits hereto) and the documents and schedules delivered pursuant hereto constitute the entire Agreement and understanding between the parties, and supersedes any prior agreement and understandings relating to the subject matter hereof. This Agreement may be modified or amended only by a written instrument executed by all parties hereto.

### Section 10.7  Severability of Provisions.

If at any time subsequent to the date hereof, any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement.

### Section 10.8  Execution in Counterparts.

This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

-79-

**Section 10.9   Attorney's Fees; Costs of Litigation.**

If any legal action or any other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

**Section 10.10  Headings.**

The subject headings of the paragraphs and sections of this Agreement are included for purposes of convenience only and shall not affect the construction or interpretation of any of its provisions.

**Section 10.11  Limitation of Rights to Parties.**

Nothing in this Agreement, whether expressed or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors, legal representatives and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provisions give any third persons any rights of subrogation or action over or against any party to this Agreement.

**Section 10.12  Arbitration.**

Any dispute, controversy or claim arising out of or relating to this Agreement or the breach thereof shall be finally settled by arbitration in accordance with the Rules of Conciliation

CGEA0040532

and Arbitration of the International Chamber of Commerce ("ICC"). There shall be three arbitrators, one selected by the Buyer, one selected by the Seller, and the third selected by the two arbitrators so selected by the Buyer and the Seller. If a party fails to nominate an arbitrator within 30 days from the date of notification to it of the other party's request for arbitration, or if the two arbitrators fail within 30 days from the date of their appointment to reach agreement on the third arbitrator, then the Court of Arbitration of the ICC shall appoint the arbitrator that was not nominated by the failing party, or shall appoint a third arbitrator, as the case may be. The place of arbitration shall be New York City and the language used shall be English.

**Section 10.13 Payment in Dollars.**

Except to the extent already expressed in U.S. dollars, all payments to be made hereunder, and all amounts on which payments are to be based hereunder, shall be in the form of United States dollars calculated at the peso-dollar exchange rate applicable to liabilities denominated in foreign currency and payable in Mexican Pesos within Mexican territory (the "Exchange Rate Fix 48 Hours"), as determined by reference to such rate as published in the "Diario Oficial de la Federacion" on the business day immediately preceding the Closing Date.

**Section 10.14 Succession and Assignment.**

This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and assigns; except as otherwise provided herein, no Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of each other Party; provided, however, that Buyer may (i) assign any

-81-

CGEA0040533

or all of its rights and interests hereunder to one or more of its wholly owned Affiliates and (ii) designate one or more of its wholly owned Affiliates to perform its obligations hereunder.

Section 10.15  Interpretation.

(a)   Schedule : Any schedules attached hereto are deemed to be incorporated in and to form an integral part of this Agreement. All schedules are deemed to express monetary amounts in Mexican pesos unless otherwise specifically indicated in writing on the schedule.

(b) Titles   Titles to the provisions of this Agreement are including for convenience only and shall not be deemed to affect the meaning of any such provision.

-82-

(c) <u>Reference to law</u>: Any reference to a statute or statutory provision includes a reference to that provision as amended, re-enacted or replaced and any regulations or orders made under such provisions from time to time whether before or after the date of this Agreement and any former statutory provision replaced (with or without modification) by the provision referred to except to the extent that any amendment, re-enactment or replacement coming into force after the date of this Agreement would increase or extend the liability of the Parties to one another :

(d) <u>Entities</u> :Any reference to persons includes a reference to firms, corporations or unincorporated associations.

(e) <u>Gender - Plural</u> :Any reference to the singular includes a reference to the plural and vice versa; and any reference to the masculine includes a reference to the feminine and vice versa.

(f) <u>Disclosure</u> : Nothing contained in any schedule hereto shall be deemed adequate to disclose an exception to a representation or warranty made herein, unless the schedule identifies the exception with particularity and describes the relevant facts in reasonable detail, except that cross-references to exceptions that adequately disclose facts relevant to more than one representation shall be deemed adequate, and except that Seller shall not be in breach of a representation if the factual basis for such claimed breach is unambiguously disclosed elsewhere in a schedule hereto and is reasonably related to such representation. Without limiting the generality of the foregoing, the mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein, unless the representation or

-83-

CGEA0040535

warranty has to do with the existence of the document or other item itself and except as is otherwise reasonably apparent from the schedule.

(g) Representations Independent : The parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any party has breached any representations, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the party has not breached shall not detract from or mitigate the fact that the party is in breach of the first representation, warranty, or covenant.

(h) Knowledge: The words have « knowledge » or is « aware » shall include a warranty that the person concerned has made due and careful inquiry. As used in this Agreement, "Knowledge" or "To the Seller's Knowledge" or similar knowledge qualifications shall mean such facts which are known to Hector Vargas Garza, Hector Vargas Aguirre, Jose de Jesus Vargas Aguirre, Guillermo Vargas Aguirre or Juan Antonio Cuellar,

(i) "Affiliate" shall mean, with respect to a specified person, any other person that directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified.

**Section 10.16  Further Requests**

The Seller agrees, at any time and from time to time after the date hereof, upon the request of Buyer, to do, execute, acknowledge and deliver or cause to be done, executed,

-84-

CGEA0040536

acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney as may be required to perfect the sale of the Shares and carry out the transactions contemplated by this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

COMPAGNIE GENERALE D'ENTREPRISES AUTOMOBILES S.A.

By: _____

Name: _____

Title: _____

SARP INDUSTRIES S.A.

By: _____

Name: _____

Title: _____

HECTOR VARGAS GARZA

VALORES ECOLOGICOS SA DE CV

By: _____

Name: _____

Title: _____

-85-

CGEA0040537

-86-

CGEA0040538

## EXHIBIT A
### Financial Statements

[see attached to Disclosure Schedule]

CGEA0040539

<u>EXHIBIT B</u>
<u>Form Of Ancillary Stock Purchase Agreement</u>

This Stock Purchase agreement is made and entered into by and among, on one part,

Compagnie Générale d'Entreprises Automobiles, S.A., a corporation organized under the laws

of the Republic of France (the "Buyer"), herein represented by _____; and on

another part, Hector Vargas Garza ("Mr. Vargas") residing at

_____ and Valores Ecologicos S.A. de C.V.

("Valores"), or CMN, as the case maybe, a corporation organized under the law of the United

Mexican States ( collectively the "Seller") and represented by                pursuant to the

following recitals and clauses:

## RECITALS

I.    Seller States:



CGEA0040540

(a) That Seller is the lawful owner of 3,270,495 shares of Immobiliaria Confinamina SA de CV, a corporation organized under the laws of the United Mexican States (the "Company"), (all such shares being, collectively, the "Shares"), as evidenced by stock certificates number ___, ____ and ____ issued by the Company.

(b) That Seller wishes to sell and transfer to the Buyer, under the terms and conditions herein established, all of the Shares.

(c) That the Shares are fully paid and free of any lien, encumbrance, obligation or any other limitation whatsoever that may restrict or impair the rights of the Buyer as shareholder in the Company.

(d) That Seller is duly represented herein by _____, who has full power and authority to execute this Agreement, which power and authority has not been limited or revoked.

II.    Buyer states:

-89-

CGEA0040541

(a) That Buyer wishes to acquire from Seller the Shares, under the terms and conditions herein established.

(b) That Buyer has full power and authority to execute this Agreement, which power and authority has not been limited or revoked.

(c) That Buyer is duly represented herein by _____, who has full power and authority to execute this Agreement, which power and authority has not been limited or revoked.

NOW, THEREFORE, the parties hereby agree as follows:

## CLAUSES

### FIRST - PURCHASE OF SHARES

Based on the representations of Seller and Buyer and the promises and agreements herein contained and subject to the terms and conditions of this Agreement, Seller hereby sells and transfers the Shares to Buyer, and Buyer hereby purchases the Shares from Seller, including all dividend rights, free and clear of all liens, claims, pledges, encumbrances, security interests or other rights or restrictions.

### SECOND - CONSIDERATION

As total consideration for the purchase of the Shares, the Buyer covenants and agrees to pay Seller, on the date hereof and against delivery of the corresponding share certificates, duly endorsed in ownership, the amount of mexican Pesos [insert amounts and dates].

-90-

CGEA0040542

THIRD - <u>TAXES</u>

Seller covenants and agrees that Buyer may withhold any percentage of the total price set forth in this Agreement, representing the minimum amount that is required to be withheld in accordance with the laws of the Republic of Mexico, subject to Seller's right to review and consent to the calculation of any amount so withheld provided, that if at or prior to the closing, the Seller shall have furnished to Buyer a tax accountant's certification to the effect that Seller will recognize no gain on its disposition of the Shares, no amount will be withheld by Buyer.

FOURTH - <u>MISCELLANEOUS</u>

4.1    <u>Notices</u>. Any notice to a party hereto pursuant to this Agreement shall be given by certified or registered mail addressed as follows:

To Buyer:    _____
               _____
               _____
               _____
               Attention:_____

To Seller:

4.2    <u>Assignment</u>. No party may assign this Agreement or its rights hereunder. Nothing contained in this Agreement shall constitute either of Buyer or Seller a partner, agent or representative of each other.

