International Court of Arbitration
International Chamber of Commerce
ICC Arbitration No. 12 125/JNK

**CGEA ONYX S.A.**
**(France)**

AND

**SARP INDUSTRIES MEXICO S.A. DE C.V.**
**(Mexico)**

AND

**SARP INDUSTRIES S.A.**
**(France)**

CLAIMANTS

V.

**HECTOR VARGAS GARZA**

AND

**VALORES ECOLÓGICOS S.A. DE C.V.**
**(Mexico)**

RESPONDENTS

---

# AMENDED REQUEST FOR ARBITRATION

---

**30 JANUARY 2003**

Freshfields Bruckhaus Deringer
69, boulevard Haussmann
75008 Paris

# CONTENTS

**SECTION**                                                                                          **PAGE**

I.      INTRODUCTION ................................................................................ 2

II.     THE PARTIES ................................................................................... 2
(A)     THE CLAIMANTS ................................................................................. 2
(B)     THE RESPONDENTS ............................................................................. 3

III.    THE ARBITRATION AGREEMENT ........................................... 3

IV.     PLACE, LANGUAGE AND APPLICABLE LAW OF THE
        ARBITRATION ................................................................................ 4

V.      APPOINTMENT OF THE ARBITRAL TRIBUNAL ................... 4

VI.     THE NATURE AND CIRCUMSTANCES OF THE DISPUTE ................. 5
(A)     MATERIAL MISREPRESENTATIONS REGARDING RIMSA'S ONGOING
        BUSINESS ............................................................................................ 7
(B)     MATERIAL MISREPRESENTATIONS RELATING TO RIMSA'S IMPROPER
        PAST PRACTICES REGARDING WASTE TREATMENT, TREATMENT AND
        DISPOSAL OF WASTE RESIDUE AND FINAL DISPOSAL OF WASTE ...................... 10
        (a)      Treatment of Waste .............................................................. 11
        (b)      Waste Residues ..................................................................... 14
        (c)      Final Disposal of Waste ....................................................... 15
(C)     MATERIAL MISREPRESENTATIONS IN BOOKS AND RECORDS OF RIMSA .......... 18
(D)     MATERIAL MISREPRESENTATION RELATING TO LAND SURROUNDING
        THE MINA SITE ................................................................................... 19
(E)     BREACH OF NON-COMPETITION OBLIGATIONS .................................. 20

VII.    NOTICE OF RELATED ARBITRATION PROCEEDINGS
        BETWEEN THE SAME PARTIES ........................................... 20

VIII.   RELIEF SOUGHT ......................................................................... 22
(A)     REQUEST FOR RESCISSION ................................................................. 22
(B)     REQUEST IN THE ALTERNATIVE FOR PURCHASE PRICE ADJUSTMENT
        UNDER SECTION 1.5 OF THE SPA ..................................................... 23
(C)     REQUEST IN THE ALTERNATIVE FOR INDEMNIFICATION UNDER SECTION
        7 OF THE SPA ..................................................................................... 26
(D)     REQUEST FOR INTERIM RELIEF ......................................................... 30
(E)     ESCROW AGREEMENT ......................................................................... 30
(F)     ADDITIONAL REQUESTS FOR RELIEF .................................................. 31

# I.     INTRODUCTION

1.     CGEA Onyx S.A., Sarp Industries S.A. and Sarp Industries Mexico S.A. de C.V. (together, *Claimants*) submit this Amended Request for Arbitration pursuant to Procedural Order N° 1 of the Arbitral Tribunal, dated 27 January 2003.

2.     On 26 August 2000, the parties entered into a stock purchase agreement (as amended) (*SPA*),[1] pursuant to which the Claimants purchased shares in a waste treatment and disposal company from Hector Vargas Garza and Valores Ecológicos S.A. de C.V. (together, *Respondents*).  A dispute has arisen between the parties in connection with the breach of representations and warranties provided to the Claimants by the Respondents in the SPA. On 7 May 2002, therefore, the Claimants filed a Request for Arbitration which is now replaced and superseded in its entirety by this Amended Request for Arbitration.

# II.     THE PARTIES

## (A)     THE CLAIMANTS

3.     The Claimants in this arbitration are:

    (1)  CGEA Onyx S.A. (*Onyx*), a company registered in France, of:

        Parc des Fontaines

        169 avenue Georges Clemenceau

        92735 Nanterre Cedex

        France

    (2)  Sarp Industries S.A. (*SARPI*), a company registered in France, of:

        Zone Portuaire de Limay, Porcheville

        Route de Hazay

        78520 Limay

        France

    (3)  Sarp Industries Mexico S.A. de C.V. (*SARPI Mexico*), a company registered in Mexico, of:

        Avenue Lazaro Cardenas

        Pte. 2400, Office No PD6D

        Residencial San Agustin

---

[1]     The SPA is annexed to this Amended Request for Arbitration as Exhibit C-1.

San Pedro Garza Garcia

N.L. 66260 Mexico

4.    The Claimants are represented in this arbitration by:

Jan Paulsson

Joseph Huse

Briana Young

Freshfields Bruckhaus Deringer

69 boulevard Haussmann

75008 Paris

Tel: (+33) 1 44 56 44 56

Fax: (+33) 1 44 56 27 30/31

Email:      jan.paulsson@freshfields.com

joseph.huse@freshfields.com

briana.young@freshfields.com

**(B)    THE RESPONDENTS**

5.    The Respondents in this arbitration are:

(1)  Mr. Hector Vargas Garza

Batallon de San Patricio No. 109-A

(Torre Dataflux Piso 15)

Col. Valle Oriente

San Pedro Garza Garcia, NL CP 88280

Mexico

(2)  Valores Ecológicos S.A. de C.V., a company registered in Mexico, of:

Batallon de San Patricio No. 109-A

(Torre Dataflux Piso 15)

Col. Valle Oriente

San Pedro Garza Garcia, NL CP 88280

Mexico

## III.    THE ARBITRATION AGREEMENT

6.    Section 10.12 of the SPA provides as follows:

"Any dispute, controversy or claim arising out of or relating to this Agreement or the breach thereof shall be finally settled by arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce ("ICC"). There shall be three arbitrators, one selected by the Buyer, one selected by the Seller, and the third selected by the two arbitrators so selected by the Buyer and the Seller. If a party fails to nominate an arbitrator within 30 days from the date of notification to it of the other party's request for arbitration, or if the two arbitrations fail within 30 days from the date of their appointment to reach an agreement on the third arbitrator, then the Court of Arbitration of the ICC shall appoint the arbitrator that was not appointed by the failing party, or shall appoint a third arbitrator, as the case may be. The place of arbitration shall be New York City and the language used shall be English."

## IV.    PLACE, LANGUAGE AND APPLICABLE LAW OF THE ARBITRATION

7.    Pursuant to Section 10.12 of the SPA, the place of the arbitration shall be New York City and the language of the arbitration shall be English.

8.    Pursuant to Section 10.4, the SPA:

"shall be governed by and construed in accordance with the laws of the state of New York applicable in the case of contracts made and to be performed in such jurisdiction, without giving effect to any conflict of laws (*sic*) rules, provided that matters concerning the form and validity of the transfer of shares shall be determined by the law of the United Mexican States and provided that in determining whether there has been an untruth, inaccuracy, violation or breach of a representation or warranty, if there is a national or local law exclusively applicable to the status, act or action which is the subject matter of the representation or warranty then said national or local law shall be applied to determine if the particular representation or warranty is untrue, inaccurate or has been violated or breached".

## V.    APPOINTMENT OF THE ARBITRAL TRIBUNAL

9.    The Arbitral Tribunal comprised of three arbitrators has already been constituted.

## VI.    THE NATURE AND CIRCUMSTANCES OF THE DISPUTE

10.    This arbitration arises out of disputes between the parties relating to the purchase by the Claimants from the Respondents of 100% of the share capital of Confinamina S.A. de C.V. (*Confinamina*), which in turn owned 30% of the share capital of Residuos Industriales Multiquim S.A. de C.V. (*RIMSA*), and 10,200 hectares of land contiguous to RIMSA's site at Mina, Nuevo Leon (the *Land*).[2]

11.    The purchase was made pursuant to the SPA and an Ancillary Stock Purchase Agreement dated 14 November 2000.  The transaction closed on 14 November 2000 (*Closing*).  The purchase price agreed by the Claimants and the Respondents for RIMSA was Mexican Pesos 310,175,000 (US$ 31,527,268), payable as follows:

- Pesos 239,975,000 (US$ 24,995,313) to the Respondents at Closing;

- Pesos 20,592,000 (approximately US$ 2,144,821) 18 months after Closing, as evidenced by a promissory note, or *pagare*, (*First Pagare*) due and payable on 14 May 2002;

- Pesos 20,592,000 (approximately US$ 2,144,821) 36 months after Closing, as evidenced by a promissory note (*Second Pagare*) due and payable on 14 November 2003;[3] and

- Pesos 8,424,000 (approximately US$ 877,427) if RIMSA's earnings for the year 2000 reached a defined target.  The Respondents have subsequently accepted that RIMSA's earnings in 2000 did not reach the defined target, and have therefore waived their right to payment of the above amount (see paragraphs 102 *ff* below).

