## CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

FRANKFURT   MUSCAT
HOUSTON   NEWARK
LONDON   PARIS
MEXICO CITY  STAMFORD
MILAN   WASHINGTON

ATTORNEYS AND COUNSELLORS AT LAW
101 PARK AVENUE
NEW YORK, N.Y. 10178-0061

TELEPHONE: 212-696-6000
TELECOPIER: 212-697-1559
VOICE MAIL: 212-696-6028
E-MAIL: INFO@CM-P.COM
INTERNET: WWW.CM-P.COM

WRITER'S DIRECT:

TELEPHONE 212-696-6046
E-MAIL BKINGHAM@CM-P.COM
FACSIMILE 212-697-1559

March 14, 2003

**BY HAND**

Lawrence W. Newman, Esq.
Baker & McKenzie
805 Third Avenue, 29th Floor
New York, New York  10022

Steven A. Hammond, Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004

Job Taylor III, Esq.
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, New York 10022-4802

> Re:   **CGEA ONYX, et. al. v. Valores Ecologicos S.A. de C.V. et. ano., ICC Case No.  12 125/JNK**

Gentlemen:

Enclosed please find Respondents' Answer and Counterclaim and Respondents' Summary of Position.  We are also providing these documents on diskette to Mr. Newman for the Tribunal's convenience.

We look forward to appearing before the Tribunal on March 24, 2003 to conclude the Terms of Reference.  In that regard, we request that the following sentence be included in the Terms of Reference:  "The issues to be determined by the Arbitral Tribunal shall be those resulting from the parties' submissions, including forthcoming submissions, and which are relevant to the adjudication of the parties' respective claims and defenses, without prejudice to the provision of Article 19 of the 1998 ICC Rules."

Sincerely yours,

T. Barry Kingham

cc:   Joseph A. Huse, Esq. (by facsimile and courier)
      Jennifer N. Kirby, Esq. (by facsimile and courier)

Enclosures

INTERNATIONAL CHAMBER OF COMMERCE

ICC INTERNATIONAL COURT OF ARBITRATION

CASE NO. 12 125/JNK

between

CGEA ONYX, S.A., SARP INDUSTRIES, S.A.
and SARP INDUSTRIES MEXICO S.A. de C.V.,

Claimants,

and

VALORES ECOLOGICOS S.A. de C.V.
and HECTOR VARGAS GARZA,

Respondents.

**ANSWER AND COUNTERCLAIM
OF RESPONDENTS
VALORES ECOLOGICOS S.A. de C.V.
AND HECTOR VARGAS GARZA**

# Table of Contents

|  |  | Page # |
|---|---|---|
| Valores's Answer | | 1 |
| I. | Respondents | 1 |
| II. | Nature And Circumstances Of The Dispute Giving Rise To Vivendi's Alleged Claims | 1 |
|  | A. Background | 2 |
|  | B. The Stock Purchase Agreement | 5 |
| III. | Valores's Response To Vivendi's Claims | 6 |
|  | A. Claims Supposedly Related To RIMSA's Ongoing Business | 8 |
|  | 1. The SECODAM Ruling | 8 |
|  | 2. Pemex Villahermosa Contracts | 12 |
|  | 3. Pemex Dos Bocas Contract | 13 |
|  | 4. FNM Lease Agreement | 14 |
|  | 5. Bethlehem Lease Agreement | 15 |
|  | B. Environmental Claims | 15 |
|  | 1. "First Treatment Zone" | 16 |
|  | 2. "Hexachloride Treatment Zone" | 18 |
|  | 3. PCBs | 19 |
|  | 4. Lagoons | 20 |
|  | 5. Dust Suppressant Program (So-Called "Chloride Dumping") | 21 |
|  | 6. Catalyst Material | 22 |
|  | 7. First Generation Cells | 23 |
|  | C. Claims About RIMSA's Books And Records | 25 |
|  | 1. Reserves | 25 |
|  | 2. Receivables | 25 |

3.    EBITDA ........................................................................... 25

D.    Land Claim .................................................................................... 26

E.    This Tribunal Has No Jurisdiction Over The So-Called
"Non-Competition Claim" ............................................................ 26

IV.    Notice Of Separate Arbitration Proceedings ................................... 26

V.    Vivendi Is Not Entitled To Any Relief ............................................. 27

A.    There Is No Basis For Rescission Of The SPA ............................. 27

B.    The Tribunal Has No Jurisdiction To Award An EBITDA Price Adjustment ...... 28

C.    Vivendi Is Not Entitled To Recover Monetary Damages ...................... 31

D.    The Tribunal Has No Jurisdiction To Grant
Interim Relief Related To Vivendi's Defaults In Payment ................... 32

E.    There Is No Claim To Adjudicate As To The Escrow Agreement ............. 32

F.    Vivendi's Additional Requests For Relief Should Be Denied ................ 33

VI.    Valores's Objections To The Jurisdiction Of The Tribunal ..................... 33

Valores's Counterclaim ....................................................................... 34

Valores's Request For Relief .............................................................. 34

Respondents Valores Ecologicos S.A. de C.V. and Hector Vargas Garza (collectively, "Valores") respectfully submit their Answer and Counterclaim in response to the Amended Request for Arbitration (the "Amended Request") of claimants CGEA ONYX, S.A., Sarp Industries, S.A. and Sarp Industries Mexico S.A. de C.V. subsidiaries of the French conglomerate, Vivendi Environnement, S.A. (collectively, "Vivendi").[1] Unless specifically otherwise addressed in this Answer and Counterclaim, respondents deny each of the allegations in claimants' Amended Request.

## Valores's Answer

### I.    Respondents

Respondent Valores Ecologicos S.A. de C.V. is a corporation organized under the laws of the United Mexican States. Respondent Hector Vargas Garza is an individual citizen of Mexico. Both respondents have an address at Batallon de San Patricio No. 109, Torre Dataflux, Piso 15, Col. Valle Oriente, San Pedro, Garza Garcia, NL CP66260, Mexico.

Valores is represented in this arbitration by T. Barry Kingham, Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, New York 10178, phone: 212-696-6046, fax: 212-697-1559, e-mail: bkingham@cm-p.com.

### II.   Nature And Circumstances Of The Dispute Giving Rise To Vivendi's Alleged Claims

In November 2000, Vivendi purchased from Valores 30% of the shares of a Mexican hazardous waste business, Residuous Industriales Multiquim S.A. de C.V. ("RIMSA"), pursuant to an Agreement for the Purchase of Stock dated August 14, 2000 ("SPA").

---

[1]    Unless otherwise necessary for context, we refer to claimants collectively as "Vivendi," and respondents collectively as "Valores."

Vivendi, one of the world's largest hazardous waste conglomerates, now claims that Valores breached representations and warranties by allegedly not disclosing certain issues when Vivendi acquired RIMSA. In fact, there were no misrepresentations and RIMSA's problems result from Vivendi's mismanagement during the last two years.

When Vivendi acquired it, RIMSA was a well-run thriving company that was operated in full compliance with the Mexican environmental laws and regulations. RIMSA's environmental compliance was such that RIMSA obtained a Clean Industry certification first in 1997, as well as subsequent re-certifications. After Vivendi took control of RIMSA and its European management team recklessly ignored the experience and knowledge of RIMSA's Mexican personnel, Vivendi caused the deterioration of RIMSA for which it now seeks to blame Valores.

A.    **Background**

Valores's owners established RIMSA in 1985. RIMSA operated the premier hazardous waste disposal company in Mexico including, to date, the only Mexican permitted hazardous waste landfill, located at Mina, N.L, Mexico (the "Mina landfill"). In 1994, Chemical Waste Management, Inc., a subsidiary of Waste Management, Inc. (collectively, "Waste Management"), acquired 60% of the stock of RIMSA from Valores, which retained 40%.

In early 2000, Waste Management sought to divest its interest in RIMSA and established a bid process in which several Mexican and foreign companies participated. One of the companies was Compagnie Generale D'Enterprises Automobiles, S.A. ("CGEA") a subsidiary of the French Group Vivendi Environnement, S.A. Vivendi was then in the process of acquiring other businesses from Waste Management in the United States and elsewhere. Vivendi contacted Valores to determine whether Valores had any interest in selling its interest in RIMSA.

2

Waste Management arranged a due diligence process, including the organization of a data room at RIMSA. Vivendi and two other bidders conducted an initial round of due diligence, including: (i) interviews with RIMSA employees; (ii) review of documents in the data room; (iii) on-site tours of RIMSA's facilities; and (iv) environmental investigations. Following this first round of due diligence, Vivendi submitted a bid of US$100 million through CGEA for all of RIMSA's shares. Vivendi prevailed. Its intention was to purchase all of Waste Management's shares and all but 10% of Valores's holdings, requesting that Mr. Hector Vargas Garza, RIMSA's founder and a principal of Valores, retain a role as a "navigator" of RIMSA.

Between April 2000 and the closing in November 2000 (the "Closing"), Vivendi conducted extensive due diligence. This second round of due diligence included: (i) numerous on-site reviews of RIMSA's financial books and records, including a review by Vivendi's outside auditors; (ii) extensive environmental investigations; (iii) extensive investigations of RIMSA's environmental books and records including all environmental permits; (iv) reviews of commercial and marketing matters; (v) reviews of legal, human resources and tax matters; (vi) interviews with officials of the company; (vii) visits to all of RIMSA's facilities (Mina, Villahermosa, Silao and Tijuana); and (viii) interviews with RIMSA's outside auditor. All due diligence was performed by Vivendi's in-house personnel as well as environmental experts, engineers, lawyers, bankers and auditors retained by Vivendi, including KPMG (accounting), Lazard Group (investment banking), Santos, Elizondo, Cantu, Rivera, Gonzalez, De la Garza, S.C. (Mexican legal counsel) and ERM de Mexico, S.A. de C.V. (environmental issues). Throughout the process, Vivendi had full access to all of RIMSA's facilities, personnel and records, which it acknowledged in the SPA.

During this period, representatives of Valores and Vivendi negotiated the SPA; at the same time, Vivendi conducted separate negotiations with Waste Management. With the

3

exception of one meeting, held in Houston, Texas on June 13 and 14, 2000, Valores did not participate in any of the discussions with Waste Management.

The June 2000 meeting was attended by representatives of Vivendi, Valores and Waste Management. The purpose of the meeting was to discuss Vivendi's concerns arising from due diligence, and the price and method of payment for 12,000 hectares of land adjacent to the Mina landfill which Vivendi desired to purchase. Vivendi raised concerns with regard to certain potential environmental issues relating to: (i) lagoons; (ii) the drum area; (iii) the truck park; (iv) the first generation cells; and (v) and the situation at Villahermosa. The first four issues relate to RIMSA's Mina landfill; the fifth to RIMSA's thermal treatment plant in Villahermosa. Vivendi also raised concerns regarding operating matters.

As a result of the meeting, an adjustment to the proposed overall purchase price was agreed in the amount of US$6 million in favor of Vivendi. Accordingly, after an initial bid fixing a US$100 million enterprise value (including the land adjacent to Mina's landfill), Valores and Waste Management agreed to a reduced global purchase price of US$94 million, allocated as follows: US$83 million for RIMSA's shares and US$11 million for the land adjacent to the Mina landfill. Waste Management was to receive 60% of the US$83 million for its shares and Valores was to receive 30% of the US$83 million for its shares, and US$11 million for the land.

