INTERNATIONAL CHAMBER OF COMMERCE

ICC INTERNATIONAL COURT OF ARBITRATION


CASE NO. 12 125/JNK

between

CGEA ONYX, S.A., SARP INDUSTRIES, S.A.
and SARP INDUSTRIES MEXICO S.A. de C.V.,

Claimants,

and

VALORES ECOLOGICOS S.A. de C.V.
and HECTOR VARGAS GARZA,

Respondents.


\


**Terms of Reference**

## A.    The Parties

### (a)    The Claimants are:

(1)    CGEA Onyx S.A. (Onyx), a company registered in France, of:

Parc des Fontaines
169 avenue Georges Clemenceau
92735 Nanterre Cedex, France

(2)    Sarp Industries S.A. (SARPI), a company registered in France, of:

Zone Portuaire de Limay, Porcheville
Route de Hazay
78520 Limay, France

(3)    Sarp Industries Mexico S.A. de C.V. (SARPI Mexico), a company registered in Mexico, of:

Avenue Lazaro Cardenas
Pte. 2400, Office No PD6D
Residencial San Agustin
San Pedro Garza Garcia
N.L. 66260 Mexico

### (b)    The Respondents are:

(1)    Hector Vargas Garza
Batallon de San Patricio No. 109
(Torre Dataflux, Piso 15)
Col. Valle Oriente
San Pedro, Garza Garcia, NL CP66260
Mexico

(2)    Valores Ecologicos S.A. de C.V., a company registered in Mexico, of:

Batallon de San Patricio No. 109
(Torre Dataflux, Piso 15)
Col. Valle Oriente
San Pedro, Garza Garcia, NL CP66260
Mexico

## B.    Persons to whom notifications/communications are to be made:

Jan Paulsson
Joseph Huse

2

Briana Young

Alexander Uff
Freshfields Bruckhaus Deringer
69 boulevard Haussmann
75008 Paris
Tel: (+33) 1 44 56 44 56
Fax:    (+33) 1 44 56 27 30/31
Email: jan.paulsson@freshfields.com
        joseph.huse@freshfields.com
        briana.young@freshfields.com
        alexander.uff@freshfields.com


T. Barry Kingham
Alexandra Maier
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178
Phone: 212-696-6046
Fax: 212-697-1559
e-mail: bkingham@cm-p.com
amaier@cm-p.com

## C.    Summary of the Parties' Respective Claims

### (a)    The Claimants' Claims and Relief

1.    This arbitration arises out of disputes between the parties relating to the purchase by the Claimants from the Respondents of 100% of the share capital of Confinamina. S.A. de C.V. *(Confinamina)*, which in turn owned 30% of the share capital of Residuos Industriales Multiquim S.A. de C.V. *(RIMSA)*, and 10,200 hectares of land contiguous to RIMSA's site at Mina, Nuevo Leon (the *Land*)[1]

2.    The purchase was made pursuant to a stock purchase agreement dated 26 August 2000 (*SPA*) and an Ancillary Stock Purchase Agreement dated 14 November 2000.  The transaction closed on 14 November 2000 (*Closing*). The purchase price agreed by the Claimants and the Respondents for RIMSA was Mexican Pesos 310,175,000 (US$ 31,527,268), payable as follows:

- Pesos 239,975,000 (US$ 24,995,313) to the Respondents at Closing;

---

[1]    Five of the shares in Confinamina were held by another company, Minera La Fd Norte S-A. de C.V., which transferred them to the Claimants at Closing.

- Pesos 20,592,000 (approximately US$ 2,144,821) 18 months after Closing, as evidenced by a promissory note, or *pagare*, (*First Pagare*) due and payable on 14 May 2002;

- Pesos 20,592,000 (approximately US$ 2,144,821) 36 months after Closing, as evidenced by a promissory note (*Second Pagare*) due and payable on 14 November 2003;[2] and

- Pesos 8,424,000 (approximately US$ 877,427) if RIMSA's earnings for the year 2000 reached a defined target. The Respondents have subsequently accepted that RIMSA's earnings in 2000 did not reach the defined target.

3.    In addition, Pesos 20,592,000 (approximately US$ 2,144,821) was payable only when RIMSA or Confinamina received a permit from the appropriate Mexican authorities, permitting it to use and operate as a hazardous waste landfill a parcel of the land known as "Lot No 39". To date, the Respondents have made only minimal efforts to obtain the permit, in breach of their obligation under the SPA, and the permit has not been obtained. In light of this, and of the circumstances described in this Summary of Claims (in particular, the request for rescission of the SPA and ancillary agreements at paragraph 72(l) below), the Claimants consider that it would no longer be appropriate to apply for the permit and therefore that the monies associated with its obtention are no longer payable.

4.    A portion of the total purchase price (Pesos 46,800,000 - US$ 4,874,594) was placed in escrow for five years from Closing, pursuant to an Escrow Agreement dated 14 November 2000 (Escrow Agreement), to serve as security for any claims by the Claimants against the Respondents under the SPA.

5.    Finally, the Claimants paid Pesos 18,720,000 (US$ 1,949,838) in return for signature by the Respondents of a Non-Competition Agreement between the Respondents and RIMSA (*Non-Competition Agreement*).

6.    Pursuant to a separate stock purchase agreement dated 17 August 2000, between Onyx and SARPI Mexico and Waste Management, Inc. and Chemical Waste Management, Inc., the Claimants purchased a further 60% of the share capital of RIMSA. The Claimants therefore hold 90% of the outstanding shares of RIMSA; the remaining 10% are held by the Respondents. The relationship of the shareholders is governed by a Shareholders Agreement dated 14 November 2000 between the Respondents and SARPI Mexico (*Shareholders Agreement*).

---

[2]    Under Mexican law, the First and Second Pagares are negotiable instruments, endorseable by the bearer in favour of a third party.

4

7.    When they entered into the SPA, the Claimants had been led to believe that RIMSA was a thriving, well-run hazardous waste disposal company. Such was their confidence in RIMSA's previous management team that they chose to leave most of it in place following the acquisition, trusting that these individuals were best placed to run the company efficiently and well.

8.    During the period subsequent to Closing the Claimants have discovered that this trust was entirely misplaced. In fact, the Respondents and their associates had systematically mismanaged RIMSA and abused their positions within the company, with the result that it is plagued with material problems relating to the period prior to Closing. These problems include: ineligibility to participate in public contracts, massive damage to its reputation, legal violations resulting from improper past practices in the treatment of waste, treatment of waste residue and the final disposal of toxic waste, and serious deficiencies in the maintenance of its accounts and records. One of RIMSA's sites has seen its activity drastically reduced, and hundreds of employees have been dismissed.

9.    The Claimants have spent the period since Closing encountering, and attempting to resolve, one difficulty after another. RIMSA currently exists under the threat of the closure by the Mexican authorities of its principal remaining treatment site. Most of these problems have been notified to the Respondents, who have denied any responsibility whatsoever, despite the fact that it was they who controlled RIMSA at every level from the date of its foundation to the date of its sale to the Claimants.

**(A)    MATERIAL MISREPRESENTATIONS REGARDING RIMSA'S ONGOING BUSINESS**

10.    To the extent that they were permitted to do so by the Respondents, the Claimants conducted a limited due diligence exercise before agreeing to purchase RIMSA. During the course of the due diligence, the Claimants requested, and were given copies of, the financial statements of the company (including the audited balance sheet for the year to 31 December 1999 and the unaudited balance sheet for the five months to 31 May 2000) (*Financial Statements*), in order that they might accurately assess RIMSA's financial situation. The Financial Statements were subsequently attached to the SPA as Exhibit A and Disclosure Schedule 2.6.

11.    The audited Financial Statements indicated that RIMSA had a turnover of 521 million pesos for the year to 31 December 1999, and that 750.7 million pesos were forecast for the year to 31 December 2000. It was clear that approximately 50% of RIMSA's income was derived from contracts with federal public, or para-statal, companies, in particular the Mexican oil company, Pemex.

[NYC] 398747.3

12.     What was not disclosed was that RIMSA's relationship with Pemex, and all para-statal entities, was at risk. In 1998, the Mexican administrative authority, Secodam, had opened an investigation into the performance of a 1997 contract between RIMSA and a division of Pemex for the discharge, management, opening and decanting of containers of highly carcinogenic hexachloride compounds (*1997 Contract*). This investigation led ultimately to heavy sanctions on five Pemex employees, who were found to have committed "irregularities" (*irregularidades*) under the 1997 Contract. Although Secodam initially focussed on the conduct of these employees, it was clear that more general questions about RIMSA's performance of the 1997 Contract (which had been egregiously breached) were at issue, and that RIMSA itself would be investigated at a later date. It was also clear to RIMSA's management that any such investigation was likely to lead to sanctions against RIMSA, including a possible period of ineligibility to bid for, or participate in, any public contract. As discussed below, RIMSA management also knew that (i) a substantial quantity of hexachlorides had simply been dumped into the ground, (h) the empty hexachloride containers had never been properly cleaned before being placed in long-term storage cells, and (iii) RIMSA had falsified analysis reports to disguise this, and thus that it was almost certain that RIMSA would eventually be sanctioned for serious deficiencies in its performance of the 1997 Contract.