4.3    <u>Paragraph Headings</u>. The paragraph headings contained in this Agreement have been inserted for reference purposes only and shall not, in any way, affect the meaning or interpretation of this Agreement.

4.4    <u>Governing Law</u>. This Agreement shall be governed and construed in accordance with the domestic laws of the Republic of Mexico.

CGEA0040543

4.5    Amendments.  No amendment or revision hereof shall have any force or effect unless the same is put in writing and executed by the parties hereto.

**(SIGNATURE PAGE FOLLOWS)**

-92-

IN WITNESS WHEREOF, the parties have executed this Agreement on the _____ day of

_____, 2000.

COMPAGNIE GENERALE D'ENTREPRISES
AUTOMOBILES S.A

By:_____

    Name:

    Title:

WITNESS:

_____


VALORES ECOLOGICA SA de CV

By:_____

    Name:

    Title:

WITNESS:

_____

CGEA0040545

<u>EXHIBIT C</u>
<u>Form Of General Release</u>

This Release is executed in connection with that certain Agreement for the Purchase of

Stock dated _____, 2000 (the "Stock Purchase Agreement") by and among Compagnie

Générale d'Entreprises Automobiles, S.A., , a corporation organized under the laws of the

Republic of France  (the "Buyer"); Hector Vargas Garza ("Mr. Vargas") residing at

_____ and Valores Ecologicos S.A. de C.V.

("Valores"), a corporation organized under the law of the United Mexican States ( collectively

the "Seller") and represented by _____ (other capitalized terms used and not otherwise

defined herein shall have the meanings assigned thereto in the Stock Purchase Agreement).

1.    For good and valuable consideration, the receipt and sufficiency of which are

hereby acknowledged, _____, for himself or itself and his or its heirs, successors and

assigns (the "Releasing Parties"), does hereby fully and forever release and discharge

_____ and its Affiliates, successors and assigns of and from any and all claims, demands,

accounts, debts, proceedings, liabilities, actions, causes of action, suits, agreements, losses,

damages, costs, expenses, sums of money, obligations, judgments, executions and controversies

of every kind and description, whether in law or equity and whether known or unknown, accrued

or unaccrued, matured or unmatured, liquidated or unliquidated, contingent or otherwise, which

any of the Releasing Parties now have, may now have, have had or which may exist or be

claimed to exist at or prior to the date of this Release; provided, however, that nothing contained

herein shall be deemed to release _____ or its successors or assigns from any of

_____ obligations under the Stock Purchase Agreement.

-94-

CGEA0040546

2.    This Release shall be binding on the undersigned and his or its heirs, successors and assigns and all those claiming through or under all or any of them.

3.    This Release shall be governed by and construed in accordance with the laws of the Republic of Mexico.

IN WITNESS WHEREOF, the undersigned has executed this Release as of the ___ day of _____, 2000.

_____
Name:_____
Address:_____
_____

WITNESS:

_____

-95-

CGEA0040547

**EXHIBIT D**
Form Of escrow or trustee agreement

[see attached]

-96-

CGEA0040548

## ESCROW AGREEMENT – PURCHASE PRICE

Between the undersigned:

Mr. Hector Vargas Garza ("Mr. Vargas") residing at

_____ and Valores
Ecologicos S.A. de C.V. ("Valores"), a corporation organized under the law of the United
Mexican States, with offices at

_____

(herein called the "Seller" when referred to collectively)


And

Compagnie Générale d'Entreprises Automobiles S.A., ("CGEA") having offices at Parc des
Fontaines, 169 avenue Georges Clémenceau, 92735 Nanterre and SARP Industries, S.A.
(SARPI) having offices at Zone Portuaire, 427 rue du Hazay, 78250 Limay.



(herein called "Buyer" when referred to collectively)



And


The        Bank



(Hereinafter referred to as the "Escrow Agent")

Represented by Mr. _____, duly empowered to execute this agreement.

1

CGEA0040549

## NOW THEREFORE, IT HAS BEEN AGREED AS FOLLOWS:

1.  Reference is made to an agreement, dated _____ 2000 (hereinafter called the "Sale Agreement") between Buyer and the Sellers relating to the purchase of certain shares in Confinamina SA de CV, a company organized under the laws of the United Mexican States, having its registered office at _____ (hereinafter called "Confinamina"), in which it is provided that a portion of the purchase price paid to Seller shall be placed in escrow to serve as security for any claims Buyer may have against Seller or any of them.

2.  Simultaneously with the execution of this Escrow Agreement, the Buyer has deposited with the Escrow Agent on behalf of Sellers, and the Escrow Agent acknowledges receipt thereof, the sum of Mexican Pesos 46,800,000 hereinafter referred to as the "Escrow Fund".

3.  The Escrow Agent shall hold the Escrow Fund during the period specified in this agreement and shall administer and deliver such Escrow Fund in accordance with the terms hereof.

4.  The Escrow Fund shall be retained by the Escrow Agent under the terms hereof to serve as security for any claims that the Buyer may have to be held harmless or indemnified under the Sale Agreement (the "Claim(s)").

5.  a) At any time or times on or before [          ], 2005 Buyer shall have the right directly or through its legal counsel to notify the Seller of any and all claims which it may have against any or all of the Sellers under the Sale Agreement, such "Notice of Claim" to specify the type of claim, the amount thereof, the relevant facts, and the provisions of the Sale Agreement and/or law on which the claims are based and a copy of the notice of claim so served, shall be delivered to the Escrow Agent.

    (i) Upon receipt by the Escrow Agent of such a Notice of Claim it shall pay to Buyer out of the Escrow Fund or the remaining balance thereof the amount of the claim specified in such Notice of Claim which can be satisfied therefrom, promptly after the earlier of the following:

    A/ Receipt by the Escrow Agent of a written authorization from the Sellers to make such payment;

2

CGEA0040550

B/ Expiration of thirty days after receipt of such Notice of Claim provided that the Escrow Agent shall not have received a written statement from the Seller objecting to such payment, in all or part. If the objection of the Seller relates only to part of a claim, the Escrow Agent shall pay to Buyer out of the Escrow Fund that amount of the Claim to which Sellers have not objected and for which there are sufficient funds in the Escrow Fund.

(ii) In case the Seller shall object to such payment in respect of any claim or claims made in any Notice of Claim, the Sellers and Buyer shall attempt in good faith to come to an agreement with respect to each of such claims, during a period of 30 days from receipt of the Notice of Claim. If the Seller and Buyer so agree a written memorandum setting forth such agreement shall be prepared and signed by both parties and shall be furnished to the Escrow Agent. The Escrow Agent shall be entitled to rely on any such memorandum and distribute the Escrow Fund in accordance with the terms thereof. If no such agreement can be reached after good faith negotiations, the dispute shall be decided by arbitration as provided in paragraph 7 below. The Escrow Agent is authorized and directed to retain in its possession without liability to anyone all or the remaining balance of the Escrow Fund until such dispute shall have been settled by a decision of the arbitrator(s), but it shall be under no duty whatsoever to institute or defend any such proceeding. The final decision of the arbitrator(s) is binding also upon the Escrow Agent.

b)   On [     ], 2005, the Escrow Agent shall pay the balance of the Escrow Fund, if any, to the Sellers, less an amount sufficient to cover any claims of Buyer specified in any Notice of Claim delivered to the Escrow Agent, which may still give rise, under the provisions of paragraph 5(a), to an obligation on the part of the Escrow Agent to pay such an amount to the Buyer, provided that the Escrow Agent cannot be required to retain an amount greater than the balance of the Escrow Fund.

6.   It is understood that nothing in the present Escrow Agreement shall be deemed to limit the right of Buyer to pursue Seller for the full amount of any claims which the former may have against the Seller or any of them, whether or not the total amount of such claims exceeds the amount of the Escrow Fund and regardless of the time when any such claims may have arisen.

7.   It is understood by the parties hereto that all disputes arising in connection with the Sale Agreement and with this Agreement shall be finally settled by arbitration in New

3

CGEA0040551

York under the Rules of Conciliation and Arbitration of the International Chamber of Commerce, by one or more arbitrators appointed under those Rules. All written briefs and pleadings and all oral proceedings shall be in the English language. The Escrow Agent may rely conclusively upon and shall be protected in acting upon any order, decree, certificate, notice, request, consent, statement or instruction of the above indicated arbitrator or arbitrators or of a competent court or tribunal believed by it to be genuine and to have been signed and presented by the proper persons.

8.   The Escrow Agent shall bear no responsibility with respect to the covenants and agreements contained in the Sale Agreement and shall have no obligation to Buyer and Sellers other than the performance of its duties as expressly set forth herein. Except in the event of its gross negligence or willful misconduct, the Escrow Agent shall not be liable or responsible for anything done or omitted to be done by it hereunder and the Buyer and the Seller agree jointly and severally to indemnify it and hold it harmless against any and all losses, claims, damages or liabilities incurred by it hereunder, and all expenses incurred by it in connection herewith or any action in respect hereof.

9.   The Escrow Agent shall not be bound by any notice of, or demand with respect to, any waiver, modification, amendment, termination, cancellation, rescission or supersession on of this Escrow Agreement, unless in writing and signed by the Buyer, Seller and the Escrow Agent.