12.    In addition, Pesos 20,592,000 (approximately US$ 2,144,821) was payable only when RIMSA or Confinamina received a permit from the appropriate Mexican authorities, permitting it to use and operate as a hazardous waste landfill a parcel of the land known as "Lot N° 39".  To date, the Respondents have made only minimal efforts to obtain the permit, in breach of their obligation under the SPA.  In light of this, and of the circumstances described in this Amended Request for Arbitration (in particular, the request for rescission of the SPA at paragraphs 92-95 below), the Claimants consider that it would no longer be appropriate to apply for the permit and therefore that the monies associated with its obtention are no longer payable.

---

2    Five of the shares in Confinamina were held by another company, Minera La Fé Norte S.A. de C.V., which transferred them to the Claimants at Closing.

3    Under Mexican law, the First and Second Pagares are negotiable instruments, endorseable by the bearer in favour of a third party.

13.  A portion of the total purchase price (Pesos 46,800,000 - US$ 4,874,594) was placed in escrow for five years from Closing, pursuant to an Escrow Agreement dated 14 November 2000 (***Escrow Agreement***), to serve as security for any claims by the Claimants against the Respondents under the SPA.

14.  Finally, the Claimants paid Pesos 18,720,000 (US$ 1,949,838) in return for signature by the Respondents of a Non-Competition Agreement between the Respondents and RIMSA (***Non-Competition Agreement***).

15.  Pursuant to a separate stock purchase agreement dated as of 17 August 2000, between Onyx and SARPI Mexico and Waste Management, Inc. and Chemical Waste Management, Inc., the Claimants purchased a further 60% of the share capital of RIMSA. The Claimants therefore hold 90% of the outstanding shares of RIMSA; the remaining 10% are held by the Respondents. The relationship of the shareholders is governed by a Shareholders Agreement dated 14 November 2000 between the Respondents and SARPI Mexico (***Shareholders Agreement***).[4]

16.  When they entered into the SPA, the Claimants had been led to believe that RIMSA was a thriving, well-run hazardous waste disposal company. Such was their confidence in RIMSA's previous management team that they chose to leave most of it in place following the acquisition, trusting that these individuals were best placed to run the company efficiently and well.

17.  During the period subsequent to Closing the Claimants have discovered that this trust was entirely misplaced. In fact, the Respondents and their associates had systematically mismanaged RIMSA and abused their positions within the company, with the result that it is plagued with material problems relating to the period prior to Closing. These problems include: ineligibility to participate in public contracts, massive damage to its reputation, legal violations resulting from improper past practices in the treatment of waste, treatment of waste residue and the final disposal of toxic waste, and serious deficiencies in the maintenance of its accounts and records. One of RIMSA's sites has seen its activity drastically reduced, and hundreds of employees have been dismissed.

18.  The Claimants have spent the period since Closing encountering, and attempting to resolve, one difficulty after another. RIMSA currently exists under the threat of the closure by the Mexican authorities of its principal remaining treatment site. Most of these problems have been notified to the Respondents, who have denied any responsibility whatsoever, despite the fact that it was they who controlled RIMSA at every level from the date of its foundation to the date of its sale to the Claimants.

19.  This Amended Request for Arbitration contains details of the problems encountered by the Claimants subsequent to Closing, in particular with

---

[4]  The Shareholders Agreement is annexed to this Amended Request for Arbitration as Exhibit C-2.

respect to RIMSA's ongoing business, its waste treatment practices, and its accounting and record keeping.

20.  The Claimants seek an order for rescission of the SPA and the return of the total consideration paid by the Claimants to the Respondents. In the event the Tribunal is unwilling to grant an order for rescission, the Claimants seek an adjustment to the purchase price under Section 1.5 of the SPA. In the alternative, the Claimants seek indemnification for breach of the Respondents' representations and warranties, covenants and indemnification obligations.

21.  Finally, the Claimants seek interim relief in connection with the First and Second Pagares, as described in paragraphs 120-123 below.

(A)  MATERIAL MISREPRESENTATIONS REGARDING RIMSA'S ONGOING BUSINESS

22.  To the extent that they were permitted to do so by the Respondents, the Claimants conducted a limited due diligence exercise before agreeing to purchase RIMSA. During the course of the due diligence, the Claimants requested, and were given copies of, the financial statements of the company (including the audited balance sheet for the year to 31 December 1999 and the unaudited balance sheet for the five months to 31 May 2000) (*Financial Statements*), in order that they might accurately assess RIMSA's financial situation. The Financial Statements were subsequently attached to the SPA as Exhibit A and Disclosure Schedule 2.6.

23.  The audited Financial Statements indicated that RIMSA had a turnover of 521 million pesos for the year to 31 December 1999, and that 750.7 million pesos were forecast for the year to 31 December 2000. It was clear that approximately 50% of RIMSA's income was derived from contracts with federal public, or para-statal, companies, in particular the Mexican oil company, Pemex.

24.  What was not disclosed was that RIMSA's relationship with Pemex, and all para-statal entities, was at risk. In 1998, the Mexican administrative authority, Secodam, had opened an investigation into the performance of a 1997 contract between RIMSA and a division of Pemex for the discharge, management, opening and decanting of containers of highly carcinogenic hexachloride compounds (*1997 Contract*). This investigation led ultimately to heavy sanctions on five Pemex employees, who were found to have committed "irregularities" (*irregularidades*) under the 1997 Contract. Although Secodam initially focussed on the conduct of these employees, it was clear that more general questions about RIMSA's performance of the 1997 Contract (which had been egregiously breached) were at issue, and that RIMSA itself would be investigated at a later date. It was also clear to RIMSA's management that any such investigation was likely to lead to sanctions against RIMSA, including a possible period of ineligibility to bid for, or participate in, any public contract. As discussed below, RIMSA management also knew that (i) a substantial quantity of hexachlorides had

simply been dumped into the ground, (ii) the empty hexachloride containers had never been properly cleaned before being placed in long-term storage cells, and (iii) RIMSA had falsified analysis reports to disguise this, and thus that it was almost certain that RIMSA would eventually be sanctioned for serious deficiencies in its performance of the 1997 Contract.

25.    The Secodam investigation was ongoing throughout the time the Claimants were conducting due diligence, and did not conclude until October 2000, two months after the SPA had been signed, but prior to Closing. RIMSA had even participated in the investigation; immediately after signature of the SPA in August 2000, RIMSA employees had been called before Secodam to answer questions about the performance of the 1997 Contract. RIMSA's senior management (including Hector Vargas Garza, the company's President) was clearly aware of the investigation, of the participation of RIMSA employees, of the possibility that RIMSA itself might be subjected to a similar investigation, and of the fact that such investigation might lead to a ruling that RIMSA was ineligible to participate in public contracts. Despite this, the Claimants were never informed of the ongoing Secodam investigation, nor of its potential consequences, and no appropriate accounting reserve was made. Similarly, the Claimants were never informed of the related environmental problems, discussed below.

26.    In fact, Secodam did later launch an enquiry into RIMSA's performance of the 1997 Contract. In July 2001, as a direct result of RIMSA's failures properly to perform the 1997 Contract, Secodam declared RIMSA ineligible, for a period of two years, to bid for, or participate in, any federal public contract. Unsurprisingly, this has had a catastrophic effect on RIMSA's business. In September 2001, as a result of an administrative action filed by RIMSA, Secodam reduced the period of ineligibility from two years to one year. The period of ineligibility was eventually suspended by the Mexican courts. Notwithstanding the suspension, between July 2001 and May 2002 RIMSA was unable to enter, or perform, a single public contract. The ineligibility decision extended to a ban on RIMSA's contracting with private companies who, in turn, would contract with public companies. The declaration of ineligibility also caused severe damage to RIMSA's reputation, with the result that many of its private customers have become reluctant to continue to contract with RIMSA. This damage will endure for many years to come. In addition, although Secodam's declaration of ineligibility is officially suspended, that suspension has never been published. Many of RIMSA's customers, both public and private, therefore continue to believe that RIMSA is still ineligible to bid for public contracts, and many continue to deal with RIMSA's competitors. Finally, it should be noted that in the event of a decision adverse to RIMSA in the context of the current court proceedings, the effect of the suspension would fall and the period of ineligibility would continue for the full one-year period.

27.    The cumulative effect on RIMSA's turnover has been devastating: instead of the dramatic increase in sales projected prior to Closing, RIMSA has

experienced a steep decline in revenue. This includes severely diminished revenue from public entities, plus significant losses associated with the resultant loss of reputation, which will be quantified subsequently for the purposes of this arbitration.