The negotiations between Vivendi and Valores culminated in the execution of an Agreement for the Purchase of Stock, dated August 26, 2000 (the "SPA"). The closings for the purchase from Valores and from Waste Management under both agreements were held in San Pedro Garza Garcia, N.L., Mexico on November 14 and 15, 2000.

## B.    The Stock Purchase Agreement

Pursuant to the SPA, Vivendi purchased from Valores 30% of the shares of RIMSA.[2] Valores retained 10% of the shares.[3] In addition, Vivendi purchased from Valores approximately 12,000 hectares of land adjacent to RIMSA's Mina landfill of which 10,200 hectares have been transferred to Vivendi.

The total purchase price agreed for Valores's 30% of RIMSA and the land was US$32,307,203[4] payable as follows:

- US$24,995,313 payable in immediately available funds at the Closing, of which US$4,874,594 was deposited in an escrow account;

- US$877,427 was withheld by Vivendi subject to a post-Closing confirmation of earnings before interest, taxes, depreciation and amortization for the year 2000 ("EBITDA");

- US$2,144,821 paid at the Closing by delivery by Sarpi Mexico of a negotiable promissory note due 18 months after the Closing;

- US$2,144,821 paid at the Closing by delivery by Sarpi Mexico of a negotiable promissory note due 36 months after the Closing;

- US$2,144,821 payable upon receipt of a permit, within five years after the Closing, allowing at least 700 hectares adjacent to the Mina landfill to be operated as a hazardous waste landfill.

---

[2]    Copies of the SPA and two amendments have been submitted with Claimant's Amended Request.

[3]    The Vivendi parties listed as "buyers" in the SPA are CGEA, Sarpi and (by amendment) Sarpi Mexico. Later, CGEA changed its name to "CGEA Onyx, S.A."

[4]    Pursuant to Section 10.13 of the SPA, the parties utilized an exchange rate of Mexican Pesos 9.6008 for US$1.

In addition, US$1,949,838 was paid at the Closing for the execution of a non-competition agreement by Valores and various members of the Vargas family.

To date, Valores has received from Vivendi only the amounts paid in cash at the Closing, a total of US$22,070,557. Sarpi Mexico has defaulted on its promissory note of US$2,144.821, which was due in full on May 14, 2002. [5] Interest has been in arrears on both notes since April 2002.

## III.    Valores's Response To Vivendi's Claims

After two years of mismanaging RIMSA in total disregard of Valores's rights and the promise to look to Mr. Vargas as a "navigator" and in the midst of Vivendi's highly publicized financial problems, Vivendi apparently is looking for cash and has decided to try to extract more than US$22 million from Valores.[6]

To achieve its goal, Vivendi first claims that Valores fraudulently induced Vivendi to buy Valores's shares. Vivendi's claim is false. Vivendi induced Valores to sell all its shareholding in RIMSA except for 10% which would allow Vivendi to secure Mr. Vargas' participation. At the time of the Closing, RIMSA was a well-run, thriving company, worth the price Vivendi paid.[7] Any financial and other difficulties RIMSA may have experienced after Closing are the direct result of Vivendi's mismanagement and of outside factors, and in no way attributable to Valores.

---

[5]    Valores has commenced a lawsuit against Sarpi Mexico in a Mexican court in accordance with the terms of the first promissory note to enforce its payment. That matter is not subject to arbitration.

[6]    A further reason for Vivendi's effort to dispose of RIMSA may be that a Mexican subsidiary of Vivendi, Proecologia, S.A. de C.V. has been trying to start a hazardous waste management business, including a proposed hazardous waste landfill, in Tecali de Herrera in the Mexican state of Puebla.

[7]    As discussed below, the parties entered into a Shareholders Agreement, which provides certain rights and protection to Valores, which Vivendi has ignored.

After Vivendi took control of RIMSA, and contrary to the commitments and intentions expressed to Valores, it fired Hector Vargas Aguirre as Vice President of Business Development, removed Mr. Hector Vargas Garza from his offices at RIMSA, and deprived him of the exercise of the privileges and duties as President of RIMSA. Vivendi installed senior managers from Europe, including a chairman/president, a chief financial officer and a landfill manager, none of whom appear to have any knowledge of or experience with the Mexican environmental market.

Contrary to its prior commitment, Vivendi did not consult with Mr. Hector Vargas Garza before making important business decisions and did not ask him to assist in the post-Closing transition, even though he had founded RIMSA, had worked in RIMSA's business for fifteen years and was well known and respected by the relevant Mexican authorities. Instead, Vivendi's inexperienced management team forced out large numbers of RIMSA's Mexican experienced employees and mishandled all-important relations with customers, suppliers, the local community and the regulatory authorities.

RIMSA's fortunes have declined for reasons completely unrelated to any of the so-called facts alleged by Vivendi. The reasons for RIMSA's decline are established conclusively by the statements of Jorge Mora Aisa, an officer of Consorcio Internacional de Medio Ambiente, S.A. de C.V. a subsidiary of Vivendi based in Mexico City, who is also RIMSA's Chief Executive Officer and chairman of RIMSA's board of directors. At RIMSA's annual general assembly on May 15, 2002, he made the following report to the shareholders:

> In 2001, RIMSA had negative results due to external factors that caused a decrease in sales of 323 million pesos, as compared with the preceding year. [...] 2001 was a hard year for Mexico. The Gross Domestic Product of the country decreased by 0.3%. However, the areas of the economy particularly affected were the manufacturing and building industries by −3.9% and −4.5%

7

respectively. RIMSA's main income derives from the manufacturing industry and the decrease in such field resulted in lower income for the company.

Due to pressures of our competitor in the southeast, Pemex decided to cancel the thermal treatment contract awarded to RIMSA in 2001, for the treatment of drilling muds. [...]

For the future, we forecast hard times due to the incursion of competitors in the segment of waste disposal to controlled landfills. This will force RIMSA to seek aggressive commercial strategies that will enable the company to retain its current market share. [...][8]

In this candid statement, RIMSA's management did not ascribe responsibility for RIMSA's alleged financial difficulties to any regulatory or contractual problems. Nonetheless, to make its case here, Vivendi has invented a number of baseless claims, to which Valores responds below.

Because Vivendi controls RIMSA, it possesses most of the documents relevant to Valores's defense of Vivendi's allegations. Valores therefore will require considerable discovery, including interviews with RIMSA's personnel, in order to respond to Vivendi's allegations in more detail. Valores respectfully reserves the right to supplement its submission and respond further to Vivendi's claims, as necessary.

A.    **Claims Supposedly Related To RIMSA's Ongoing Business**

1.    **The SECODAM Ruling**
       **(Amended Request, ¶¶ 22-27)**

In October 1997, RIMSA entered into a contract for the incineration of 2,000 tons of hexachloride contaminated waste from Petroquimica Pajaritos, S.A. de C.V., an affiliate of the Mexican national oil company Petroleos Mexicanos (collectively "Pemex") (the "Hexachloride

---

[8]    A copy of the report and an English translation is annexed hereto as Exhibit 1.

8

Contract"). Pursuant to the Hexachloride Contract, the waste, which Pemex had packed in drums, was to be transported to the United States to be incinerated. However, the drums did not meet U.S. standards for transporting hexachloride waste. At RIMSA's suggestion, Pemex approved and authorized the transfer of the drums from Pemex's Pajaritos facility to RIMSA's Mina facility. Once there, Pemex and RIMSA agreed to transfer the waste from drums to supersacks that complied with U.S. requirements. In accordance with a permit from the Mexican environmental authorities, RIMSA sandblasted the empty drums and confined them in the Mina landfill. RIMSA kept Pemex informed of this procedure and Pemex approved and supervised the work. RIMSA complied with all requirements of its permit.

Vivendi now alleges that the Secretaria de Contraloria y Desarrollo Administrativo ("SECODAM"), a Mexican government agency that audits the relationships between Mexican governmental entities and private companies, began an investigation in 1998 into RIMSA's performance of the Hexachloride Contract. Vivendi's claim has no merit. There was no such investigation of RIMSA prior to the Closing. RIMSA did know that, in 1998, an Internal Comptroller[9] at Petroquimica Pajaritos had commenced an investigation into the conduct of certain employees of Petroquimica Pajaritos related to the Hexachloride Contract. During August 2000, the Internal Comptroller questioned RIMSA employees as witnesses in connection with that investigation. At no time before the Closing did RIMSA receive notice of any inquiry, request or threat of an investigation by SECODAM of RIMSA or its employees regarding RIMSA's performance under the Hexachloride Contract.

---

[9]     The Internal Comptroller is an employee of SECODAM but is paid by Petroquimica Pajaritos and reports directly to an agency of SECODAM. All public entities in Mexico have an Internal Comptroller paid by the entity but who reports to SECODAM.

In April 2001, almost six months after Closing, RIMSA apparently was notified of a SECODAM investigation concerning RIMSA's performance.[10]  Subsequently, on July 11, 2001. SECODAM stated that RIMSA had violated the Hexachloride Contract in two respects: (a) by hiring subcontractors to open the drums containing the hexachloride wastes; and (b) by confining the drums in its landfill rather than sending them to be incinerated and disposed of in facilities located in the United States.  SECODAM assessed a penalty against RIMSA in the amount of Mexican pesos 246,000 (US$25,894) and prohibited RIMSA from bidding on public contracts for a period of two years.[11]

RIMSA's new management, which was inexperienced in dealing with SECODAM and other Mexican authorities, refused to allow Mr. Vargas to attend a meeting held in Mexico City on July 26, 2001 with RIMSA's environmental counsel regarding the July 11 decision.

Vivendi initiated a series of administrative appeals in which it argued that the events challenged by SECODAM had actually been approved by Pemex.  These administrative appeals resulted in a revocation of SECODAM's initial ruling and a new ruling was issued on September 18, 2001, reducing the ban on RIMSA's participation in public bids to only one year and reinstating the fine.  RIMSA appealed this ruling in the Mexican courts, and the courts suspended the ban pending a final resolution.  The suspension was effective as of January 2002.

Vivendi now alleges that Valores did not disclose the SECODAM investigation to Vivendi prior to the Closing and that no accounting reserve was established for a contingent

---

[10]     This investigation is entirely different from the investigation by the Internal Comptroller and was in fact conducted by an entirely different office of SECODAM.

[11]     Because Pemex is a government-controlled entity, contracts for providing hazardous waste services to Pemex are "public contracts."

penalty. Prior to the Closing, however, Valores did not know of the SECODAM investigation of RIMSA and RIMSA certainly had no reason to establish an accounting reserve.[12]  Even if Valores had known of SECODAM's interest in the Hexachloride Contract, there would have been no reason to expect the July 11, 2001 ruling.  Valores denies any liability to Vivendi in connection with the SECODAM ruling.

The fact that Vivendi successfully appealed SECODAM's ruling demonstrates that the ruling was not justified.  Vivendi cannot claim that Valores should have disclosed an investigation of RIMSA (i) that had not started at the time of Closing; and  (ii) whose unbalanced and unjustified results were not foreseeable.  Moreover, Valores cannot be held responsible for SECODAM's rulings, especially considering that Vivendi, in breach of the SPA, excluded Valores from assisting in RIMSA's defense.