13.     The Secodam investigation was ongoing throughout the time the Claimants were conducting due diligence, and did not conclude until October 2000, two months after the SPA had been signed, but prior to Closing. RIMSA had even participated in the investigation; immediately after signature of the SPA in August 2000, RIMSA employees had been called before Secodam to answer questions about the performance of the 1997 Contract. RIMSA's senior management (including Hector Vargas Garza, the company's President) was clearly aware of the investigation, of the participation of RIMSA employees, of the possibility that RIMSA itself might be subjected to a similar investigation, and of the fact that such investigation might lead to a ruling that RIMSA was ineligible to participate in public contracts. Despite this, the Claimants were never informed of the ongoing Secodam investigation, nor of its potential consequences, and no appropriate accounting reserve was made. Similarly, the Claimants were never informed of the related environmental problems, discussed below.

14.     In fact, Secodam did later launch an enquiry into RIMSA's performance of the 1997Contract. In July 2001, as a direct result of RIMSA's failures properly to perform the 1997 Contract, Secodam declared RIMSA ineligible, or a period of two years, to bid for, or participate in, any federal public contract. Unsurprisingly, this has had a catastrophic effect on RIMSA's business. In September 2001, as a result of an administrative action filed by RIMSA, Secodam reduced the period of ineligibility from

two years to one year. The period of ineligibility was eventually suspended by the Mexican courts. Notwithstanding the suspension, between July 2001 and May 2002 RIMSA was unable to enter, or perform, a single public contract. The ineligibility decision extended to a ban on RIMSA's contracting with private companies who, in turn, would contract with public companies. The declaration of ineligibility also caused severe damage to RIMSA's reputation, with the result that many of its private customers have become reluctant to continue to contract with RIMSA. This damage will endure for many years to come. In addition, although Secodam's declaration of ineligibility is officially suspended, that suspension has never been published. Many of RIMSA's customers, both public and private, therefore continue to believe that RIMSA is still ineligible to bid for public contracts, and many continue to deal with RIMSA's competitors. Finally, it should be noted that in the event of a decision adverse to RIMSA in the context of the current court proceedings, the effect of the suspension would fall and the period of ineligibility would continue for the full one-year period.

15.    The cumulative effect on RIMSA's turnover has been devastating: instead of the dramatic increase in sales projected prior to Closing, RIMSA has experienced a steep decline in revenue. This includes severely diminished revenue from public entities, plus significant losses associated with the resultant loss of reputation, which will be quantified subsequently for the purposes of this arbitration.

16.    RIMSA had other problems in relation to its public contracts that were not revealed to the Claimants. At Closing, RIMSA was performing two contracts with Pemex for the treatment of oil drilling waste at RIMSA's Villahermosa site (*1999 Contracts*). However, RIMSA had been consistently late in carrying out the required treatment, in part because the thermal treatment machines it was using under the 1999 Contracts were incapable of performing the work in the stipulated time. As a result, at Closing there was a significant backlog of waste stored at Villahermosa awaiting treatment. The 1999 Contracts gave Pemex the right to impose fines on RIMSA for performance delays, which it subsequently did, and which have caused further substantial loss to the Claimants. There is nothing in the SPA to indicate that RIMSA was having difficulty performing the 1999 Contracts, or that it was liable to fines. In addition, the accounting reserve in respect of this stockpile was substantially lower than it should have been at Closing.[3] Finally, the Claimants were misled to believe that permits in respect of additional waste treatment equipment

---

[3]    The reserve in respect of the costs of treating stockpiled waste under the 1999 Contracts was, at the date of Closing, less than 10% of the eventual cost of such treatment presumably the result of a deliberate attempt by previous management to conceal the extent of its performance failures under those contracts.

[NYC] 398747.3

would soon be issued and enable RIWSA to process additional waste using such equipment.

17.  RIMSA's performance failures under the 1999 Contracts, and the resulting fines, ultimately led Pemex to decide that RIMSA was unable to guarantee performance of two contracts for performance in 2001 to 2003, which were considered the continuation of the 1999 Contracts (2001 Contracts). During the bidding process for the 2001 Contracts, Promotora, Ambiental S.A. (*PASA*),[4] a competitor of RIMSA, brought an administrative action against RIMSA requiring the technical rejection of RIMSA's bid for the 2001 Contracts. As a result of such action, Pemex did reject RIMSA's bid, notwithstanding the fact that RIMSA's economic proposal had been the lowest submitted. Following the loss of the 2001 Contracts, RD4SA was forced effectively to shut down its site at Villahermosa, and to dismiss almost all of the employees based there. The 2001 Contracts were awarded to PASA.

18.  RIMSA was subjected to another fine for default under a 1998 contract with Pemex. This contract, for the restoration, transport and final disposal of toxic waste in the maritime terminal of Dos Bocas, had been performed prior to Closing. However, RIMSA had failed to commence the contract on time. The contract provided for fines in the event of performance delay so, in August 2001, RIMSA was notified of a fine equivalent to ten percent of the total value of the contract. Despite the fact that it was clear long before Closing that RIMSA was in default under the Dos Bocas contract this fact was never disclosed, and no appropriate accounting reserve was made for the cost of the fine.

19.  RIMSA was also in default under contracts with entities other than Pemex. For example, it failed to make payment under an agreement dated 5 September 1997 with Ferrocariles Nacionales de Mexico (*FNM*) for the lease of railway gondolas, despite an obligation to do so. As a result of the blatant failure of its previous management to comply with a valid contract, RIMSA has recently been forced to pay a substantial settlement to avoid legal action by the liquidators of FNM. Despite the fact that the contract dates from 1997, the potential liability to FNM was not disclosed to the Claimants, and no accounting reserve was made.

20.  Yet more problems have arisen out of an agreement dated 31 January 2000 between RIMSA and the Bethlehem Steel Corporation (*Bethlehem*), pursuant to which RIMSA leased equipment for the thermal treatment of oil drilling waste. RIMSA's obligations under the lease were guaranteed by its then majority shareholder, Waste Management, Inc.

---

[4]  It is interesting to note that, at this time, approximately 47% of the share capital of PASA was held by Waste Management, Inc., which had previously been the majority shareholder in RIMSA.

[NYC] 398747.3

21.    When the equipment was delivered and RIMSA began to use it, it became clear that the equipment was not performing as it should, and was incapable of doing the work for which RIMSA required it. RIMSA's previous management had known about these problems before Closing, but had not revealed them to the Claimants. As a result of the problems it had encountered, RIMSA decided to withhold one half of one month's rent under the lease. Although RIMSA subsequently repaid the money, Bethlehem in the meantime called on the guarantee, and as a consequence Waste Management, Inc. has had to pay Bethlehem over US$ 795,000. Waste Management, Inc. has recently brought legal proceedings against RIMSA in Texas, seeking to recover this money. These proceedings are still pending, but there is a risk that RIMSA will be ordered to reimburse Waste Management, Inc. in the full amount of its guarantee.

**(B)    MATERIAL MISREPRESENTATIONS RELATING TO RIMSA'S IMPROPER PAST PRACTICES REGARDING WASTE TREATMENT, TREATMENT AND DISPOSAL OF WASTE RESIDUE AND FINAL DISPOSAL OF WASTE**

22.    During due diligence and up to Closing, the Claimants were led to believe that RIMSA's waste treatment methods and practices were sophisticated and effective, and in all material respects compliant with all applicable environmental laws, regulations and authorisations. This was no more than the Claimants had expected, given the assurances of the Respondents during due diligence, including the fact that RIMSA had recently received the coveted "ISO 14001 " certification of environmental compliance. The Claimants also relied on the fact that Waste Management, Inc., the world's largest waste management company, had in its capacity as majority shareholder been providing technical assistance to the company for six years before its sale to the Claimant.[5]

23.    However, after assuming control of the company, the Claimants began to realise that RIMSA was by no means compliant with its legal and regulatory obligations. On the contrary, RIMSA's previous management (including Hector Vargas Garza, his sons and close associates, all of whom held important and well-paid positions in the company) had condoned or committed numerous breaches, not only of Mexican environmental law and regulations, but also of the permits by which RIMSA was authorised to conduct its business, including its general authorisation, no. 19-37-ps-VII-0193. This was true in respect of all of RIMSA's activities, from (a) the treatment of waste, to (b) the treatment and disposal of waste residues, to (c) the final disposal of the treated waste itself.

---

[5]    Note, however, that Waste Management, Inc. apparently had little or no involvement in the day-to-day running of RIMSA, which was handled almost exclusively by Mr. Vargas and his close family and associates. In addition, Mr. Vargas was heavily involved on the administrative and strategic side, in his capacity as President of RIMSA.

[NYC] 398747.3

24.    As a result, RIMSA's principal site at Mina is heavily contaminated, both in specific areas (as set out below) and more generally, throughout the site. Moreover, it appears that certain pollutants are migrating across a substantial portion of the site, such that the true extent and consequences of the environmental damage cannot be finally determined without extensive further testing. The Claimants are therefore not yet in a position to provide an exhaustive description of all the pollution on the site, but are aware at least of the following instances:

(a)    **Treatment of Waste**

*First Treatment Zone*

25.    Treatment zones are specially-constructed platforms or enclosed metallic work pits on which waste treatment processes are conducted, for example mixing hazardous materials with stabiliser prior to confinement. They are designed to prevent toxic waste from coming into contact with, and contaminating, the underlying and surrounding ground and water. As such, they are an essential component of the specialist equipment required by a hazardous waste company, the nature of whose activities dictates that it take every precaution to avoid contaminating or polluting the environment in any way.