10.  The Sellers and the Buyer agree jointly and severally to pay the Escrow Agent an annual fee of _____ (plus all expenses incurred by the Escrow Agent in connection herewith, including without limitation the reasonable fees and disbursements of its counsel or governmental charges incurred by the Escrow Agent) for its services in connection with this Escrow Agreement. Simultaneously with the execution hereof, the Buyer and Sellers have delivered to the Escrow Agent a check in the amount of _____ representing such annual fee for the first year (plus its expenses in connection with the preparation and execution hereof). The annual fee for each successive year shall be payable on each anniversary date hereof, and the aforesaid expenses shall be reimbursed when requested by the Escrow Agent. The Buyer and Seller agree between themselves (without affecting their joint and several obligation to the Escrow Agent) that the Buyer and Seller shall each bear one half of such annual fee (plus the aforesaid expenses).

4

CGEA0040552

11. In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder and shall receive instructions from any of the other parties hereto, which in the Escrow Agent's opinion are in conflict with any of the provisions of this Agreement, the Escrow Agent shall be entitled to refrain from taking any action in writing by all of the other parties hereto or by a final decision of an arbitration proceeding as described in paragraph 7.

12. The Escrow Agent shall have no duties or responsibilities except those expressly set forth herein.

13. In the event that Buyer shall assign all or any part of the Sale Agreement or shall cause any of the shares to be purchased by a designee, the terms of this Escrow Agreement shall apply mutatis mutandis to such assignee or designee.

14. Any notices, requests, demands, claims or other communications hereunder (hereinafter called "Notices") shall be in writing and shall be deemed sufficiently given upon dispatch if mailed (airmailed if mailed outside the country of destination) by registered mail, postage prepaid, return receipt requested, to the parties at their respective address set forth on the first page of this agreement, pending written designation of another address. Any notices to be given by the Sellers shall be valid only if they are signed personally by all the Sellers. Any notices to be given by the Buyer shall be valid if they are signed by its president or any of its officers.

Executed this _____ day of _____ 2000

Mr. Hector Vargas Garza                    CGEA S.A.

Valores Ecologicos S.A. de C.V.            SARPI S.A.

Bank

5

CGEA0040553

## EXHIBIT E
### Form Of Non-Competition Agreement

[see attached]

-97-

CGEA0040554

## NON-COMPETITION AGREEMENT

THIS NON-COMPETITION AGREEMENT (the "Agreement") is entered into this __ day of _____, 2000, by and among Mr. Hector Vargas Garza, Hector Vargas Aguirre, Alberto Vargas Aguirre, Eduardo Vargas Aguirre, Jose de Jesus Aguirre, and Guillermo Vargas Aguirre residing at Rio Papaloapan 450, Col. Mexico, Monterrey NL CP 64740_____and Valores Ecologicos SA de CV acting jointly and severally (collectively known as "Promisors"); Residuos Industriales Multiquim, S.A. de C.V. (the "Company"), a corporation organized under the laws of the United Mexican States; and CGEA SA and its subsidiary SARP Industries , corporations organized under the laws of the Republic of France (the "Buyer").

### W I T N E S S E T H :

WHEREAS, pursuant to that certain Stock Purchase Agreement dated _____, 2000 (the "Stock Purchase Agreement") by and among Mr. Hector Vargas Garza ("HVG"), Valores Ecologicos SA de CV ("Valores") and Buyer, Buyer has agreed to purchase from HVG and Valores 75% of the shares of common and preferred stock of the Company owned by HVG and Valores, pursuant to the terms and conditions described therein;

WHEREAS, Buyer has required that the parties hereto enter into this Agreement as a condition to the consummation of the transactions contemplated in the Stock Purchase Agreement; and

WHEREAS, All of the Promisors will derive substantial benefit as a result of the performance by all of the Promisors of their obligations under the Stock Purchase Agreement:

NOW, THEREFORE, in consideration of the promises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are mutually acknowledged by each party, it is agreed as follows:

1.    Defined Terms.  Capitalized terms used herein without definition have the meanings assigned to them in the Stock Purchase Agreement.

2.    Restrictive Covenant.  (a) Promisors agree that for a period commencing at the Time of Closing and ending three and a half (3.5) years after HVG and Valores cease to own or hold any shares of common stock of the Company (the "Period"), Promisors and their Affiliates will not directly or indirectly engage in any business or activity that competes with or falls within the definition of the Business (as defined below) anywhere in the United Mexican States including but not limited to the owning of (except as specifically provided for in sub-paragraphs (b) and (d) below), investing in, managing, operating, controlling, assisting, counseling, or providing services to any person or entity and will not solicit business, directly or indirectly, that competes with or

CGEA0040555

falls in the definition of the Business anywhere in the United Mexican States. For the purposes of this Section 2, the "Business" shall mean the business of performing, with respect to Hazardous Waste (as defined by the Environmental and safety laws of the United Mexican States) and non-hazardous and non hazardous waste, importation and exportation, collection (other than collection that results in services performed by the Company), transportation, transfer, storage, treatment, reuse, recycling, solidification, stabilization, physico-chemical treatment, biological treatment, thermal desorption, tank cleaning, lab pack and repackaging services, reactive chemical management, brokerage services, inplant environmental administration services, remedial services, chemical cleaning, high pressure water blasting services and technology, incineration, deepwell injection, blending, solvent distillation, disposal, confinement and final disposal services, landfill, waste to energy, radioactive waste services (including any subsequently developed technology related to the foregoing).

(b)    Nothing in this Agreement shall limit on prevent the right of Promisors to hold the ownership of less than 5% of any class of issued and outstanding securities of any publicly held corporation listed on a national stock exchange, engaged in the Business.

(c)    Without the Buyer's written consent, Promisors and their Affiliates shall not, and shall cause their Affiliates not to, for the duration of the Period, (i) make, offer, solicit or induce to enter into, any written or oral arrangement, agreement or understanding regarding employment or retention as a consultant or independent contractor with any person who was, on the date hereof or who becomes during the Period, a full-time employee of the Company, and (ii) enter into any such written or oral arrangement, agreement or understanding with any person who was, on the date hereof, or who becomes during the Period a full-time employee of the Company.

(d)    Nothing in this agreement shall prevent the Promissors from continuing to hold a 99 % voting interest in Inginieria de Proceso Ambiental SA de CV (IPA) a company engaged in the business of Bio remediation and water treatment and a 99 % voting interest in Trans Quimica National SA de CV ("TQN") a transportation company, provided that: (i) as to IPA, if Buyer or any of its affiliates enters the Bioremediation or the water treatment business in the United Mexican States, Promissors agrees to immediately cause IPA to cease from undertaking any new Bioremediation or water treatment project and to solicit offer from the Buyer for the sale of all of their shares in IPA as provided for in Section 5 below, (ii) as to TQN, not more than 10% of the sales of TQN shall be derived from sources having an activity in competition with the definition of the Business and provided that Promissors grant first negotiation last refusal rights to Buyer as provided for in section 5 below.

(e)    Promisors and their Affiliates recognize and agree that a breach by Promisors and their Affiliates of any of the covenants and agreements in this Section 2 would cause irreparable harm to the Company and the Buyer, that the Company's and the Buyer's remedies at law in the event of such breach may be inadequate, and that, accordingly, in the event of such breach by Promisors and their Affiliates, in addition to any other rights and remedies that may be available under applicable law to the Company

-2-

CGEA0040556

or Buyer, the Company or Buyer may seek injunctive relief in a court of competent jurisdiction. Promisors and their Affiliates covenant that they will not contest the fairness and reasonableness of the restraints imposed by this Section 2, or the appropriateness or availability of temporary or permanent injunctive relief without the necessity of proving actual damages, or posting bond. If this Section 2 is more restrictive than permitted by the laws of the jurisdiction in which the Company or Buyer seek enforcement hereof, this Section 2 shall be limited to the extent required to permit enforcement under such laws. The rights and benefits contained in this Section 2, shall inure to the benefit of and be enforceable by any successor or assignee of the Buyer that may hereafter acquire the Shares.

3.    <u>Joint and Several Liability.</u>Promisors shall be jointly and severably liable for the full and prompt performance of the obligations of Promisors and their Affiliates herein.

4.    <u>Payment.</u> As consideration for this Agreement, Buyer shall pay to Promisor the sum of Mexican Pesos 18,720,000, which sum shall be payable on the date of Closing by wire transfer of immediately available funds to such account as may be specified by Promisor in writing.

5.    <u>First Negotiation, Last refusal rights</u>

(a) In the event that either Promissors or an Affiliate of any of them (in any such case, the "Offeror") wishes to sell in a transaction with an independent third party all or any portion of the shares of common stock of IPA or TON, owned by the Offeror (the "Shares"), the Offeror shall first, and prior to soliciting any third parties, notify the Buyer (the "Offeree") in writing (the "Notice of Intended Sale") of the number of Shares for sale by the Offeror (the "Offered Shares") and the material proposed terms of sale, including the purchase price per share if the Offeror has received an unsolicited offer from an independent third party to buy the Offered Shares.