28.   RIMSA had other problems in relation to its public contracts that were not revealed to the Claimants.   At Closing, RIMSA was performing two contracts with Pemex for the treatment of oil drilling waste at RIMSA's Villahermosa site (*1999 Contracts*).   However, RIMSA had been consistently late in carrying out the required treatment, in part because the thermal treatment machines it was using under the 1999 Contracts were incapable of performing the work in the stipulated time.   As a result, at Closing there was a significant backlog of waste stored at Villahermosa awaiting treatment.   The 1999 Contracts gave Pemex the right to impose fines on RIMSA for performance delays, which it subsequently did, and which have caused further substantial loss to the Claimants.   There is nothing in the SPA to indicate that RIMSA was having difficulty performing the 1999 Contracts, or that it was liable to fines.   In addition, the accounting reserve in respect of this stockpile was substantially lower than it should have been at Closing.[5]   Finally, the Claimants were misled to believe that permits in respect of additional waste treatment equipment would soon be issued and enable RIMSA to process additional waste using such equipment.

29.   RIMSA's performance failures under the 1999 Contracts, and the resulting fines, ultimately led Pemex to decide that RIMSA was unable to guarantee performance of two contracts for performance in 2001 to 2003, which were considered the continuation of the 1999 Contracts (*2001 Contracts*). During the bidding process for the 2001 Contracts, Promotora Ambiental S.A. (*PASA*),[6] a competitor of RIMSA, brought an administrative action against RIMSA requiring the technical rejection of RIMSA's bid for the 2001 Contracts.   As a result of such action, Pemex did reject RIMSA's bid, notwithstanding the fact that RIMSA's economic proposal had been the lowest submitted.   Following the loss of the 2001 Contracts, RIMSA was forced effectively to shut down its site at Villahermosa, and to dismiss almost all of the employees based there.   The 2001 Contracts were awarded to PASA.

30.   RIMSA was subjected to yet another fine for default under a 1998 contract with Pemex.   This contract, for the restoration, transport and final disposal of toxic waste in the maritime terminal of Dos Bocas, had been performed prior to Closing.   However, RIMSA had failed to commence the contract on

---

[5]   The reserve in respect of the costs of treating stockpiled waste under the 1999 Contracts was, at the date of Closing, less than 10% of the eventual cost of such treatment, presumably the result of a deliberate attempt by previous management to conceal the extent of its performance failures under those contracts.

[6]   It is interesting to note that, at this time, approximately 47% of the share capital of PASA was held by Waste Management, Inc., which had previously been the majority shareholder in RIMSA.

time. The contract provided for fines in the event of performance delay so, in August 2001, RIMSA was notified of a fine equivalent to ten percent of the total value of the contract. Despite the fact that it was clear long before Closing that RIMSA was in default under the Dos Bocas contract, this fact was never disclosed, and no appropriate accounting reserve was made for the cost of the fine.

31.    RIMSA was also in default under contracts with entities other than Pemex. For example, it failed to make payment under an agreement dated 5 September 1997 with Ferrocariles Nacionales de Mexico (*FNM*) for the lease of railway gondolas, despite an obligation to do so. As a result of the blatant failure of its previous management to comply with a valid contract, RIMSA has recently been forced to pay a substantial settlement to avoid legal action by the liquidators of FNM. Despite the fact that the contract dates from 1997, the potential liability to FNM was not disclosed to the Claimants, and no accounting reserve was made.

32.    Yet more problems have arisen out of an agreement dated 31 January 2000 between RIMSA and the Bethlehem Steel Corporation (*Bethlehem*), pursuant to which RIMSA leased equipment for the thermal treatment of oil drilling waste. RIMSA's obligations under the lease were guaranteed by its then majority shareholder, Waste Management, Inc..

33.    When the equipment was delivered and RIMSA began to use it, it became clear that the equipment was not performing as it should, and was incapable of doing the work for which RIMSA required it. RIMSA's previous management had known about these problems before Closing, but had not revealed them to the Claimants. As a result of the problems it had encountered, RIMSA decided to withhold one half of one month's rent under the lease. Although RIMSA subsequently repaid the money, Bethlehem in the meantime called on the guarantee, and as a consequence Waste Management, Inc. has had to pay Bethlehem over US$ 795,000. Waste Management, Inc. has recently brought legal proceedings against RIMSA, seeking to recover this money. These proceedings are still pending, but there is a risk that RIMSA will be ordered to reimburse Waste Management, Inc. in the full amount of its guarantee.

**(B)    MATERIAL MISREPRESENTATIONS RELATING TO RIMSA'S IMPROPER PAST PRACTICES REGARDING WASTE TREATMENT, TREATMENT AND DISPOSAL OF WASTE RESIDUE AND FINAL DISPOSAL OF WASTE**

34.    During due diligence and up to Closing, the Claimants were led to believe that RIMSA's waste treatment methods and practices were sophisticated and effective, and in all material respects compliant with all applicable environmental laws, regulations and authorisations. This was no more than the Claimants had expected, given the assurances of the Respondents during due diligence, including the fact that RIMSA had recently received the coveted "ISO 14001" certification of environmental compliance. The Claimants also relied on the fact that Waste Management, Inc., the world's

largest waste management company, had in its capacity as majority shareholder been providing technical assistance to the company for six years before its sale to the Claimants.[7]

35.    However, after assuming control of the company, the Claimants began to realise that RIMSA was by no means compliant with its legal and regulatory obligations.  On the contrary, RIMSA's previous management (including Hector Vargas Garza, his sons and close associates, all of whom held important and well-paid positions in the company) had condoned or committed numerous breaches, not only of Mexican environmental law and regulations, but also of the permits by which RIMSA was authorised to conduct its business, including its general authorisation, no. 19-37-ps-VII-01-93.  This was true in respect of all of RIMSA's activities, from (a) the treatment of waste, to (b) the treatment and disposal of waste residues, to (c) the final disposal of the treated waste itself.

36.    As a result, RIMSA's principal site at Mina is heavily contaminated, both in specific areas (as set out below) and more generally, throughout the site. Moreover, it appears that certain pollutants are migrating across a substantial portion of the site, such that the true extent and consequences of the environmental damage cannot be finally determined without extensive further testing.  The Claimants are therefore not yet in a position to provide an exhaustive description of all the pollution on the site, but are aware at least of the following instances:

**(a)    Treatment of Waste**

*First Treatment Zone*

37.    Treatment zones are specially-constructed platforms or enclosed metallic work pits on which waste treatment processes are conducted, for example mixing hazardous materials with stabiliser prior to confinement.  They are designed to prevent toxic waste from coming into contact with, and contaminating, the underlying and surrounding ground and water.  As such, they are an essential component of the specialist equipment required by a hazardous waste company, the nature of whose activities dictates that it take every precaution to avoid contaminating or polluting the environment in any way.

38.    For more than eight years prior to Closing, RIMSA had conducted a large part of its waste treatment activities at Mina on a single treatment zone (*First Treatment Zone*).  Prior to Closing, management decided to replace the First Treatment Zone, and to construct a new one.  Construction of the new zone commenced on 16 February 1999, and was completed (under the Claimants' management) in February 2002.

---

[7]    Note, however, that Waste Management, Inc. apparently had little or no involvement in the day-to-day running of RIMSA, which was handled almost exclusively by Mr Vargas and his close family and associates.  In addition, Mr Vargas was heavily involved on the administrative and strategic side, in his capacity as President of RIMSA.

39. RIMSA has dismantled, and is now obliged to remediate contamination in, the First Treatment Zone. During due diligence, the Claimants were told that the First Treatment Zone had been constructed in accordance with relevant legislation, and that the ground underneath it was protected by a suitable liner to prevent waste leaking into the ground. The presence of such a liner is a legal requirement. Following investigations conducted subsequent to Closing, it became clear that there was no liner (just holes in the ground, into which RIMSA employees would simply pour untreated toxic waste for subsequent treatment), and that waste treatment containers in the zone were holed and corroded. As a result, pollutants including oil, heavy metals and arsenic, have leaked or been injected directly into the ground.

40. An area of approximately 76,000 cubic metres of the surrounding and underlying soil is subject to this contamination, to a depth of between five and twelve metres. Remediation of this area, including treatment of the contaminated soil and storage of the treated material in long-term storage cells, is now necessary in order to comply with RIMSA's environmental permits, its "*Industria Limpia*" certificate, and Mexican law.

41. As a result of the Respondents' failures properly to construct or maintain the First Treatment Zone, the cost of cleaning the zone is now estimated at US$ 4.3 million.

42. Nevertheless, the deficiencies in the construction of the First Treatment Zone, and the resulting contamination were not disclosed to the Claimants before Closing. Further, although the decision to dismantle the zone and construct a new one was taken by the Respondents, no accounting reserve was made to account for the cost of the cleanup.