Vivendi complains that the suspension of the ban has never been published and that many of RIMSA's customers still believe RIMSA is ineligible to bid for public contracts. While RIMSA may have a claim against SECODAM for not publishing the suspension, the SPA contains no provision even remotely requiring indemnification by Valores in such circumstances.

Vivendi claims that the SECODAM ruling had a serious economic impact upon RIMSA's business.  However, Vivendi fails to cite even one bid lost due to the SECODAM rulings.  Obviously, any damage caused by the SECODAM ruling was caused by SECODAM, not by Valores, and probably by Vivendi's inability to effectively manage its business in Mexico. Vivendi has no basis for recovering any damages from Valores as a result of the SECODAM ruling.

---

[12]    Vivendi alleges that RIMSA failed to reserve in its financial statements for payments that were due to a bonding company.  The issues related to the bond were disclosed on Disclosure Schedule 2.20 of the SPA.  Vivendi did not request a pre-Closing reserve and RIMSA had no reason to establish such a reserve.

Respondents did not breach Sections 2.7(a), 2.11(b), 2.15, 2.20, 2.22 or 2.25 of the SPA with respect to the SECODAM investigation.

### 2. Pemex Villahermosa Contracts
### (Amended Request, ¶¶ 28-29)

In September 1999, RIMSA entered into a contractual relationship with Pemex to treat drilling muds used at Pemex's drilling sites at Villahermosa. RIMSA began treating the muds through direct incineration in an Astec Kiln. However, because the water content of the muds exceeded contract specifications, the kiln proved to be ineffective. RIMSA added a pre-treatment process in an effort to reduce the moisture content of the waste prior to incineration. Unfortunately, these processes together did not have the capacity to treat the volumes of drilling muds produced by Pemex and a backlog resulted.

In February 2000, after consulting with RIMSA's majority owner Waste Management, RIMSA imported equipment from the United States that was able to process the drilling muds without time consuming pre-processing. With the help of that new equipment, RIMSA was able to eliminate most of the backlog.

RIMSA informed Vivendi of the problems associated with the Astec Kiln prior to the Closing and listed the permit application for the new equipment on Disclosure Schedule 2.13(a) to the SPA. Indeed, in part to accommodate Vivendi's concerns about the situation at Villahermosa regarding the backlog and the permitting of equipment, Valores and Waste Management agreed, as a result of the June 2000 meeting in Houston, Texas, to reduce the global purchase price by US$3 million.

Clearly recognizing it has no claim for non-disclosure, Vivendi tries to blame Valores for RIMSA's failure to retain the contracts for treating drilling muds at Villahermosa for the years 2001-2003. That claim is hollow. RIMSA's failure to maintain the 2001-2003

contracts was not the result of any act or omission of Valores. As Vivendi admits in its Amended Request, those contracts were bid for and awarded to RIMSA under Vivendi's management and were later lost due to legal challenges from a competitor. RIMSA's chairman also admitted that challenges from competitors were the reason for RIMSA's loss of the contracts as stated in his report to the shareholders cited above.

Respondents did not breach Sections 2.8(c), 2.19, 2.20 or 2.25 of the SPA with respect to the 1999 Pemex Villahermosa contract. And respondents did not breach Sections 2.7(a), 2.7(b), 2.11(a), 2.13(a), 2.15 or 2.20 of the SPA with respect to the loss of the 2001-2003 Pemex Villahermosa contract.

### 3. Pemex Dos Bocas Contract
### (Amended Request, ¶ 30)

Vivendi alleges that in connection with a 1998 contract with Pemex for the restoration, transportation and final disposal of toxic waste in the maritime terminal of Dos Bocas (the "Dos Bocas Contract"), Pemex imposed a fine in an unspecified amount on RIMSA in August 2001, almost a year after the Closing.

RIMSA's performance under the Dos Bocas Contract, which had been completed in November 1998, was secured by a bond. After the work was completed, RIMSA, with Pemex's consent, informed the bonding company that the work had been performed and the performance bond was cancelled. As of the Closing in November 2000, RIMSA had no reason to know that Pemex intended to assert any claims in connection with this contract. Accordingly, there was nothing to be disclosed to Vivendi in the SPA nor to reserve for in RIMSA's financial statements. Moreover, Vivendi does not allege it suffered any damage or made any payment with respect to this claim.

Respondents did not breach Sections 2.6, 2.12, 2.20, 2.22 or 2.25 of the SPA with respect to the Dos Bocas Contract.

4.    **FNM Lease Agreement**
(**Amended Request, ¶ 31**)

Vivendi further alleges that RIMSA failed to make a payment under a September 1997 lease contract with Ferrocariles Nacionales de Mexico ("FNM"). As of the Closing, RIMSA had paid all the open invoices with respect to the 1997 contract with FNM, the last of which RIMSA had received in July 1998. FNM apparently later claimed that certain services rendered remained unpaid; however, such alleged services were not invoiced to RIMSA prior to the Closing. Vivendi first informed Valores of the claim on April 26, 2001 and of Vivendi's intention to settle for a maximum amount of Mexican Pesos 1 million. Vivendi subsequently paid more than this amount without providing Valores the chance to defend against FNM's claim, and incurred legal fees and expenses which were disproportionate to the importance of the matter. Also, Vivendi apparently failed to assert the one-year statue of limitations regarding an open account debt, which would bar any recovery by FNM.

No accounting reserve was made before the Closing for the alleged liability because it was unknown and all known payment obligations of RIMSA regarding invoiced services had been fully paid before Closing.

Respondents did not breach Sections 2.6, 2.12, 2.20, 2.22 or 2.25 of the SPA with respect to the FNM lease agreement. In any event, Vivendi breached the SPA's provision relating to indemnification and, accordingly, is not entitled to any indemnity.

14

5.    **Bethlehem Lease Agreement**
       **(Amended Request, ¶¶ 32-33)**

Vivendi seems to be seeking indemnification from Valores for a claim brought by Waste Management against RIMSA in a Texas court in connection with a letter of credit arranged by Waste Management to secure RIMSA's performance under a lease agreement with Bethlehem Corporation ("Bethlehem").  The lease agreement was disclosed to Vivendi in Schedule 2.19(f) to the SPA.

Because the legal proceeding Waste Management commenced in Texas is apparently still pending, Vivendi's claim is premature at best.  In clear breach of Section 7.6 of the SPA, Vivendi neither notified Valores of Waste Management's claim nor did it provide Valores with an opportunity to defend it.  Moreover, RIMSA's failure to pay Bethlehem under the lease agreement occurred after the Closing under Vivendi's management, and apparently caused Bethlehem to draw under a letter of credit arranged by Waste Management.

Valores denies any liability for this contingent claim.

B.    **Environmental Claims**

Vivendi's environmental claims, all of which are unsupported, are premature and therefore not subject to arbitration.  Vivendi's claims of wanton non-compliance with environmental laws and large scale undisclosed contamination at RIMSA's Mina facility are contrary to the facts and simply are an attempt to cover for Vivendi's own mismanagement.

Under its previous management, RIMSA operated in full compliance with Mexican environmental laws and regulations and was a leading environmental service company in Mexico.  RIMSA's environmental compliance was at a level that allowed RIMSA to obtain, in April 1997, its first Clean Industry (*"Industria Limpia"*) certification from the Department of Environmental Protection ("PROFEPA").  RIMSA subsequently received re-certifications for

1998 and 1999-2001. Through an intensive audit process conducted by the enforcement arm of Mexico's environmental authorities, the *Industria Limpia* certification confirms that RIMSA was in compliance with all applicable environmental legal requirements through the Closing. In March 2000, RIMSA also obtained ISO 14001 certification demonstrating that it had implemented a world class environmental management system. According to RIMSA's current website, RIMSA was the first environmental service company in Mexico to obtain a Clean Industry Certificate and ISO 14001 certification.

Valores responds as follows to claimants' allegations concerning environmental matters.

1.    **"First Treatment Zone"**
       **(Amended Request, ¶¶ 37-42)**

In August 1998, as part of its *Industria Limpia* certification, RIMSA voluntarily proposed to construct a new treatment area and to transfer to it some of its hazardous waste treatment operations from the treatment zone constructed in 1990 (the "first treatment zone"). RIMSA made no commitment to either close or remediate the first treatment zone, and was not required to do so. In fact, Vivendi continued using it until construction of the new zone was completed in February 2002, almost 16 months after Vivendi took control of RIMSA. Vivendi now claims, without any support, that the first treatment zone must be remediated, at a cost in excess of US$4.3 million.

Prior to the Closing and, indeed, to date, Valores has had no reason to believe there was any need to remediate the first treatment zone. Mexican authorities did not request remediation of the first treatment zone in 1998 nor at any time before the Closing, nor did RIMSA commit to remediation. As part of the procedure for obtaining its *Industria Limpia* certificate, RIMSA underwent intensive audits in 1997, 1998 and 2001 by PROFEPA and

16

PROFEPA's designees. During the 1998 audit, and thereafter, PROFEPA was well aware that RIMSA intended to move some hazardous waste treatment activities at Mina out of the first treatment zone. However, PROFEPA did not at any time prior to the Closing allege that soil in the first treatment zone might be contaminated, let alone require RIMSA to undertake a major remedial effort of the type described by Vivendi. Significantly, Vivendi cites no government order to remediate the first treatment zone, only Vivendi's vague assertion that remediation is required by some unstated section of environmental law and unspecified provisions of RIMSA's permits and the *Industria Limpia* certificate.[13]

Because Vivendi does not state which contaminants may exist in the soil, at what concentrations, and which testing procedures were used to determine those concentrations, Vivendi makes no assertions regarding the matter to which Valores can directly reply. Valores can only state that prior to the Closing there were no allegations of contamination regarding the first treatment zone and no government order nor legal requirement that RIMSA remediate the soil in that location.

Vivendi's only specific claim appears to relate to the alleged absence of a certain liner that would prevent contamination of soil in and around the first treatment zone. Contrary to Vivendi's assertion, the active treatment areas of the first treatment zone were suitably protected with the appropriate synthetic liner. Moreover because RIMSA had no reason to believe that it would be required to remediate the existing treatment zone, and because managing treatment

---

[13]    If Vivendi amended RIMSA's *Industria Limpia* certificate after closing to require remediation of the first treatment zone, this should not result in liability for such remediation costs on the part of Valores. The *Industria Limpia* certificate incorporates actions required by PROFEPA to comply with the law that are the result of a comprehensive PROFEPA audit, as well as voluntary actions undertaken by the certificate holder. RIMSA's commitment in the 1998 certificate to open a new treatment zone and to move some hazardous waste treatment operations to the new zone is an example of a voluntary practice that is not required under Mexican law.' To the extent that any action in the certificate to be undertaken by RIMSA, either pre or post-Closing, is not in response to a finding in the PROFEPA audit, it is a voluntary action on the part of RIMSA for which Valores cannot be liable.

zones is a day to day operation, there was nothing to disclose in the SPA nor could RIMSA create a reserve for such a non-event.

Respondents did not breach Sections 2.7(a), 2.13(a), 2.13(c), 2.13(g), 2.13(h) or 2.20 of the SPA with respect to the first treatment zone.