26.    For more than eight years prior to Closing, RIMSA had conducted a large part of its waste treatment activities at Mina on a single treatment zone (First Treatment Zone), Prior to Closing, management decided to replace the First Treatment Zone, and to construct a new one. Construction of the new zone commenced on 16 February 1999, and was completed (under the Claimants' management) in February 2002.

27.    RIMSA has dismantled, and is now obliged to remediate contamination in, the First Treatment Zone. During due diligence, the Claimants were told that the First Treatment Zone had been constructed in accordance with relevant legislation, and that the ground underneath it was protected by a suitable liner to prevent waste leaking into the ground. The presence of such a liner is a legal requirement. Following investigations conducted subsequent to Closing, it became clear that there was no liner Oust holes in the ground, into which RIMSA employees would simply pour untreated toxic waste for subsequent treatment), and that waste treatment containers in the zone were holed and corroded. As a result, pollutants including oil, heavy metals and arsenic, have leaked or been injected directly into the ground.

28.    An area of approximately 76,000 cubic metres of the surrounding and underlying soil is subject to this contamination, to a depth of between five and twelve metres. Remediation of this area, including treatment of the contaminated soil and storage of the treated material in long-term storage

10

cells, is now necessary in order to comply with RIMSA's environmental permits, its "*Industria Limpia*" certificate, and Mexican law.

29.  As a result of the Respondents' failures properly to construct or maintain the First Treatment Zone, the cost of cleaning the zone is now estimated at US$ 4.3 million.

30.  Nevertheless, the deficiencies in the construction of the First Treatment Zone and the resulting contamination were not disclosed to the Claimants before Closing. Further, although the decision to dismantle the zone and construct a now one was taken by the Respondents, no accounting reserve was made to account for the cost of the cleanup.

### *Hexachloride Treatment Zone*

31.  RIMSA's illegal treatment practices were not confined to the First Treatment Zone. Other zones at Mina had been used for the treatment of waste containing carcinogenic hexachlorides (*Hexachloride Treatment Zone*), under the 1997 Contract and a previous contract with Pemex. RIMSA failed to construct a treatment zone of sufficient size, so these highly toxic materials spilled over onto unprotected ground beside the zone, along with rainwater that had fallen onto the zone and become contaminated. In addition, when it came to decommission the site, RIMSA used a bulldozer to tear up what liner there was, and ploughed it and the hexachlorides on its surface back into the ground, thereby fix1her polluting the soil.

32.  As a result, approximately 100,000 tonnes of soil are contaminated, with hexachloride concentrations in some areas of up to 55,000 parts per million.[6] This is a clear violation of Mexican law, and the environmental authorities are entitled to require that the contaminated soil be decontaminated. Theoretically, they could demand that RIMSA return the Hexachloride Treatment Zone to a condition in which it contains no contamination whatsoever. Were they to do so (and assuming remediation by incineration) RIMSA would be obliged to incinerate all the contaminated soil, with the result that final clean-up costs could be in excess of US$ 50 million.

33.  However, the Claimants may be able to persuade the authorities to accept a less extensive remediation programme. It is therefore possible that the cost of remediating the Hexachloride Treatment Zone, while still significant, will be less than the figure quoted above.

---

[6]   It is worth noting that, in respect of certain of the hexachloride compounds present on the Hexachloride Treatment Zone, die US Environmental Protection Agency considers contamination even over a certain number of parts per billion to be unacceptable.

[NYC] 398747.3

34.    In addition, RIMSA failed propertey or at all to clean the drums that had contained the hexachlorides. Instead, it simply confined them on the Mina site (although the relevant contracts provided that they be incinerated, and RIMSA's general authorisation does not allow it to store hexachlorides on its sites), and falsified records to make it look as though the barrels had been cleaned, in compliance with the relevant contracts. The presence on the site of over 1,400 drums, coated with dangerous hexachlorides, is a violation of RIMSA's environmental authorisation and Mexican law and regulations, and the authorities may require RIMSA to remove, clean and re-store the containers, at an estimated cost of US$ 4 million.

35.    The violation in respect of the Hexachloride Treatment Zone is of such a nature that the authorities could decide at any time to close the Mina site. Such an action would likely result in the bankruptcy of RIMSA. Despite this, at no stage before Closing was any of the above disclosed to the Claimants, and no accounting reserve was made in respect of the cost of decontamination and remediation.

*PCBs*

36.    RIMSA's failures in respect of waste treatment were not limited to the treatment zones themselves. In late 1999/early 2000, the Respondents attempted to convert a solvent recycling facility at Mina into a facility for cleaning and recycling used electrical transformers and drums containing PCBs. The facility proved to be unsuitable for this purpose, and the process never functioned properly.

37.    PCBs are extremely toxic, so much so that few hazardous waste companies anywhere in the world are still authorised to handle them. Nevertheless, before ensuring that the facility was capable of treating them, and obtaining permanent authorisation to conduct this activity, the Respondents accepted onto the site approximately two hundred transformers and drums, each containing highly toxic PCBs. There is no suitable storage facility for these transformers and drums on the site, and leaving them uncleaned and unprotected would create a significant risk of soil contamination. RIMSA therefore had no option but to send the transformers and drums to another facility which is capable of cleaning them. The most suitable facility is in Finland, so RIMSA has been forced to bear significant export and treatment costs (approximately US$ 200,000 to date). The equipment used by RIMSA, however, remains on the site and is contaminated with PCB's. RIMSA's treatment facility must therefore be dismantled and the equipment inside it exported for decontamination, at further cost. Nevertheless, no accounting reserve was made in respect of such cost. In addition, it was never suggested to the Claimants that the facility might be unsuitable for the purpose for which it was being used before Closing, nor that the transformers and drums in

[NYC] 398747.3

storage, and the contaminated equipment, could not be remediated at the site.

**(b)    Waste Residues**

38.    RIMSA's inadequate practices prior to Closing also extended to its methods of storing, and disposing of, waste residues generated during waste treatment processes.

*Lagoons*

39.    The Mina site contains several artificial ponds (*Lagoons*) used to store liquid and waste residues and waste water generated during the waste neutralisation process. These residues contain, inter alia, calcium chloride and iron hydroxide, and must by law be treated before they can be permanently disposed of. One of the Lagoons was decommissioned by the Respondents immediately before Closing, and the waste it contained placed directly on the ground on and immediately adjacent to the Hexachloride Treatment Zone, without protection and without adequate treatment, and in breach of RIMSA's environmental authorisations and Mexican law. This material must now be removed, mixed with lime, homogenised and transferred to a cell suitable for long-term storage. The cost of this operation, which is complicated by the need to avoid disturbing the Hexachloride Treatment Zone, is estimated at US$ 250,000.

40.    Two other Lagoons are full of many years' worth of untreated, toxic liquid, estimated at approximately 35,000 tonnes. This liquid should have been removed and treated prior to Closing, and indeed the Respondents represented to the Claimants that such works would be carried out before the Claimants took control of RIMSA. Despite this, the work was not done, and the Lagoons are now in danger of overflowing in heavy rain and contaminating the surrounding land. Such contamination would constitute a breach both of the applicable law and of RIMSA's *Industria Limpia* Certificate. The Lagoons must therefore be emptied and decontaminated, and the liquid neutralised, stabilised and solidified before being stored on a long-term basis, at an estimated cost to RIMSA of US$ 2 million. No proper accounting reserves were established prior to Closing and it will be necessary to undertake the decontamination by March 2003.

*Chloride Dumping Programme*

41.    To the extent that the Respondents did empty the Lagoons of untreated liquid waste residue, they failed either to treat or to dispose of this liquid as they should. Instead, between 1995 and 1999 approximately 60,000 cubic metres of untreated liquid, containing calcium and iron chlorides, were simply dumped on and around dirt roads inside and outside the Mina site, including on the property of third parties. RIMSA's archives contain

[NYC] 398747.3

a letter from the Mexican environmental agency PROFEPA (*Procuraduria Federal de Proteccion al Ambiente*), expressing no objection to this activity, but there is no evidence of an official authorisation. In addition, analyses required by the PROFEPA "no objection letter" were never carried out, and RIMSA's management falsified reports to suggest that the vast quantities of liquid waste residue on the ground had been deposited there over a longer period than was actually the case.

42.  The Respondents were fully aware that the dumping programme (***Chloride Dumping Programme***) posed a risk to the environment, but the existence of this programme was not revealed to the Claimants. Immediately prior to Closing, however, the Respondents attempted to conceal the chlorides by engaging in an extensive programme of dilution. Staff worked day and night to mix the chlorides with uncontaminated soil from the roadside, thereby diluting the toxic material, before placing it back on the ground.

43.  The Respondents were also aware of the reputational risk posed by the spreading activity. Many local residents have alleged that RIMSA has been responsible for deaths of livestock in the area. Although to date RIMSA has not been held liable for the deaths of these animals, the issue has received extensive press coverage, as a result of which RIMSA's reputation has suffered further damage. In addition, the long-term environmental effects of the programme are unknown.