(b) The Offeror shall engage in exclusive discussions with the Offeree if the latter so desires, for a period not to exceed 30 days from the date of receipt by the Offeree of the Notice of Intended Sale, to mutually agree on a purchase price per share for the Offered Shares. Not later than the end of such 30 day period, the Offeree shall notify the Offeror in writing either of its offer (the "Offer") to buy all and not less than all of the Offered Shares at a specified price per share (the "Offeree Proposed Price") and on all other material terms proposed by the Offeror subject to confirmatory due diligence, negotiation of definitive transaction documents and any other customary conditions, or that the Offeree does not wish to purchase any of the Offered Shares.

(c) Within 30 days after the date of receipt by the Offeror of the notice of the Offeree Proposed Price, the Offeror shall notify the Offeree in writing in accordance with the following provisions:

(i) If either (x) the Offeree Proposed Price is equal to or greater than the proposed purchase price per share for the Offered Shares contained in the

-3-

CGEA0040557

Notice of Intended Sale, or (y) the Notice of Intended Sale did not contain any proposed purchase price for the Offered Shares but the Offeror wishes in its discretion to sell the Offered Shares to the Offeree at the Offeree Purchase Price, then (z) the Offeree and the Offeror shall, as promptly as practicable, negotiate in good faith in order to enter into a definitive stock purchase agreement and execute and deliver such documents to one another as shall be necessary for the sale of shares as contemplated hereby to be consummated within 90 days after the date of receipt by the Offeree of the notice of the Offeror under this sub-section (c). The Offeror shall be afforded the opportunity to conduct confirmatory due diligence during this 90 day period.

(ii) If either (x) the Offeree Proposed Price is less than the proposed purchase price per share for the Offered Shares contained in the Notice of Intended Sale, or (y) the Notice of Intended Sale did not contain any proposed purchase price for the Offered Shares and the Offeror in its discretion does not wish to sell the Offered Shares to the Offeree at the Offeree Proposed Price (or if the Offeree has notified the Offeror that it does not wish to purchase any of the Offered Shares), then (z) the Offeror shall be free, for a period of 90 days after the date of receipt by the Offeree of the notice required by paragraph (c), to consummate a sale of the Offered Shares to any Person at a price equal to or greater than the proposed purchase price per share contained in the Notice of Intended Sale refered to in (x) above and on substantially the same material terms as set forth in the Notice of Intended Sale; provided, however, that in the event the Notice of Intended Sale did not contain any proposed purchase price for the Offered Shares and during such 90 day period the Offeror receives an offer from an independent third party to buy the Offered Shares, the Offeror shall so advise the Offeree in writing and shall afford the Offeree one opportunity for a period not to exceed 30 days to notify the Offeror in writing of its Offer as defined in (b) above to buy all and not less than all of the Offered Shares at a purchase price per share (the "Revised Offeree Proposed Price") that is equal to or greater than the purchase price per share contained in, and on all other material terms of, such third party offer, whereupon the Offeree and the Offeror shall, as promptly as practicable, negotiate in good faith in order to enter into a definitive stock purchase agreement and execute and deliver such documents to one another as shall be necessary for the sale of shares as contemplated hereby to be consummated within 90 days after the date of receipt by the Offeror of the notice of the Revised Offeree Proposed Price. ;the Offeree shall be afforded the opportunity to conduct confirmatory due diligence during this 90 day period. To the extent that a sale is not consummated by the Offeror within the periods contemplated by this subparagraph (ii), without any fault on the part of the Offeree, the Offered Shares shall thereafter again be subject to the provisions of this Section 5.

-4-

CGEA0040558

6.    Conflict. Promisors hereby represent and warrant to the Company and to Buyer that Promisors and their Affiliates have not executed any written agreement with any other person or entity that would prohibit them from entering into this Agreement.

7.    Notices. Any notice to a party hereto pursuant to this Agreement shall be given by hand delivery, telecopier, certified or registered mail or a private courier service which provides evidence of receipt as a part of its service, addressed, if to the Company, to: Chairman of the Board, Residuous Industriales Multiquim, S.A. de C.V., Ave. Lazaro Cardenas 2400 B-21, Garza Garcia, Nuevo Leon C.P. 66260, telecopier number (8)152-21-90; or, if to Promisors or their Affiliates, to: Mr. Hector Vargas Garza residing at Rio Papaloapan 450, Col. Mexico, Monterrey NL CP 64740, or if to Buyer, to CGEA, Parc des Fontaines, 169 av. Georges Clémenceau 92735 Nanterre Cedex FRANCEtelecopier number (33) 1 46 69 33 63 with a copy to Kenneth Levine, 51 avenue Montaigne, 75008 Paris – France, telecopier number : (33)145632496.  Any notice given hereunder shall be deemed given on the date of hand delivery, transmission by telecopier, five day after deposit with the postal service or two days after delivery to a courier service, as appropriate.  In the event any proceeding, action or suit is commenced by any party to this Agreement against any other party to either enforce the performance of this Agreement or any right or obligation arising thereunder, Promisors each hereby appoint Mr. Hector Vargas Garza, Buyer hereby appoints its President, and the Company hereby appoints its Chairman of the Board, as their respective agents for service of process.  Any party may change the address to which notices are given by giving notice to the other parties in the manner indicated below.

8.    Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the United Mexican States applicable in the case of contracts made and to be performed in such jurisdiction.

9.    Binding Effect.  This Agreement shall inure to the benefit of, and be binding on and enforceable against the successors and assigns of the Buyer, Company, and Promisors.

10.    Entire Agreement.  This Agreement constitutes the entire Agreement and understanding between the parties, and supersedes any prior agreement and understandings relating to the subject matter hereof.  This Agreement may be modified or amended by a written instrument executed by all parties hereto.

11.    Severability of Provisions.  If at any time subsequent to the date hereof, any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement.

12.    Execution in Counterparts.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

-5-

CGEA0040559

13.    Attorney's Fees; Costs of Litigation.  If any legal action or any other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

14.    Headings.  The subject headings of the paragraphs and sections of this Agreement are included for purposes of convenience only and shall not affect the construction or interpretation of any of its provisions.

15.    Limitation of Rights to Parties.  Nothing in this Agreement, whether expressed or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors, legal representatives and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provisions give any third persons any rights of subrogation or action over or against any party to this Agreement.

16.    Arbitration.  Any dispute, controversy or claim arising out of or relating to this Agreement or the breach thereof shall be finally settled by arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce ("ICC"). There shall be three arbitrators, one selected by the Buyer, one selected by the Promisors, and the third selected by the two arbitrators so selected.  If a party fails to nominate an arbitrator within 30 days from the date of notification to it of the other party's request for arbitration, or if the two arbitrators fail within 30 days from the date of their appointment to reach agreement on the third arbitrator, then the Court of Arbitration of the ICC shall appoint the arbitrator that was not nominated by the failing party, or shall appoint a third arbitrator, as the case may be.  The place of arbitration shall be New York City and the language used shall be English.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

CGEA SA

By:    _____
Name:    _____
Title:    _____

RESIDUOS INDUSTRIALES MULTIQUIM,
S.A. DE C.V.

By:    _____
Name:    _____
Title:    _____

-6-

CGEA0040560

HECTOR VARGAS GARZA


HECTOR VARGAS AGUIRRE


ALBERTO VARGAS AGUIRRE


EDUARDO VARGAS AGUIRRE


JOSE DE JESUS AGUIRRE


GUILLERMO VARGAS AGUIRRE


VALORES ECOLOGICOS SA de CV.

By: _____
Name: _____
Title: _____

10094089.2

-7-

CGEA0040561

## EXHIBIT F
### Map of the Land

[see attached]