### *Hexachloride Treatment Zone*

43. RIMSA's illegal treatment practices were not confined to the First Treatment Zone. Other zones at Mina had been used for the treatment of waste containing carcinogenic hexachlorides (***Hexachloride Treatment Zone***), under the 1997 Contract and a previous contract with Pemex. RIMSA failed to construct a treatment zone of sufficient size, so these highly toxic materials spilled over onto unprotected ground beside the zone, along with rainwater that had fallen onto the zone and become contaminated. In addition, when it came to decommission the site, RIMSA used a bulldozer to tear up what liner there was, and ploughed it and the hexachlorides on its surface back into the ground, thereby further polluting the soil.

44. As a result, approximately 100,000 tonnes of soil are contaminated, with hexachloride concentrations in some areas of up to 55,000 parts per

million.[8]  This is a clear violation of Mexican law, and the environmental authorities are entitled to require that the contaminated soil be decontaminated.  Theoretically, they could demand that RIMSA return the Hexachloride Treatment Zone to a condition in which it contains no contamination whatsoever.  Were they to do so (and assuming remediation by incineration) RIMSA would be obliged to incinerate all the contaminated soil, with the result that final clean-up costs could be in excess of US$ 50 million.

45.    However, the Claimants may be able to persuade the authorities to accept a less extensive remediation programme.  It is therefore possible that the cost of remediating the Hexachloride Treatment Zone, while still significant, will be less than the figure quoted above.

46.    In addition, RIMSA failed properly or at all to clean the drums that had contained the hexachlorides.  Instead, it simply confined them on the Mina site (although the relevant contracts provided that they be incinerated, and RIMSA's general authorisation does not allow it to store hexachlorides on its sites), and falsified records to make it look as though the barrels had been cleaned, in compliance with the relevant contracts.  The presence on the site of over 1,400 drums, coated with dangerous hexachlorides, is a violation of RIMSA's environmental authorisation and Mexican law and regulations, and the authorities may require RIMSA to remove, clean and re-store the containers, at an estimated cost of US$ 4 million.

47.    The violation in respect of the Hexachloride Treatment Zone is of such a nature that the authorities could decide at any time to close the Mina site.  Such an action would likely result in the bankruptcy of RIMSA.  Despite this, at no stage before Closing was any of the above disclosed to the Claimants, and no accounting reserve was made in respect of the cost of decontamination and remediation.

*PCBs*

48.    RIMSA's failures in respect of waste treatment were not limited to the treatment zones themselves.  In late 1999/early 2000, the Respondents attempted to convert a solvent recycling facility at Mina into a facility for cleaning and recycling used electrical transformers and drums containing PCBs.  The facility proved to be unsuitable for this purpose, and the process never functioned properly.

49.    PCBs are extremely toxic, so much so that few hazardous waste companies anywhere in the world are still authorised to handle them.  Nevertheless, before ensuring that the facility was capable of treating them, and obtaining permanent authorisation to conduct this activity, the Respondents accepted

---

[8]    It is worth noting that, in respect of certain of the hexachloride compounds present on the Hexachloride Treatment Zone, the US Environmental Protection Agency considers contamination even over a certain number of parts per *billion* to be unacceptable.

onto the site approximately two hundred transformers and drums, each containing highly toxic PCBs. There is no suitable storage facility for these transformers and drums on the site, and leaving them uncleaned and unprotected would create a significant risk of soil contamination. RIMSA therefore had no option but to send the transformers and drums to another facility which is capable of cleaning them. The most suitable facility is in Finland, so RIMSA has been forced to bear significant export and treatment costs (approximately US$ 200,000 to date). The equipment used by RIMSA, however, remains on the site and is contaminated with PCBs. RIMSA's treatment facility must therefore be dismantled and the equipment inside it exported for decontamination, at further cost. Nevertheless, no accounting reserve was made in respect of such cost. In addition, it was never suggested to the Claimants that the facility might be unsuitable for the purpose for which it was being used before Closing, nor that the transformers and drums in storage, and the contaminated equipment, could not be remediated at the site.

**(b)    Waste Residues**

50.    RIMSA's inadequate practices prior to Closing also extended to its methods of storing, and disposing of, waste residues generated during waste treatment processes.

*Lagoons*

51.    The Mina site contains several artificial ponds (*Lagoons*) used to store liquid and waste residues and waste water generated during the waste neutralisation process. These residues contain, *inter alia*, calcium chloride and iron hydroxide, and must by law be treated before they can be permanently disposed of. One of the Lagoons was decommissioned by the Respondents immediately before Closing, and the waste it contained placed directly on the ground on and immediately adjacent to the Hexachloride Treatment Zone, without protection and without adequate treatment, and in breach of RIMSA's environmental authorisations and Mexican law. This material must now be removed, mixed with lime, homogenised and transferred to a cell suitable for long-term storage. The cost of this operation, which is complicated by the need to avoid disturbing the Hexachloride Treatment Zone, is estimated at US$ 250,000.

52.    Two other Lagoons are full of many years' worth of untreated, toxic liquid, estimated at approximately 35,000 tonnes. This liquid should have been removed and treated prior to Closing, and indeed the Respondents represented to the Claimants that such works would be carried out before the Claimants took control of RIMSA. Despite this, the work was not done, and the Lagoons are now in danger of overflowing in heavy rain and contaminating the surrounding land. Such contamination would constitute a breach both of the applicable law and of RIMSA's *Industria Limpia* Certificate. The Lagoons must therefore be emptied and decontaminated, and the liquid neutralised, stabilised and solidified before being stored on a

long-term basis, at an estimated cost to RIMSA of US$ 2 million.  No proper accounting reserves were established prior to Closing and it will be necessary to undertake the decontamination by March 2003.

### Chloride Dumping Programme

53.   To the extent that the Respondents did empty the Lagoons of untreated liquid waste residue, they failed either to treat or to dispose of this liquid as they should.  Instead, between 1995 and 1999 approximately 60,000 cubic metres of untreated liquid, containing calcium and iron chlorides, were simply dumped on and around dirt roads inside and outside the Mina site, including on the property of third parties.  RIMSA's archives contain a letter from the Mexican environmental agency PROFEPA (*Procuraduria Federal de Proteccion al Ambiente*), expressing no objection to this activity, but there is no evidence of an official authorisation.  In addition, analyses required by the PROFEPA "no objection letter" were never carried out, and RIMSA's management falsified reports to suggest that the vast quantities of liquid waste residue on the ground had been deposited there over a longer period than was actually the case.

54.   The Respondents were fully aware that the dumping programme (***Chloride Dumping Programme***) posed a risk to the environment, but the existence of this programme was not revealed to the Claimants.  Immediately prior to Closing, however, the Respondents attempted to conceal the chlorides by engaging in an extensive programme of dilution.  Staff worked day and night to mix the chlorides with uncontaminated soil from the roadside, thereby diluting the toxic material, before placing it back on the ground.

55.   The Respondents were also aware of the reputational risk posed by the spreading activity.  Many local residents have alleged that RIMSA has been responsible for deaths of livestock in the area.  Although to date RIMSA has not been held liable for the deaths of these animals, the issue has received extensive press coverage, as a result of which RIMSA's reputation has suffered further damage.  In addition, the long-term environmental effects of the programme are unknown.

## (c)    Final Disposal of Waste

56.   RIMSA's practices were equally deplorable when it came to arranging the long-term disposal of waste it had treated, or should have treated.

### Catalyst Materials

57.   In May 1997, RIMSA signed a contract with Pemex for the collection, treatment and disposal of 12,000 tonnes of catalyst materials.  The catalysts contain hazardous heavy metals and hydrocarbons, and require treatment to comply not only with the original contract, but also with RIMSA's general environmental authorisation and Mexican law.  Nevertheless, RIMSA failed properly to treat and dispose of these materials, but since 1999 has held some 7,600 tonnes on its Mina site in cells suitable only for provisional

storage, inadequate for long-term disposal.   Notwithstanding, RIMSA's previous management declared to the authorities that the catalyst materials were properly stored for long-term disposal.  In fact, as currently stored, the catalysts are liable spontaneously to combust in hot weather, and to leak through the inadequate liner of their cell, and thus pose a significant risk to the environment.  It has fallen to the Claimants to begin, and to pay for, treatment and disposal of these materials, at an estimated total cost of US$ 500,000.  Prior to the Closing, no accounting reserve was made in respect of this cost.

### First Generation Cells

58.    The first waste disposal cells at Mina (*First Generation Cells*) were filled between 1987 and 1993, and declared to the relevant authorities as cells for the storage of non-toxic waste only.  As recently as 1998, RIMSA was continuing to declare to the authorities that the First Generation Cells contained no toxic substances.  Despite this, the Claimants now suspect that the First Generation Cells contain substantial quantities of toxic material, including   arsenic,   pharmaceutical   chemicals,   trichloretane, tetrachlorotyline, and ethylbenzene, either untreated or inadequately treated.  The Claimants also understand that there are substantial quantities of toxic materials in the cells for which there are no storage records whatsoever.

59.    Some 18,000 tonnes of waste in the First Generation Cells are stored in metal drums and containers, which inevitably corrode over time and spill their contents into the cells.   This leads to an accumulation of toxic leachates; in addition, the reaction of the metal containers with certain acidic wastes in the cells can produce potentially fatal poisonous gases.  Finally, the First Generation Cells suffer from a risk of explosion.