2.    **"Hexachloride Treatment Zone"**
       **(Amended Request, ¶¶ 43-47)**

Vivendi alleges that Valores did not disclose the existence of contamination -- and its expected consequences -- at a so-called "hexachloride treatment zone." Vivendi ignores that in 2000 there was nothing to disclose.

Contrary to Vivendi's assertions, there was no "hexachloride treatment zone" at RIMSA prior to the Closing. Under authority of a permit issued by the Mexican authorities, RIMSA established a transfer area for the sole purpose of transferring hexachloride waste from approximately 777 drums that did not meet United States standards for transporting hazardous waste, to supersacks that did meet those standards.[14] RIMSA did not treat the hexachloride waste; it merely added some fly ash to the waste to prepare it for transport. The waste and all materials used for the operation of the project were transferred into supersacks and eventually transported to Port Arthur, Texas for incineration. Prior to Closing, RIMSA complied in every respect with the government permit for this operation.

Valores further denies Vivendi's allegation that RIMSA disposed of "1,400 drums, coated with dangerous hexachlorides." RIMSA did not dispose of any contaminated drums. In fact, RIMSA cleaned the drums, of which there were 777, and later landfilled all of them at the Mina landfill in compliance with the permit. Valores denies falsifying any records

---

[14]    This relates to the same Pemex contract referred to in the SECODAM ruling discussed above.

18

relating to the storage or disposal of the drums. Valores is not aware of any basis for Vivendi's unspecified claim that approximately 100,000 tons of soil at Mina are contaminated with hexachloride concentrations in some areas up to 55,000 ppm, so that remediation is required.[15]

Moreover, despite Vivendi's vague and speculative claim about "theoretical" actions the government is "entitled" to take that "could" result in the closure of the Mina site, Vivendi cites no government order requiring remediation of any area of the Mina landfill for any reason, let alone to remediate hexachloride contamination.

Finally, because RIMSA had no reason to believe it would be required to remediate any hexachloride contamination at Mina, it was not necessary or appropriate to create an accounting reserve.

Respondent did not breach Sections 2.7(a), 2.7(b), 2.13(a), 2.13(c), 2.13(g), 2.13(h) or 2.20 of the SPA with respect to the disposal of the hexachloride drums.

3.    **PCBs**
      **(Amended Request, ¶¶ 48-49)**

Beginning in 1998, RIMSA was authorized by government permits to handle PCB waste on site at the Mina landfill but did not treat the waste there. Valores disclosed all of the relevant permits on Disclosure Schedule 2.7 to the SPA and had provided copies to Vivendi. The facilities RIMSA used to handle electrical transformers and drums containing PCBs were adequate for that purpose and complied with all permit requirements. Prior to the Closing, RIMSA was never cited for any non-compliance with such permits.

---

[15]    Claimants' reference to hexachloride standards set by the United States Environmental Protection Agency ("EPA") is misleading. The EPA has indeed set standards for some hexachloride compounds (i.e. hexachloroethane) in the parts per billion range but for contamination of drinking water. There is no claim here concerning drinking water.

Nonetheless, Vivendi now claims that Valores should have disclosed that the PCB operation was somehow deficient. That claim is nonsense. As Vivendi well knows, RIMSA did not treat PCBs at Mina. Instead, RIMSA drained oil from transformers and drums and shipped the oil, transformers, and drums (except for one or two clean transformers which remained at the site) to Ekokem, a PCB treatment company in Finland. RIMSA maintained an ongoing business relationship with Ekokem, as Valores fully disclosed to Vivendi in Schedule 2.13(j) to the SPA.

There simply is no basis for a claim against Valores as to PCBs and respondents did not breach Sections 2.6, 2.8, 2.11(a) or 2.13(g) of the SPA with respect to any alleged treatment of PCBs.

4. **Lagoons**
   **(Amended Request, ¶¶ 51-52)**

RIMSA maintained three artificial "lagoons" to store treatment sludge composed primarily of calcium chloride and iron oxide. Vivendi was fully aware of the lagoons and their operation prior to Closing to the extent that Vivendi obtained an adjustment in the global purchase price to accommodate its concerns. Not satisfied, Vivendi now invents further complaints about the lagoons.

The first lagoon was decommissioned before the Closing, and the material from that operation was handled properly at the Mina landfill. The location of the material prior to the Closing complied fully with all laws and permits and the condition of the lagoons and material did not constitute a breach of the SPA. Vivendi now alleges it must treat material resulting from the earlier decommissioning of the lagoon and dispose of it elsewhere. As current owner of RIMSA, Vivendi may move that material wherever it wishes but the cost of its removal is not Valores's responsibility.

Vivendi now alleges that the remaining two lagoons contain toxic material and must be emptied or decommissioned by March 2003. However, Vivendi does not cite any requirement under Mexican law or by any other authority requiring such action. Vivendi states only that RIMSA should have emptied liquid from the two lagoons prior to the Closing, but RIMSA was under no obligation to do so and the SPA contains no representation or warranty to that effect. Indeed, Vivendi received an adjustment in the purchase price to accommodate any remediation of the three lagoons.

Valores can only assume that Vivendi has decided to decommission the lagoons for its own reasons. However, it is not Valores' obligation to indemnify Vivendi for those decisions.

Respondents did not breach Sections 2.7(a), 2.13(a), 2.13(c), 2.13 (g) or 2.13 (h) of the SPA with respect to the lagoons.

5.    **Dust Suppressant Program (So-Called "Chloride Dumping")**
      **(Amended Request, ¶¶ 53-55)**

Vivendi refers to an activity it calls "chloride dumping," but makes no claim of non-disclosure or for damages. That should end the matter but, to clarify the record, Valores must respond to this false allegation.

RIMSA did not engage in illegal chloride dumping prior to the Closing. At the request of adjoining property owners, RIMSA spread, as a dust suppressant, a solution of calcium chloride and iron oxide, which is not harmful on dirt roads in and near the Mina landfill. RIMSA ensured that any other material that might have been inadvertently present in the solution would be neutralized prior to its use. RIMSA notified the proper authorities of its intent to spread the dust suppressant and, as Vivendi acknowledges, the authorities did not object to the practice.

21

Citing unsubstantiated allegations made by others, Vivendi now insinuates that the dust suppressant program was somehow detrimental to area livestock. In fact, studies performed by the Secretaria de Salud del Estado de Nuevo Leon, PROFEPA and Subsecretaria de Ecologia del Estado de Nuevo Leon have shown that neither RIMSA's operations in general nor the dust suppressant program in particular had any impact on local livestock.

RIMSA did not falsify reports regarding these activities and did not conceal the dust suppression program from Vivendi. Nor has Vivendi suffered any damage as a result of this program. Any "reputational" damage to RIMSA resulted solely from Vivendi's mismanagement of RIMSA and its relations with adjoining property owners and residents, not from actions taken by RIMSA prior to the Closing.

Respondents did not breach Sections 2.6, 2.7(a), 2.13(a), 2.13(c) or 2.13(g) of the SPA with respect to the dust suppressant program.

6.    **Catalyst Material**
      **(Amended Request, ¶ 57)**

Vivendi alleges that certain catalyst material in a cell must be treated and disposed of permanently. This claim has no merit. The cell where the material is currently located is permanent and suitable for long-term disposal. Prior to the Closing, RIMSA disposed of spent catalyst material it had collected pursuant to a 1997 contract with Pemex. RIMSA placed the material in a disposal cell that complied with Mexican legal requirements and reported such disposal to the environmental authorities as required by law.

As Vivendi well knew from its due diligence inspection of the landfill prior to Closing, the disposal cell was open and ready to be subject to customary closing procedures. The cost of closing the cell is an ongoing operating expense of RIMSA and no reserve was required. During due diligence, Vivendi was informed both of the state of the disposal cell and

the lack of a reserve to close the cell, and did not object to either. Vivendi is free to close the cell or treat the catalyst material as it chooses; however, Valores cannot be liable for the cost of the closure or treatment.

Respondents did not breach Sections 2.6, 2.7(a), 2.8(c), 2.11, 2.13(a), 2.13(b), 2.13(g), 2.13(h) or 2.20 of the SPA with respect to catalyst materials.

### 7.   First Generation Cells
   (Amended Request, ¶¶ 58-63)

Vivendi alleges that so-called "first generation cells," used between 1987 and 1993, must be emptied and cleaned and the stored waste removed to other cells. Vivendi proposes this activity not because it is required to do so by government authorities or Mexican law but because of Vivendi's unsupported "suspicion" that untreated toxic material is stored in the cells. Valores denies any responsibility for this proposed work. Vivendi's decision to do this work is clearly voluntary, and is not Valores's responsibility.

Valores believes the first generation cells were constructed and, prior to the Closing, operated in compliance with all applicable Mexican environmental laws and standards. Significantly, although the Mexican authorities regularly inspected the first generation cells, Vivendi makes no reference to any government order stating that the cells were at any time in violation of applicable law or that they must be opened, cleaned, and closed again.

Vivendi knew all about the first generation cells prior to the Closing. During due diligence, Vivendi and its outside environmental auditors (ERM de Mexico) were provided access to all of RIMSA's records regarding the first generation cells and their contents, as well as to all of RIMSA's permits and relevant authorizations.

23

Moreover, at the June 2000 meeting, Vivendi claimed deficiencies and received a US$1 million dollar price reduction to account for possible cleaning and treating of the first generation cells.

As the managing owner of RIMSA, Vivendi -- provided it complies with applicable law -- may open cells, and "clean" the cells and transfer waste from containers that it dislikes to containers it prefers.  But Vivendi's post-Closing voluntary decision as to the first generation cells is irrelevant to this arbitration.  Because there was no breach of the SPA with regard to these cells, Valores has no responsibility for the costs of implementing Vivendi's post-Closing decisions.

Finally, Valores is not aware of any contamination emanating from the first generation cells.  Vivendi's cryptic statements alleging that unknown concentrations of unnamed pollutants are "apparently migrating in a northeasterly direction" across unspecified areas of the Mina landfill does not state a claim under the applicable provisions of the SPA.  As recently as July 2001, PROFEPA conducted a comprehensive inspection of the landfill, and addressed the issue of the first generation cells.  PROFEPA found none of the problems with the cells cited by Vivendi.  PROFEPA did note that the leachate collection systems of some of the cells had captured leachate.  PROFEPA ordered the leachate be disposed of properly but did not require RIMSA to open and clean the cells.

Respondents did not breach Sections 2.7(a), 2.13(a), 2.13(g) or 2.13(h) with respect to the first generation cells, and respondents did not breach Sections 2.7(a), 2.13(a),2.13(c), 2.13(g), 2.13(h) or 2.20 of the SPA with respect to any alleged improper contamination emanating from the first generation cells.

C.     **Claims About RIMSA's Books And Records**
       **(Amended Request, ¶¶ 67-75)**

In a sweeping, generalized series of statements, Vivendi appears to make certain allegations under the rubric of "Material Misrepresentations In Books and Records of RIMSA." Valores denies any such misrepresentations. As to the specifics, Valores responds as follows:

1.     **Reserves**
       **(Amended Request, ¶¶ 68-69)**

As set forth above, all reserves complied with applicable Mexican accounting principles in effect through and as of the Closing and neither RIMSA nor Valores had reason to believe that the events claimed by Vivendi existed or had materialized, therefore any claim based on lack of accounting reserves is inappropriate.