**(c)    Final Disposal of Waste**

44.  RIMSA's practices were equally deplorable when it came to arranging the long-term disposal of waste it had treated, or should have treated.

***Catalyst Materials***

45.  In May 1997, RIMSA signed a contract with Pemex for the collection, treatment and disposal of 12,000 tonnes of catalyst materials. The catalysts contain hazardous heavy metals and hydrocarbons, and require treatment to comply not only with the original contract, but also with RIMSA's general environmental authorisation and Mexican law. Nevertheless, RIMSA failed properly to treat and dispose of these materials, but since 1999 has held some 7,600 tonnes on its Mina site in cells suitable only for provisional storage, inadequate for long-term disposal.  Notwithstanding, RIMSA's previous management declared to the authorities that the catalyst materials were properly stored for long-term disposal. In fact, as currently stored, the catalysts are liable spontaneously to combust in hot weather, and to leak through the inadequate liner of their cell, and thus pose a significant risk to the environment. It has fallen to the Claimants to begin, and to pay for, treatment and disposal of these materials, at an estimated total cost of US$ 500,000. Prior to the Closing, no accounting reserve was made in respect of this cost.

[NYC] 398747.3

### *First Generation Cells*

46. The first waste disposal cells at Mina (*First Generation Cells*) were filled between 1987 and 1993, and declared to the relevant authorities as cells for the storage of non-toxic waste only. As recently as 1998, RIMSA was continuing to declare to the authorities that the First Generation Cells contained no toxic substances. Despite this, the Claimants now suspect that the First Generation Cells contain substantial quantities of toxic material, including arsenic, pharmaceutical chemicals, trichloretane, tetrachlorotyline, and ethylbenzene, either untreated or inadequately treated. The Claimants also understand that there are substantial quantities of toxic materials in the cells for which there are no storage records whatsoever.

47. Some 18,000 tonnes of waste in the First Generation Cells are stored in metal drums and containers, which inevitably corrode over time and spill their contents into the cells. This leads to an accumulation of toxic leachates; in addition, the reaction of the metal containers with certain acidic wastes in the cells can produce potentially fatal poisonous gases. Finally, the First Generation Cells suffer from a risk of explosion.

48. It is also clear that, in violation of the relevant regulatory scheme, the Respondents constructed the cells without adequate linings to prevent the contents from leaking into the surrounding soil. Unsurprisingly, it now appears that the cells are leaking toxins and polluting the soil and groundwater around them.

49. The First Generation Cells were not designed or authorised for the long-term storage of toxic material, and will have to be opened, emptied, and cleaned, and the waste classified, treated, and placed in new cells, in order to ensure that RIMSA complies with all applicable laws and regulations, and with the terms of its environmental authorisations. This task is made more difficult by the fact that approximately 20% of the 53,000 tonnes of waste in the cells was stored without a record of its exact location. In other words, while the records confirm that this material (much of which is thought to be toxic) was placed in one of the eleven First Generation Cells, they do not specify which cell. In order to find and treat this material, it will be necessary to excavate completely all eleven First Generation Cells.

50. Remediation on such a large scale will involve substantial cost to RIMSA (estimated at US$ 10 million) and pose a significant risk to the RIMSA employees carrying out the work. In addition, as stated above, the Claimants believe that as a result of the toxins leaking from the First Generation Cells, a substantial quantity of soil and groundwater is now contaminated, and that such contamination is migrating across the site. The nature and extent of such contamination can only be completely

confirmed once the First Generation Cells are opened and emptied; however the remediation costs are likely to be significant.

51.   Prior to Closing, the Claimants were not given access to RIMSA's records of materials stored in the First Generation Cells. Only once they had assumed control of the company and had access to the relevant documents did the Claimants begin to realise the likely contents of these cells. As a result, the nature and extent of the remediation work now necessary was not known to the Claimants at Closing. In fact, the violation is of such a nature that the authorities could decide at any time to close the Mina site. Such an action would again be likely to result in the bankruptcy of RIMSA. Despite this, no accounting reserve was made.

52.   The failures listed at paragraphs 22 to 51 above have resulted in large-scale contamination at Mina. Where the nature and extent of such contamination is known, it is described and, to the extent possible, the costs of remediation are estimated.

53.   However, it is not yet possible to determine definitively the extent of the pollution at Mina. As stated above, contaminants (including toxins from the First Generation Cells and First Treatment Zone) are apparently migrating in a northeasterly direction through the soil on the site, with the result that a substantial part of the land appears already to be contaminated. Further testing is necessary before the Claimants can assess the exact percentage of the site affected, and whether the contamination has yet reached beyond the boundaries of the site.

54.   In addition, the illegal and haphazard way in which waste was handled on the site prior to Closing makes it a virtual certainty that more areas of specific pollution will be discovered as the result of spills, deliberate dumping, or migration. Due to the manner in which surface water flows over the site, there is also a risk of contamination to nearby rivers and streams.

(C)   **MATERIAL MISREPRESENTATIONS IN BOOKS AND RECORDS OF RIMSA**

55.   The Claimants' decision to purchase RIMSA was based in large part on the information contained in the Financial Statements. In particular, the Claimants relied on the audited balance sheet for the year to 31 December 1999, and the unaudited balance sheet for the five months to 31 May 2000. At Section 2.6 of the SPA, the Respondents represented and warranted that the Financial Statements were "*correct and complete except in immaterial respects*", and that they were "*consistent with the books and records of Confinamina* and [RIMSA], *which books and records are accurate and complete except in immaterial respects*". In fact RIMSA's bookkeeping prior to Closing, both financial and operational, was

16

frequently neither correct nor complete. As the Claimants have subsequently discovered, RIMSA's accounts, and its records of activities and analyses conducted on its sites, presented a picture of the company which was often deliberately inaccurate.

56.    The most obvious deficiency was the failure by the Respondents to make provision in the accounts, adequately or at all, for the numerous environmental and operational problems it knew the company faced. For example, no or no adequate accounting reserves were made in respect of the costs associated with the upcoming ineligibility declaration, Environmental Claim (as defined at paragraph 70(3)(f) below), and other issues described above.

57.    The SPA contained a further representation (Section 2.8) that it contained a "*complete and accurate list of all receivables of Confinamina or [RIMSA]*". Despite this, the reserve in respect of client accounts receivable was approximately half of the amount it should have been.

58.    Falsification was not limited to RIMSA's financial records. For example, the Respondents ordered staff to fabricate analysis reports in respect of the Chloride Dumping Programme, although no analyses were ever conducted. Similarly, staff prepared records indicating that hexachloride containers confined at Mina had been cleaned before being confined. In fact, as described above, only a tiny percentage of the containers was actually cleaned (for the purposes of falsification of laboratory analysis to demonstrate that all of the containers were cleaned); the rest were placed in RIMSA's macrocells, without any decontamination whatsoever.

59.    In summary, it is clear that prior to Closing, RIMSA management made no attempt to keep accurate books and records, nor to account on an accrual basis for real operational costs or the cost of remediation, and thus that the Financial Statements on which the Claimants relied were substantially inaccurate. What is more, the Respondents and their associates deliberately concealed this fact from the Claimants, even after Closing.

60.    Throughout the due diligence and SPA negotiation process, and up to Closing, the Respondents' conduct can be characterised as one long series of material misrepresentations and concealments. However, following Closing, the Respondents engaged in active fraud against the Claimants.

61.    Under Section 1.5 of the SPA, RIMSA was required to prepare accounts for the year ended 31 December 2000, including details of the company's earnings before interest, taxes and amortisation (*EBITDA*). If Actual EBITDA (as defined) was less than Target EBITDA (as defined), the SPA provided for a refund to the Claimants of thirty percent of five times the difference between Target EBITDA and Actual EBITDA (*Price Decrease*). In late 2000, the Respondents, and their previous partners in

17

RIMSA Waste Management, Inc. and Chemical Waste Management, Inc., clearly anticipated that Actual EBITDA would not be sufficient to avoid triggering the Price Decrease. Consequently, with the help of RIMSA's old management team (in whom the Claimants had placed the highest degree of trust by appointing them to continue managing the company) and on the orders of the Respondents, approximately US$ 1 million was fraudulently injected into RIMSA.

62.    In order to "launder" these monies, false invoices were prepared and submitted, and records of the entry, exit and storage of waste were fabricated, to suggest that the services invoiced had actually been rendered. In fact, these services had never been performed. Nevertheless, the invoices were paid by cheques drawn on the account of Ingenieria de Proceso Ambiental S.A. de C.V. (IPA), a company affiliated with Mr. Vargas. One of the signatories to the cheques was a representative not only of IPA, but also of the Respondents.

63.    By such fraudulent means, the Respondents arranged artificially and dishonestly to increase RIMSA's earnings for 2000, and thereby to deceive the Claimants and avoid triggering the Price Decrease, to which the Claimants are entitled.[7] In addition, the Respondents deliberately concealed the existence of the numerous operational and environmental problems described above, and fraudulently prepared the Financial Statements so as to exclude the appropriate substantial reserves which should have been included in respect of these problems, as required in Mexico (*Missing Reserves*). In the Claimants' view, the blatant dishonesty and bad faith evidenced by this and the "fraudulent invoice" episode are typical of the spirit in which the Respondents conducted both their business prior to Closing and the entire purchase transaction.