-98-

CGEA0040562

## "LAND TO BE DELIVERED AT THE TIME OF CLOSING"

| Lots | N°. | Actual Surface | | |
|---|---|---|---|---|
| | | Hectares | Areas | Centi-areas |
| La Popa lote # 37, area parcelada | 37 Z-5 P1/1 | 835 | 40 | 45.497 |
| La Popa lote # 38, area parcelada | 38 Z-5 P1/1 | 888 | 81 | 26.619 |
| La Popa lote # 39, area parcelada | 39 Z-5 P1/1 | 1625 | 68 | 71.26 |
| Suma | 37, 38, 39 | 3348 | 189 | 143.376 |
| **Sub-total parcelled area** | **37, 38, 39** | **3349** | **90** | **43.376** |
| | | | | |
| **Santa Andrea** | | | | |
| Santa Andrea lote # 14 | 14 Z-1 P1/1 | 211 | 18 | 5.223 |
| Santa Andrea lote # 15 | 15 Z-1 P1/1 | 209 | 97 | 68.574 |
| Santa Andrea lote # 16 | 16 Z-1 P1/1 | 245 | 83 | 53.982 |
| Santa Andrea lote # 17 | 17 Z-1 P1/1 | 208 | 27 | 52.673 |
| Santa Andrea lote # 18 | 18 Z-1 P1/1 | 221 | 95 | 52.607 |
| Santa Andrea lote # 19 | 19 Z-1 P1/1 | 209 | 99 | 84.466 |
| Santa Andrea lote # 20 | 20 Z-1 P1/1 | 200 | 70 | 10.803 |
| Santa Andrea lote # 21 | 21 Z-1 P1/1 | 209 | 33 | 45.613 |
| Santa Andrea lote # 22 | 22 Z-1 P1/1 | 245 | 5 | 53.218 |
| Santa Andrea lote # 23 | 23 Z-1 P1/1 | 230 | 56 | 31.393 |
| Santa Andrea lote # 24 | 24 Z-1 P1/1 | 233 | 13 | 17.52 |
| Santa Andrea lote # 25 | 25 Z-1 P1/1 | 224 | 55 | 73.569 |
| Santa Andrea lote # 26 | 26 Z-1 P1/1 | 195 | 81 | 49.639 |
| Santa Andrea lote # 27 | 27 Z-1 P1/1 | 214 | 37 | 94.469 |
| Santa Andrea lote # 28 | 28 Z-1 P1/1 | 230 | 11 | 39.909 |
| Suma | | 3283 | 780 | 733.658 |
| **Sub-total Sta. Andrea** | | **3,290** | **87** | **33.658** |
| | | | | |
| **El Divisadero** | 1 Z-1 P1/1 | 171 | 72 | 99.817 |
| Idem | 2 Z-1 P1/1 | 192 | 0 | 20.203 |
| Idem | 3 Z-1 P1/1 | 185 | 95 | 89.481 |
| Idem | 4 Z-1 P1/1 | 186 | 37 | 11.005 |
| Idem | 5 Z-1 P1/1 | 185 | 47 | 44.745 |
| Idem | 6 Z-1 P1/1 | 187 | 7 | 82.232 |
| Idem | 7 Z-1 P1/1 | 194 | 30 | 86.148 |
| Idem | 8 Z-1 P1/1 | 196 | 84 | 91.541 |
| Idem | 9 Z-1 P1/1 | 189 | 37 | 6.422 |
| Idem | 10 Z-1 P1/1 | 176 | 43 | 24.729 |
| Idem | 11 Z-1 P1/1 | 185 | 98 | 95.835 |
| Idem | 12 Z-1 P1/1 | 186 | 17 | 15.627 |
| Idem | 13 Z-1 P1/1 | 183 | 94 | 96.862 |
| Idem | 14 Z-1 P1/1 | 184 | 64 | 56.499 |
| Idem | 15 Z-1 P1/1 | 184 | 95 | 20.679 |
| Idem | 16 Z-1 P1/1 | 185 | 52 | 38.659 |
| Idem | 17 Z-1 P1/1 | 186 | 16 | 10.036 |
| Idem | 18 Z-1 P1/1 | 185 | 25 | 43.671 |
| Idem | 19 Z-1 P1/1 | 189 | 53 | 2.185 |
| Suma | | 3,528 | 966 | 936.376 |
| **Sub-total Divisadero** | | **3,537** | **75** | **36.376** |
| | | | | |
| **Total Surface** | | **10,178** | **53** | **13.410** |
| Adjusted surface (fractions) | | 10176 | 252 | 113.410 |

**1 - EXHIBIT F**

CGEA0040563



CGEA00040564

## LAND TO BE DELIVERED WITHIN 3 YEARS AFTER THE TIME OF CLOSING"

| Lots | N° | Actual Surface | | |
|------|-----|----------|-------|-------------|
| | | Hectares | Areas | Centi-areas |
| **Santa Andrea** | | | | |
| nta Andrea lote # 6 | 6 Z-5 P1/1 | 224 | 81 | 91.543 |
| nta Andrea lote # 7 | 7 Z-5 P1/1 | 196 | 1 | 4.136 |
| anta Andrea lote # 8 | 8 Z-1 P1/1 | 195 | 75 | 26.507 |
| nta Andrea lote # 9 | 9 Z-1 P1/1 | 266 | 21 | 87.204 |
| anta Andrea lote # 10 | 10 Z-1 P1/1 | 208 | 6 | 7.092 |
| anta Andrea lote # 11 | 11 Z-1 P1/1 | 190 | 62 | 91.322 |
| ma | | 1279 | 246 | 307.804 |
| **tal Sta. Andrea** | | **1,281** | **49** | **7.804** |
| **40** | | **542** | | |
| **otal Surface** | | **1,823** | **49** | **7.8040** |

3 - EXHIBIT F

CGEA0040566



LOT 39-LANDFILL PERMIT EXTENSION



5-EXHIBIT  F

CGEA0040567

## EXHIBIT G
### Form of Shareholder Agreement

[see attached]



CGEA0040568

# SHAREHOLDERS AGREEMENT

Agreement dated as of _____, 2000 among

Mr. Hector Vargas Garza ("Mr. Vargas), a citizen and resident of the United Mexican States having his domicile at Rio Papaloapan 450, Col. Mexico, Monterrey NL CP 64740and Valores Ecologicos SA de CV, ("Valores"), a corporation organized under the law of the United Mexican States(Hereinafter referred to collectively as "the Vargas Interests")

AND

SARP Industries, S.A. a corporation organized under the laws of the Republic of France, having its registered office at Zone Portuaire 427, route du Hazay 78250 Limay, represented by Mr._____, its _____. [SARP Industries may be replaced by a Mexican holding company]

(Hereinafter referred to as "SARPI")

(Mr. Vargas, the Vargas Interests, Valores and SARPI each referred to as a "Party" and collectively the "Parties").

1

CGEA0040569

## IT HAS BEEN AGREED AS FOLLOWS:

### Article I – Preliminary Statements

1.1    Pursuant to an agreement (the "Agreement") of even date entitled "Agreement for the Purchase of Stock of Residuos Industriales Multiquim, S.A. de C.V. ("RIMSA" or the "Company") among Mr. Vargas, Valores , Compagnie Générale d'Entreprises Automobiles, SA ("CGEA") through it wholly owned subsidiary designee SARPI (the "Buyer") as defined in that Agreement acquired 100% of the authorized issued and outstanding stock of Immobiliaria Confinamina S.A. de C.V. which is the owner of 30% of the authorized, issued and outstanding capital stock of RIMSA (686 Series B shares, 42 Series B-V Shares and 1,672 Series P shares) and of the Land as defined in that Agreement. The Buyer also acquired 60% of the authorized issues and outstanding stock of RIMSA from Chemical Waste Management, Inc.. Mr. Vargas continues to own 10 % of the authorized, issued and outstanding capital stock of RIMSA (the "Shares"). (229 Series B shares, 14 Series B-V Shares and 557 Series P shares) through Valores, a company in which he owns the quasi-totality of the shares, i.e. 495 shares out of a total of 500

1.2    The Parties desire to enter into this Agreement for the purpose of defining their future relations as the sole remaining shareholders of RIMSA. The parties acknowledge that all of their undertakings here under are subject to compliance with the legal requirements of the United Mexican States.

### Article II – RIMSA's Business

2.1    RIMSA's actual current business activities consist mainly of the collection, storage, transportation, treatment and final disposal of solid or liquid hazardous waste in the United Mexican States, including but not limited to reuse, recycling, blending, thermal treatment, bioremediation, confinement, importation, exportation and also has some industrial waste activities..

2.2    During the term of this agreement, RIMSA's activities may be expanded to include incineration, transportation, thermal

2

CGEA0040570

treatment and bioremediation of solid or liquid hazardous waste in the United Mexican States. Additional facilities and sites for the conduct of the business defined in 2.1 and 2.2 may be acquired, constructed and/or operated by RIMSA.

2.3    Extensions of the activities of RIMSA beyond those defined in 2.1 and 2.2 above shall require the unanimous approval of the parties.

## Article III – Management of RIMSA

### 3.1    Board of Directors

(a)    The Board of Directors of RIMSA shall have the general supervision of the business and operations of RIMSA, and shall be composed of at least 5 Directors who shall be elected by the shareholders;

(b)    Mr. Vargas through Valores shall be entitled to nominate 1 member and SARPI shall be entitled to nominate 4 members. Each party shall nominate its proposed members and their alternates of the Board, and the Parties agree to elect all such nominees at the annual ordinary meeting of shareholders of RIMSA, and at the meeting of shareholders of RIMSA held on this date. If the Shareholders decide to increase the number of directors, the proportions set forth in this section (Vargas : 1, SARPI : 4) shall be maintained;

(c)    Any director (or alternate) elected as provided above may be removed from office without cause only upon the initiative of the Party which originally nominated such director (or alternate). In such event, the other Party agrees to vote for the removal of such director (or alternate). Any Party may propose the removal of a director not originally nominated by it only for cause;

(d)    In the event there is any vacancy on the Board arising out of death, disability, removal, resignation or otherwise, the Party which originally nominated the director (or alternate) vacating such office shall nominate a new director (or alternate) to the Board.

(e)    Any Board action may be taken by the affirmative vote of a majority of directors present or represented at the meeting.

3

CGEA0040571

### 3.2    Officers

(a)    The Board of Directors shall elect the officers who shall consist of a President, a Chief Executive Officer, a Vice-President of Business development, a Secretary, and other officers as may determined by the Board, provided however that for as long as Mr. Vargas, directly or indirectly owns any share participation in RIMSA the director appointed by him will be entitled to propose candidates for such positions, and one of such positions shall be occupied by one of the candidates proposed by such director;

(b)    Mr. Hector Vargas Garza will be named President by the Board of Directors' meeting held shortly after the signature of this agreement and the organization chart annexed hereto as Exhibit A, will be adopted at that meeting. The President will not have a casting vote.