60.    It is also clear that, in violation of the relevant regulatory scheme, the Respondents constructed the cells without adequate linings to prevent the contents from leaking into the surrounding soil.  Unsurprisingly, it now appears that the cells are leaking toxins and polluting the soil and groundwater around them.

61.    The First Generation Cells were not designed or authorised for the long-term storage of toxic material, and will have to be opened, emptied, and cleaned, and the waste classified, treated, and placed in new cells, in order to ensure that RIMSA complies with all applicable laws and regulations, and with the terms of its environmental authorisations.  This task is made more difficult by the fact that approximately 20% of the 53,000 tonnes of waste in the cells was stored without a record of its exact location.  In other words, while the records confirm that this material (much of which is thought to be toxic) was placed in one of the eleven First Generation Cells, they do not specify which cell. In order to find and treat this material, it will be necessary to excavate completely all eleven First Generation Cells.

62.    Remediation on such a large scale will involve substantial cost to RIMSA (estimated at US$ 10 million) and pose a significant risk to the RIMSA

employees carrying out the work.  In addition, as stated above, the Claimants believe that as a result of the toxins leaking from the First Generation Cells, a substantial quantity of soil and groundwater is now contaminated, and that such contamination is migrating across the site. The nature and extent of such contamination can only be completely confirmed once the First Generation Cells are opened and emptied; however the remediation costs are likely to be significant.

63.   Prior to Closing, the Claimants were not given access to RIMSA's records of materials stored in the First Generation Cells.  Only once they had assumed control of the company and had access to the relevant documents did the Claimants begin to realise the likely contents of these cells. As a result, the nature and extent of the remediation work now necessary was not known to the Claimants at Closing.  In fact, the violation is of such a nature that the authorities could decide at any time to close the Mina site.  Such an action would again be likely to result in the bankruptcy of RIMSA.  Despite this, no accounting reserve was made.

64.   The failures listed at paragraphs 34 to 63 above have resulted in large-scale contamination at Mina.  Where the nature and extent of such contamination is known, it is described and, to the extent possible, the costs of remediation are estimated.

65.   However, it is not yet possible to determine definitively the extent of the pollution at Mina.  As stated above, contaminants (including toxins from the First Generation Cells and First Treatment Zone) are apparently migrating in a northeasterly direction through the soil on the site, with the result that a substantial part of the land appears already to be contaminated.  Further testing is necessary before the Claimants can assess the exact percentage of the site affected, and whether the contamination has yet reached beyond the boundaries of the site.[9]

66.   In addition, the illegal and haphazard way in which waste was handled on the site prior to Closing makes it a virtual certainty that more areas of specific pollution will be discovered, the result of spills, deliberate dumping, or migration.  Due to the manner in which surface water flows over the site, there is also a risk of contamination to nearby rivers and streams.

---

[9]   In this context, the Claimants note that a further programme of site inspection and sample analysis will be necessary in this arbitration, and in ICC Case N° 12 125/JNK.  The Claimants assume that each of the Parties to both arbitrations will appoint an environmental expert to assist it in the conduct of the proceedings.  In addition, the Claimants respectfully suggest that the Tribunal consider appointing its own expert, both to assist it in assessing the evidence of the Party-appointed experts, and to coordinate/take the lead in the process of site inspection and sample analysis, so that the process does not become overly complicated or disruptive to RIMSA's day-to-day activities.

**(C)    MATERIAL MISREPRESENTATIONS IN BOOKS AND RECORDS OF RIMSA**

67.    The Claimants' decision to purchase RIMSA was based in large part on the information contained in the Financial Statements.    In particular, the Claimants relied on the audited balance sheet for the year to 31 December 1999, and the unaudited balance sheet for the five months to 31 May 2000. At Section 2.6 of the SPA, the Respondents represented and warranted that the Financial Statements were "*correct and complete except in immaterial respects*", and that they were "*consistent with the books and records of Confinamina and* [RIMSA]*, which books and records are accurate and complete except in immaterial respects*".    In fact, RIMSA's bookkeeping prior to Closing, both financial and operational, was frequently neither correct nor complete.    As the Claimants have subsequently discovered, RIMSA's accounts, and its records of activities and analyses conducted on its sites, presented a picture of the company which was often deliberately inaccurate.

68.    The most obvious deficiency was the failure by the Respondents to make provision in the accounts, adequately or at all, for the numerous environmental and operational problems it knew the company faced.    For example, no or no adequate accounting reserves were made in respect of the costs associated with the upcoming ineligibility declaration, Environmental Claim (as defined at paragraph 116(vi) below), and other issues described above.

69.    The SPA contained a further representation (Section 2.8) that it contained a "*complete and accurate list of all receivables of Confinamina or* [RIMSA]". Despite this, the reserve in respect of client accounts receivable was approximately half of the amount it should have been.

70.    Falsification was not limited to RIMSA's financial records.    For example, the Respondents ordered staff to fabricate analysis reports in respect of the Chloride Dumping Programme, although no analyses were ever conducted. Similarly, staff prepared records indicating that hexachloride containers confined at Mina had been cleaned before being confined.    In fact, as described above, only a tiny percentage of the containers was actually cleaned (for the purposes of falsification of laboratory analysis to demonstrate that all of the containers were cleaned); the rest were placed in RIMSA's macrocells without any decontamination whatsoever.

71.    In summary, it is clear that prior to Closing, RIMSA management made no attempt to keep accurate books and records, nor to account on an accrual basis for real operational costs or the cost of remediation, and thus that the Financial Statements on which the Claimants relied were substantially inaccurate.    What is more, the Respondents and their associates deliberately concealed this fact from the Claimants, even after Closing.

72.    Throughout the due diligence and SPA negotiation process, and up to Closing, the Respondents' conduct can be characterised as one long series of

material misrepresentations and concealments. However, following Closing, the Respondents engaged in active fraud against the Claimants.

73. Under Section 1.5 of the SPA, RIMSA was required to prepare accounts for the year ended 31 December 2000, including details of the company's earnings before interest, taxes and amortisation (***EBITDA***). If Actual EBITDA (as defined) was less than Target EBITDA (as defined), the SPA provided for a refund to the Claimants of thirty percent of five times the difference between Target EBITDA and Actual EBITDA (***Price Decrease***). In late 2000, the Respondents, and their previous partners in RIMSA Waste Management, Inc. and Chemical Waste Management, Inc., clearly anticipated that Actual EBITDA would not be sufficient to avoid triggering the Price Decrease. Consequently, with the help of RIMSA's old management team (in whom the Claimants had placed the highest degree of trust by appointing them to continue managing the company) and on the orders of the Respondents, approximately US$ 1 million was fraudulently injected into RIMSA.

74. In order to "launder" these monies, false invoices were prepared and submitted, and records of the entry, exit and storage of waste were fabricated, to suggest that the services invoiced had actually been rendered. In fact, these services had never been performed. Nevertheless, the invoices were paid by cheques drawn on the account of Ingenieria de Proceso Ambiental S.A. de C.V. (***IPA***), a company affiliated with Mr. Vargas. One of the signatories to the cheques was a representative not only of IPA, but also of the Respondents.

75. By such fraudulent means, the Respondents arranged artificially and dishonestly to increase RIMSA's earnings for 2000, and thereby to deceive the Claimants and avoid triggering the Price Decrease, to which the Claimants are entitled.[10] In addition, the Respondents deliberately concealed the existence of the numerous operational and environmental problems described above, and fraudulently prepared the Financial Statements so as to exclude the appropriate substantial reserves which should have been included in respect of these problems, as required in Mexico. In the Claimants' view, the blatant dishonesty and bad faith evidenced by this and the "fraudulent invoice" episode are typical of the spirit in which the Respondents conducted both their business prior to Closing and the entire purchase transaction.

(D)    MATERIAL MISREPRESENTATION RELATING TO LAND SURROUNDING THE MINA SITE

76. At Section 2.16(a) of the SPA, the Respondents represented and warranted that RIMSA and/or Confinamina had good, valid, marketable title to all real

---

[10]    The Respondents have subsequently accepted that the Claimants are entitled to a Price Decrease in respect of the monies fraudulently injected into RIMSA; see paragraphs 102 *ff* below.

property owned by them, including the Land, free and clear of any lien, mortgage, encumbrance, etc.

77.   On assuming control of RIMSA, however, the Claimants discovered that a substantial portion of the Land was occupied by a local farmer, who had acquired rights of possession. The continued presence of this man, his ranch and his large herd of cattle on the Land will prevent RIMSA expanding its landfill and constitute an impediment to any future sale of the Land. As a result, the value of the Land has been substantially reduced. In order to try to redress the damage to the value of its property, RIMSA held discussions with the farmer with a view to agreeing his departure from the land, but was unable to persuade him to leave. RIMSA has therefore been forced to bring civil proceedings to try to evict him. In the meantime, the farmer remains on the Land, impeding its use by RIMSA and diminishing its value significantly.