During due diligence, Vivendi had ample opportunity to check and verify the existence and adequacy of RIMSA's reserves and raised no objections to the reserves, other than the reserve for the doubtful accounts, which the parties resolved.

Respondents therefore did not breach Sections 2.6, 2.8 or 2.12 of the SPA.

2.     **Receivables**
       **(Amended Request, ¶ 69)**

Valores submits that the receivables were accurately listed in Disclosure Schedule 2.8(a) of the SPA and the doubtful accounts reserve was consistently applied in accordance with RIMSA's accounting procedures, which were fully known to Vivendi.

3.     **EBITDA**
       **(Amended Request, ¶¶ 73-75)**

Valores denies any improper activity with respect to the calculation of EBITDA for the year 2000. In any event, as discussed below, this Tribunal does not have jurisdiction to consider this matter, which must be submitted to independent accountants for decision.

### D.   Land Claim
###      (Amended Request, ¶¶ 76-77)

This claim is absurd.  It appears to relate to the land adjacent to the Mina landfill that was conveyed pursuant to the SPA.  Valores believes that a local farmer and perhaps 100 cows are illegally occupying less than 20 hectares out of 10,200 hectares adjacent to the Mina landfill.  It is hard to imagine that this occupancy could have any significant effect on the growth of the landfill.  Moreover, impact on the land price, if measurable, is minimal.  Obviously, Valores did not breach any of the Sections of the SPA cited by Vivendi.

### E.   This Tribunal Has No Jurisdiction Over
###      The So-Called "Non-Competition Claim"
###      (Amended Request, ¶¶ 78-79)

At the Closing, Hector Vargas Garza and five members of his family executed a so-called "Non-Competition Agreement" (Exhibit F to the SPA).  Valores and RIMSA are also parties.  However, none of the claimants in this arbitration is a party to that agreement, which has a separate arbitration clause and is governed by Mexican law.  This Tribunal has no jurisdiction to consider a claim for violation of the Non-Competition Agreement because no claimant is a party to it and no arbitration has been commenced pursuant to that agreement.

## IV.   Notice Of Separate Arbitration Proceedings

On December 26, 2002, pursuant to a separate and independent arbitration clause in the Shareholders Agreement between Valores and Sarpi Mexico, Valores commenced an arbitration against Sarpi Mexico for violation of the Shareholders Agreement.  In that arbitration, Case No. 12 510/JNK, Valores seeks to compel Sarpi Mexico to comply with its obligation to buy Valores's 10% stake in RIMSA pursuant to a "put/call" arrangement in the Shareholders Agreement.  Valores's "put" was triggered by RIMSA's entering into a services contract with Sarpi Mexico that was not in the ordinary course of business of RIMSA and for which Sarpi

26

Mexico did not obtain unanimous approval of the shareholders pursuant to the Shareholders Agreement.

Sarpi Mexico has submitted a Request for Consolidation to the ICC Court, seeking to consolidate Case No. 12 510/JNK with the instant arbitration. Valores has opposed that request, noting that the distinct disputes are not in connection with the same legal relationship between the parties. The arguments have been fully submitted to the ICC Court and the parties are awaiting a decision. Accordingly, this is not a matter before this Tribunal and the Tribunal should ignore Vivendi's arguments on this point.

## V.    Vivendi Is Not Entitled To Any Relief

### A.    There Is No Basis For Rescission Of The SPA
### (Amended Request, ¶¶ 92-95)

Vivendi has no legal or factual basis to rescind the SPA. The SPA does not provide for rescission as a remedy but contains a detailed mechanism for indemnification, which Vivendi has repeatedly ignored. Vivendi entered into the SPA only after it conducted extensive due diligence over a period of many months. Indeed, Vivendi then proposed and received a US$6 million global price adjustment.

None of the requisite elements for rescission under New York law exists here. There has been no fraud or material breach of the SPA. Nor has the essence of the SPA or Vivendi's ability to conduct RIMSA's business been destroyed. RIMSA's Chairman has not reported that RIMSA was on the verge of bankruptcy nor does the financial statement submitted at the Board of Directors meeting of November 18, 2002 show that RIMSA is in a distressed financial condition. RIMSA's problems are operational and are due to the inadequate management of the company by Vivendi.

In addition, rescission is not a viable remedy even if it were potentially available. Rescission requires the restoration of the *status quo ante*. Vivendi consistently has mismanaged RIMSA for the more than two years that have elapsed since the Closing. Vivendi's poor operational and strategic choices, including repeatedly ignoring Mr. Vargas and removing the majority of RIMSA's experienced, well-trained personnel on whose expertise RIMSA had depended prior to Closing, are the cause of RIMSA's deteriorated condition.[16]

**B.     The Tribunal Has No Jurisdiction To Award An EBITDA Price Adjustment (Amended Request, ¶¶ 96-113)**

Vivendi seeks a price adjustment with respect to the calculation of EBITDA for the year 2000. Section 1.5 of the SPA provides that if the Actual EBITDA for that year (as defined) is less than the Target EBITDA (as defined), then the purchase price shall be decreased by an amount computed pursuant to a defined formula.

The SPA contains a separate resolution procedure for any disputes regarding the EBITDA calculation. Pursuant to Section 1.5(d) of the SPA, in the event of a disagreement between the parties regarding the EBITDA calculation, after a cure period, the parties shall:

> promptly thereafter cause the company's firm of independent accountants, Arthur Andersen, to promptly review this Agreement and the disputed items or amounts for the purpose of calculating Actual EBITDA. [...]. Such independent accountants shall deliver to Buyer, the Company and Seller as promptly as practicable, a report setting forth the calculation. Such report shall be <u>final and binding</u> upon Buyer, the Company and Seller" (emphasis added).

---

[16]     If, for some reason the Tribunal decides to grant a rescission remedy notwithstanding the inability to return the parties to status quo ante, there must be a downward adjustment to the amount due to Vivendi in order to compensate for the post-Closing damage to RIMSA caused by Vivendi.

RIMSA issued its EBITDA calculation for the year 2000 on May 7, 2001. Valores submitted its Notice of Disagreement pursuant to Section 1.5(c) of the SPA on May 17, 2001. Vivendi did not submit a Notice of Disagreement within the requisite 30 days after receiving the calculation.

Following delivery of Valores's Notice of Disagreement, the parties attempted to resolve the matter. Unable to do so, they were prepared to submit the matter to Arthur Andersen as provided in Section 1.5(d) of the SPA. However, the Mexican affiliate of Arthur Andersen declined to perform the calculation. Although the parties have exchanged correspondence regarding the issue, they have not yet been able to agree on another independent accounting firm.

Vivendi now seeks to raise the EBITDA calculation in this arbitration, although this Tribunal has no jurisdiction to consider it. The SPA provides in Section 1.5(d) that the EBITDA dispute shall be submitted to independent accountants, whose report is final and binding. The only disagreement Valores believes is subject to arbitration is the selection of the independent accounting firm to prepare the report.

Vivendi apparently wishes to submit more EBITDA issues to this Tribunal under the guise of EBITDA calculation disputes, including: (1) a supposed "waiver" of the notice provision of Section 1.5(c); (2) scope of the accountants' "mission"; and (3) legal guidance to the accountants as to whether RIMSA violated relevant laws, regulations and permits. Vivendi therefore seeks to delay the EBITDA calculation until this Tribunal rules on its claims in this arbitration.

There is no basis for such a delay, and no basis for the Tribunal to insert itself into the EBITDA calculation mechanism that the parties intended to be performed by independent experts and not be subject to arbitration.

Likewise, there is no need for any guidance as to the scope of the accountants' mission nor for legal advice to the accountants. Section 1.5(d) of the SPA states that the accountants shall:

> [r]eview this Agreement and the disputed items or amounts for the purpose of calculating Actual EBITDA. In making such calculation, such independent accountants shall consider only those items as amounts in the Company's calculation of Actual EBITDA as to which the disagreeing party has contested.

Accordingly, the experts' mission is clear and needs no direction or advice from the Tribunal. All the experts need to do is determine EBITDA for the year 2000. As the parties have agreed, that is an accounting matter.

Finally, Vivendi states (Amended Request, ¶¶ 74-75) that Valores somehow injected US$1 million into RIMSA by way of "fraudulent invoices" designed to increase EBITDA for the year 2000. Valores denies any improper conduct. But Vivendi has referred to a letter from Valores to Vivendi, dated December 3, 2002, which was sent "[w]ith the purpose of settling in a final and binding manner the EBITDA calculation" as somehow constituting an admission of misconduct by Valores.

Valores's settlement letter is not an admission and Vivendi's use of the letter in this fashion is shameful and in clear violation of Section 4547 of the New York CPLR. Valores makes no admission of any wrongdoing and will respect and expects Vivendi to respect the decision of the independent accountants who are charged with arriving at the final and binding calculation of EBITDA.[17]

---

[17]    Vivendi further asserts that respondents' alleged "acceptance" of the EBITDA calculation constitutes a waiver of their right to payment of the US$877,427 which was withheld subject to the confirmation of EBITDA. Once actual EBITDA has been determined by the independent accounting firm, respondents, if entitled, will seek payment from Vivendi.

C.    <u>Vivendi Is Not Entitled To Recover Monetary Damages</u>
      (Amended Request, ¶¶ 114-119)

Vivendi has not specified the extent of monetary damages it claims to have incurred.[18] However, the SPA contains limitations on damages. For example, the SPA provides in Section 7.5 that Valores would be liable for certain losses only if those losses exceed US$500,000. Furthermore, Valores' liability for violations of certain representations and warranties is limited to 40% of total losses. Because Vivendi has not specified in its Amended Request what monetary damage it supposedly suffered, respondents cannot at this time refer to specific damage limitations in response, and must reserve the right to do so.

Further, to the extent Vivendi incurred any damage, the cause of that damage was Vivendi's own mismanagement and operation of the business of RIMSA after the Closing. For example, Vivendi recklessly ignored the experience and knowledge of Mexican personnel involved in RIMSA's operation and drastically changed operating and managerial practices at the Mina landfill for no valid reason. Vivendi failed to invest the funds necessary to maintain RIMSA as a market leader in Mexico. Instead, it diverted to other Vivendi entities funds generated and required by RIMSA. Vivendi failed to maintain good relations with the communities neighboring the Mina landfill and with the relevant governmental authorities. Moreover, Vivendi's management team imposed on RIMSA from Europe resulted in the departure of a considerable number of trained RIMSA employees whose tenure, experience and expertise had contributed to RIMSA's success prior to the sale and whose departure created labor instability that continues to damage RIMSA's ongoing operations, productivity, and profitability.

---

[18]    In paragraph 117 of the Amended Request, Vivendi claims unidentified damages for loss of revenue attributable to something it calls "lost airspace." It is unclear what Vivendi's basis for this claim could be, but consequential losses, including loss of revenue, are not recoverable under the SPA or New York law.