**(D)    MATERIAL MISREPRESENTATION RELATING TO LAND SURROUNDING THE MINA SITE**

64.    At Section 2.16(a) of the SPA, the Respondents represented and warranted that RIMSA and/or Confinamina had good, valid, marketable title to all real property owned by them, including the Land, free and clear of any lien, mortgage, encumbrance, etc.

65.    On assuming control of RIMSA, however, the Claimants discovered that a substantial portion of the Land was occupied by a local farmer, who had acquired rights of possession. The continued presence of this man, his ranch and his large herd of cattle on the Land will prevent RIMSA expanding its landfill and constitute an impediment to any future sale of the Land. As a result, the value of the Land has been substantially reduced.

---

[7]    The Respondents have subsequently accepted that the Claimants are entitled to a Price Decrease in respect of the monies fraudulently injected into RIMSA.

[NYC] 398747.3

In order to try to redress the damage to the value of its property, RIMSA held discussions with the farmer with a view to agreeing his departure from the land, but was unable to persuade him to leave. RIMSA has therefore been forced to bring civil proceedings to try to evict him. In the meantime, the farmer remains on the Land, impeding its use by RIMSA and diminishing its value significantly.

### (E)    BREACH OF NON-COMPETITION OBLIGATIONS

66.    As a condition precedent to signature of the SPA, the Respondents were required to enter into the Non-Competition Agreement,[8] under which they agreed not to compete with the Business of RIMSA (as defined) for a period commencing at the time of Closing and ending three and a half years after the Respondents cease to own or hold any shares in RIMSA, in return for a substantial payment by the Claimants. In addition, the Respondents agreed not to employ or retain, or offer to employ or retain, any person who is or was a full-time employee of RIMSA.

67.    Despite this, the Claimants have subsequently discovered that several former employees of RIMSA (including many who held senior management and operational positions) are now working for one or both of the Respondents or their associated companies. The Claimants are also aware of a case in which an individual repeatedly provided confidential information and assistance to the Respondents, while still employed by RIMSA.

## III    CLAIMANTS' POSITION

68.    By neglecting to disclose the failures and defaults described above, the Respondents breached their representations and warranties in the SPA, on which the Claimants had relied. These breaches are so fundamental as substantially to defeat the purpose of the contract. Preliminary investigations also indicate that the Respondents' misrepresentations were made fraudulently, in order to induce the Claimants to purchase shares in RIMSA, and therefore constitute fraud in the inducement. The Claimants therefore believe that they are entitled to rescission of the SPA and ancillary agreements, and to the return of the total consideration paid by the Claimants to the Respondents for those agreements.

69.    If tile Tribunal does not agree to grant rescission, the Claimants believe they are entitled to a substantial Price Decrease under Section 1.5 of the SPA or, in the alternative, to indemnification under Section 7 of the SPA.

## IV.    RELIEF SOUGHT

70.    The Claimants seek the following relief:

---

[8]    Section 9.8 SPA.

1.  An order for rescission of the SPA and the ancillary agreements executed pursuant thereto (including, without limitation, the Shareholders Agreement), and the return of the total consideration paid by the Claimants to the Respondents for those agreements.

2.  In the alternative, a Price Decrease under Section 1.5 of the SPA, in respect of the Missing Reserves and the "fraudulent invoices". In this regard, the Claimants seek:

    (a)  an order that, in light of the Respondents' improper conduct as described above, Section 1.5 does not apply to prevent the Claimants submitting a Notice of Disagreement, despite the expiry of the original thirty-day notice period;

    (b)  assistance from the Tribunal in appointing a firm of independent accountants to perform the calculation of Actual EBITDA on which the Claimants' entitlement to a Price Decrease is based (if the Parties are unable to agree on a suitable firm within three months of signature of the Terms of Reference);

    (c)  assistance from the Tribunal in determining the scope of the independent accountants' mission (if the Parties are unable to agree on the scope within a reasonable time after the appointment of the accountants);

    (d)  general assistance from the Tribunal to the independent accountants, as required;

    (e)  an interim award enforcing the final determination of the independent accountants (if the Respondents fail to comply with that determination within the time specified in the SPA); and

    (f)  an order that the Respondents pay any costs incurred in connection with the Price Decrease Claim, including but not limited to the costs of the independent accountants, and any legal and other costs incurred by the Claimants in connection with the calculation of Actual EBITDA.

3.  In the alternative, indemnification under Section 7 of the SPA, plus interest:

    Section 7.3 of the SPA entitles the Claimants to indemnification in various circumstances, including where the Respondents are in breach of their representations and warranties. The Claimants are also entitled to indemnification for any liabilities having their cause or source prior to the Closing Date (7.3(v)) and any losses

[NYC] 398747.3

suffered in any action, demand proceeding, claim or administrative proceeding having its source prior to the Closing Date (7.3(vii)) to the extent that the liabilities or losses exceed corresponding accounting provisions. The Claimants have the right to seek indemnification in relation to the breaches, defaults and failures described above.

In particular, the Claimants seek indemnification in respect of the following breaches of representations, warranties and covenants (for the avoidance of doubt, this list is not intended to be exhaustive):

(a)     The Respondents' failure to disclose the existence of the Secodam investigation into the performance of the 1997 Contract, the likelihood of a subsequent investigation into RIMSA's role in the performance of that contract, and the potential consequences of such investigation, as well as the failure to make an appropriate accounting reserve, constitute material breaches by the Respondents of their representations and warranties in the following sections of the SPA: 2.7(a), 2.11 (b), 2.15, 2.20, 2.22, 2.25. In addition, RIMSA was required to pay amounts to its bonding company for Pemex claims in respect of which no financial reserves were made.

(b)     RIMSA's performance delays under the 1999 Contracts, the waste treatment equipment used, RIMSA's consequent liability to penalties, and its inaccurate records of the volume of stockpiled waste which remained to be treated at Closing, constitute a material breach by the Respondents of their representations and warranties in the following sections of the SPA: 2.8(c), 2.19, 2.20, 2.25.

(c)     RIMSA's technical inability to obtain the 2001 Contracts constitutes a material breach by the Respondents of their representations and warranties in the following sections of the SPA: 2.7(a) and (b), 2.11 (a), 2.13 (a), 2.15 and 2.20.

(d)     RIMSA's default under the Dos Bocas contract, and its resulting liability to a fine equivalent to ten percent of the contract price, constitute a material breach by the Respondents of their representations and warranties in the following sections of the SPA: 2.6, 2.12, 2.20, 2.22, 2.25.

(e)     RIMSA's payment defaults under the FNM lease agreement constitute a material breach by the Respondents

21

of their representations and warranties in the following sections of the SPA: 2.6, 2.12, 2.20, 2.22, 2.25.

(f)    RIMSA's failure to comply with Mexican environmental law and regulations and the terms of its environmental authorisations, with the result that the Mina site is substantially contaminated, constitutes a material breach of numerous representations and warranties (*Environmental Claim*), including but not limited to the following:

(i)    RIMSA's failure properly to construct or maintain the First Treatment Zone and the resulting pollution of the surrounding soil constitutes a material breach by the Respondents of their representations and warranties in the following sections of the SPA: 2.7(a), 2.13(a), 2.13(c), 2.13(g), 2.13(h), 2.20.

(ii)    RIMSA's failure properly to construct or decontaminate the Hexachloride Treatment Zone constitutes a material breach by the Respondents of their representations and warranties in the following sections of the SPA: 2.7(a), 2.13(a), 2.13(c), 2.13(g), 2.13(h), 2.20.

(iii)    RIMSA's failure (adequately or at all) to clean and decontaminate over 1,400 hexachloride containers before storing them at its site constitutes a material breach by the Respondents of their representations and warranties in the following sections of the SPA: 2.7(a), 2.7(b), 2.13(a), 2.13(c), 2.13(g), 2.13(h), 2.20.

(iv)    The fact that RIMSA's PCB treatment facility (and accumulated stock awaiting treatment) was unsuitable for its intended purpose constitutes a material breach by the Respondents of their representations and warranties in the following sections of the SPA: 2.6, 2.8, 2.11(a), 2.13(g).

(v)    RIMSA's failure to treat (adequately or at all) waste by-products stored in or extracted from the Lagoons constitutes a material breach by the Respondents of their representations and warranties in the following sections of the SPA: 2.7(a), 2.13(a), 2.13(c), 2.13(g), 2.13(h).

(vi)    RIMSA's failure properly to treat or store dangerous Catalyst Materials constitutes a material breach by the Respondents of their representations and warranties in the following sections of the SPA: 2.6, 2.7(a), 2.8(c), 2.11, 2.13(a), 2.13(b), 2.13(g), 2.13(h), 2.20.

22

(vii)    The defective construction of the First Generation Cells, and the fact that they contain toxic materials which are polluting the surrounding soil and groundwater, constitute material breaches by the Respondents of their representations and warranties in the following sections of the SPA: 2.7(a), 2.13(a), 2.13(g), 2.13(h).