(c)    The following actions will require the affirmative vote of the Board of Directors :

➢    Approval or modification of the yearly Budget, Business Plan, or Capital Investment Program,

➢    Approval of capital expenditures per item and per period in excess of an amount to be determined by the Board;

➢    Purchase, sale or lease of assets with a value exceeding an amount to be determined by the Board other than in the ordinary course of business;

➢    Approval of or amendment to any contract with a value in excess of an amount to be determined by the Board;

➢    Incurrence of any item of indebtedness in excess of an amount to be determined by the Board;

➢    Commencement or settlement of any material litigation in excess of an amount to be determined by the Board;

➢    Approval of any contract or amendment with any shareholder or an Affiliate thereof;

4

> Undertaking to guarantee payment or performance of the obligations of any third party or granting credit to any third party (other than in the ordinary course of business);

> Creation, acquisition or disposition of any subsidiary of RIMSA or of any shares in any such subsidiary;

> Acquisition, purchase or subscription for any interest, shares, debentures or other securities in any company (other than subsidiaries of RIMSA);

> Creation of any encumbrance of any kind whatsoever upon assets, other than purchase money encumbrances in connection with authorized purchases or encumbrances arising by operation of law;

> Change of accounting policies;

> Requesting any material permits, authorizations or licenses from governmental authorities;

> Any agreements, licenses, operations, or action which may render the continuation of the operations of the Company difficult or impossible;

> Hiring or firing any persons having a salary in excess of an amount to be determined by the Board;

> Material changes in labor policies.

**3.3  Shareholders**

(a)  The following actions shall require the affirmative vote of all outstanding shares:

(i)

> Mergers, spin-offs (escision) or sales of substantially all of the assets of the business.

5

CGEA0040573

> Extension of the activities of the Company outside its area of business as defined in Section 2.1 and 2.2.

> Issuance of Preferred Shares.

> Increase or decrease of capital, share split-up or spin-off.

> Appointment and removal of the Examiner of the Company, provided that if SARPI and the Vargas Interests cannot agree on the Examiner, each Party may elect an Examiner.

> Change of the nationality of the Company.

> Dissolution of the Company.

> Amendments to the charter or by-laws in connection with any of the above provide matters.

(ii)

> Executing or amending any contract or agreement with any shareholder or affiliate which is not in the ordinary course of business; It being agreed that an agreement with SARPI or affiliate for the providing of administrative services in consideration of the payment of a fee of 2% of the sales of Rimsa, and billings by Confinamina for the providing of raw materials beginning June 26, 2000 at fair market values no less than current values, and the agreement with Valores or affiliates for the providing of management services to Rimsa for three years from the Closing or until Valores sells its Shares in Rimsa, whichever is earlier, shall each be deemed to be agreements in the ordinary course of business.

> Making any capital expenditures which in the aggregate or in a single transaction exceeds U.S. $ 10 million per fiscal year;

> Sale of any assets for an aggregate amount or in a single transaction exceeding U.S. $ 1 million per fiscal year ;

> Obtaining any loans or credit facilities which singly or cumulatively exceed U.S. $ 10 million per fiscal year;

> Granting of any liens, mortgages or pledges of assets in an amount which exceeds singly or cumulatively U.S. $ 10 million.

6

CGEA0040574

(b)  All other actions by the shareholders shall be taken by the affirmative vote of the majority customary required by law for ordinary meetings and for extraordinary (special) meetings.

(c)  If SARPI proposes any decision requiring the Vargas' Interests shareholder approval under Section 3.3(a) and the Vargas Interests vote against such proposal which for purposes of this agreement shall include abstaining to vote or failing to be present at a meeting at which a vote is taken on a section 3.3 (a) question , the Vargas Interest and SARPI shall meet over a period not to exceed 30 days in an attempt to find a mutually agreeable solution. If SARPI maintains its proposed decision a second shareholders meeting to decide on said decision shall be held and if the Vargas Interests vote against such proposal for a second time, each of the parties may exercise the Put/Call arrangement of Section 6.3 below.

## Article IV – Financial statements

The Board of Directors shall cause the management of RIMSA to distribute to the Board and to the parties for internal management purposes, no later than 30 days after the end of each quarter, unaudited financial statements for such quarter prepared in accordance with U.S. GAAP.

## Article V – Financing

The parties may make additional capital investments or shareholder loans available to RIMSA on terms, conditions, and interest rate to be determined by the Board, or may borrow from external sources.

## Article VI – Transfer of Shares – Put and Call

6.1  Valores shall not during the term of this agreement sell, assign, or encumber any Shares except as provided for below.

6.2  For a period of three years from the date of this agreement Valores may only sell, assign, encumber or transfer Shares under the following put and call agreement.

6.3  If SARPI proposes any decision requiring the Vargas Interests shareholder approval under Sections 3.3(a)(i) or (ii) and if the

7

CGEA0040575

Vargas Interests vote against said decision for a second time at a second shareholders meeting called to decide on said decision as provided for in sub-paragraph 3.3 (c) then SARPI shall have the right and option to purchase ("the Call") all of the Shares owned by the Vargas Interests at the Exit Price defined below and the Vargas Interests shall have the obligation to sell such shares at that price, and (ii) the Vargas Interests shall have the right and option to sell ("the Put") all of the Shares owned by the Vargas Interests and SARPI will have the obligation to purchase all of the Shares at the Exit Price defined below. SARPI shall exercise its Call and the Vargas Interests shall exercise their Put, as the case may be, within sixty days after the holding of the second shareholders meeting referred to in subsection 3.3 (c) by delivery of a written notice ("the Exercise Notice") to the other Party during such sixty days. The price for the shares shall be the Exit Price as determined below, which shall be payable in cash at the Closing. The Vargas Interests upon written notice of the exercise of such option ("Exercise Notice") shall deliver all Shares owned by them against payment of the Exit Price at the Closing.

6.4     Should Mr. Vargas sell all or part of his 95% share interest in Valores, then SARPI shall have a Call on all of the Shares owned by the Vargas Interests. SARPI may exercise its call by sending a written notice ("Exercise Notice") to the Vargas interest within 60 days of being notified by the Vargas Interests of the change in Mr. Vargas participation in Valores or within 60 days of learning of such change whichever is the latest. The price for the shares shall be the Exit Price as determined below, which shall be payable in cash at the Closing.

6.5     Commencing on October 1, 2003 and at any time during the ninety (90) day period thereafter:

-       The Vargas Interests shall have the right, but not the obligation, to sell ("the Put") to SARPI all of the Shares owned by them and SARPI will have the obligation to purchase such Shares, and

-       SARPI shall have the right, but not the obligation, to purchase ("the Call") all of the Shares owned by the Vargas Interests and the Vargas Interests shall have the obligation to sell such Shares;

8

CGEA0040576

- by delivering a written notice ("the Exercise Notice") to the other party during such period. The price for the shares shall be the Exit Price as determined below, which shall be payable in cash at the Closing.

6.6    Exit Price :

The Exit Price for each share to be sold shall de determined as follows:

- If the Exercise Notice is sent subsequent to October 1, 2003, the Exit Price shall be average EBITDA of RIMSA for the years 2001, 2002 and 2003, multiplied by five less any financial or shareholder indebtedness at the time of the Exercise Notice, and divided by the total number of shares outstanding at the time of exercise;

- If the Exercise Notice is sent subsequent to December 1, 2002, the Exit Price Shall be average net EBITDA of RIMSA for the years 2000, 2001, 2002, multiplied by five less any financial or shareholder indebtedness at the Time of the Exercise Notice, and divided by the total number of shares outstanding at the time of exercise;

- If the Exercise Notice is sent subsequent to December 1, 2001, the Exit Price Shall be the EBITDA of RIMSA for the years 1999, 2000 and 2001, multiplied by five less any financial or shareholder indebtedness at the time of the Exercise Notice, and divided by the total number of shares outstanding at the time of exercise;

- If the Exercise Notice is sent subsequent to December 1, 2000, the Exit Price Shall be the EBITDA of RIMSA for the years 1999 and 2000, multiplied by five less any financial or shareholder indebtedness at the time of the Exercise Notice, and divided by the total number of shares outstanding at the time of exercise;

EBITDA for purposes hereof shall mean the Earnings Before Interest, Income Taxes, Depreciation and Amortization, deducting any amount of profit sharing payable to employees, and shall not take into account any inflation escalation. Payments to, or expenses incurred in favor of shareholders or affiliates not in the ordinary course of business shall not be deducted for determining

9

CGEA0040577

EBITDA unless they have been unanimously agreed to between the parties.

### 6.7 Closing

Within thirty (30) days following sending of an Exercise Notice by either the Vargas Interests or SARPI, subject to the terms and conditions hereof, the Vargas Interests shall sell and SARPI shall purchase the Vargas Interests Shares in RIMSA at a mutually agreeable time and place (the "Option Closing"). At the Option Closing, the Vargas Interests deliver all instruments and certificates duly endorsed necessary to effect the transfer of the interests contemplated hereby free and clear of all liens and encumbrances, and SARPI shall deliver to the Vargas Interests an amount equal to the Exit Price by cashier's or certified check or wire transfer of immediately available funds to an account designated by the Vargas Interests.