**(E)    BREACH OF NON-COMPETITION OBLIGATIONS**

78.   As a condition precedent to signature of the SPA, the Respondents were required to enter into the Non-Competition Agreement,[11] under which they agreed not to compete with the Business of RIMSA (as defined) for a period commencing at the time of Closing and ending three and a half years after the Respondents cease to own or hold any shares in RIMSA, in return for a substantial payment by the Claimants. In addition, the Respondents agreed not to employ or retain, or offer to employ or retain, any person who is or was a full-time employee of RIMSA.

79.   Despite this, the Claimants have subsequently discovered that several former employees of RIMSA (including many who held senior management and operational positions) are now working for one or both of the Respondents or their associated companies. The Claimants are also aware of a case in which an individual repeatedly provided confidential information and assistance to the Respondents, while still employed by RIMSA.

## VII.   NOTICE OF RELATED ARBITRATION PROCEEDINGS BETWEEN THE SAME PARTIES

80.   On 2 January 2003, SARPI Mexico was notified that the Respondents had initiated separate arbitration proceedings against it (the *Related Arbitration*), despite the existence of the present proceedings between the same parties and concerning the same legal relationship. The Related Arbitration has been allocated ICC Case N° 12 510/JNK.

---

[11]   Section 9.8 SPA.

81. The Related Arbitration concerns a dispute arising out of the Respondents' purported exercise of a put-option under the Shareholders Agreement, as follows.

82. The Shareholders Agreement provides that any decision to execute an agreement with a shareholder or affiliate of RIMSA which is not in the ordinary course of business requires the unanimous approval of the shareholders of RIMSA. Agreements in the ordinary course of business require only the approval of a majority of RIMSA's board of directors.[12]

83. Where SARPI Mexico proposes in a shareholders meeting a decision requiring a unanimous vote, and the Respondents vote against such decision, the parties must meet to attempt to find a mutually acceptable solution. If no agreement can be reached, a second shareholders meeting will be held. If at that meeting the Respondents vote against the decision a second time, the Shareholders Agreement provides for a put/call option, exercisable by the Respondents and SARPI Mexico respectively.[13]

84. When exercised in accordance with the provisions of the Shareholders Agreement, the put/call option allows the Respondents to require SARPI Mexico to buy, or SARPI Mexico to require the Respondents to sell, the Respondents' remaining 10% shareholding in RIMSA.

85. In January 2002, RIMSA's board of directors approved an agreement between RIMSA and SARPI Mexico for the provision of technical assistance. This agreement was in the ordinary course of business of RIMSA, and was thus validly approved by the board.

86. Nevertheless, the Respondents objected to RIMSA's entering the agreement, and purported to vote against it at a shareholders meeting on 11 July 2002, by voting against the approval of financial statements which contained a note referring to technical assistance provided under the agreement.

87. At a second shareholders meeting on 4 October 2002, representatives of SARPI Mexico offered to discuss the disagreement with the Respondents, but received no response. Instead, by letter dated 7 October 2002, the Respondents purported to exercise their put-option, despite the fact that they were not entitled to do so. In their letter, the Respondents demanded that SARPI Mexico purchase their shares in RIMSA for almost 150,000,000 Pesos.

88. On receipt of the so-called "exercise notice", CGEA Onyx wrote to the Respondents, rejecting the put on the grounds that it was invalidly exercised, and offering again to meet to resolve the parties' disagreement. The Respondents never replied to this letter, or to a follow-up letter from the Claimants dated 22 November 2002, repeating the offer of a meeting.

---

[12] Clause 3.3(a)(ii) Shareholders Agreement.

[13] Clauses 3.3(c) and 6.3 Shareholders Agreement.

89.   Having rejected all opportunities to resolve the matter by amicable means despite the willingness of the Claimants, and an express obligation under the Shareholders Agreement, to try to do so, the Respondents filed arbitration proceedings. In their Request for Arbitration, the Respondents seek an order enforcing the put-option and compelling SARPI Mexico to purchase the Respondents' shares. The Respondents have deliberately chosen not to include this issue in the present proceedings, despite the fact that the Related Arbitration involves the same parties, and arises in connection with the same legal relationship, as these proceedings.

90.   For the above dispute to be decided by different arbitrators, in a separate arbitration, is clearly illogical and impractical. Separate proceedings would lead to substantial additional and unnecessary cost for both Parties, and could also result in inconsistent, and incompatible, final awards.[14]   A separate arbitration is inappropriate particularly in light of the Claimants' claim in the present proceedings for rescission of the SPA.

91.   In an effort to avoid such results, on 30 January 2003 the Claimants filed a request that the Related Arbitration be consolidated with the present proceedings. A copy of the Request for Consolidation has been sent to the Tribunal in the present proceedings, and the Claimants will notify the Tribunal as soon as they have received a response from the ICC. In the event that consolidation is granted, the Claimants reserve the right to amend this Amended Request for Arbitration to request that the Tribunal deny the Respondents' claim for enforcement of the put-option.

## VIII.   RELIEF SOUGHT

### (A)   REQUEST FOR RESCISSION

92.   By neglecting to disclose the above failures and defaults as provided under the SPA, the Respondents breached the representations and warranties they had given in the SPA, on which the Claimants were entitled to rely. Indeed, during the course of 2001 and into 2002, the Claimants discovered that the company they had bought, far from being thriving, fully functioning, well-run and free from major environmental and regulatory problems, was subject to numerous serious problems and liabilities, as described above, to the extent that it was substantially different to the company the Claimants believed they had purchased. Thus, instead of running a thriving going concern, the Claimants have been obliged to spend much of the period since Closing engaged in crisis management. These breaches of representations and warranties are so fundamental as substantially to defeat the purpose of the contract and justify rescission.

---

[14]   The Claimants believe that the chances of a separate tribunal finding in the Respondents' favour in respect of the put-option are negligible. Nevertheless, a risk remains and reinforces the Claimants' opinion that separate proceedings are inappropriate in this case.

93.    By failing adequately to disclose the above failures and defaults, the Respondents misrepresented and concealed numerous material and substantial facts about RIMSA, in order to induce the Claimants to proceed with the purchase. The Claimants relied on these misrepresentations and were thereby induced to purchase RIMSA. Preliminary investigations would indicate that these material misrepresentations were fraudulent so as to constitute fraud in the inducement for which rescission is also the appropriate remedy. The Claimants, naturally, wish to run RIMSA in full compliance with all applicable legislation. Under Mexican law, RIMSA is obliged to give full and prompt disclosure to the relevant authorities of any contamination on its sites. Upon giving such notice, RIMSA will be subjected to thorough investigations by these authorities, and an appropriate programme of remediation will have to be implemented. Once RIMSA has fully determined and disclosed the extent of the problems that exist on its sites, problems which result, *inter alia*, from the actions and omissions of the Respondents, the authorities will require extensive remediation works, at substantial cost. In addition, RIMSA could be ordered to close its Mina site.

94.    To have placed the Claimants in such a position is untenable. Instead, it should have been for the Respondents, whose past actions have led to the obligation to disclose, to decide whether or not to make such disclosure, and to incur the resulting costs. The Claimants face a similar issue with respect to the creation of the appropriate accounting reserves.

95.    The Claimants therefore seek an order for rescission of the SPA and the ancillary agreements executed pursuant thereto, and the return of the total consideration paid by the Claimants to the Respondents for those agreements. In return, the Claimants will return to the Respondents the shares purchased from them under the SPA, in order that the parties may be returned to the *status quo ante* as if the SPA had never existed, and that the burden of resolving, and paying for, RIMSA's numerous problems may be placed upon those responsible for creating those problems.

**(B)    REQUEST IN THE ALTERNATIVE FOR PURCHASE PRICE ADJUSTMENT UNDER SECTION 1.5 OF THE SPA**

96.    As stated at paragraph 67 above, the Claimants' decision to purchase RIMSA, and the price they offered, were based largely on the information contained in the Financial Statements, including projections of RIMSA's earnings for the year of the purchase. Logically, the SPA (Section 1.5) provides that where the company's actual earnings turn out to be lower than they had been led to believe, the Claimants are entitled to compensation in the form of a Price Decrease. In order to determine the amount of the appropriate Price Decrease, Section 1.5 establishes a formula for the calculation of RIMSA's Actual EBITDA, based on an audited statement of the company's operating results for the year 2000, and on Target EBITDA. Where application of this formula demonstrates that Actual EBITDA is less than Target EBITDA, the Claimants have a right to a Price Decrease.

97. The SPA provides that any Price Decrease shall be debited to a portion of the purchase price withheld by the Claimants pending confirmation of RIMSA's Actual EBITDA for 2000 (**Withholding Fund**).[15]  If the Withholding Fund is not sufficient to cover the Price Decrease, the Respondents shall pay to the Claimants the difference between the Price Decrease and the Withholding Fund.