31

D.    **The Tribunal Has No Jurisdiction To Grant
Interim Relief Related To Vivendi's Defaults In Payment**

Vivendi is not entitled to the interim award requested by paragraph 121 of the Amended Request. Pursuant to Sections 1.1(a)(i)(c) and (D) of the SPA, payments after the Closing were secured by promissory notes ("*pagares*") in the form attached as Annex B to the SPA. The *pagares* provide that they are governed only by Mexican law and, as Vivendi points out in its Amended Request, are separate negotiable instruments. Each *pagare* is an unconditional promise to pay the specified amount at the specified date. Each provides that "any legal action or proceeding arising out of this PAGARE may be brought in any Court of competent jurisdiction sitting in the City of Monterrey, N.L., Mexico [...]."

Vivendi defaulted on the first *pagare* by not making the payment of US$2,144,821 that was due on May 14, 2002. After due demand and non-payment, Valores commenced a lawsuit against Sarpi Mexico in The Eleventh Civil Court of Monterrey, Nuevo Leon Mexico, Case No. 410/2002. Sarpi Mexico has moved to stay that proceeding pending this arbitration. That motion is *sub judice* and is awaiting decision.

Because the parties agreed that enforcement of the *pagares* is governed by Mexican law and is to be made in the Mexican courts, Valores's claim for Vivendi's non-payment is not subject to the arbitration clause of the SPA and this Tribunal is without jurisdiction to grant any relief.

E.    **There Is No Claim To Adjudicate
As To The Escrow Agreement**

Pursuant to Section 1.2 of the SPA, the sum of $4,874,594.00 was placed with an escrow agent, UBS in New York. The purpose of the escrow was to provide a fund for the payment of claims that might arise under the SPA. The Escrow Agreement is Exhibit N to the SPA.

32

Vivendi now requests that the Tribunal order the escrow agent to satisfy any eventual award in Vivendi's favor out of the funds held in escrow. That request is obviously premature.

Accordingly, Valores requests that the Tribunal not consider this issue unless and until it becomes ripe for decision.

**F.    Vivendi's Additional Requests For Relief Should Be Denied (Amended Request ¶¶ 128-132)**

Valores denies that there is any basis for this Tribunal to order any declaratory relief, including an award of costs and fees to Vivendi.

As to Vivendi's claim for indemnification for RIMSA's potential obligation to Waste Management under the Bethlehem equipment lease, Valores denies any liability and therefore no such claim should be recognized.

**VI.    Valores's Objections To The Jurisdiction Of The Tribunal**

For the reasons set forth above, respondents respectfully object to the Tribunal's assertion of jurisdiction over any dispute arising out of or relating to: (1) the EBITDA calculation, including the price adjustment Vivendi seeks as relief; (2) Vivendi's default on the *pagares* plus interest; and (3) the so-called non-competition claim. Those matters are not within the disputes covered by the arbitration agreement in Section 10.12 of the SPA, from which this Tribunal derives its agreed jurisdiction.

## Valores's Counterclaim

1.  Section 1.1(i)(f) of the SPA provides that Valores will receive US$2,144,821 if RIMSA, within 5 years of the closing, obtains a permit to operate certain property as a hazardous landfill. The SPA further provides that RIMSA will cooperate with Valores in pursuing the permit application and will be responsible for the costs incurred in preparing, filing, prosecuting and supporting the permit application.

2.  Vivendi, which controls RIMSA, has refused to allow RIMSA to cooperate, thereby frustrating Valores' efforts. In a January 17, 2003 letter, Valores proposed a meeting with RIMSA to finalize a time schedule for the work that must be accomplished in order for RIMSA to apply for the permit. Vivendi's response to the letter states that RIMSA will not cooperate with Valores, which Vivendi repeats in paragraph 12 of its Amended Request. Such non-cooperation is a flagrant breach of the SPA.

3.  Valores therefore requests that the Tribunal require Vivendi to honor and perform its obligation under the SPA to cause RIMSA to cooperate in the permit process. In the alternative, Valores seeks an award from the Tribunal in the full amount of its damages, at least US$2,144,821.

## Valores's Request For Relief

Valores respectfully requests the following relief:

1.  a partial award declining jurisdiction over Vivendi's EBITDA claim;

2.  a partial award declining jurisdiction over Vivendi's claim with respect to the promissory notes (*pagares*);

3.  a partial award declining jurisdiction over the "non-competition" claim;

4.  an award that Valores has not committed any breach of the SPA;

5.    an award denying rescission and monetary damages to Vivendi; if, for some reason the Tribunal decides to grant a rescission remedy notwithstanding the inability to return the parties to status quo ante, an award adjusting downward the amount due to Vivendi to compensate for the post-Closing damage to RIMSA caused by Vivendi;

6.    an award that Vivendi must pay US$4,874,594 (the amount held in escrow) to Valores;

7.    an award that Vivendi must cause RIMSA to co-operate with Valores in pursuing the permit application for Lot No.39 (as indicated on the map annexed to the SPA as Exhibit F) and that Vivendi is responsible for all the costs incurred in preparing, filing and prosecuting the permit application.  In the alternative, an award that Vivendi must pay Valores the full amount of its damages, at least US$2,144,821 plus interest; and

8.    an award in favor of Valores for its attorneys' fees and the other costs of this arbitration.

March 14, 2003

Respectfully submitted on behalf of respondents by their duly authorized attorneys,

CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP


By:  _____
        T. Barry Kingham
101 Park Avenue
New York, NY 10178
212-696-6000

# EXHIBIT 1

**Mayo 15, 2002**

**Estimados Accionistas:**

En el 2001 RIMSA tuvo un resultado negativo debido a la influencia de factores externos que ocasionaron una baja en ventas de 323 Millones de pesos en comparación con el año anterior, en este ejercicio se registraron ventas por 429 millones pesos y la perdida neta generada fue de -65 millones de pesos.

El 2001 fue un año difícil para México, El producto interno bruto del País disminuyo en -0.3%, sin embargo los ramos de la economía mayormente afectados fueron la Industria Manufacturera y la de la construcción en -3.9% y -4.5% respectivamente, El grueso de los ingresos de RIMSA proviene de la Industria Manufacturera, la disminución en esta industria influyo en una baja de volumen en los ingresos de la Compañía.

Debido a presiones de nuestro competidor en el Sureste, Pemex decidió cancelar el contrato de Tratamiento térmico que RIMSA había ganado en el 2001 para el tratamiento de recortes de perforación, esto ocasionó la perdida de ventas por aproximadamente 43 millones de pesos, la operación de tratamiento térmico de recortes de perforación registró una perdida de 95 millones de pesos durante el ejercicio 2001.

En Septiembre del 2001 RIMSA fue inhabilitada para prestar servicios a las dependencias y entidades de la Administración Pública Federal, esto debido a que se le imputo una falta administrativa por el contrato que se tuvo en 1997 para el tratamiento de residuos hexaclorados, lo que impidió a la empresa cubrir su presupuesto de ventas de la industria paraestatal, sin embargo en Enero del 2002, El Tribunal Federal de Justicia Fiscal y Administrativa resolvió conceder la suspensión definitiva contra el acto de inhabilitación impuesta a la Compañía.

La cartera de la empresa disminuyo en 136 millones de pesos, lo que le permitió a la Compañía solventar los malos resultados del 2001 sin necesidad de solicitar Financiamientos adicionales.

En Marzo del 2001 la Compañía obtuvo el certificado de ISO-14001 en la estación de Transferencia Silao, también se llevaron a cabo los trabajos de implementación del sistema ISO-14001 en la estación de Transferencia de Tijuana, este certificado se obtuvo en Febrero del 2002, con esto RIMSA sigue avanzando con su plan de certificación buscando la mejora continua en sus operaciones.

RIMSA buscara consolidar sus ventas de disposición en confinamiento con los clientes actuales de la industria privada durante el 2002, así como recuperar la participación que tenia con la industria Paraestatal.

Para el futuro se vislumbran tiempos difíciles debido a la incursión de competidores en la disposición de residuos en confinamientos controlados, esto obligara a RIMSA a buscar estrategias comerciales agresivas que le permitan conservar su participación de mercado.

Agradezco a ustedes, su apoyo y confianza en RIMSA, seguiremos trabajando en fortalecer la situación actual de la empresa, recuperar la rentabilidad perdida y posicionar a RIMSA como el líder en la Industria Ambiental de México.

Jorge Mora
Presidente del Consejo de Administración

**May 15, 2002.**

**Dear shareholders:**

In 2001 RIMSA had negative results due to external factors that caused a decrease in sales of 323 million pesos, as compared with the preceding year. During this exercise, our sales reached 429 million pesos and the net loss was of 65 million pesos.

2001 was a hard year for Mexico. The Gross Domestic Product of the country decreased by 0.3%. However, the areas of the economy particularly affected were the Manufacturing and Building industries by -3.9% and -4.5% respectively. RIMSA's main income derives from the manufacturing industry and the decrease in such field resulted in lower income for the Company.

Due to pressures of our competitor in the Southeast, Pemex decided to cancel the thermal treatment contract awarded to RIMSA in 2001, for the treatment of drilling muds. This resulted in a loss in sales of 43 million pesos approximately. The drilling muds thermal treatment operation showed a loss of 95 million pesos during 2001.

On September 2001 RIMSA was banned from participating on public bids for provision of services to agencies and entities of the Federal Public Administration. RIMSA was charged with an administrative infringement in respect of the contract of 1997 for treatment of hexachlorine waste. This prevented the Company to reach its budgeted sales on the public sector industry. However, on January 2002, the *Tribunal Federal de Justicia Fiscal y Administrativa* [Federal Court of Fiscal and Administrative Justice] suspended the ban imposed on the RIMSA pending final

1

resolution regarding the prohibition to participate on public bids with public sector entities.

The account recievables of the Company decreased by 136 million pesos, thus allowing the Company to overcome the bad results of 2001 without the need of any additional financing.

On March 2001, the Silao Transfer Unit of the Company was certified as ISO-14001. Likewise, the works to implement the ISO-14001 system to the Tijuana Transfer Unit were performed during said year and the certification was obtained in February 2002. With this, RIMSA keeps going ahead with its certification plans, seeking a continuing improvement in its operation.

RIMSA will seek to consolidate its sales of landfill disposals with its current clients of the private industry during 2002, as well as to recover the share it had with the public sector industry.

For the future, we forecast hard times due to the incursion of competitors in the segment of waste disposal to controlled landfills. This will force RIMSA to seek aggressive commercial strategies that will enable the Company to retain its current market share.

I appreciate your support and trust in RIMSA. We'll keep working to strengthen the current condition of the Company, recover the lost profitability and place RIMSA as leader of the Environmental Industry in Mexico.

*[Signed]*
Jorge Mora
Chairman of the Board

2

INTERNATIONAL CHAMBER OF COMMERCE

ICC INTERNATIONAL COURT OF ARBITRATION

CASE NO. 12 125/JNK

between

CGEA ONYX, S.A., SARP INDUSTRIES, S.A.
and SARP INDUSTRIES MEXICO S.A. de C.V.,

Claimants,

and

VALORES ECOLOGICOS S.A. de C.V.
and HECTOR VARGAS GARZA,

Respondents.