(viii)    The existence of further areas of contamination adjacent or close to known areas of contamination, and of contamination resulting from the migration of pollutants over the site, constitutes a material breach by the Respondents of their representations and warranties in the following sections of the SPA: 2.7(a), 2.13(a), 2.13(c), 2.13(g), 2.13(h), 2.20.

(ix)    The Chloride Dumping Programme conducted by RIMSA, and the falsification of analysis reports in connection with this programme, constitute material breaches by the Respondents of their representations and warranties in the following sections of the SPA: 2.6, 2.7(a), 2.13(a), 2.13(c), 2.13(g).

(g)    The inaccuracy of the Financial Statements, the failure to disclose liabilities and the inadequacy of the accounting reserves, including but not limited to the failures to make adequate reserves in respect of the breaches described in this Summary and the Amended Request, constitute material breaches by the Respondents of their representations and warranties in the following sections of the SPA: 2.6, 2.8, 2.12.

(h)    By issuing invoices in respect of sales the company had never made, and by conspiring to arrange payment of those invoices so as artificially to increase RIMSA's Actual EBITDA and to avoid paying the Price Decrease, the Respondents not only committed fraud, but breached their covenant of good faith, and deprived the Claimants of a Price Decrease, to which the Respondents admit the Claimants are contractually entitled.

(i)    By failing to disclose the presence on the Land of a farmer with rights of possession, the Respondents materially breached their representations and warranties in the following sections of the SPA: 2.16, 2.25.

The breaches of the SPA described above have caused the Claimants to incur substantial financial loss, including a significant

[NYC] 398747.3

reduction in the value of their shares in RIMSA, for which they are entitled to indemnification. Where possible, preliminary estimates of the amount of loss are indicated above. The Claimants will quantify their loss at the time of submitting their first memorial in this arbitration. Where remediation of the relevant breach requires RIMSA to treat contaminated material and store the treated product in cells which could otherwise have been used to store waste generated by RIMSA's clients (*Lost Airspace*), the Claimants' loss will also include loss of revenue attributable to Lost Airspace.[9]

71.    In addition, the Claimants seek:

1.    An order that the Respondents repay to the Claimants the amounts they received in consideration of their entering into the Non-Competition Agreement.

2.    An interim award in respect of the First and Second Pagares, stating that:

(a)    any dispute between the Parties as to whether the Claimants are obliged to pay the full purchase price for RIMSA falls within the present arbitration;

(b)    if the Monterrey court finds in favour of the Respondents and orders the Claimants to pay the First Pagare, the Respondents should take no steps toward enforcing the court's decision, pending the outcome of the present arbitration;

(c)    on the facts, the Claimants are not required to honour the First or Second Pagare, pending the outcome of the present arbitration; and

(d)    the Respondents are prevented from endorsing the Second Pagare to any third party, pending the outcome of the present arbitration.[10]

---

[9]    For the avoidance of doubt, the figures in this Summary do not yet include any estimate in respect of Lost Airspace.

[10]    Given the numerous problems and misrepresentations described above, and particularly in light of the Claimants' claim for rescission, the Claimants consider that they are no longer obliged to pay the full amount of the agreed purchase price for RIMSA. As a result, the Claimants did not honour the First Pagare when it fell due in May 2002, after the present arbitration had been commenced. The Respondents initiated proceedings in the courts of Monterrey, seeking to attach the Claimants' shares in RIMSA, despite the fact that any dispute relating to the purchase price constitutes a dispute arising out of or relating to the SPA, and is thus arbitrable under Section 10.12 of the SPA. Further, the Respondents knew that arbitration proceedings had been

3.  An order that the Claimants are not required to honour the First and Second Pagares.

4.  An order that the monies associated with obtaining a permit to use and operate Lot N' 39 as a hazardous waste landfill are no longer payable.

5.  To the extent that the Tribunal allows the Claimants' claims, an order that the escrow agent release to the Claimants the funds held pursuant to the Escrow Agreement, in satisfaction or part satisfaction of those claims, as appropriate.

6.  If RIMSA is ordered by a court or arbitral tribunal to reimburse Waste Management, Inc. for sums paid by Waste Management, Inc. to Bethlehem, an order that the Respondents reimburse the Claimants in the same amount.

7.  An order that the Respondents pay the costs of the arbitral proceedings, including the costs of the Arbitral Tribunal, the ICC administrative costs and the legal and other costs incurred by the Claimants in this arbitration,

8.  An order for such further or other relief as the Tribunal may consider appropriate.

72.  The Claimants reserve the right during the term of the present arbitration to request further declaratory relief, as appropriate.

73.  The Claimants request that, where the Tribunal agrees to grant declaratory relief as contemplated above, it remain constituted for the purposes of enforcing such relief where necessary.

*The Claimants deny the Respondents' Counterclaim in its entirety.*

**(b)    The Respondents' Answer**

This case arises out of the purchase by subsidiaries of Vivendi Environnement, S.A. ("Vivendi") of 75% of Valores's 40 % interest in a Mexican hazardous waste business, Residuos Industriales Multiquim S.A. de C.V. ("RIMSA"). As a result of that purchase and Vivendi's concurrent but separate acquisition of 60% of the RIMSA shares from an affiliate of Waste Management, Inc., Vivendi owns 90% of RIMSA and Valores owns 10%.[11]

---

commenced against them at the time they initiated court proceedings. The decision of the Monterrey court as to whether the First Pagare is payable is pending. Until the Arbitral Tribunal has ruled on whether to grant the interim relief requested above, the Claimants note that they would consider any attempt to endorse the Second Pagare an indication of the utmost bad faith on the part of the Respondents.

[11]  The Vivendi parties listed as "buyers" in the SPA are CGEA, Sarpi and Sarpi Mexico. Later, CGEA changed its name to "CGEA Onyx, S.A."

[NYC] 398747.3

Valores sold its shares to Vivendi pursuant to a stock purchase agreement ("SPA") dated August 26, 2000. The sale closed on November 14, 2000 (the "Closing"), when Vivendi took control of RIMSA and began to operate the business.

Having operated, and grossly mismanaged, RIMSA for more than two years, Vivendi now wants to rescind the SPA and return RIMSA to Valores and Waste Management.[12] Vivendi commenced this arbitration in May 2002 by submitting a Request for Arbitration that contained multiple ill-defined claims. In its Amended Request, submitted on January 30, 2003, Vivendi has conjured as many as twenty claims, all but four of them entirely new.

The gist of Vivendi's claims appears to be that, in selling RIMSA shares to Vivendi, Valores breached a number of representations and warranties in the SPA concerning certain pre-Closing environmental and financial matters. The claims are premised on the ridiculous notion that Vivendi, one of the world's largest and most experienced hazardous waste conglomerates, conducted only limited due diligence in purchasing the RIMSA shares and did not understand the nature and risks of RIMSA's business. The contrary is true. Vivendi was given full access to all of RIMSA and conducted extensive due diligence in the many months preceding to the Closing, using its own experts as well as outside consultants.

There was no trickery here. Vivendi was fully informed about the business it purchased. That business was operated by a well-managed company in full compliance with the regulations and laws governing hazardous waste disposal in Mexico. It benefited from the successful participation of Hector Vargas Garza, who founded RIMSA and had worked in the business for more than fifteen years. After the Closing, however, Vivendi decided to ignore Mr. Vargas's expertise, despite promises to the contrary. Vivendi fired many of RIMSA's most experienced employees and replaced them with absentee managers. Now that Vivendi's new management has failed, Vivendi is in need of a scapegoat, blaming its failure on RIMSA's former owners.

Vivendi's claims cannot succeed. Whatever failures RIMSA has suffered since the Closing are the result of Vivendi's mismanagement and outside forces, and not of any act or omission of Valores. RIMSA's chairman has admitted as much in his report to the shareholders for the year 2001. Moreover, Vivendi has not suffered any damage caused by Valores.

Vivendi also attempts to include matters in its claims that are not subject to this Tribunal's jurisdiction, including a price adjustment claim that the parties agreed would be determined solely by independent accountants, the issue of Vivendi's failure to honor promissory notes issued to Valores as part of the purchase price and a claim of breach of a non-competition agreement to which the claimants are not even parties. Not only are those claims not within the jurisdiction of this Tribunal, they also are without any merit.

---

[12]    Vivendi has also initiated an arbitration against Waste Management, Inc. in which Vivendi seeks to rescind the stock purchase agreement with Waste Management pursuant to which Vivendi acquired control of RIMSA.

[NYC] 398747.3

II.    **Respondents' Position On Claimants'**
       **Request For Rescission And Damages**

        This is at most a simple breach of contract case, which does not raise a single issue that could possibly merit the extraordinary and extreme remedy of rescission. Significantly, the SPA does not provide for rescission as a remedy. The SPA provides only for adjusting, under certain circumstances, RIMSA's EBITDA for the year 2000 and for indemnification for all other matters. Moreover, even if rescission were potentially available, it is not a viable remedy because as a result of Vivendi's mismanagement, RIMSA is not the same company it was at the Closing and the requisite restoration of the status quo ante is thus not possible.