### 6.8 Right of First Refusal

(a)    For periods subsequent to January 1, 2004 if the Vargas Interests continue to own Shares, and if the Vargas Interests desire to sell, assign or otherwise transfer Shares, the Vargas Interests shall first offer to sell all of the Shares owned by them to SARPI. The Vargas Interests shall deliver a notice (the "Sale Notice") to SARPI of their intention to sell, assign, or otherwise transfer such shares, identifying the proposed purchaser, assignee or transferee and indicating the per share price and other terms and conditions.

(b)    In a period of 30 days following the Sale Notice, SARPI shall have the option to purchase all of the Shares   owned by the Vargas Interests, by delivering a notice stating that it has elected to purchase such shares on the same per share price as stipulated in the Sale Notice.

(c)    In the event that SARPI does not exercise its option, then the Vargas Interests shall be free to sell, assign or transfer all of their Shares to the purchaser, assignee, or transferee identified in the Sale Notice at the price and on the terms and conditions specified



10

CGEA0040578

therein for a period of 30 days. If the transfer to such purchaser, assignee or transferee is not effected within such time period, then the Vargas Interests must again follow the procedure set forth in this section 6.8 in order to sell assign or transfer shares.

(d)    If SARPI elects to purchase the shares, a Closing as defined in sub-section 6.7 shall take place within 30 days after the notice of election refered to in (b) above has been delivered by SARPI.

6.9    Co-sale

(a)    Should SARPI propose to accept an offer (the "Purchase Offer") from any person, (the "Offeror") to purchase a majority of RIMSA's shares from SARPI (either directly or indirectly by the sale of Confinamina Shares), then SARPI shall promptly notify the Vargas Interests of the terms of such Purchase Offer (the"Notice of Purchase Offer").

(b)    The Vargas Interests shall have the right, exercisable upon written notice to SARPI with 15 days after receipt of the Notice of Purchase Offer to elect to sell all of their Shares in RIMSA at the same price per share and on the same terms and conditions described in the said Notice of Purchase Offer .

(c)    Should SARPI deliver a Notice of Purchase Offer to the Vargas Interests pursuant to sub-section (a) above, it may deliver to the Vargas Interests a notice with respect to said Purchase Offer obligating the Vargas Interests to sell all of their Shares in RIMSA to the Offeror at the same price per share and on the same terms and conditions as described in the Notice of Purchase Offer and the Vargas Interests agree to sell said Shares.

(d)    A Closing as defined in sub-section 6.7 above shall take place on the date indicated in the Purchase Offer.

6.10   O.I.A. (Operedora  Industrial  Administrativa  SA  de  CV  Valores )owns more than a 99%    stock interest in O.I.A. a company organized under the laws of the United Mexican States and which provides personnel administrative services to RIMSA. Valores agrees to sell to SARPI or its designee at SARPI's option,

11

CGEA0040579

exercised at any time prior to January 31, 2004, all of the shares of O.I.A. at a price equal to the tax cost of the shares. SARPI may exercise this right by sending an exercise notice following which a Closing as defined in subparagraph 6.7 will be held.

## Article VII – Corporate Charter

To the extent appropriate the agreements and undertakings contained in this Agreement shall be reflected in the corporate charter of RIMSA.

## Article VIII – Termination

(a)    This Agreement shall terminate on the earlier to occur of :

(i)    a written agreement of the parties to that effect;

(ii)    the dissolution, insolvency or bankruptcy, of RIMSA under the laws of the United Mexican States;

(iii)    all of the shares are transferred by one party to the other party.

(b)    Articles II, III, IV, V and sub-sections 6.2 to 6.6 shall terminate on January 31, 2004.

## Article IX – General Notices

9.1    Notices.

Any notice to a party hereto pursuant to this Agreement shall be given by hand delivery, telecopier, certified or registered mail or a private courier service which provides evidence of receipt as a part of its service, addressed, if to RIMSA, to: Chairman of the Board, Residuos Industriales Multiquim, S.A. de C.V., Ave. Lazaro Cardenas 2400 B-21, Garza Garcia, Nuevo Leon C.P. 66260, telecopier number (8) 152-21-90; or if to SARPI,:  President, CGEA, Parc des Fontaines, 169 av. Georges Clémenceau 92735 Nanterre Cedex FRANCEtelecopier number (33) 1 46 69 33 63with

12

a copy to Kenneth Levine, Levine & Okoshken, 51 avenue Montaigne, 75008 Paris, tel. : 33.1.44.13.69.21, fax : 33.1.45.63.24.96; or, if to the Vargas Interests, to: Valores Ecologicos, S.A. de C.V. , Ave. Lazaro Cardenas 2400 PB-7, Garza Garcia, Nuevo Leon C.P. 66260

. Any notice given hereunder shall be deemed given on the date of hand delivery, transmission by telecopier, five days after deposit with the postal service or, two days after delivery to a courier service, as appropriate. In the event any proceeding, action or suit is commenced by any party to this Agreement against any other party to either enforce the performance of this Agreement or any right or obligation arising thereunder, the Vargas Interests hereby appoints Mr. Hector Vargas Garza , RIMSA hereby appoints its Chairman of the Board, and SARPI hereby appoints its President as their respective agents for service of process. Any party may change the address to which notices are given by giving notice to the other parties in the manner indicated herein.

9.2    Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the    United Mexican States  applicable in the case of contracts made and to be performed in such jurisdiction, without giving effect to any conflict of laws rules.

9.3    Binding Effect.

This Agreement shall inure to the benefit of, and be binding on and enforceable against the successors and assigns of the Buyer, the Company and the Seller.

9.4    Entire Agreement.

This Agreement (including the Exhibits hereto) and the documents and schedules delivered pursuant hereto constitute the entire Agreement and understanding between the parties, and supersedes any prior agreement and understandings relating to the subject matter hereof. This Agreement may be modified or amended only by a written instrument executed by all parties hereto.

13

CGEA0040581

9.5    Severability.

If at any time subsequent to the date hereof, any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement.

9.6    Execution in Counterparts.

This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

9.7    Attorney's Fees; Costs of Litigation.

If any legal action or any other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

9.8    Headings.

The subject headings of the paragraphs and sections of this Agreement are included for purposes of convenience only and shall not affect the construction or interpretation of any of its provisions.

9.9    Arbitration.

Any dispute, controversy or claim arising out of or relating to this Agreement or the breach thereof shall be finally settled by arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce ("ICC"). There shall be three arbitrators, one selected by the Buyer, one selected by the Seller, and the third selected by the two arbitrators so selected by the Buyer and the Seller. If a party fails to nominate an arbitrator within 30 days from the date of notification

14

CGEA0040582

to it of the other party's request for arbitration, or if the two arbitrators fail within 30 days from the date of their appointment to reach agreement on the third arbitrator, then the Court of Arbitration of the ICC shall appoint the arbitrator that was not nominated by the failing party, or shall appoint a third arbitrator, as the case may be.  The place of arbitration shall be New York City and the language used shall be English.

9.10    Succession and Assignment.

This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and assigns; except as otherwise provided herein, no Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of each other Party; provided, however, that  SARPI may (i) assign any or all of its rights and interests hereunder to one or more of its wholly owned Affiliates and (ii) designate one or more of its wholly owned Affiliates to perform its obligations hereunder.; provided that SARPI guaranties to the Vargas Interests the performance by the assignee of the obligations of SARPI hereunder.

In witness Whereof, the parties have executed this agreement on the date first written above.

Mr. Hector Vargas Garza                SARP Industries SA

                                       By:
                                       Name:
VALORES Ecologica SA de CV             Title:
By:
Nama:
Title:

CGEA0040583

15

**EXHIBIT H**
**RIMSA – Projected Profit & Loss for Year 2000**

[see attached]

CGEA0040584

Annual / Projected Profit & Loss for Year 2000

(Thousands of Pesos)