98. The Claimants believe that in the present circumstances, if the Tribunal is unwilling to grant rescission of the SPA, they are entitled to a substantial Price Decrease (**Price Decrease Claim**).

99. The SPA stipulates that where one Party disagrees with RIMSA's calculation of Actual EBITDA, it may serve a Notice of Disagreement (as defined) within thirty days of receiving such calculation.

100. RIMSA issued its calculation of Actual EBITDA in May 2001, however the Claimants and Respondents disagree with respect to several items in this calculation.

101. The Claimants hereby indicate that they intend to submit a Notice of Disagreement to the Respondents, and respectfully request the Tribunal to order that Section 1.5 of the SPA does not apply to prevent them submitting such Notice.

102. The litany of improper conduct by the Respondents described in this Amended Request for Arbitration, including but not limited to the preparation and submission of fraudulent invoices to increase RIMSA's earnings and avoid paying the Price Decrease, has deprived the Respondents of the right to rely on the contractual notice period.  Indeed, the Respondents themselves recognise this, as evidenced by the fact that they have recently agreed that the "fraudulent invoices" claim should be taken into account in the Actual EBITDA calculation, despite the expiry of the original notice period.[16]

103. If the Tribunal agrees to make the order requested, the Claimants will state in their Notice that RIMSA's statement of operating results for the year 2000 should have contained appropriate reserves for the consequences (the full extent of which is only now becoming clear) of the improper conduct described in this Amended Request for Arbitration (**Missing Reserves**). The Claimants will claim a Price Decrease in respect of the Missing Reserves.  The Claimants will also claim a Price Decrease in respect of the fraudulent invoices.  Finally, the Claimants will state their intention to

---

[15]  See paragraph 11 above.

[16]  The Claimants notified the Respondents of the fraudulent invoice issue by letter dated 19 November 2001, and requested a corresponding Price Decrease and an adequate explanation of the Respondents' conduct.  Although they have never adequately explained their conduct, by letter dated 3 December 2002 the Respondents acknowledged that the calculation of Actual EBITDA should exclude amounts paid in respect of the fraudulent invoices.

retain the full amount of the Withholding Fund as the Respondents, in their letter dated 3 December 2002, accept they are entitled to do.

104. Following submission of RIMSA's accounts in May 2001, the Parties have met on several occasions to try to agree a figure for Actual EBITDA, but without success. Where the Parties cannot agree on the calculation of Actual EBITDA, Section 1.5 provides that the question shall be referred to "*[RIMSA's] firm of independent accountants, Arthur Andersen*", who shall calculate Actual EBITDA.

105. The parties therefore agreed to refer the dispute to Arthur Andersen, and to request it to produce a calculation of Actual EBITDA. However, Arthur Andersen's Mexican entity, Ruiz Urquiza, has refused to perform the calculation on the grounds of conflict of interest. The parties therefore agreed to refer the dispute to another firm of independent accountants, but have so far been unable to agree on an appropriate firm, despite several attempts by the Claimants to propose a firm acceptable to the Respondents.

106. In the meantime, the Respondents wrote to the Claimants on 3 December 2002, offering a payment of Pesos 15,392,000 in full and final settlement of the dispute over determination of Actual EBITDA, without recourse to the provisions of Section 1.5 of the SPA. As part of the proposed settlement, the Respondents agreed to waive their right to the Withholding Fund. The Claimants have rejected the Respondents' offer, which is substantially lower than the amount to which the Claimants believe they are entitled, and it is now necessary to agree on a firm of independent accountants to produce the final calculation.

107. The Claimants will of course continue to consult with the Respondents with a view to agreeing on a suitable firm, and are hopeful that agreement will be reached shortly. However, in the event that there has been no agreement within three months of signature of the Terms of Reference in this arbitration, the Claimants will ask the Tribunal to undertake the appointment.

108. Once a firm of independent accountants has been appointed, the Claimants anticipate that the Parties will try to agree the scope of the firm's mission, to the extent it is not set out in the SPA. In the event that the Parties are unable to agree on the scope within a reasonable time, the Claimants will seek the assistance of the Tribunal.

109. Further, the independent accountants appointed to determine Actual EBITDA (and any resulting Price Decrease) will inevitably require legal assistance. For example, in order to determine the amount of the Missing Reserve in respect of the Environmental Claim, the accountants will have to consider whether RIMSA violated the relevant laws, regulations and permits. This is clearly the task of a lawyer, not an accountant.

110. As such, the process of determining whether the relevant laws, regulations and permits have been violated, and the amount of the Missing Reserve in

each case, is properly the role of the Tribunal, and not the independent accountants. The Tribunal will in any case consider these issues in the course of deciding the Claimants' claims for rescission or, in the alternative, damages/indemnification (see paragraphs 114-118 below).

111. Once the Tribunal has ruled whether there have been violations of the relevant laws, regulations and permits and/or the Respondents' representations and warranties under the SPA, and has determined the loss incurred by the Claimants as a result of such violations, the independent accountants can proceed with their calculation of Actual EBITDA.

112. In the event that Respondents fail to comply with the final determination of the independent accountants, the Claimants believe that it would be appropriate for the present Tribunal to enforce such determination.

113. In light of the Respondents' fraudulent attempts to deprive the Claimants of a Price Decrease to which, as the Respondents themselves admit, they are entitled, the Claimants seek an order that the Respondents pay any costs incurred in connection with the Price Decrease Claim, including but not limited to the costs of the independent accountants appointed to calculate Actual EBITDA, and any legal and other costs incurred by the Claimants in connection with the calculation of Actual EBITDA.

**(C)    REQUEST IN THE ALTERNATIVE FOR INDEMNIFICATION UNDER SECTION 7 OF THE SPA**

114. As set out in Section VIII (A) of this Amended Request for Arbitration, the Claimants believe that the above circumstances constitute a case that cries out for rescission. However, in the event that the tribunal were to decide to the contrary, the Claimants request in the alternative indemnification under Section 7 of the SPA.

115. As described above, the Claimants did not carry out extensive due diligence prior to the signature of the SPA. They were not allowed to do so by the Respondents. They did, however, negotiate and receive from the Respondents an extensive "insurance policy" in the form of the relevant provisions of the SPA. The coverage of such provisions is broad. The representations and warranties are extensive. The right to claim is not subject to a cap. Indemnification in respect of breaches of environmental representations and warranties can be made during a period of six years. The right to indemnification is not affected by knowledge gained prior to the date of the SPA.

116. Section 7.3 of the SPA entitles the Claimants to indemnification in various circumstances, including where the Respondents are in breach of their representations and warranties. In addition, the Claimants are also entitled to indemnification for any liabilities having their cause or source prior to the Closing Date (7.3(v)) and any losses suffered in any action, demand proceeding, claim or administrative proceeding having its source prior to the Closing Date (7.3(vii)) to the extent that the liabilities or losses exceed

corresponding accounting provisions. The Claimants have the right to seek indemnification in relation to the breaches, defaults and failures described above. In particular, the following representations, warranties and covenants have been breached (for the avoidance of doubt, this list is not intended to be exhaustive):

(i)     The Respondents' failure to disclose the existence of the Secodam investigation into the performance of the 1997 Contract, the likelihood of a subsequent investigation into RIMSA's role in the performance of that contract, the potential consequences of such investigation, and the failure to make an appropriate accounting reserve, constitute material breaches by the Respondents of their representations and warranties in the following sections of the SPA: 2.7(a), 2.11(b), 2.15, 2.20, 2.22, 2.25. In addition, RIMSA was required to pay amounts to its bonding company for Pemex claims in respect of which no financial reserves were made.

(ii)    RIMSA's performance delays under the 1999 Contracts, the waste treatment equipment used, RIMSA's consequent liability to penalties, and its inaccurate records of the volume of stockpiled waste which remained to be treated at Closing, constitute a material breach by the Respondents of their representations and warranties in the following sections of the SPA: 2.8(c), 2.19, 2.20, 2.25.

(iii)   RIMSA's technical inability to obtain the 2001 Contracts constitutes a material breach by the Respondents of their representations and warranties in the following sections of the SPA: 2.7(a) and (b), 2.11(a), 2.13(a), 2.15 and 2.20.

(iv)    RIMSA's default under the Dos Bocas contract, and its resulting liability to a fine equivalent to ten percent of the contract price, constitute a material breach by the Respondents of their representations and warranties in the following sections of the SPA: 2.6, 2.12, 2.20, 2.22, 2.25.

(v)     RIMSA's payment defaults under the FNM lease agreement constitute a material breach by the Respondents of their representations and warranties in the following sections of the SPA: 2.6, 2.12, 2.20, 2.22, 2.25.

(vi)    RIMSA's failure to comply with Mexican environmental law and regulations and the terms of its environmental authorisations, with the result that the Mina site is substantially contaminated, constitutes a material breach of numerous representations and warranties (***Environmental Claim***), including but not limited to the following:

(a)     RIMSA's failure properly to construct or maintain the First Treatment Zone and the resulting pollution of the surrounding soil constitutes a material breach by the Respondents of their representations and warranties in the following sections of the SPA:  2.7(a), 2.13(a), 2.13(c), 2.13(g), 2.13(h), 2.20.