**<u>RESPONDENTS' SUMMARY OF POSITION</u>**

## Table of Contents

Page #

I.    Introduction ........................................................................................................ 1

II.   Respondents' Position On Claimants' Request For Rescission And Damages ................... 3

III.  Respondents' Position On Vivendi's Specific Claims ................................................ 4

    A.    Misrepresentation Claims ................................................................................ 4

        1.    The Secodam Ruling ........................................................................... 4
        2.    Pemex Villahermosa Contracts ............................................................. 4
        3.    Pemex Dos Bocas Contract .................................................................. 4
        4.    FNM Lease Agreement ........................................................................ 5
        5.    Bethlehem Lease Agreement ................................................................. 6

    B.    Environmental Claims ...................................................................................... 6

        1.    "First Treatment Zone" ........................................................................ 6
        2.    "Hexachloride Treatment Zone" ............................................................ 6
        3.    PCBs ................................................................................................ 6
        4.    Lagoons ............................................................................................ 7
        5.    Dust Suppressant Program (So-Called "Chloride Dumping") ..................... 7
        6.    Catalyst Material ................................................................................ 7
        7.    First Generation Cells ......................................................................... 8

    C.    Claims About RIMSA's Books And Records ........................................................ 9

        1.    Reserves ........................................................................................... 9
        2.    Receivables ....................................................................................... 9
        3.    EBITDA ........................................................................................... 9

    D.    Other Claims ................................................................................................ 10

        1.    Land Claim ...................................................................................... 10
        2.    The Non-Competition Claim ................................................................ 10

IV.   Respondents' Challenges To Jurisdiction ............................................................... 10

    A.    The Tribunal Has No Jurisdiction To Award An EBITDA Price Adjustment ............ 10

    B.    The Tribunal Has No Jurisdiction To Grant Interim Relief Related To Vivendi's
        Defaults In Payment ...................................................................................... 11

  C. The Tribunal Has No Jurisdiction To Consider The Non-Competition Claim .......... 12

V. There Is No Claim To Adjudicate As To The Escrow Agreement....................................... 12

VI. Respondents' Counterclaim........................................................................................... 12

VII. Valores's Request For Relief........................................................................................ 13

Respondents Valores Ecologicos S.A. de C.V. and Hector Vargas Garza (collectively, "Valores") respectfully submit their Summary of Position with respect to (i) claimants' claims and relief sought; (ii) challenges to arbitral jurisdiction; and (iii) respondents' counterclaim and relief sought.

## I.    Introduction

This case arises out of the purchase by subsidiaries of Vivendi Environnement, S.A. ("Vivendi") of 75% of Valores's 40 % interest in a Mexican hazardous waste business, Residuous Industriales Multiquim S.A. de C.V. ("RIMSA"). As a result of that purchase and Vivendi's concurrent but separate acquisition of 60% of the RIMSA shares from an affiliate of Waste Management, Inc., Vivendi owns 90% of RIMSA and Valores owns 10%.[1]

Valores sold its shares to Vivendi pursuant to a stock purchase agreement ("SPA") dated August 26, 2000. The sale closed on November 14, 2000 (the "Closing"), when Vivendi took control of RIMSA and began to operate the business.

Having operated, and grossly mismanaged, RIMSA for more than two years, Vivendi now wants to rescind the SPA and return RIMSA to Valores and Waste Management.[2] Vivendi commenced this arbitration in May 2002 by submitting a Request for Arbitration that contained multiple ill-defined claims. In its Amended Request, submitted on January 30, 2003, Vivendi has conjured as many as twenty claims, all but four of them entirely new.

The gist of Vivendi's claims appears to be that, in selling RIMSA shares to Vivendi, Valores breached a number of representations and warranties in the SPA concerning certain pre-Closing environmental and financial matters. The claims are premised on the

---

[1]    The Vivendi parties listed as "buyers" in the SPA are CGEA, Sarpi and Sarpi Mexico. Later, CGEA changed its name to "CGEA Onyx, S.A."

[2]    Vivendi has also initiated an arbitration against Waste Management, Inc. in which Vivendi seeks to rescind the stock purchase agreement with Waste Management pursuant to which Vivendi acquired control of RIMSA.

ridiculous notion that Vivendi, one of the world's largest and most experienced hazardous waste conglomerates, conducted only limited due diligence in purchasing the RIMSA shares and did not understand the nature and risks of RIMSA's business. The contrary is true. Vivendi was given full access to all of RIMSA and conducted extensive due diligence in the many months preceding to the Closing, using its own experts as well as outside consultants.

There was no trickery here. Vivendi was fully informed about the business it purchased. That business was operated by a well-managed company in full compliance with the regulations and laws governing hazardous waste disposal in Mexico. It benefited from the successful participation of Hector Vargas Garza, who founded RIMSA and had worked in the business for more than fifteen years. After the Closing, however, Vivendi decided to ignore Mr. Vargas's expertise, despite promises to the contrary. Vivendi fired many of RIMSA's most experienced employees and replaced them with absentee managers. Now that Vivendi's new management has failed, Vivendi is in need of a scapegoat, blaming its failure on RIMSA's former owners.

Vivendi's claims cannot succeed. Whatever failures RIMSA has suffered since the Closing are the result of Vivendi's mismanagement and outside forces, and not of any act or omission of Valores. RIMSA's chairman has admitted as much in his report to the shareholders for the year 2001. Moreover, Vivendi has not suffered any damage caused by Valores.

Vivendi also attempts to include matters in its claims that are not subject to this Tribunal's jurisdiction, including a price adjustment claim that the parties agreed would be determined solely by independent accountants, the issue of Vivendi's failure to honor promissory notes issued to Valores as part of the purchase price and a claim of breach of a non-competition

agreement to which the claimants are not even parties. Not only are those claims not within the jurisdiction of this Tribunal, they also are without any merit.

## II.  Respondents' Position On Claimants' Request For Rescission And Damages

This is at most a simple breach of contract case, which does not raise a single issue that could possibly merit the extraordinary and extreme remedy of rescission. Significantly, the SPA does not provide for rescission as a remedy. The SPA provides only for adjusting, under certain circumstances, RIMSA's EBITDA for the year 2000 and for indemnification for all other matters.   Moreover, even if rescission were potentially available, it is not a viable remedy because as a result of Vivendi's mismanagement, RIMSA is not the same company it was at the Closing and the requisite restoration of the *status quo ante* is thus not possible.

Nor is Vivendi entitled to recover monetary damages. First, Vivendi has not specified the extent of monetary damages it claims to have incurred. Furthermore, the SPA contains limitations on damages. Certain type of damages are excluded, damages of less than US$500,000 cannot be recovered and, in any event, Valores' share of liability for violations of certain representations and warranties is limited to 40%. Because Vivendi has not alleged in its Amended Request what monetary damage it supposedly suffered, respondents cannot at this time refer to specific damage limitations in response, and must reserve the right to do so.

To the extent Vivendi incurred any losses, the cause of its losses is Vivendi's own mismanagement and operation of the business of RIMSA after the Closing. For example, Vivendi recklessly ignored the experience and knowledge of Mexican personnel involved in RIMSA's operation and drastically changed operating and managerial practices at the Mina landfill. Vivendi failed to maintain good relations with the communities neighboring the Mina

landfill and with the relevant governmental authorities. Moreover, a new management team, imposed on RIMSA from Europe, forced the departure of a considerable number of trained RIMSA employees whose tenure, experience and expertise had contributed to RIMSA's success prior to the sale and whose departure created labor instability that continues to damage RIMSA's ongoing operations, productivity, and profitability. Vivendi failed to invest funds necessary to maintain RIMSA as a market leader in Mexico and diverted resources to other Vivendi entities which were required by RIMSA.[3]

## III.    Respondents' Position On Vivendi's Specific Claims

### A.    Misrepresentation Claims

#### 1.    The Secodam Ruling

Valores has not breached Sections 2.7(a), 2.11(b), 2.15, 2.20, 2.22, 2.25 of the SPA. Valores could not have disclosed an investigation by Secodam which, as to RIMSA, had not been threatened or started at the time of Closing. Further, Valores had no reason to believe that an investigation of Pemex' employees would include RIMSA. Moreover, the results of the investigation were not foreseeable. Vivendi mishandled the investigation and compounded its errors by excluding Valores from the defense, in clear breach of Section 7.6 of the SPA.

Valores also believes that RIMSA did not suffer any damages as a result of Secodam's ruling.

#### 2.    Pemex Villahermosa Contracts

Valores has not breached Sections 2.8(c), 2.19, 2.20, 2.25 of the SPA. The problems associated with the equipment utilized to perform the Pemex Villahermosa contract

---

[3]       A further reason for Vivendi's effort to dispose of RIMSA may be that a Mexican subsidiary of Vivendi. Proecologia, S.A. de C.V. has been trying to start a hazardous waste business in Tecali de Herrera in the Mexican state of Puebla.

were discussed during due diligence and Valores subsequently listed the permit application on Disclosure Schedule 2.13(a) to the SPA. Indeed, in part to accommodate Vivendi's concerns about the situation at Villahermosa, Valores and Waste Management agreed to reduce the global purchase price by US$3 million.

Furthermore, respondents did not breach Sections 2.7(a), 2.7(b), 2.11(a), 2.13(a), 2.15 or 2.20 of the SPA. As Vivendi admits in its Summary of Claims and Relief Sought, RIMSA's bid for treating drilling muds at the Villahermosa plant -- submitted under Vivendi's management -- was rejected due to pressure from a competitor. RIMSA's failure to obtain the 2001 contract was not the result of any act or omission of Valores.

### 3.    **Pemex Dos Bocas Contract**

Valores did not breach Sections 2.6, 2.12, 2.20, 2.22 or 2.25 of the SPA. RIMSA's performance under the Dos Bocas Contract was completed in November 1998. Furthermore, in November 2000, RIMSA and Valores did not know that Pemex would assert any claims in connection with this contract. Therefore, there was nothing to disclose to Vivendi in the SPA, nor any basis for RIMSA to reserve for a potential liability in its financial statements.

### 4.    **FNM Lease Agreement**

Valores did not breach Sections 2.6, 2.12, 2.20, 2.22 or 2.25 of the SPA. As of the Closing, RIMSA had paid all open invoices with respect to the 1997 contract with FNM, the last of which RIMSA had received in July 1998. After the Closing, FNM apparently claimed that certain invoices remained unpaid. Vivendi opted to settle FNM's claim without providing Valores the chance to defend against FNM's claim, in clear breach of Section 7.6 of the SPA, and apparently without regard for the one-year statute of limitations which would bar the claim.

5.    **Bethlehem Lease Agreement**

Vivendi seems to be seeking indemnification from Valores for a claim brought by Waste Management against RIMSA in Texas courts. Apparently, that action is still pending and therefore, at best, Vivendi's claim is premature. In addition, Section 7.6 of the SPA provides that if a third party asserts a claim against RIMSA for which indemnification is claimed, Vivendi must promptly notify Valores and Valores then has the right to takeover the defense of the claim. Yet again, in clear breach of the SPA, Vivendi neither notified Valores of Waste Management's claim nor did it provide Valores with an opportunity to defend this claim.

Valores denies any liability for this contingent claim. Moreover, RIMSA's failure to pay occurred after the Closing, under Vivendi's management.

B.    **Environmental Claims**

1.    **"First Treatment Zone"**

Valores did not breach Sections 2.7(a), 2.13(a), 2.13(c), 2.13(g), 2.13(h) or 2.20 of the SPA. When Vivendi acquired RIMSA, RIMSA was neither required to remediate the first treatment zone nor was it required to sample the soil for contamination. In addition, contrary to Vivendi's allegation, the active treatment areas of the first treatment zone were suitably protected with the appropriate liner. Moreover, because RIMSA had no reason to believe that it would be required to remediate the existing treatment zone, there was no reason for RIMSA to create an accounting reserve in its financial statement.