        Nor is Vivendi entitled to recover monetary damages. First, Vivendi has not specified the extent of monetary damages it claims to have incurred. Furthermore, the SPA contains limitations on damages. Certain type of damages are excluded, damages of less than US$500,000 cannot be recovered and, in any event, Valores' share of liability for violations of certain representations and warranties is limited to 40%. Because Vivendi has not alleged in its Amended Request what monetary damage it supposedly suffered, respondents cannot at this time refer to specific damage limitations in response, and must reserve the right to do so.

        To the extent Vivendi incurred any losses, the cause of its losses is Vivendi's own mismanagement and operation of the business of RIMSA after the Closing. For example, Vivendi recklessly ignored the experience and knowledge of Mexican personnel involved in RIMSA's operation and drastically changed operating and managerial practices at the Mina landfill. Vivendi failed to maintain good relations with the communities neighboring the Mina landfill and with the relevant governmental authorities. Moreover, a new management team, imposed on RIMSA from Europe, forced the departure of a considerable number of trained RIMSA employees whose tenure, experience and expertise had contributed to RIMSA's success prior to the sale and whose departure created labor instability that continues to damage RIMSA's ongoing operations, productivity, and profitability. Vivendi failed to invest funds necessary to maintain RIMSA as a market leader in Mexico and diverted resources to other Vivendi entities which were required by RIMSA.

III.   **Respondents' Position On Vivendi's Specific Claims**

       A.    **Misrepresentation Claims**

             1.    **The Secodam Ruling**

        Valores has not breached Sections 2.7(a), 2.11(b), 2.15, 2.20, 2.22, 2.25 of the SPA. Valores could not have disclosed an investigation by Secodam which, as to RIMSA, had not been threatened or started at the time of Closing. Further, Valores had no reason to believe that an investigation of Pemex' employees would include RIMSA. Moreover, the results of the investigation were not foreseeable. Vivendi mishandled the

[NYC] 398747.3

investigation and compounded its errors by excluding Valores from the defense, in clear breach of Section 7.6 of the SPA.

Valores also believes that RIMSA did not suffer any damages as a result of Secodam's ruling.

### 2.    Pemex Villahermosa Contracts

Valores has not breached Sections 2.8(c), 2.19, 2.20, 2.25 of the SPA. The problems associated with the equipment utilized to perform the Pemex Villahermosa contract were discussed during due diligence and Valores subsequently listed the permit application on Disclosure Schedule 2.13(a) to the SPA. Indeed, in part to accommodate Vivendi's concerns about the situation at Villahermosa, Valores and Waste Management agreed to reduce the global purchase price by US$3 million.

Furthermore, respondents did not breach Sections 2.7(a), 2.7(b), 2.11(a), 2.13(a), 2.15 or 2.20 of the SPA. As Vivendi admits in its Summary of Claims and Relief Sought, RIMSA's bid for treating drilling muds at the Villahermosa plant – submitted under Vivendi's management -- was rejected due to pressure from a competitor. RIMSA's failure to obtain the 2001 contract was not the result of any act or omission of Valores.

### 3.    Pemex Dos Bocas Contract

Valores did not breach Sections 2.6, 2.12, 2.20, 2.22 or 2.25 of the SPA. RIMSA's performance under the Dos Bocas Contract was completed in November 1998. Furthermore, in November 2000, RIMSA and Valores did not know that Pemex would assert any claims in connection with this contract. Therefore, there was nothing to disclose to Vivendi in the SPA, nor any basis for RIMSA to reserve for a potential liability in its financial statements.

### 4.    FNM Lease Agreement

Valores did not breach Sections 2.6, 2.12, 2.20, 2.22 or 2.25 of the SPA. As of the Closing, RIMSA had paid all open invoices with respect to the 1997 contract with FNM, the last of which RIMSA had received in July 1998. After the Closing, FNM apparently claimed that certain invoices remained unpaid. Vivendi opted to settle FNM's claim without providing Valores the chance to defend against FNM's claim, in clear breach of Section 7.6 of the SPA, and apparently without regard for the one-year statute of limitations which would bar the claim.

### 5.    Bethlehem Lease Agreement

Vivendi seems to be seeking indemnification from Valores for a claim brought by Waste Management against RIMSA in Texas courts. Apparently, that action is still pending and therefore, at best, Vivendi's claim is premature. In addition, Section 7.6 of the SPA provides that if a third party asserts a claim against RIMSA for which indemnification is claimed, Vivendi must promptly notify Valores and Valores then has

the right to takeover the defense of the claim. Yet again, in clear breach of the SPA, Vivendi neither notified Valores of Waste Management's claim nor did it provide Valores with an opportunity to defend this claim.

Valores denies any liability for this contingent claim. Moreover, RIMSA's failure to pay occurred after the Closing, under Vivendi's management.

## B.     Environmental Claims

### 1.     "First Treatment Zone"

Valores did not breach Sections 2.7(a), 2.13(a), 2.13(c), 2.13(g), 2.13(h) or 2.20 of the SPA. When Vivendi acquired RIMSA, RIMSA was neither required to remediate the first treatment zone nor was it required to sample the soil for contamination. In addition, contrary to Vivendi's allegation, the active treatment areas of the first treatment zone were suitably protected with the appropriate liner. Moreover, because RIMSA had no reason to believe that it would be required to remediate the existing treatment zone, there was no reason for RIMSA to create an accounting reserve in its financial statement.

### 2.     "Hexachloride Treatment Zone"

Valores did not breach Sections 2.7(a), 2.7(b), 2.13(a), 2.13(c), 2.13(g), 2.13(h) or 2.20 of the SPA. When Vivendi acquired RIMSA, the so-called "hexachloride treatment zone" was not contaminated and RIMSA was not required to remediate the soil.

Valores is not aware of any basis for Vivendi's vague claim that approximately 100,000 tons of soil at the Mina landfill are contaminated with concentrations that require remediation.

Because RIMSA had no reason to believe that it would be required to remediate an alleged hexachloride contamination, it could not create an accounting reserve in its financial statements.

### 3.     PCBs

Valores did not breach Sections 2.6, 2.8, 2.11(a) or 2.13(g) of the SPA. RIMSA's permits to handle PCB waste on the Mina site were disclosed on Schedule 2.7 to the SPA and copies of those permits were provided to Vivendi during due diligence. Prior to the Closing, RIMSA had not been cited for any non-compliance with permits and facilities for handling the PCB waste. RIMSA handled PCB contaminated transformers and drums by removing PCBs for treatment by other companies such as Ekokem in Finland, a PCB treatment company, all of which was fully disclosed to Vivendi on Schedule 2.13(j) to the SPA.

### 4.     Lagoons

[NYC] 398747.3

Valores did not breach Sections 2.7(a), 2.13(a), 2.13(c), 2.13 (g) or 2.13 (h) of the SPA. Vivendi was fully informed about the lagoons prior to Closing and an adjustment in the global purchase price had been made to accommodate Vivendi's concern.

### 5. Dust Suppressant Program (So-Called "Chloride Dumping")

Valores did not breach Sections 2.6, 2.7(a), 2.13(a), 2.13(c) or 2.13(g) of the SPA. RIMSA did not engage in illegal chloride dumping prior to the Closing. In addition, RIMSA did not falsify reports regarding these activities.

Valores did not attempt to conceal the dust suppressant activities from Vivendi. Moreover, Vivendi has not suffered any damage as a result of this program.

### 6. Catalyst Material

Valores did not breach Sections 2.6, 2.7(a), 2.8(c), 2.11, 2.13(a), 2.13(b), 2.13(g), 2.13(h) or 2.20 of the SPA. Prior to the Closing, RIMSA properly disposed of spent catalyst material it had collected pursuant to a 1997 contract with Pemex.

The cost for closing the cell, into which the catalyst materials had been placed, is an ongoing operating expense of RIMSA and no reserve was required.

### 7. First Generation Cells

Valores did not breach Sections 2.7(a), 2.13(a), 2.13(g) or 2.13(h) of the SPA. Valores believes the first generation cells were constructed and, prior to the Closing, were operated in compliance with all Mexican environmental laws and standards. Mexican authorities regularly inspected RIMSA's first generation cells. Significantly, Vivendi does not refer to any government order stating that the cells were at any time in violation of applicable law or that they must be opened, cleaned, and closed again.

During a seven month due diligence period, Vivendi was given full access to RIMSA's records regarding the first generation cells and all other aspects of RIMSA's business.

Moreover, with respect to any alleged improper contamination emanating from the first generation cells, Valores did not breach Sections 2.7(a), 2.13(a),2.13(c), 2.13(g), 2.13(h) or 2.20 of the SPA. Respondents are not aware of any improper contamination emanating from the first generation cells. Vivendi's cryptic statements alleging that unknown concentrations of unnamed pollutants are "apparently migrating in a northeasterly direction" across unspecified areas of the Mina site are insufficient to state a claim regarding this matter under the applicable provisions of the SPA.

### C. Claims About RIMSA's Books And Records

[NYC] 398747.3

In a sweeping, generalized series of statements, Vivendi weaves allegations under the rubric of "Material Misrepresentations In Books and Records of RIMSA." Valores denies that RIMSA failed to make adequate reserves or breached Sections 2.6, 2.8 or 2.12 of the SPA. As to the specifics, Valores responds as follows:

### 1.    Reserves

Valores denies that any conditions existed that would have justified a reserve by RIMSA for any of the so-called liabilities Vivendi alleges. RIMSA's reserves prior to the Closing were adequate and correct.