EXHIBIT E

## Rimsa Consolidated Results

Excluding Potential Projects benefit on Exhibit C)

| Description | | Not Audited Jan - May | % | Projected Jun - Dec | % | Sub-Total 2000 Projected | % | Non-recurring Expenses | Total 2000 Projected | % |
|---|---|---|---|---|---|---|---|---|---|---|
| Disposal Mina | (2) | 150,633.1 | 60.0% | 270,776.8 | 54.2% | 421,409.9 | 56.1% | | 421,409.9 | 56.1% |
| Disposal 3rd parties | | 13,684.3 | 5.5% | 20,481.8 | 4.1% | 34,166.1 | 4.6% | | 34,166.1 | 4.5% |
| Incineration | | 18,662.0 | 7.4% | 90,960.0 | 18.2% | 109,622.0 | 14.6% | | 109,622.0 | 14.6% |
| Freight | | 49,565.3 | 19.7% | 117,386.5 | 23.5% | 166,951.8 | 22.2% | | 166,951.8 | 22.2% |
| Services | | 6,495.2 | 2.6% | | 0.0% | 6,495.2 | 0.9% | | 6,495.2 | 0.9% |
| Unbilled | (1) | 12,045.8 | 4.8% | | 0.0% | 12,045.8 | 1.6% | | 12,045.8 | 1.6% |
| Total Revenue | | 251,085.7 | 100.0% | 499,605.0 | 100.0% | 750,690.7 | 100.0% | 0.0 | 750,690.7 | 100.0% |
| | | | | | | | | | | |
| Operating Cost | | | | | | | | | | |
| Production Cost | | 12,652.7 | 5.0% | 25,176.1 | 5.0% | 37,828.8 | 5.0% | | 37,828.8 | 5.0% |
| Maintenance Cost | | 7,648.5 | 3.0% | 15,218.8 | 3.0% | 22,867.3 | 3.0% | | 22,867.3 | 3.0% |
| Environmental Salaries | | 748.4 | 0.3% | 1,047.6 | 0.2% | 1,796.2 | 0.2% | | 1,796.2 | 0.2% |
| Environmental Costs | | 2,654.8 | 1.1% | 5,282.5 | 1.1% | 7,937.3 | 1.1% | | 7,937.3 | 1.1% |
| Disposal Cost 3rd parties | | 4,566.6 | 1.6% | 23,463.6 | 4.7% | 28,032.6 | 3.7% | | 28,032.6 | 3.7% |
| Freight | | 46,134.4 | 18.4% | 105,647.8 | 21.1% | 151,782.2 | 20.2% | -1,182.5 | 150,599.7 | 20.1% |
| Labour Operating Expense | | 16,084.6 | 6.4% | 23,644.7 | 4.7% | 39,729.5 | 5.3% | | 39,729.5 | 5.3% |
| Equipment Operating Expense | | 30,566.5 | 12.2% | 60,820.6 | 12.2% | 91,387.1 | 12.2% | -11,616.0 | 79,771.1 | 10.6% |
| Labour Maintenance Expense | | 1,247.6 | 0.5% | 1,746.6 | 0.3% | 2,994.2 | 0.4% | | 2,994.2 | 0.4% |
| Well Amortization | | 2,562.8 | 1.0% | 5,099.4 | 1.0% | 7,662.2 | 1.0% | | 7,662.2 | 1.0% |
| Lab expenses | | 2,272.0 | 0.8% | 4,520.8 | 0.9% | 6,792.8 | 0.9% | | 6,792.8 | 0.9% |
| Depreciation | | 2,853.6 | 1.1% | 4,394.5 | 0.9% | 7,248.1 | 1.0% | | 7,248.1 | 1.0% |
| Other Operating Expenses | | 10,279.2 | 4.1% | 20,453.3 | 4.1% | 30,732.5 | 4.1% | -11,022.0 | 19,710.5 | 2.6% |
| Technical Support | | 5,021.7 | 2.0% | 9,992.1 | 2.0% | 15,013.8 | 2.0% | | 15,013.8 | 2.0% |
| Total Operating Cost | | 145,285.6 | 57.9% | 306,508.8 | 61.4% | 451,894.6 | 60.2% | -23,820.5 | 427,984.1 | 57.0% |
| | | | | | | | | | | |
| Operating Margin | | 105,760.9 | 42.1% | 193,096.2 | 38.6% | 298,886.1 | 39.8% | 23,820.5 | 322,706.5 | 43.0% |
| | | | | | | | | | | |
| Sales Salaries Expense | | 9,938.1 | 4.0% | 13,913.3 | 2.8% | 23,851.4 | 3.2% | | 23,851.4 | 3.2% |
| Sales Expenses | | 16,918.8 | 6.7% | 29,607.9 | 5.9% | 46,526.7 | 6.2% | | 46,526.7 | 6.2% |
| Administration Salaries Expense | | 6,709.6 | 3.6% | 12,193.7 | 2.4% | 20,903.5 | 2.8% | | 20,903.5 | 2.8% |
| Administrative Expenses | | 15,685.9 | 6.2% | 27,450.3 | 5.5% | 43,136.2 | 5.7% | -5,000.0 (3) | 38,136.2 | 5.1% |
| Total S,G&A expenses | | 51,252.6 | 20.4% | 83,165.3 | 16.6% | 134,417.9 | 17.9% | -5,000.0 | 129,417.9 | 17.2% |
| | | | | | | | | | | |
| EBIT | | 54,337.3 | 21.7% | 109,931.0 | 22.0% | 164,468.2 | 21.9% | 28,820.5 | 193,288.7 | 25.7% |

Unbilled not reflected in accounting books for Jan-May 00, however recognized on management internal reporting for measuring performance of operations.

Freight revenues reclassified from disposal to represent allocation of unitary pricing for same customers.

Related to business development agreement with IPA

Does not include profit sharing which is reflected on Projected vs. Budget Schedule.

CGEA00040585

-101-

CGEA0040586

# DISCLOSURE SCHEDULE

[to be prepared by Seller]

CGEA0040587

DISCLOSURE SCHEDULE
TO
AGREEMENT FOR THE PURCHASE OF STOCK


By and Among

CGEA, S.A./SARP INDUSTRIES, S.A.

INMOBILIARIA CONFINAMINA, S.A. DE C.V.
AND
RESIDUOS INDUSTRIALES MULTIQUIM, S.A. DE C.V.


Initials:

CGEA, S.A.

~~INMOBILIARIA CONFINAMINA, S.A. DE C.V.~~

~~RESIDUOS INDUSTRIALES MULTIQUIM, S.A. DE C.V.~~
VALORES ECOLOGICOS

GR HECTOR VARGAS GARZA

CGEA0040588

Section 2.1
Organization

No exceptions.

CGEA0040589

## Section 2.2
## Agreements with Respect to Shares

No exceptions.

CGEA0040590

## Section 2.3
### Authorization; Absence of Liens

In accordance with the laws of the Republic of Mexico and the by-laws of the Company, only the shareholders of the Corporation must consent to the transactions contemplated by the Agreement.

**Section 2.4**
**Conflicting Agreements**

### Section 2.4(a)

No exceptions

### Section 2.4(b)

No exceptions.

CGEA0040592

### Section 2.5
### Capitalization; Title to the Shares

No exceptions.

CGEA0040593

## Section 2.6
### Financial Statements

CGEA0040594

# INMOBILIARIA CONFINAMINA, S.A. DE C.V.

## ESTADO DE SITUACIÓN FINANCIERA

### AL 31 DE JULIO DEL 2000

#### Cifras en Pesos M.N.

**ACTIVO**

| | | |
|---|---|---:|
| Efectivo en caja y bancos | $ | 11,815 |
| Impuestos por recuperar | | 4,550 |
| **Total Activo** | **$** | **16,365** |

**PASIVO** $ -

**CAPITAL CONTABLE**

| | | |
|---|---|---:|
| Capital Social | $ | 50,000 |
| Utilidades (pérdidas) retenidas | | (30,000) |
| Utilidad (pérdida) del ejercicio | | (3,635) |
| **Total Capital Contable** | **$** | **16,365** |

| | | |
|---|---|---:|
| **Total Pasivo y Capital Contable** | **$** | **16,365** |

CGEA0040595

**INMOBILIARIA CONFINAMINA, S.A. DE C.V.**

ESTADO DE SITUACIÓN FINANCIERA

**PROFORMA AL 05 DE SEPTIEMBRE DEL 2000**

**Cifras en Pesos M.N.**

**ACTIVO**

| | | |
|---|---|---|
| Efectivo en caja y bancos | $ | 11,815 |
| Impuestos por recuperar | | 4,550 |
| Terrenos | | 245,000,000 |
| Inversión en acciones de subsidiarias | | 82,000,000 |
| **Total Activo** | **$** | **327,016,365** |

| | | |
|---|---|---|
| **PASIVO** | **$** | **-** |

**CAPITAL CONTABLE**

| | | |
|---|---|---|
| Capital Social | $ | 327,050,000 |
| Utilidades (pérdidas) retenidas | | (30,000) |
| Utilidad (pérdida) del ejercicio | | (3,635) |
| **Total Capital Contable** | **$** | **327,016,365** |
| **Total Pasivo y Capital Contable** | **$** | **327,016,365** |

CGEA0040596

## INMOBILIARIA CONFINAMINA, S.A. DE C.V.

**ESTADO DE SITUACIÓN FINANCIERA**

**PROFORMA AL 05 DE SEPTIEMBRE DEL 2000**

**Cifras en Pesos M.N.**

| | | |
|---|---|---:|
| **ACTIVO** | | |
| Efectivo en caja y bancos | $ | 11,815 |
| Impuestos por recuperar | | 4,550 |
| Terrenos | | 245,000,000 |
| Inversión en acciones de subsidiarias | | 82,000,000 |
| **Total Activo** | **$** | **327,016,365** |
| | | |
| **PASIVO** | **$** | **-** |
| | | |
| **CAPITAL CONTABLE** | | |
| Capital Social | $ | 327,050,000 |
| Utilidades (pérdidas) retenidas | | (30,000) |
| Utilidad (pérdida) del ejercicio | | (3,635) |
| **Total Capital Contable** | **$** | **327,016,365** |
| | | |
| **Total Pasivo y Capital Contable** | **$** | **327,016,365** |

CGEA0040597

## Section 2.7
## Compliance With Laws

### Section 2.7(a)

No exceptions.

### Section 2.7(b)

1.      No exceptions.

2.      No exceptions

CGEA0040598