(b)     RIMSA's failure properly to construct or decontaminate the Hexachloride Treatment Zones constitutes a material breach by the Respondents of their representations and warranties in the following sections of the SPA:  2.7(a), 2.13(a), 2.13(c), 2.13(g), 2.13(h), 2.20.

(c)     RIMSA's failure (adequately or at all) to clean and decontaminate over 1,400 hexachloride containers before storing them at its site constitutes a material breach by the Respondents of their representations and warranties in the following sections of the SPA:  2.7(a), 2.7(b), 2.13(a), 2.13(c), 2.13(g), 2.13(h), 2.20.

(d)     The fact that RIMSA's PCB treatment facility (and accumulated stock awaiting treatment) was unsuitable for its intended purpose constitutes a material breach by the Respondents of their representations and warranties in the following sections of the SPA:  2.6, 2.8, 2.11(a), 2.13(g).

(e)     RIMSA's failure to treat (adequately or at all) waste by-products stored in or extracted from the Lagoons constitutes a material breach by the Respondents of their representations and warranties in the following sections of the SPA:  2.7(a), 2.13(a), 2.13(c), 2.13(g), 2.13(h).

(f)     RIMSA's failure properly to treat or store dangerous Catalyst Materials constitutes a material breach by the Respondents of their representations and warranties in the following sections of the SPA:  2.6, 2.7(a), 2.8(c), 2.11, 2.13(a), 2.13(b), 2.13(g), 2.13(h), 2.20.

(g)     The defective construction of the First Generation Cells, and the fact that they contain toxic materials which are polluting the surrounding soil and groundwater, constitute material breaches by the Respondents of their representations and warranties in the following sections of the SPA:  2.7(a), 2.13(a), 2.13(g), 2.13(h).

(h)     The existence of further areas of contamination adjacent or close to known areas of contamination, and of

contamination resulting from the migration of pollutants over the site, constitutes a material breach by the Respondents of their representations and warranties in the following sections of the SPA: 2.7(a), 2.13(a), 2.13(c), 2.13(g), 2.13(h), 2.20.

(i)  The Chloride Dumping Programme conducted by RIMSA, and the falsification of analysis reports in connection with this programme, constitute material breaches by the Respondents of their representations and warranties in the following sections of the SPA: 2.6, 2.7(a), 2.13(a), 2.13(c), 2.13(g).

(vii)  As a result of the inaccuracy of the Financial Statements, the failure to disclose liabilities and the inadequacy of the accounting reserves, including but not limited to the failures to make adequate reserves in respect of the breaches described in this Amended Request for Arbitration, the Respondents materially breached their representations and warranties in the following sections of the SPA: 2.6, 2.8, 2.12.

(viii)  By issuing invoices in respect of sales the company had never made, and by conspiring to arrange payment of those invoices so as artificially to increase RIMSA's Actual EBITDA and to avoid paying the Price Decrease, the Respondents not only committed fraud, but breached their covenant of good faith, and deprived the Claimants of a Price Decrease, to which the Respondents admit the Claimants are contractually entitled.

(ix)  By failing to disclose the presence on the Land of a farmer with rights of possession, the Respondents materially breached their representations and warranties in the following sections of the SPA: 2.16, 2.25.

117.  The breaches of the SPA described above have caused the Claimants to incur substantial financial loss. The Claimants will quantify their loss at the time of submitting their first memorial in this arbitration. Where remediation of the relevant breach requires RIMSA to treat contaminated material and store the treated product in cells which could otherwise have been used to store waste generated by RIMSA's clients (*Lost Airspace*), the Claimants' loss will also include loss of revenue attributable to Lost Airspace.[17]

118.  The Claimants seek indemnification under Section 7 of the SPA, and interest, in respect of the breaches listed above.

---

17  For the avoidance of doubt, the figures in this Summary do not yet include any estimate in respect of Lost Airspace.

119. By competing with the Business of RIMSA although they had expressly agreed not to do so, the Respondents have deprived the Claimants of the benefit of the Non-Competition Agreement, for which good consideration was given. The Claimants therefore request the Tribunal to order that the Respondents repay the amounts they received in consideration of their entering into the Non-Competition Agreement.

**(D)    REQUEST FOR INTERIM RELIEF**

120. Given the numerous problems and misrepresentations described above, and particularly in light of the Claimants' claim for rescission, the Claimants consider that they are no longer obliged to pay the full amount of the agreed purchase price for RIMSA. As a result, the Claimants did not honour the First Pagare when it fell due in May 2002, after the present arbitration had been commenced. The Respondents therefore initiated proceedings in the courts of Monterrey, seeking to attach the Claimants' shares in RIMSA, despite the fact that any dispute relating to the purchase price constitutes a dispute arising out of or relating to the SPA, and is thus arbitrable under Section 10.12 of the SPA. Further, the Respondents knew that arbitration proceedings had been commenced against them at the time they initiated court proceedings. The decision of the Monterrey court as to whether the First Pagare is payable is pending.

121. In light of the above, the Claimants respectfully request the Tribunal to make an interim award stating that: (i) any dispute as to whether the Claimants are obliged to pay the full purchase price for RIMSA falls within the present arbitration; (ii) in the event that the Monterrey court finds in favour of the Respondents, the Respondents should take no steps toward enforcing the court's decision, pending the outcome of the present arbitration; (iii) on the facts, the Claimants are not required to honour the First or Second Pagare, pending the outcome of the present arbitration; and (iv) the Respondents are prevented from endorsing the Second Pagare to any third party pending the outcome of the present arbitration.

122. Until the Tribunal has ruled on whether to grant the interim relief requested above, the Claimants hereby state that they would consider any attempt to endorse the Second Pagare an indication of the utmost bad faith on the part of the Respondents.

123. The Claimants further request that the Tribunal's final award in these proceedings include a provision that the Claimants are not required to honour the First and Second Pagares.

**(E)    ESCROW AGREEMENT**

124. Under Clause 6(a) of the Escrow Agreement, the Claimants are entitled to notify the Respondents of any claim against them under the SPA (*Notice of Claim*). A copy of the Notice of Claim must be given to the escrow agent, who shall pay to the Claimants from the escrowed funds the amount of the claim, promptly after the earlier of the following:

    (a)   receipt by the escrow agent of a written authorisation from the Respondents to make such payment;

    (b)   expiration of thirty days after receipt of the Notice of Claim, where the Respondents have not objected in writing to payment of the claim.

125.   Where the Respondents object in writing to the claim, the Escrow Agreement provides that the Parties shall attempt to resolve their dispute by amicable negotiation, failing which it shall be decided by an arbitral tribunal in accordance with the ICC Rules.[18] The decision of the arbitral tribunal is final and binding on the escrow agent.

126.   Therefore, in accordance with their obligations under the Escrow Agreement and in the absence of an amicably negotiated resolution of the Parties' dispute, the Claimants will submit to the escrow agent, in the form of a copy of the Terms of Reference in the present arbitration, a Notice of Claims in respect of the claims set out above.

127.   To the extent that the Tribunal grants the Claimants' claims, the Claimants respectfully request the Tribunal to order that the escrow agent release the escrowed funds, to the Claimants in satisfaction or part satisfaction of those claims, as appropriate.

## (F)    ADDITIONAL REQUESTS FOR RELIEF

128.   RIMSA's difficulties with equipment leased from Bethlehem, and the Respondents' failure to disclose such difficulties, constitute a material breach by the Respondents of their representations and warranties in the following sections of the SPA: 2.11(a), 2.25, as a result of which there is a risk of loss to the Claimants. The Claimants therefore respectfully request the Tribunal to declare that, if RIMSA is ordered by a court or arbitral tribunal to reimburse Waste Management, Inc. for sums paid by Waste Management, Inc. to Bethlehem, the Respondents shall reimburse the Claimants in the same amount.

129.   The Claimants reserve the right during the term of the present arbitration to request further declaratory relief, as appropriate.

130.   The Claimants respectfully request that, where the Tribunal agrees to grant declaratory relief as contemplated above, it remain constituted for the purposes of enforcing such relief where necessary.

131.   The Claimants respectfully request the Tribunal to order that the Respondents pay the costs of the arbitral proceedings, including the costs of

---

[18]   Clause 8 of the Escrow Agreement provides: "...all disputes arising in connection with the SPA and with this Agreement shall be finally settled by arbitration in New York, N.Y., U.S.A. under the Rules of Conciliation and Arbitration of the International Chamber of Commerce, by one or more arbitrators appointed under those Rules."

the Arbitral Tribunal, the ICC administrative costs and the legal and other costs incurred by the Claimants in this arbitration.

132. Finally, the Claimants respectfully request the Tribunal to order such further relief as it may consider appropriate.

Freshfields Bruckhaus Deringer

JAH/BY/CS

30 January 2003