2.    **"Hexachloride Treatment Zone"**

Valores did not breach Sections 2.7(a), 2.7(b), 2.13(a), 2.13(c), 2.13(g), 2.13(h) or 2.20 of the SPA. When Vivendi acquired RIMSA, the so-called "hexachloride treatment zone" was not contaminated and RIMSA was not required to remediate the soil.

–6–

Valores is not aware of any basis for Vivendi's vague claim that approximately 100,000 tons of soil at the Mina landfill are contaminated with concentrations that require remediation.

Because RIMSA had no reason to believe that it would be required to remediate an alleged hexachloride contamination, it could not create an accounting reserve in its financial statements.

3.    **PCBs**

Valores did not breach Sections 2.6, 2.8, 2.11(a) or 2.13(g) of the SPA. RIMSA's permits to handle PCB waste on the Mina site were disclosed on Schedule 2.7 to the SPA and copies of those permits were provided to Vivendi during due diligence. Prior to the Closing, RIMSA had not been cited for any non-compliance with permits and facilities for handling the PCB waste. RIMSA handled PCB contaminated transformers and drums by removing PCBs for treatment by other companies such as Ekokem in Finland, a PCB treatment company, all of which was fully disclosed to Vivendi on Schedule 2.13(j) to the SPA.

4.    **Lagoons**

Valores did not breach Sections 2.7(a), 2.13(a), 2.13(c), 2.13 (g) or 2.13 (h) of the SPA. Vivendi was fully informed about the lagoons prior to Closing and an adjustment in the global purchase price had been made to accommodate Vivendi's concern.

5.    **Dust Suppressant Program (So-Called "Chloride Dumping")**

Valores did not breach Sections 2.6, 2.7(a), 2.13(a), 2.13(c) or 2.13(g) of the SPA. RIMSA did not engage in illegal chloride dumping prior to the Closing. In addition, RIMSA did not falsify reports regarding these activities.

–7–

Valores did not attempt to conceal the dust suppressant activities from Vivendi. Moreover, Vivendi has not suffered any damage as a result of this program.

### 6.    Catalyst Material

Valores did not breach Sections 2.6, 2.7(a), 2.8(c), 2.11, 2.13(a), 2.13(b), 2.13(g), 2.13(h) or 2.20 of the SPA.  Prior to the Closing, RIMSA properly disposed of spent catalyst material it had collected pursuant to a 1997 contract with Pemex.

The cost for closing the cell, into which the catalyst materials had been placed, is an ongoing operating expense of RIMSA and no reserve was required.

### 7.    First Generation Cells

Valores did not breach Sections 2.7(a), 2.13(a), 2.13(g) or 2.13(h) of the SPA. Valores believes the first generation cells were constructed and, prior to the Closing, were operated in compliance with all Mexican environmental laws and standards.  Mexican authorities regularly inspected RIMSA's first generation cells.  Significantly, Vivendi does not refer to any government order stating that the cells were at any time in violation of applicable law or that they must be opened, cleaned, and closed again.

During a seven month due diligence period, Vivendi was given full access to RIMSA's records regarding the first generation cells and all other aspects of RIMSA's business.

Moreover, with respect to any alleged improper contamination emanating from the first generation cells, Valores did not breach Sections 2.7(a), 2.13(a),2.13(c), 2.13(g), 2.13(h) or 2.20 of the SPA.  Respondents are not aware of any improper contamination emanating from the first generation cells.  Vivendi's cryptic statements alleging that unknown concentrations of unnamed pollutants are "apparently migrating in a northeasterly direction" across unspecified

areas of the Mina site are insufficient to state a claim regarding this matter under the applicable provisions of the SPA.

###   C.    Claims About RIMSA's Books And Records

In a sweeping, generalized series of statements, Vivendi weaves allegations under the rubric of "Material Misrepresentations In Books and Records of RIMSA." Valores denies that RIMSA failed to make adequate reserves or breached Sections 2.6, 2.8 or 2.12 of the SPA. As to the specifics, Valores responds as follows:

####    1.    Reserves

Valores denies that any conditions existed that would have justified a reserve by RIMSA for any of the so-called liabilities Vivendi alleges. RIMSA's reserves prior to the Closing were adequate and correct.

####    2.    Receivables

Valores believes the receivables were accurately listed on Schedule 2.8(a) of the SPA and that the doubtful accounts reserve was consistently applied in accordance with RIMSA's accounting procedures, all of which were fully known to Vivendi.

####    3.    EBITDA

Valores denies any improper activity with respect to the calculation of EBITDA. In any event, as discussed below, this Tribunal does not have jurisdiction to consider this matter, which must be submitted to independent accountants for resolution.

### D.    Other Claims

#### 1.    Land Claim

This claim is absurd.  Valores believes that a local farmer and perhaps 100 cows are illegally occupying less than 20 hectares out of 10,200 hectares adjacent to the Mina landfill. It is hard to imagine that this occupancy could have any significant effect on the Mina landfill growth.  Obviously, Valores has not breached any of the Sections of the SPA cited by Vivendi.

#### 2.    The Non-Competition Claim

At the Closing, Hector Vargas Garza and five members of his family executed a "Non-Competition Agreement" (Exhibit F to the SPA).  None of the claimants is a party to the agreement. Valores and RIMSA however, are parties to that agreement, which has a separate arbitration clause and is governed by Mexican law.  This Tribunal has no jurisdiction to consider a claim for violation of that agreement because no claimant is a party and no arbitration has been commenced pursuant to the arbitration clause of that agreement.

### IV.    Respondents' Challenges To Jurisdiction

#### A.    The Tribunal Has No Jurisdiction To Award An EBITDA Price Adjustment

Vivendi seeks a price adjustment with respect to the calculation of EBITDA for the year 2000.  The SPA contains a separate, exclusive resolution procedure for resolving disputes regarding RIMSA's EBITDA in 2000.  RIMSA issued its EBITDA calculation for the year 2000 on May 7, 2001.  Valores submitted its Notice of Disagreement pursuant to Section 1.5(c) of the SPA on May 17, 2001.  Vivendi did not submit a Notice of Disagreement within the requisite 30 days after receiving the calculation (Section 1.5(d) of the SPA).

The SPA provides in Section 1.5(d) that the EBITDA dispute shall be submitted to independent accountants, whose report is final and binding. The only disagreement Valores believes is subject to arbitration is the selection of the independent accounting firm to prepare the report. The Tribunal has no further role in the EBITDA calculation and no jurisdiction to adjudicate the EBITDA calculation.

### B.    The Tribunal Has No Jurisdiction To Grant Interim Relief Related To Vivendi's Defaults In Payment

Vivendi is not entitled to the interim award requested by paragraph 121 of the Amended Request. Pursuant to Sections 1.1(a)(i)(c) and (D) of the SPA, payments after the Closing were made by Vivendi issuing promissory notes ("*pagares*") in the form attached as Annex B to the SPA. The *pagares* are governed only by Mexican law and, as Vivendi points out in its Amended Request, are separate negotiable instruments. Each *pagare* is an unconditional promise to pay a specified amount at the specified date. Each provides that "any legal action or proceeding arising out of this PAGARE may be brought in any Court of competent jurisdiction sitting in the City of Monterrey, N.L., Mexico [...]."

Accordingly, after Vivendi defaulted on May 14, 2002 on the first *pagare* by not making the payment of US$2,144,821 then due, Valores commenced a lawsuit in The Eleventh Civil Court of Monterrey, Nuevo Leon Mexico Case No. 410/2002. Vivendi has moved to stay that proceeding pending this arbitration. That motion is *sub judice* and is awaiting decision.

Because the parties agreed that enforcement of the *pagares* is governed by Mexican law and is to be made in the Mexican courts, Valores's claim for Vivendi's non-payment is not subject to the arbitration clause of the SPA and this Tribunal is without jurisdiction to grant any relief.

C. **The Tribunal Has No Jurisdiction**
   **To Consider The Non-Competition Claim**

As noted above, claimants in this arbitration are not parties to the non-competition agreement. Accordingly, this Tribunal has no jurisdiction to consider their claim for its violation. That agreement has a separate arbitration clause, subject to Mexican law, and applies only to the parties to that agreement.

V. **There Is No Claim To Adjudicate As To The Escrow Agreement**

Pursuant to Section 1.2 of the SPA, the sum of US$4,874,593.78 was placed with an escrow agent, UBS in New York. The purpose of the escrow was to provide a fund for the payment of claims that might arise under the SPA (Exhibit N to the SPA).

Vivendi now requests that the Tribunal order the escrow agent to satisfy any eventual award in Vivendi's favor out of the funds held in escrow. That request is obviously premature.

Accordingly, the Tribunal should not consider this issue unless and until it becomes ripe for decision.

VI. **Respondents' Counterclaim**

Section 1.1(i)(f) of the SPA provides that Valores is to receive US$2,144,821 if RIMSA, within 5 years of the Closing, obtains a permit to operate certain property as a hazardous landfill. The SPA further provides that RIMSA will cooperate with Valores in pursuing the permit application and will be responsible for the costs incurred in preparing, filing, prosecuting and supporting the permit application.

Vivendi has refused to allow RIMSA to cooperate, thereby frustrating Valores' efforts to obtain the permit. Such non-cooperation is a clear breach of the SPA.

Valores therefore requests that the Tribunal order Vivendi to perform Vivendi's obligation under the SPA to cause RIMSA to cooperate in the permit process and that Vivendi is to bear all costs in connection with this process. In the alternative, Valores seeks an award from the Tribunal in the full amount of its damages, at least US$2,144,821 plus interest.

## VII.   Valores's Request For Relief

Valores respectfully requests the following relief:

1.    a partial award declining jurisdiction over Vivendi's EBITDA claim;

2.    a partial award declining jurisdiction over Vivendi's claim with respect to the promissory notes (*pagares*);

3.    a partial award declining jurisdiction over the "non-competition" claim;

4.    an award that Valores has not committed any breach of the SPA;

5.    an award denying rescission and monetary damages to Vivendi; if, for some reason the Tribunal decides to grant a rescission remedy notwithstanding the inability to return the parties to status quo ante, an award adjusting downward the amount due to Vivendi to compensate for the post-Closing damage to RIMSA caused by Vivendi;

6.    an award that Vivendi must pay US$4,874,594 (the amount held in escrow) to Valores;

7.    an award that Vivendi must cause RIMSA to co-operate with Valores in pursuing the permit application for Lot No.39 (as indicated on the map annexed to the SPA as Exhibit F) and that Vivendi is responsible for all the costs incurred in preparing, filing and prosecuting the permit application. In the alternative, an award that Vivendi must pay Valores the full amount of its damages, at least US$2,144,821 plus interest; and

–13–

8.    an award in favor of Valores for its attorneys' fees and the other costs of this arbitration.

March 14, 2003

Respectfully submitted on behalf of respondents by their duly authorized attorneys,

CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP

By: _____
        T. Barry Kingham
101 Park Avenue
New York, NY 10178
212-696-6000