### 2.    Receivables

Valores believes the receivables were accurately listed on Schedule 2.8(a) of the SPA and that the doubtful accounts reserve was consistently applied in accordance with RIMSA's accounting procedures, all of which were fully known to Vivendi.

### 3.    EBITDA

Valores denies any improper activity with respect to the calculation of EBITDA. In any event, as discussed below, this Tribunal does not have jurisdiction to consider this matter, which must be submitted to independent accountants for resolution.

## D.    Other Claims

### 1.    Land Claim

This claim is absurd. Valores believes that a local farmer and perhaps 100 cows are illegally occupying less than 20 hectares out of 10,200 hectares adjacent to the Mina landfill. It is hard to imagine that this occupancy could have any significant effect on the Mina landfill growth. Obviously, Valores has not breached any of the Sections of the SPA cited by Vivendi.

### 2.    The Non-Competition Claim

At the Closing, Hector Vargas Garza and five members of his family executed a "Non-Competition Agreement" (Exhibit F to the SPA). None of the claimants is a party to the agreement. Valores and RIMSA however, are parties to that agreement, which has a separate arbitration clause and is governed by Mexican law. This Tribunal has no jurisdiction to consider a claim for violation of that agreement because no claimant is a party and no arbitration has been commenced pursuant to the arbitration clause of that agreement.

## IV.    Respondents' Challenges To Jurisdiction

### A.    The Tribunal Has No Jurisdiction To
### Award An EBITDA Price Adjustment

[NYC] 398747.3

Vivendi seeks a price adjustment with respect to the calculation of EBITDA for the year 2000. The SPA contains a separate, exclusive resolution procedure for resolving disputes regarding RIMSA's EBITDA in 2000. RIMSA issued its EBITDA calculation for the year 2000 on May 7, 2001. Valores submitted its Notice of Disagreement pursuant to Section 1.5(c) of the SPA on May 17, 2001. Vivendi did not submit a Notice of Disagreement within the requisite 30 days after receiving the calculation (Section 1.5(d) of the SPA).

The SPA provides in Section 1.5(d) that the EBITDA dispute shall be submitted to independent accountants, whose report is final and binding. The only disagreement Valores believes is subject to arbitration is the selection of the independent accounting firm to prepare the report. The Tribunal has no further role in the EBITDA calculation and no jurisdiction to adjudicate the EBITDA calculation.

**B.**      **The Tribunal Has No Jurisdiction To**
                   **Grant Interim Relief Related**
                   <u>**To Vivendi's Defaults In Payment**</u>

Vivendi is not entitled to the interim award requested by paragraph 121 of the Amended Request. Pursuant to Sections 1.1(a)(i)(c) and (D) of the SPA, payments after the Closing were made by Vivendi issuing promissory notes ("pagares") in the form attached as Annex B to the SPA. The pagares are governed only by Mexican law and, as Vivendi points out in its Amended Request, are separate negotiable instruments. Each pagare is an unconditional promise to pay a specified amount at the specified date. Each provides that "any legal action or proceeding arising out of this PAGARE may be brought in any Court of competent jurisdiction sitting in the City of Monterrey, N.L., Mexico [...]."

Accordingly, after Vivendi defaulted on May 14, 2002 on the first pagare by not making the payment of US$2,144,821 then due, Valores commenced a lawsuit in The Eleventh Civil Court of Monterrey, Nuevo Leon Mexico Case No. 410/2002. Vivendi has moved to stay that proceeding pending this arbitration. That motion is sub judice and is awaiting decision.

Because the parties agreed that enforcement of the pagares is governed by Mexican law and is to be made in the Mexican courts, Valores's claim for Vivendi's non-payment is not subject to the arbitration clause of the SPA and this Tribunal is without jurisdiction to grant any relief.

**C.**      **The Tribunal Has No Jurisdiction**
                   <u>**To Consider The Non-Competition Claim**</u>

As noted above, claimants in this arbitration are not parties to the non-competition agreement. Accordingly, this Tribunal has no jurisdiction to consider their claim for its violation. That agreement has a separate arbitration clause, subject to Mexican law, and applies only to the parties to that agreement.

**V.**      <u>**There Is No Claim To Adjudicate As To The Escrow Agreement**</u>

[NYC] 398747.3

Pursuant to Section 1.2 of the SPA, the sum of US$4,874,593.78 was placed with an escrow agent, UBS in New York. The purpose of the escrow was to provide a fund for the payment of claims that might arise under the SPA (Exhibit N to the SPA).

Vivendi now requests that the Tribunal order the escrow agent to satisfy any eventual award in Vivendi's favor out of the funds held in escrow. That request is obviously premature.

Accordingly, the Tribunal should not consider this issue unless and until it becomes ripe for decision.

## VI.    Respondents' Counterclaim

Section 1.1(i)(f) of the SPA provides that Valores is to receive US$2,144,821 if RIMSA, within 5 years of the Closing, obtains a permit to operate certain property as a hazardous landfill. The SPA further provides that RIMSA will cooperate with Valores in pursuing the permit application and will be responsible for the costs incurred in preparing, filing, prosecuting and supporting the permit application.

Vivendi has refused to allow RIMSA to cooperate, thereby frustrating Valores' efforts to obtain the permit. Such non-cooperation is a clear breach of the SPA.

Valores therefore requests that the Tribunal order Vivendi to perform Vivendi's obligation under the SPA to cause RIMSA to cooperate in the permit process and that Vivendi is to bear all costs in connection with this process. In the alternative, Valores seeks an award from the Tribunal in the full amount of its damages, at least US$2,144,821 plus interest.

## VII.    Valores's Request For Relief

Valores respectfully requests the following relief:

1.    a partial award declining jurisdiction over Vivendi's EBITDA claim;

2.    a partial award declining jurisdiction over Vivendi's claim with respect to the promissory notes (pagares);

3.    a partial award declining jurisdiction over the "non-competition" claim;

4.    an award that Valores has not committed any breach of the SPA;

5.    an award denying rescission and monetary damages to Vivendi; if, for some reason the Tribunal decides to grant a rescission remedy notwithstanding the inability to return the parties to status quo ante, an award adjusting downward the amount due to Vivendi to compensate for the post-Closing damage to RIMSA caused by Vivendi;

33

6.      an award that Vivendi must pay US$4,874,594 (the amount held in escrow) to Valores;

7.      an award that Vivendi must cause RIMSA to co-operate with Valores in pursuing the permit application for Lot No.39 (as indicated on the map annexed to the SPA as Exhibit F) and that Vivendi is responsible for all the costs incurred in preparing, filing and prosecuting the permit application. In the alternative, an award that Vivendi must pay Valores the full amount of its damages, at least US$2,144,821 plus interest; and

8.      an award in favor of Valores for its attorneys' fees and the other costs of this arbitration.

**D.      Issues**

The issues to be determined by the Arbitral Tribunal shall be those resulting from the parties' submissions, including forthcoming submissions, and which are relevant to the adjudication of the parties' respective claims and defenses, without prejudice to the provision of Article 19 of the 1998 ICC Rules.

**E.      The Amount in dispute is, as asserted by the Claimants, approximately $40,000,000 and as asserted by the Respondents, approximately $5,000,000.**

**F.      Arbitrators**

**Lawrence W. Newman, Esq., Chairman**
**Baker & McKenzie**
**805 Third Avenue, 29th Floor**
**New York, New York 10022**
**E-mail address:  lwn@bakernet.com**

**Steven A. Hammond, Esq.**
**Hughes Hubbard & Reed LLP**
**One Battery Park Plaza**
**New York, New York  10004**
**E-mail address:  hammond@hugheshubbard.com**

**Job Taylor III, Esq.**
**Latham & Watkins LLP**
**885 Third Avenue, Suite 1000**
**New York, New York  10022-4802**
**E-mail address:  job.taylor@lw.com**

**G.      Place of Arbitration**

805 Third Avenue

[NYC] 398747.3

29th Floor
New York, New York  10022

## H.      Particulars of the Applicable Procedural Rules

The rules to be applied are, pursuant to the parties' agreement as follows or as set forth in the arbitration clause of their agreement, as follows:

Any dispute, controversy or claim arising out of or relating to this Agreement or the breach thereof shall be finally settled by arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce ("ICC").  There shall be three arbitrators, one selected by the Buyer, one selected by the Seller, and the third selected by the two arbitrators so selected by the Buyer and the Seller.  If a party fails to nominate an arbitrator within 30 days from the date of notification to it of the other party's request for arbitration, or if the two arbitrators fail within 30 days from the date of their appointment to reach agreement on the third arbitrator, then the Court of Arbitration of the ICC shall appoint the arbitrator that was not nominated by the failing party, or shall appoint a third arbitrator, as the case may be.  The place of arbitration shall be New York City and the language used shall be English.

The above sets forth the Terms of Reference for the Arbitral Tribunal in this matter.

For the Claimants


_____


For the Respondents


_____

The Arbitral Tribunal

35

[NYC] 398747.3

_____
Lawrence W. Newman, Chairman

_____
Steven A. Hammond


_____
Job Taylor III

36